# EXHIBIT A
# (Part 1 of 3)



? Get Help    ⏻ Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DB wc HUD Approval | Non-PIC Homeownership |

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

List    **Form HUD-52860** Supporting Documents Quality Checklist    Submission

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |

**Demolition / Disposition Application**

| | | | |
|---|---|---|---|
| Application Type: | **Disposition** | Processor: | **H48298** |
| Application Status: | **HQ Approved** | Status Date: | **07/25/2022** |

[Add/Remove Development](#)

| Section | Section Type | Status | Status Date |
|---|---|---|---|
| [Section 1: General Information](#) | Required | Modified | 09/16/2022 |
| [Section 2: Long-Term Possible Impact of Proposed Action](#) | Required | Modified | 08/19/2022 |
| [Section 3: Board Resolution, Environmental Review, and Local Government Consultation](#) | Required | Modified | 08/25/2022 |
| Section 4: Description of Property [IL002001000   ABLA](#) | Required | Modified | 08/25/2022 |
| Section 5: Description of Proposed Removal Action [IL002001000   ABLA](#) | Required | Modified | 07/25/2022 |
| Section 6: Relocation [IL002001000   ABLA](#) | Required | Not Started | 07/25/2022 |
| Section 7: Resident Consultation [IL002001000   ABLA](#) | Required | Modified | 08/31/2022 |
| Section 8: Offer of Sale [IL002001000   ABLA](#) | Required | Modified | 08/25/2022 |
| Section 9: Certification of Compliance [IL002001000   ABLA](#) | Required | Modified | 07/25/2022 |

Get Help  |  Logoff / Return to Secure Systems

**pic**

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/e HUD Approval | Non-PIC Homeownership |

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

List    **Form HUD-52860** Supporting Documents Quality Checklist    Submission

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |

**Application Status**

| | | | |
|---|---|---|---|
| Application Type: | **Disposition** | Processor: | **H48298** |
| | | Reviewer: | **Andres Acosta** |
| Application Status: | **HQ Approved** | Status Date: | **07/25/2022** |

**Section 1: General Information**

OMB Approval No. 2577-0075
(exp. 07/31/2008)

Public reporting burden for this collection of information is estimated to average 16 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

This information is required to request permission to demolish or sell all or portion of a development (i.e., dwelling units, non-dwelling property or vacant land) owned and operated by a Housing Authority. The information requested in the application is based on requirements of Section 18 of the United States Housing Act of 1937, as amended and 24 CFR Part 970. HUD will use the information to determine whether, and under what circumstances, to permit HAs to demolish or sell all or a portion of a public housing development. Responses to the collection of information are statutory and regulatory to obtain a benefit. Approval of this application does not substitute approval for funding of the demolition or disposition action. The information requested does not lend itself to confidentiality.

---

| 1. Housing Authority: | **IL002 Chicago Housing Authority** | 2. Date of Application: | **09/21/2022** |
|---|---|---|---|

---

3. Address:      **60 E. Van Buren St**

    City/Locality:     **CHICAGO**

    State:          **Illinois**            Zip Code:     **60605-1207**

4. Phone No:     **(312) 742 - 8500**    Ext.    **0**       Fax No:

    Email Address:    **operez@thecha.org**

---

5. Executive Director's Name:     **Tracey Scott**

    Phone No:     **(312) 913 - 7040**    Ext.             Fax No:

    Email Address:    **tscott@thecha.org**

---

6. Primary Contact's Name:     **Ann McKenzie**

    Phone No:     **(312) 913 - 7656**    Ext.             Fax No:

    Email Address:    **amckenzie@thecha.org**

---

**\***   Designates a required field.

Return to Application Index

Case: 1:23-cv-03476 Document #: 1-1 Filed: 06/01/23 Page 4 of 327 PageID #:55



Get Help    |    Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/o HUD Approval | Non-PIC Homeownership |

List        **Form HUD-52860** Supporting Documents Quality Checklist        Submission

Phaedra Mapp (H02040)
**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |

**Application Status**

| | | | |
|---|---|---|---|
| Application Type: | **Disposition** | Processor: | **H48298** |
| | | Reviewer: | **Andres Acosta** |
| Application Status: | **HQ Approved** | Status Date: | **07/25/2022** |

**Section 2: Long-Term Possible Impact of Proposed Action**

Enter the total number of units proposed for removal  **0**

1. Performance Funding Subsidy (PFS)

In FY **2018** , this HA received $ **0** per unit in PFS funds.
The HA realizes that after this activity takes place, PFS will decrease by $ **0** / year.

2. Capital Fund Program

In FY **2018** , this HA received $ **0** per unit in Capital funds.
The HA realizes that after this activity takes place, Capital funding will decrease by $ **0** / year.

Return to Application Index



Get Help | Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/o HUD Approval | Non-PIC Homeownership |

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

List    Form HUD-52860 Supporting Documents Quality Checklist    Submission

HQ Office:              **Public and Indian Housing**
HQ Division:            **PO Field Operations**
Hub:                    **5HCHI Chicago Hub**
Field Office:           **5APH CHICAGO HUB OFFICE**
Field Office HA:        **IL002 Chicago Housing Authority**
Application:            **DDA0012060**

**Application Status**

Application Type:       **Disposition**            Processor:    **H48298**
                                                   Reviewer:     **Andres Acosta**
Application Status:     **HQ Approved**            Status Date:  **07/25/2022**

**Section 3: Board Resolution, Environmental Review, and Local Government Consultation**

1. Board Resolution Number          2. Date of Board Resolution
   **2022-23**                          **05/17/2022**

3. Who is conducting the environmental review?
   ○ Field Office under 24 CFR Part 50
   ◉ Responsible Entity under 24 CFR Part 58

If the environmental review is to be performed by a responsible entity, name the entity.
   **AIS**

4. Jurisdictions covered by the HA (list all cities, counties, etc.):

5. Letter of Support from Appropriate Government Official is dated : **05/10/2022**.

Return to Application Index

Get Help  |  Logoff / Return to Secure Systems

**pic**

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/o HUD Approval | Non-PIC Homeownership |

Form HUD-52860 Supporting Documents Quality Checklist   Submission

List

Phaedra Mapp (H02040)

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |
| Development: | **IL002001000 ABLA** |

**Application Status**

| | | | |
|---|---|---|---|
| Application Type: | **Disposition** | Processor: | **H48298** |
| | | Reviewer: | **Andres Acosta** |
| Application Status: | **HQ Approved** | Status Date: | **07/25/2022** |

**Section 4: Description of Property**

Modify Section 4 After HQ Approval

| | | | |
|---|---|---|---|
| 1. Development Name: | **ABLA** | 2. Development Number: | **IL002001000** |
| 3. Date of Full Availability: | **7/26/1981** | 4. No. of Residential Buildings: | **44** |
| 5. No. of Non-Residential Buildings: | **4** | 6. Date Constructed: | |
| 7. Scattered Site: | **N** | | |
| 8. Single Family Houses: | | Duplexes: | |
| 3-Plexes: | | 4-Plexes: | |
| Other: | | | |
| 9. Row House: | **330** | Walk-Up: | **0** |
| High Rise: | **0** | | |
| 10. Total Acres of the Development: | **67.00** | | |

Return to Application Index

**11. Existing Unit Distribution**

| | General Occupancy | Elderly/Disabled Units | Total Units Being Used for Non-Dwelling Purposes | Merged Units | Total Existing Units | Approved Units yet to be Removed | Total Adjusted Units |
|---|---|---|---|---|---|---|---|
| 0 Bdrm | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 Bdrm | 63 | 0 | 0 | 0 | 63 | 0 | 63 |
| 2 Bdrms | 160 | 0 | 0 | 0 | 160 | 0 | 160 |
| 3 Bdrms | 70 | 0 | 0 | 0 | 70 | 0 | 70 |
| 4 or more Bdrms | 37 | 0 | 0 | 0 | 37 | 0 | 37 |
| Total | 330 | 0 | 0 | 0 | 330 | 0 | 330 |

Get Help | Logoff / Return to Secure Systems

pic

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/e HUD Approval | Non-PIC Homeownership |

List        **Form HUD-52860** Supporting Documents Quality Checklist     Submission

HQ Office:     **Public and Indian Housing**

HQ Division:     **PO Field Operations**

Hub:     **5HCHI Chicago Hub**

Field Office:     **5APH CHICAGO HUB OFFICE**

Field Office HA:     **IL002 Chicago Housing Authority**

Application:     **DDA0012060**

Development:     **IL002001000 ABLA**

**Application Status**

Application Type:   **Disposition**       Processor:   **H48298**

                                          Reviewer:   **Andres Acosta**

Application Status:   **HQ Approved**     Status Date:   **07/25/2022**

Section 5: Description of Proposed Removal Action

[Modify Section 5 After HQ Approval]

**1. Proposed Action By Building Type**

Calendar Year:

Available Buildings :                      Proposed Buildings :

*(Building Number\Building Number*            *(Building Number\Building Number*
*Entrance\Address Line1 Text)*                 *Entrance\Address Line1 Text)*

| |
|---|
| ADM01\1\1254 S LOOMIS # |
| ADM02\1\1324 S LOOMIS # |
| ADM03\1\1313 S THROOP # |
| BR120\1\1232 W 14TH ST |

*# indicates Non Dwelling Building Structures*

**2. Proposed Action By Unit Designation**

Select the building number(s): `BR120\1\1232 W 14TH ST ▾` [Select]

**\*** - indicates the building has units that are assigned in this application.

**@** - indicates the building is proposed in this application.

Available Units :                          Proposed Units :

*(Unit Number\Unit Designation\Bedroom Count)*     *(Unit Number\Unit Designation\Bedroom Count)*

| |
|---|
| 991209\General Occupancy\Bedroom2 |

**3. Proposed Action for Non Residential Inventory**

A. Acres included in Proposed Disposition

Calendar Year:   **2022**                           Number of Acres :  **23.23**

B. Buildings included in Proposed Disposition

Calendar Year :         Number of Non-Dwelling Buildings without PIC building numbers :

**4.**

*Intentionally deleted to conform to HUD-52860*

5. If the proposed action involves a partial removal of a Development, a site map is required     **0.00**
*Attach a copy of the site map and reference it as Section 5, line 5*

6. If the proposed action involves a partial removal of a development, attach a description of the property to be removed along with a narrative explaining why the PHA is proposing to remove this portion of the development and if disposition is for vacant land, attach the legal description of each parcel of vacant land. Reference this attachment as Section 5, line 6

7. Which of the following describe the proposed disposition? (Check that which applies)
☑ A. Disposition at Fair Market Value (FMV)
☐ B. Disposition at less than Fair Market Value (e.g. donation)
☐ C. Disposition which includes an exchange of property
*If B and/or C are checked, provide a justification and reference it as Section 5, line 7.*

8. What is the value of the property subject to disposition:
**$ 20234500.00**
*Attach evidence verifying the value (e.g. executive summary of the appraisal) and reference it as Section 5, line 8*

9. Was an appraiser used to determine the value of the property listed at Number 8?     **No**
If so, name of appraiser who conducted the appraisal:
Date of appraisal:

10. Calculation of Net Proceeds
Estimated Sales Price **$0.00** - Debt **$0.00** - Cost & Fees **$0.00** = Estimated Net Proceeds **$0.00**
*Attach an itemization of costs and fees (including relocation, moving, and counseling costs) to be paid out of gross proceeds and reference it as Section 5, line 10*

11. How will the Net Proceeds be used?
*Attach a narrative providing details concerning the use of Net Proceeds and reference it as Section 5, line 11*

12. What is the estimated cost of demolition?
(Include professional fees, hazardous waste removal, building and site improvement, demolition costs, and seeding and sodding of land. Do not include relocation costs or site improvements such as landscaping, playground, retaining walls, streets, sidewalks, etc.)
(a) $  **0.00**

(b) Indicate the source of funds:
☐ Operating Funds for FY
☐ CFP Funds for FY
☐ CDBG Funds
☐ Other
*If Other, attach a narrative explaining how the PHA will fund the demolition and reference it as Section 5, line 12*

13. General Timetable: The HA is to provide a brief timetable based on the number of days after approval of the application that the following major actions will occur:
A. Begin relocation of residents **0**   B. Complete relocation of residents     **0**

C. Execution of contract for removal (e.g. sales contract or demolition contract) **60** D. Actual Removal Action (e.g. demolition or sale closing) **90**

Return to Application Index

❓ Get Help     ⏻ Logoff / Return to Secure Systems

**pic**

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/o HUD Approval | Non-PIC Homeownership |
|---|---|---|---|---|---|---|

List     **Form HUD-52860**     Supporting Documents     Quality Checklist     Submission

Phaedra Mapp (H02040)

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |
| Development: | **IL002001000 ABLA** |
| **Application Status** | |
| Application Type: | **Disposition** |
| Application Status: | **HQ Approved** |

Processor:  **H48298**
Reviewer:  **Andres Acosta**
Status Date:  **07/25/2022**

**Section 6: Relocation**

1. Occupied units:
a. Of the **0** units proposed for removal, **0** are occupied as of the date of this application.
*Attach a narrative explaining the circumstances that resulted in the units becoming vacant and the relocation of the residents and reference it as Section 6, line 1(a).*
b. Of the **330** total units in the development, **330** units will remain after removal.
c. Of the **330** units that will remain after removal, **302** are occupied as of the date of this Application.

***If any units are listed as occupied in 1(a), complete questions 2-8***
2. How many individuals will be affected by this action?

3. How will counseling and advisory services be provided?
*Attach a narrative explaining and reference it as Section 6, line 3.*

4. What housing resources are expected to be used for relocation?
☐ Other Public Housing     ☐ Section 8     ☐ Other
*Attach a narrative explaining and reference it as Section 6, line 4.*

7. Total cost of relocation expenses

| | Per Unit Cost  x | No. of Units  = | Total |
|---|---|---|---|
| 5. Estimated cost of counseling and advisory services | | | |
| 6. Estimated cost of moving expenses | | | |
| | | | |

8. What sources of funding will be used to pay for relocation activities?
☐ Operating Funds for FY:
☐ Capital Fund for FY:
☐ Other
*If Other, provide an attachment explaining and reference it as Section 6, line 8.*

Return to Application Index



? Get Help   |   ⏻ Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/e HUD Approval | Non-PIC Homeownership |

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

List     **Form HUD-52860** Supporting Documents Quality Checklist     Submission

HQ Office:            **Public and Indian Housing**
HQ Division:          **PO Field Operations**
Hub:                  **5HCHI Chicago Hub**
Field Office:         **5APH CHICAGO HUB OFFICE**
Field Office HA:      **IL002 Chicago Housing Authority**
Application:          **DDA0012060**
Development:          **IL002001000 ABLA**

Application Status
Application Type:     **Disposition**          Processor:    **H48298**
                                               Reviewer:     **Andres Acosta**
Application Status:   **HQ Approved**          Status Date:  **07/25/2022**

Section 7: Resident Consultation

1. Describe how the residents of the development were informed and consulted about the proposed action.

*Attach a narrative explaining the PHA�s consultation with the residents of the affected Development and reference it as Section 7, line 1*

---

**If proposed action is for Demolition and/or Disposition under Section 18 of the Act, complete questions 2-5**

2. Resident Council (at development): Provide the name of the Resident Council representing the residents of the development          **Mary Baggett, LAC President**

*Attach a narrative explaining the PHA�s consultation with the Resident Council of the affected Development and reference it as Section 7, line 2*

---

3. Resident Council (PHA-jurisdiction-wide): Provide the name of the PHA-wide Resident Council representing the interests of the residents of the development          **Mary Baggett, LAC President**

*Attach a narrative explaining the PHA�s consultation with Resident Council (PHA jurisdiction-wide), and reference it as Section 7, line 3*

---

4. Resident Advisory Board (RAB) (as defined by 24 CFR 903.13):
*Attach a narrative explaining the PHA�s consultation with the RAB and reference it as Section 7, line 4.*

---

5. Did you receive any written comments from the residents, the Resident Council(s), or the RAB?          ⦿ Yes    ○ No
*If yes, attach the comments, along with any evaluation the PHA has made of those comments and reference it as Section 7, line 5*

Return to Application Index



⊘ Get Help       ⏻ Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DB w/e HUD Approval | Non-PIC Homeownership |

List      **Form HUD-52860** Supporting Documents Quality Checklist      Submission

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

**Logoff**

HQ Office:            **Public and Indian Housing**
HQ Division:          **PO Field Operations**
Hub:                  **5HCHI Chicago Hub**
Field Office:         **5APH CHICAGO HUB OFFICE**
Field Office HA:      **IL002 Chicago Housing Authority**
Application:          **DDA0012060**
Development:          **IL002001000 ABLA**

**Application Status**

Application Type:     **Disposition**          Processor:    **H48298**
                                               Reviewer:     **Andres Acosta**
Application Status:   **HQ Approved**           Status Date:  **07/25/2022**

**Section 8: Offer of Sale**

1. Is the PHA exercising any of the exceptions to the offer of sale requirement
permitted by 24 CFR 970.9(b)(3):                                              ● Yes   ○ No
     Note: Additional options may be displayed upon selecting an answer

2. If yes, check the exception below:

24 CFR 970.9 (b)(3)(i): a unit of state or local government requests to acquire vacant land that is
less than two acres in order to build or expand its public services (a local government wishes to use
the land to build or establish a police substation)

24 CFR 970.9 (b)(3)(ii): the PHA seeks disposition outside the public housing program to privately
finance or otherwise develop a facility to benefit low-income families (e.g., day care center,
administrative building, mixed-finance housing, or other types of low-income housing)

24 CFR 970.9 (b)(3)(iii): the units that have been legally vacated in accordance with the HOPE VI
program, the regulations at 24 CFR Part 971, or the Required Conversion regulations at 24 CFR
part 972, excluding developments where the PHA has consolidated vacancies

24 CFR 970.9 (b)(3)(iv): the units are distressed units required to be converted to tenant-based
assistance under Section 33 of the Act

24 CFR 970.9 (b)(3)(v): the proposed disposition is for non-dwelling property, including
administration and community buildings, and maintenance facilities.

If No, complete questions #3-7 below.

Return to Application Index



? Get Help | ⏻ Logoff / Return to Secure Systems

| Application | Application Review | Comments | Remove from Inventory | Reports | DD w/e HUD Approval | Non-PIC Homeownership |

List    **Form HUD-52860** Supporting Documents Quality Checklist    Submission

**Phaedra Mapp (H02040)**

**PIC Main**

Housing Agency

Development

Inventory Removals

Logoff

| | |
|---|---|
| HQ Office: | **Public and Indian Housing** |
| HQ Division: | **PO Field Operations** |
| Hub: | **5HCHI Chicago Hub** |
| Field Office: | **5APH CHICAGO HUB OFFICE** |
| Field Office HA: | **IL002 Chicago Housing Authority** |
| Application: | **DDA0012060** |
| Development: | **IL002001000 ABLA** |

**Application Status**

| | | | |
|---|---|---|---|
| Application Type: | **Disposition** | Processor: | **H48298** |
| | | Reviewer: | **Andres Acosta** |
| Application Status: | **HQ Approved** | Status Date: | **07/25/2022** |

**Section 9: Certification of Compliance**

1. Attach the applicable PHA Certification of Compliance from the HUD-52860 for the applicable removal action and reference it as Section 9, Line 1: Certification of Compliance

PHA Certification of Compliance: HUD 52860

Section 18 Demolition/Disposition
Section 18 Disposition 24 CFR Subpart F
De Minimis Exception to Demolition
Section 32 Homeownership
Section 33 Required Conversion
Section 22 Voluntary Conversion
Eminent Domain

These Certifications can be found at the SAC web site

2. Attach any applicable addendum(s) from the HUD-52860 (as identified below) for the specific removal action for which you are applying for and reference it as Section 9, Line 2: Addendums

The new HUD-52860 form and its addendums include:

| | |
|---|---|
| **HUD-52860-B: Total Development Cost (TDC) Calculation** | Attach for all Demolition actions and for all Disposition actions where the justification is obsolescence |
| **HUD-52860-C: Homeownership** | Attach for all actions involving homeownership |
| **HUD-52860-D: Required Conversion** | Attach for all actions involving the required conversion of public housing units |
| **HUD-52860-E: Voluntary Conversion** | Attach for all actions involving the voluntary conversion of public housing units |
| **HUD-52860-F: Eminent Domain** | Attach for all disposition actions involving eminent domain proceedings |

These Forms can be found at the SAC web site

Return to Application Index



❓ Get Help | ⏻ Logoff / Return to Secure Systems

| Application List | Application Review | Comments | Remove from Inventory | Reports | DD w/o HUD Approval | Non-PIC Homeownership |
|---|---|---|---|---|---|---|

Form HUD-52860    Supporting Documents    Quality Checklist    Submission

Phaedra Mapp (H02040)

PIC Main

Housing Agency

Development

Inventory Removals

Logoff

| | |
|---|---|
| HQ Office: | Public and Indian Housing |
| HQ Division: | PO Field Operations |
| Hub: | 5HCHI Chicago Hub |
| Field Office: | 5APH CHICAGO HUB OFFICE |
| Field Office HA: | IL002 Chicago Housing Authority |
| Application: | DDA0012060 |

Application Status

| | | | |
|---|---|---|---|
| Application Type: | Disposition | Processor: | H48298 |
| | | Reviewer: | Andres Acosta |
| Application Status: | HQ Approved | Status Date: | 07/25/2022 |

Upload Inventory Removal Application Supporting Documentation

**Attachment Type:** [Please Select] ▾  [Select]

**Enter Description:** [                    ]

The recommended maximum attachment file size is 8 megabytes. Files larger than 8 MB in size may take longer to upload or may not get uploaded.

**Select File:** [            ]  [Browse...]

Allowed file types: doc, docx, xls, xlsx, pdf, gif, jpg, bmp, png, mpp, rtf, ppt, pptx, txt, zip

[Attach]

Application Attachments

| Section | Description | Date - Time | Owner Name | Download | Delete |
|---|---|---|---|---|---|
| Section 3, Line 1 : Board Resolution | Board Resolution | 08/19/2022-11:24:48 | Michelle Harrington | Download | Delete |
| Section 3, Line 5 : Letter of Support | Mayoral Support Letter | 08/19/2022-11:28:04 | Michelle Harrington | Download | Delete |
| Section 3, Line 4 : Consultation with Appropriate Government Officials | Request for Release of Funds | 08/23/2022-16:49:58 | Michelle Harrington | Download | Delete |
| Attachment hook 01 | Legal Description | 11/15/2022-15:20:26 | Andres Acosta | Download | Delete |
| Attachment hook 01 | 3-29-22 Meeting Sign in | 11/15/2022-15:21:52 | Andres Acosta | Download | Delete |
| Attachment hook 01 | 4-5-22 meeting sign in | 11/15/2022-15:22:06 | Andres Acosta | Download | Delete |
| Attachment hook 01 | 4-12-22 meeting sign in | 11/15/2022-15:22:29 | Andres Acosta | Download | Delete |
| Attachment hook 01 | 5-2-22 meeting sign in | 11/15/2022-15:22:43 | Andres Acosta | Download | Delete |
| Attachment hook 01 | JLL Appraisal | 11/15/2022-15:23:05 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Updated 52860 | 11/15/2022-15:23:59 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Updated 52860-A | 11/15/2022-15:24:16 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Narrative | 11/15/2022-15:24:30 | Andres Acosta | Download | Delete |
| Attachment hook 01 | FO Cert | 12/14/2022-18:17:32 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Supplemental INfo | 03/05/2023-13:59:38 | James Isaacs | Download | Delete |
| Attachment hook 01 | Fair Housing Response | 03/06/2023-12:44:44 | Andres Acosta | Download | Delete |

| | | | | | |
|---|---|---|---|---|---|
| Attachment hook 01 | Email Thread 1 | 03/06/2023-12:52:57 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Email Thread 2 | 03/06/2023-12:53:08 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Email Thread 3 | 03/06/2023-12:53:17 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Email Thread 4 | 03/06/2023-12:53:28 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Email Thread 5 | 03/06/2023-12:53:39 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Email Thread 6 | 03/06/2023-12:53:50 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Email Thread 1 | 03/06/2023-12:54:07 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Email Thread 2 | 03/06/2023-12:54:16 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Email Thread 3 | 03/06/2023-12:54:23 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Narrative - 2 | 03/08/2023-13:49:21 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Narrative - 3 | 03/08/2023-13:49:59 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Additional Narrative - 4 | 03/08/2023-14:16:43 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Letter from Third Pary - 1 | 03/08/2023-14:52:32 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Letter from Third Pary - 2 | 03/08/2023-14:52:51 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Letter from Third Pary - 3 | 03/08/2023-14:53:08 | Andres Acosta | Download | Delete |
| Attachment hook 01 | Letter from Third Pary - 4 | 03/08/2023-14:53:23 | Andres Acosta | Download | Delete |
| Approval Letter | DISP Approval 20230306 | 03/14/2023-11:41:03 | Marcus Sanders | Download | Delete |
| Attachment hook 01 | James' emails with CHA | 03/14/2023-13:22:28 | James Isaacs | Download | Delete |
| Attachment hook 01 | Updated Legal Description | 03/20/2023-17:22:04 | Andres Acosta | Download | Delete |

**Development Attachments**

| Section | Development | Description | Date - Time | Owner Name | Download | Delete |
|---|---|---|---|---|---|---|
| Section 5, Line 5 : Site Map | ABLA | Site Map | 08/19/2022-11:58:25 | Michelle Harrington | Download | Delete |
| Section 5, Line 6 : Land Legal Description | ABLA | Legal Description | 08/23/2022-16:55:51 | Michelle Harrington | Download | Delete |
| Section 5, Line 8 : Appraisal | ABLA | CBRE Appraisal | 08/24/2022-11:14:26 | Michelle Harrington | Download | Delete |
| Section 7, Line 5 : Written Comments | ABLA | Public Comments | 08/25/2022-12:06:29 | Michelle Harrington | Download | Delete |
| Section 7, Line 2 : Consultation with Resident Council | ABLA | Resident Council Consultation | 08/25/2022-12:09:15 | Michelle Harrington | Download | Delete |
| Section 7, Line 2 : Consultation with Resident Council | ABLA | Resident Council Consultation | 08/25/2022-12:09:43 | Michelle Harrington | Download | Delete |
| Section 7, Line 2 : Consultation with Resident Council | ABLA | Resident Council Consultation | 08/25/2022-12:10:06 | Michelle Harrington | Download | Delete |
| Section 7, Line 1 : Consultation Process | ABLA | Resident Consultation | 08/25/2022-12:11:57 | Michelle Harrington | Download | Delete |
| Section 7, Line 1 : Consultation Process | ABLA | Resident Consultation | 08/25/2022-12:12:26 | Michelle Harrington | Download | Delete |
| Section 7, Line 1 : Consultation Process | ABLA | Resident Consultation | 08/25/2022-12:13:26 | Michelle Harrington | Download | Delete |
| Section 7, Line 2 : Consultation with Resident Council | ABLA | LAC Consultation | 08/25/2022-13:24:26 | Michelle Harrington | Download | Delete |

| Section 5, Line 8 : Appraisal | ABLA | Memo to Appraisal | 08/31/2022-12:48:54 | Michelle Harrington | Download | Delete |
|---|---|---|---|---|---|---|
| Section 7, Line 1 : Consultation Process | ABLA | Resident Consultation | 08/31/2022-12:56:32 | Michelle Harrington | Download | Delete |
| Section 8, Line 2 : Sale Exceptions | ABLA | Disposition Justification | 09/01/2022-11:27:17 | Michelle Harrington | Download | Delete |
| Section 9, Line 1 : Certification of Compliance | ABLA | HUD 52860 | 09/20/2022-17:10:23 | Michelle Harrington | Download | Delete |
| Section 9, Line 1 : Certification of Compliance | ABLA | HUD 52860-A | 09/20/2022-17:11:14 | Michelle Harrington | Download | Delete |
| Section 9, Line 1 : Certification of Compliance | ABLA | 52860- Section 18, Subpart F | 09/20/2022-17:12:08 | Michelle Harrington | Download | Delete |



# Chicago Housing Authority

**60 East Van Buren Street**
**Chicago, IL 60605**

## Board Letter

---

**Agenda Date: May 17, 2022**                                    **Agenda #: 10**

---

Authorization to take actions necessary for the Commercial Development of a portion of the ABLA development site.

| Development Boundaries | Community Area |
|---|---|
| Bounded by Roosevelt Road on the north, Loomis Avenue on the east, 15ᵗʰ Street on the south and Ashland Avenue on the west. | Near West |

Presenter: Ann McKenzie, Chief Development Officer

### Recommendation

It is recommended that the Board of Commissioners (Board) of the Chicago Housing Authority (CHA) authorize the Chief Executive Officer or her designee to:

1) Submit a Disposition application to the U.S. Department of Housing and Urban Development ("HUD") for the disposition of CHA land commonly referred to as the land west of Loomis Avenue and south of Roosevelt Road, Chicago Illinois (the "CHA Land"); and

2) Execute a market rate commercial lease with the Chicago Fire Football Club or its designee; and

3) Execute and deliver such other documents and perform such actions as may be necessary or appropriate to implement the foregoing.

### PROPERTY SUMMARY AND ESTIMATED CONTRACT:

| Acreage of Site | Estimated Value for Ground Lease |
|---|---|
| 25.5 acres | Market Rate - TBD |

The requested action complies in all material respects with all applicable federal, state and local laws, and CHA board policies. Staff have completed all necessary due diligence to support the submission of this initiative.

### Funding

NA

---

**Agenda Date: May 17, 2022**                                    **Agenda #: 10**

## Developer

The Chicago Fire Football Club (the "Fire") is an American professional soccer franchise based in Chicago. The team competes in Major League Soccer (MLS) and was founded in 1997. The Fire's home stadium is Soldier Field. The owner and chairman of the Fire is Joe Mansueto, who purchased the club in 2019. Mansueto is also the founder, majority owner and executive chairman of Morningstar Inc. The club president is Ishwara Glassman-Chrein; Georg Heitz was appointed sporting director in December 2019; the chief operating officer is John Urban.

Since 1998, the Chicago Fire Foundation, the charitable arm of the Fire, has given back to the community by developing programs that reach out to Chicagoland's community. The Fire has also made significant contributions to enhance the lives of disadvantaged youth by providing more than $1.8 million back into the community.

Any requirements and community investments and specific terms of the ground lease will be brought back to the Board at the appropriate time.

## Background

The site is the former location of Grace Abbott Homes, a portion of the ABLA development (Jane Addams Homes, Robert Brooks Homes ("Brooks Homes"), Loomis Courts and Grace Abbott Homes). The site is generally bounded by Cabrini Avenue to the north (east of Loomis) and Roosevelt Road to the north (west of Loomis), 15th Street to the south, Racine Avenue/Blue Island Avenue to the east, and the alley east of Ashland Avenue to the west.

To date, the CHA, through its residential development team of Related Midwest and Heartland Housing, have completed multiple phases of committed housing and are working to close another phase of redevelopment which will result in a total of 889 units of which 369 are for CHA families.

Recently, the Fire approached CHA regarding redevelopment of approximately 25 acres of vacant land west of Loomis Avenue into a training center for the Fire. The proposed development would include practice fields for the Fire's professional team, fields for the Fire's youth academy and other youth programming, a sports training facility, the Fire's headquarter offices, and related parking. The development would also include the following for the benefit of CHA and residents: community green/recreation space, additional parking for the William Jones Apartments, replacement of CHA's property management office and storge warehouse.

This transaction will bring additional benefits by providing recreational activities and creating programming partnerships between the Fire and CHA. The revenue stream from the Lease will support CHA's mission to revitalize communities, specifically Brooks Homes and the Loomis Courts site. CHA intends to evaluate the physical needs of Brooks Homes over the summer of 2022 and will work with residents on a plan for rehabilitation.

**Agenda Date: May 17, 2022**                                    **Agenda #: 10**

<u>**Preliminary Site Plan**</u>:



<u>**Rendering**</u>:



**Timeline**

- CHA submits HUD disposition application – June, 2022.
- HUD approval of the disposition application – Summer, 2022.
- Lease terms and planning timeline for Brooks Homes - September 2022 Board of Commissioners meeting.

This disposition activity was identified in the CHA FY 2022 MTW Annual Plan approved by HUD.

Respectfully Submitted:

**Tracey Scott**
**Chief Executive Officer**



**CHA**
CHICAGO HOUSING
AUTHORITY

**Agenda #: 10**

**RESOLUTION NO. 2022-CHA-23**

**WHEREAS,** the Board of Commissioners of the Authority has reviewed the Board Letter dated May 17, 2022 entitled "Authorization to take actions necessary for the Commercial Development of a portion of the ABLA development site."

**THEREFORE, BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE CHICAGO HOUSING AUTHORITY:**

**THAT,** the Board hereby authorizes the Chief Executive Officer, or her designee, to submit a disposition application to HUD for the disposition of CHA land west of Loomis Street, east of Ashland Avenue, south of Roosevelt Road and north of 15th Street; and

**THAT,** the Board hereby authorizes the Chief Executive Officer, or her designee, to negotiate and enter into a long-term lease with the Chicago Fire Football Club or its designee.

**THAT,** the Board hereby authorizes the Chief Executive Officer, or her designee, to execute such other documents and perform such actions as may be necessary or appropriate to implement the foregoing upon HUD approval of the disposition application.



APPROVED

MAY 17 2022

**Board of Commissioners**

**Angela Hurlock**
**Chairperson**
**Chicago Housing Authority**

1



## OFFICE OF THE MAYOR

### CITY OF CHICAGO

LORI E. LIGHTFOOT
MAYOR

May 10, 2022

The Honorable Marcia L. Fudge
Secretary
U.S. Department of Housing and Urban Development
451 7th Street S.W.
Room 1000
Washington, District of Columbia 20410

Dear Secretary Fudge:

On behalf of the City of Chicago, I am proud to support the Chicago Housing Authority's (CHA) revitalization activities in Chicago's Near West Side community at the former ABLA Homes site. CHA is applying to the U.S. Department of Housing and Urban Development (HUD) for the disposition of portions of land within the ABLA redevelopment area as part of a joint effort with the City of Chicago to support a public-private partnership that will contribute to the areas' public housing and community revitalization.

CHA continues to implement its plan to transform public housing developments into vibrant residential, retail, and commercial communities. Currently, CHA seeks to dispose of land located in ABLA to create a new sports training facility under a long-term, market-rate lease agreement. The lease would allow Chicago's Major League Soccer team, the Chicago Fire Football Club, to develop a training facility and fields while also providing various community and public investments, including long-term employment for community members and recreational opportunities for youth. The lease proceeds will help support CHA housing in that area, including ABLA Brooks Homes and Loomis Courts. Both sites require rehabilitation, which presently, without this lease proposal, would take many years to fund. CHA will begin planning for ABLA Brooks Homes this summer, and it will conduct plans for Loomis Courts next year. The proposal also seeks to provide William Jones Senior Apartments with designated parking as the site does not currently have adequate parking for residents.

I can confirm that CHA is collaborating with the City of Chicago on this matter. I have tremendous confidence in the current CHA leadership led by an experienced and thoughtful CEO, Tracey Scott.

As Mayor of the City of Chicago, I reiterate my strong support for CHA in its efforts to accomplish the above proposed disposition application. HUD's approval of CHA's application toward these ends will help CHA and the City of Chicago with their mutual goals to strengthen our communities and provide a better life for all Chicagoans.

Sincerely,

Mayor



CITY OF CHICAGO
✳
DEPARTMENT OF ASSETS, INFORMATION & SERVICES

July 13, 2022

Ms. Tracey Scott
Chief Executive Officer
Chicago Housing Authority
60 E. Van Buren St., 12th Floor
Chicago, Illinois 60605

Re:     Request for Release of Funds and Certification
        Roosevelt and Loomis, Long-term Lease of Lands

Dear Ms. Scott:

Enclosed herewith is a Request for Release of Funds (RROF) and Certification Form (HUD-7015.15), for the
Chicago Housing Authority's (CHA) proposed use of U.S. Department of Housing and Urban Development
(HUD) funds for the above-referenced project.  This documentation has been prepared under the terms of
the Intergovernmental Agreement between the CHA and the City of Chicago, and in accordance with the
Environmental Review Procedures for Entities Assuming HUD Environmental Responsibilities (24 CFR Part
58).

During the National Emergency concerning the Novel Coronavirus Disease (COVID-19) Outbreak, HUD's
Office of Environment and Energy (OEE) is temporarily allowing for flexibilities in the signature and
certification process for the RROF form 7015.15. As the direct recipient and manager of the HUD program
funds, the CHA is responsible for completing Part 3 of the enclosed HUD RROF form and returning the signed
form, via e-mail, to the City of Chicago. Upon receipt, the City of Chicago shall submit the RROF to HUD on
behalf of the CHA; at which time HUD will initiate the required 15-day public comment period for objections
to the release of funds and certification.  At the end of the public comment period, and assuming that no
objections have been received, HUD will have completed its statutory responsibilities under the National
Environmental Policy Act and be able to issue its "Authority to Use Grant Funds" (form HUD-7015.16) to the
CHA. Should you have any questions regarding this matter, please call Jaime Blakesley of my staff at (312)
744-0963.

Sincerely,

Sandra Blakemore
Acting Commissioner

Enclosure
cc:     Jaime Blakesley – Department of Assets, Information & Services

2 N. LaSalle Street, Suite 200, Chicago, Illinois 60602

# Request for Release of Funds and Certification

U.S. Department of Housing
and Urban Development
Office of Community Planning
and Development

OMB No. 2506-0087
(exp. 07/31/2017)

This form is to be used by Responsible Entities and Recipients (as defined in 24 CFR 58.2) when requesting the release of funds, and requesting the authority to use such funds, for HUD programs identified by statutes that provide for the assumption of the environmental review responsibility by units of general local government and States. Public reporting burden for this collection of information is estimated to average 36 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

---

**Part 1. Program Description and Request for Release of Funds (to be completed by Responsible Entity)**

| 1. Program Title(s) | 2. HUD/State Identification Number | 3. Recipient Identification Number (optional) |
|---|---|---|
| Public Housing Capital Fund | IL002VOW337 | |

| 4. OMB Catalog Number(s) | 5. Name and address of responsible entity |
|---|---|
| 14.872 | City of Chicago |
| 6. For information about this request, contact (name & phone number) | 121 N. LaSalle Street |
| Jaime Blakesley, 312-744-0963 | Chicago, Illinois 60602 |

| 8. HUD or State Agency and office unit to receive request | 7. Name and address of recipient (if different than responsible entity) |
|---|---|
| Office of Public Housing | Chicago Housing Authority |
| 77 W. Jackson Blvd., Rm. 2400 | 60 E. Van Buren St. |
| Chicago, Illinois 60604 | Chicago, Illinois 60605 |

The recipient(s) of assistance under the program(s) listed above requests the release of funds and removal of environmental grant conditions governing the use of the assistance for the following

| 9. Program Activity(ies)/Project Name(s) | 10. Location (Street address, city, county, State) |
|---|---|
| Roosevelt and Loomis | An area generally bounded by W. Roosevelt Rd. to the north, the alley due east of S. Ashland Ave. to the west, W. 15th St. to the south, and S. Loomis St. to the east Chicago, Cook County, IL |

11. Program Activity/Project Description

The proposed project would involve a long-term lease of approximately 25 acres of Chicago Housing Authority (CHA) owned property currently occupied by vacant land located at the site of a portion of former ABLA Homes. CHA would execute a 40-year long-term lease with the Chicago Fire Football Club for the construction and operation of soccer/football practice facilities. The lease term would include two 10-year negotiated options. For the purposes of Part 58 reviews, long-term leases are categorized as de facto dispositions.

Mitigation measures for this project include: 1.) Enroll the proposed site in the Illinois Environmental Protection Agency (IEPA) Site Remediation Program (SRP) and obtain a Comprehensive Residential No Further Remediation (NFR) letter. A copy of the Comprehensive NFR letter must be provided to the City of Chicago Department of Assets, Information and Services (AIS). An IEPA approved Remedial Action Plan (RAP) must be obtained prior to the commencement of construction; 2.) A minimum of two paths/trails for at least pedestrians, and preferably also cyclists, should be provided in order to continue to allow for public access across and/or adjacent to the proposed site; 3.) Acquire all required federal, state and local permits before beginning construction; and 4.) Properly dispose of construction and demolition debris in accordance with all applicable federal, state, and local laws and regulations.

The proposed project would be a disposition of CHA property (capital) through a long-term lease. The proposed 40-year lease term would be approximately $1,000,000 per year with a proposed one-time lump sum additional payment of approximately $8,000,000 for a total of approximately $48,000,000. The 40-year lease term would include two 10-year negotiated options.

The estimated total redevelopment project cost for the long-term leased site is $138,000,000. The redevelopment costs for the long-term lease site are estimated at $90,000,000. The disposition of CHA property would be approximately $48,000,000 over the course of the lease term. The redevelopment costs are to be privately funded by the Chicago Fire Football Club.

---

Previous editions are obsolete

form HUD-7015.15 (1/99)

**Part 2. Environmental Certification** (to be completed by responsible entity)

**With reference to the above Program Activity(ies)/Project(s), I, the undersigned officer of the responsible entity, certify that:**

1. The responsible entity has fully carried out its responsibilities for environmental review, decision-making and action pertaining to the project(s) named above.

2. The responsible entity has assumed responsibility for and complied with and will continue to comply with, the National Environmental Policy Act of 1969, as amended, and the environmental procedures, permit requirements and statutory obligations of the laws cited in 24 CFR 58.5; and also agrees to comply with the authorities in 24 CFR 58.6 and applicable State and local laws.

3. The responsible entity has assumed responsibility for and complied with and will continue to comply with Section 106 of the National Historic Preservation Act, and its implementing regulations 36 CFR 800, including consultation with the State Historic Preservation Officer, Indian tribes and Native Hawaiian organizations, and the public.

4. After considering the type and degree of environmental effects identified by the environmental review completed for the proposed project described in Part 1 of this request, I have found that the proposal did ☐ did not ✓ require the preparation and dissemination of an environmental impact statement.

5. The responsible entity has disseminated and/or published in the manner prescribed by 24 CFR 58.43 and 58.55 a notice to the public in accordance with 24 CFR 58.70 and as evidenced by the attached copy (copies) or evidence of posting and mailing procedure.

6. The dates for all statutory and regulatory time periods for review, comment or other action are in compliance with procedures and requirements of 24 CFR Part 58.

7. In accordance with 24 CFR 58.71(b), the responsible entity will advise the recipient (if different from the responsible entity) of any special environmental conditions that must be adhered to in carrying out the project.

As the duly designated certifying official of the responsible entity, I also certify that:

8. I am authorized to and do consent to assume the status of Federal official under the National Environmental Policy Act of 1969 and each provision of law designated in the 24 CFR 58.5 list of NEPA-related authorities insofar as the provisions of these laws apply to the HUD responsibilities for environmental review, decision-making and action that have been assumed by the responsible entity.

9. I am authorized to and do accept, on behalf of the recipient personally, the jurisdiction of the Federal courts for the enforcement of all these responsibilities, in my capacity as certifying officer of the responsible entity.

| Signature of Certifying Officer of the Responsible Entity | Title of Certifying Officer |
|---|---|
| | Sandra Blakemore, Acting Commissioner |
| X *Sandra Blakemore* | Date signed 7/13/22 |

Address of Certifying Officer

Chicago Department of Assets, Information & Services (AIS), 2 N. LaSalle Street, Suite 200, Chicago, Illinois 60602

**Part 3. To be completed when the Recipient is not the Responsible Entity**

The recipient requests the release of funds for the programs and activities identified in Part 1 and agrees to abide by the special conditions, procedures and requirements of the environmental review and to advise the responsible entity of any proposed change in the scope of the project or any change in environmental conditions in accordance with 24 CFR 58.71(b).

| Signature of Authorized Officer of the Recipient | Title of Authorized Officer |
|---|---|
| | Tracey Scott, Chief Executive Officer |
| X | Date signed 7/14/22 |

**Warning:** HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

CDM
Chicago Fire Football Club

| | |
|---|---|
| **ADORDERNUMBER:** | 0001145282-01 |
| **PO NUMBER:** | Chicago Fire Football Clu |
| **AMOUNT:** | 819.00 |
| **NO OF AFFIDAVITS:** | 2 |

# Chicago Sun-Times
# Certificate of Publication

**State of Illinois - County of**      Cook

Chicago Sun-Times, does hereby certify it has published the attached advertisments in the following secular newspapers. All newspapers meet Illinois Compiled Statue requirements for publication of Notices per Chapter 715 ILCS 5/0.01 et seq. R.S. 1874, P728 Sec 1, EFF. July 1, 1874. Amended by Laws 1959, P1494, EFF. July 17, 1959. Formerly Ill. Rev. Stat. 1991, CH100, Pl.
Note: Notice appeared in the following checked positions.

**PUBLICATION DATE(S):**  06/19/2022

Chicago Sun-Times

IN WITNESS WHEREOF, the undersigned, being duly authorized, has caused this Certificate to be signed

By

Robin Munoz

Manager | Recruitment & Legals

This 19th Day of June 2022 A.D.

CDM
125 S WACKER DR STE 700
ATTN PAM JOHNSON
CHICAGO, IL 60606

**NOTICE OF FINDING OF NO SIGNIFICANT IMPACT AND
NOTICE OF INTENT TO REQUEST RELEASE OF FUNDS**

June 19, 2022

City of Chicago
Department of Assets, Information and Services
2 North LaSalle Street, Suite 200
Chicago, Illinois 60602
(312) 744-0963

These notices shall satisfy two separate but related procedural requirements for activities to be undertaken by the Chicago Housing Authority (CHA).

**REQUEST FOR RELEASE OF FUNDS**

On or about July 5, 2022, the City of Chicago will authorize CHA to submit a request to the U.S. Department of Housing and Urban Development (HUD), Office of Public and Indian Housing, for the release of HUD Public Housing Capital Fund Program funds; under the Quality Housing and Work Responsibility Act of 1998, Consolidated Appropriations Act 2017, Public Law 114-113, to undertake a project known as Roosevelt &amp; Loomis, located at an area generally bounded by W. Roosevelt Rd. to the north, the alley due east of S. Ashland Ave. to the west, W. 15th St. to the south, and S. Loomis St. to the east, Chicago, Cook County, Illinois. The proposed project would dispose of approximately 25 acres of CHA owned property currently occupied by vacant land located at the site of a portion of former ABLA Homes. CHA proposes to execute a 40-year long-term lease (a de-facto disposition) with the Chicago Fire Football Club. The lease term would include two 10-year negotiated options. On the proposed leased property, the Chicago Fire Football Club would redevelop the land into a performance center, associated practice fields, and parking. The 40-year lease term would be approximately $1,000,000 per year with a one-time lump sum additional payment by the Chicago Fire Football Club to the CHA of approximately $8,000,000, for a total of approximately $48,000,000. The estimated total redevelopment project cost is $138,000,000. In addition to the long-term lease total of $48,000,000, the Chicago Fire Football Club's redevelopment costs for the long-term lease site are estimated at $90,000,000, to be covered by private funds.

**FINDING OF NO SIGNIFICANT IMPACT**

The City of Chicago has determined that the project will have no significant impact on the human environment. Therefore, an Environmental Impact Statement under the National Environmental Policy Act of 1969 (NEPA) is not required. An Environmental Review Record (ERR) that documents the environmental determinations for this project will be made available to the public for review either electronically or by U.S. mail. Additionally, the ERR will be accessible on the following website:
https://www.chicagogov/city/en/depts/dgs/provdrs/environmental_management/supp_info.html.
Please submit your request by U.S. mail to City of Chicago Department of Assets, Information and Services to the attention of the Deputy Commissioner, Bureau of Environmental, Health &amp; Safety Management, 2 North LaSalle Street, Suite 200, Chicago, Illinois 60602 or by email to AIS_NEPA@cityofchicago.org .

**PUBLIC COMMENTS**

Any individual, group, or agency may submit written comments on the ERR to the City of Chicago Department of Assets, Information and Services to the attention of the Deputy Commissioner, Bureau of Environmental, Health &amp; Safety Management, 2 North LaSalle Street, Suite 200, Chicago, Illinois 60602 or by email to AIS_NEPA@cityofchicago.org. All comments received by July 4, 2022, will be considered by the City of Chicago prior to authorizing submission of a request for release of funds. Comments should specify which Notice they are addressing.

**ENVIRONMENTAL CERTIFICATION**

The City of Chicago certifies to HUD that Ms. Sandra Blakemore in her capacity as Acting Commissioner of the Department of Assets, Information and Services, consents to accept the jurisdiction of the Federal Courts if an action is brought to enforce responsibilities in relation to the environmental review process and that these responsibilities have been satisfied. HUD's approval of the certification satisfies its responsibilities under NEPA and related laws and authorities and allows the CHA to use capital funds.

**OBJECTIONS TO RELEASE OF FUNDS**

HUD will accept objections to its release of funds and the City of Chicago's certification for a period of fifteen days following the anticipated submission date or its actual receipt of the request (whichever is later) only if they are on one of the following bases: (a) the certification was not executed by the Certifying Officer of the City of Chicago; (b) the City of Chicago has omitted a step or failed to make a decision or finding required by HUD regulations at 24 CFR part 58; (c) the grant recipient or other participants in the development process have committed funds, incurred costs or undertaken activities not authorized by 24 CFR Part 58 before approval of a release of funds by HUD; or (d) another Federal agency acting pursuant to 40 CFR Part 1504 has submitted a written finding that the project is unsatisfactory from the standpoint of environmental quality. Objections must be prepared and submitted via email in accordance with the required procedures (24 CFR Part 58, Sec. 58.76) and shall be addressed to Mr. William Dawson III, MPA Director Illinois State Office of Public Housing, Region V, at William.O.DawsonIII@hud.gov. Potential objectors should contact HUD via email to verify the actual lastday of the objection period.

Sandra Blakemore, Acting Commissioner
6/19/2022    #1145282



**LAC/Resident Roundtable Discussion**
*Chicago Fire FC Proposal*
**March 29, 2022 – Jane Addams Family Resource Center, 1254 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|--------------------|
| Nate Tortora | | ntortora@thecha.org | x3358 | CHA | N | |
| | | | | | | |
| Tracy Scott | | | | CHA | N | |
| | | | | | | |
| PAUL CADVELL | | PCADVELL@chicagofirefc.com | 708 496 5766 | CHICAGO FIRE | N | |
| JESSICA VAVITZ | | jvavitz@chicagofirefc.com | | Chicago Fire | N | |
| Ishwar Glassman | | ishwar@chicagofirefc.com | 619-701-5968 | Fire | N | |
| C.S. Brown | | Cbrown@chicagofirefc.com | 862-448-8615 | Fire | N | |
| Evan Whitfield | | ewhitfield@chicagofirefc.com | 312-719-7394 | FIRE | N | |
| | | | | | | |
| Juan Teague | | jvan@juandonly.com | 312 545-4775 | Juan tonly | N | |
| Eric Garrett | | egarrett@thecha.org | (312) 913-7210 | CHA | N | 1360 E. Van Buren |
| Claudiece Ware | | Cware@thecha.org | (312) 913-7828 | CAC | N | 243 E. 32nd St. |
| | | | | CHA | N | |



CHICAGO HOUSING
AUTHORITY

**LAC/Resident Roundtable Discussion**
*Chicago Fire FC Proposal*
**March 29, 2022 – Jane Addams Family Resource Center, 1254 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|--------------------|
| Dwen Cruz | | deruz @ cha | | CHA | | |
| Mary Howard | M | mhoward@thechas.org | | CHA | | |
| Crystal Palmer | Cryola | cpalmer@thecha.org | | CHA | | |
| Ald Ervet | | jason.Williams@cityofchicago | 773 533 0900 | Cit of Chicago | N | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**LAC/Resident Roundtable Discussion**
*Chicago Fire FC Proposal*
**April 5, 2022 – Jane Addams Family Resource Center, 1254 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|---|---|---|---|---|---|---|
| Tracey Scott | | | | CHA | N | |
| MARY HOWARD | | Mhoward@thecha.org | 312 913 7830 | CHA | N | |
| ▮ | | | | | X | ▮ |
| Ginestal Father | | aplines@thecha.org | 312-927-2005 | CHA | N | |
| ▮ | | | | | Y | |
| EVAN WHITFIELD | | ewhitfield@chicagofirefc.com | 312 717 7377 | FIRE | N | 1 N Dearbin |
| Ishwar Glassman | | ishwar@chicagofirefc.com | 691-701-5968 | FIRE | N | 1 N Dearb |
| PAUL CADWELL | | pcadwell@chicagofirefc.com | 708 821 3272 | Fire | N | 1 N DEARBORN |
| ARI GLASS | | Ari.glass@morsucoffice.com | 312 825 1968 | FIRE | N | |
| JESSICA YAVITZ | | jyavitz@chicagofirefc.com | 773-807-1044 | FIRE | N | |
| LEONARD McDowell | | l@juanandonlyevents.com | 773-495-3068 | JUAN & ONLY | N | |
| Robin Bromea | | RBroman@thecha.org | 312-935-2662 | CHA. | N | — |
| Michael Kaplan | | MKaplan@relatedmidwest.com | 312-274-3402 | Related Midwest | N | |
| Don Cruz | | dcruz@thecha.org | 317 913-7821 | CHA | Y | |
| ▮ | | | | | Y | ▮ |



**LAC/Resident Roundtable Discussion**
*Chicago Fire FC Proposal*
**April 5, 2022 – Jane Addams Family Resource Center, 1254 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|-----------------------|
| ███ | ███ | ███ | ███ | | X | ███ |
| ███ | | ███ | ███ | | Y | ███ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**LAC/Resident Roundtable Discussion**
*Chicago Fire FC Proposal*
**April 12, 2022 – Jane Addams Family Resource Center, 1254 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|----------------------|
| ▮ | | | ▮ | ▮ | Y | ▮ |
| ▮ | | | ▮ | | Y | ▮ |
| ▮ | | | | | Y | ▮ |
| JESSICA YANTZ | | jyantz@chicagofirefc.com | 708-872-0640 | Chicago Fire | N | |
| Paul Cadwell | | pcadwell@Chicago-Fire.... | 708 621 3272 | " " | N | |
| ARI GLASS | | ari.glass@mansuetoffice.com | 312 925 1400 | " | N | |
| Crystal Palmer | | cpalmer@thecha.org | 312 913-784 | CHA | N | |
| ▮ | | | ▮ | | Y | ▮ |
| ▮ | | | | | N | |
| Juan Tejeda | | suanejuanandonlyants | 312 545 4775 | Chicago Fire / JOE | N | |
| Ann McKenzie | | amckenzie@thecha.org | 312 913-7656 | CHA | N | |
| ▮ | | | ▮ | C CHA | ⟋ | |
| Eric Garrett | | egarrett@thecha.org | (312) 913 7210 | CHA | N | |
| Mary Howard | | mhoward@thecha.org | 312 913 7830 | CHA | N | |
| ▮ | | | | | Y | ▮ |



**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|----------------------|
| ███████████ | | | █████████ | | Y | ████████ |
| | | | | | Y | |
| Dan Cruz | | | | CHA | | |
| Leonard Langston | | | | | | |
| Robin Broman | | | | | | |
| Mary Howard | | | | | | |
| Tracey Scott | | | | | | |
| Matt Aguilar | | | | | | |
| Crystal Palmer | | | | | | |
| Dornita Houser | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



CHA
CHICAGO HOUSING
AUTHORITY

**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|---|---|---|---|---|---|---|
| | | | | | Yes | |
| | | | | | yes | |
| Rosie STATEV | Rasm Stat | | | | YeS | |
| | | | | | Yes | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
May 2, 2022 – ComEd Rec Center, 1434 S. Loomis

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|----------------------|
| | | | | | YES | |
| | | | | | yes | |
| | | | | | yes | |
| | | | | | yes | |
| | | | | | yes | |
| | | | | | Y | |
| | | | | | YES | |
| | | | | | yes | |
| | | | | | YES | |
| | | | | ABLA | yes | |
| | | | | ABLA | Yes | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|---|---|---|---|---|---|---|
| ███████ | ███████ | | | ███████ | tenant | ███████ |
| | | | | | tcant | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 — ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|--------------------|
| Byron Sigcho Lopez | B— | byon.sigch@ohshcy.j | 773-523-7100 | Alderman 25th Ward. | | |
| Jessie Johnson | | | 773-551-5053 | Alderman 25th ward | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|--------------------|--------------------|
| Sarah Paton | Sarah Paton | SPaton@Related.com | 312·783·7515 | Related | N | |
| Christopher Coleman | C. Coleman | | | Kates | | |
| Dionte Kates | Dionte Kates | | | Kates | | |
| Bobby Morris | Bobby M | | | Kates | | |
| Karla Hollomon | Karla Hollomon | Karlahollomon@gmail.com | | Kates | N | |
| Tyrone Winters | Tyr W | | | Kates | N | |
| Lexus Hill | Lexus Hill | | | Kates | N | |
| Darnita A. Van Sei | | | | | | |
| Coty Sykes | Coty Collins Sykes | CSykes@hhdevcorp.com | 312 492 7968 | William Jones | N | |
| Gmy Thompson Atkins | Cri Atkins | ktatkins@chacontractor.com | 312-491-2980 | ABLA Homes | N | |
| Ala Kerr | | | 773 332 | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |



CHICAGO HOUSING
AUTHORITY

**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|---|---|---|---|---|---|---|
| Cathy Rajcan | Catherine Rajcan | efficiencyrptg@csi.com | 630 682 8887 | Efficiency Reporting | N | |
| Travis Moore-Murray | | travis.moore-murray @city of | | Mayor's Office | N | |
| C Sanders | C Sander | | 773-248-9121 | CHA | N | |
| Juan Teamo | | juan@juanandonefnote.v | 312 545 4755 | Juan + ony | N | |
| Jamika Hann | | Junika@juanandonefnote | 708-354-1512 | Juan & M | N | |
| | | | | | Y | |
| Eric Garrett | | esarrette@thecha.org | (312) 913-7210 | CHA | N | |
| Tina Hone | Hone | martin.hone@city.chga.org | 312-744-7217 | | N | |
| Brian Hacker | | brian.hacker@cityofchicago.org | | Chicago DPP | N | |
| Felicia Johnson | | fjohnson@habitat.co | 312-527-7989 | Habitat CO | N | |
| Janay Mohamed | Mohamed | jhayes-mohamed@habitat.com | 312/527-7485 | The Habitat Co | N | |
| Bill Higgins | | William.Higgins@cityofchicago | 312-744-7189 | CDOT | N | |
| Reginald Cur | | reggie@juanandonefevent | 3125437273 | Juan & Ones | N | |
| Nate Morgan III | NM3 | nmorgan@kstardetectiveagency.com | /312-720-7107 | Kates | N. | |
| Javaka Thompson | | | | Kates | N | |
| April W. Davis | April W. Davis | adavis@thecha.org | 312-913-7416 | CHA | N | |



CHA

CHICAGO HOUSING
AUTHORITY

**CHA Resident Meeting**
*Chicago Fire FC Lease Proposal*
**May 2, 2022 – ComEd Rec Center, 1434 S. Loomis**

| Name | Signature | Email | Phone Number | Organization | CHA Resident (Y/N) | CHA Resident Address |
|------|-----------|-------|--------------|--------------|---------------------|----------------------|
| ███████ | | | ███████ | | Y | ███████ |
| | | | | | y | |
| | | | | | y | |
| Juan Gon. | | | ███████ | | y | ███████ |
| ███████ | | | 312-461-1023 | Facilitator | N | N/a |
| | | | ███████ | | Y | ███████ |
| Demetria Stanes | Dai St | | 312-491.2980 | ELM | N | 1324 S. loomis |
| Alberta Gilmore | Alberta gilmore | | 312 606 2407 | | | |
| ███████ | | | ███████ | | y | ███████ |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | ███████ | | Y | ███████ |



# Valuation Advisory

Client:                          Mansueto Office

Property Name:          Addams Medill Park

Property Address:       1301 W 14th Street, Chicago, IL 60608

Report Date: May 9, 2022

JLL File #: VA-22-184256





Addams Medill Park
1301 W 14th Street
Chicago, IL 60608



200 E. Randolph Street, 47th Floor
Chicago, IL 60601

Phone: 312-252-8913
Fax: 312-252-8914

May 9, 2022

Mr. Ari F. Glass
Head of Real Estate
Mansueto Office
400 N Michigan Ave. Suite 350
Chicago, IL 60611

Re: Appraisal

Addams Medill Park
1301 W 14th Street
Chicago, Cook County, IL 60608

File Number: VA-22-184256

Dear Mr. Glass:

At your request, we have prepared an appraisal for the above referenced property, which may be briefly described as follows:

The subject is an existing land property that consists of an irregularly shaped site with a gross site area of 7.35 acres or 320,166 square feet. The subject is currently owned by the Chicago Housing Authority and utilized as Addams/Medill Park. The subject does not include the park areas with frontage on Roosevelt Road or Ashland Avenue. The park is currently part Residential-Business Planned Development 896, subarea A-5, which allows for uses based on the uses permitted in the R4, General Residence District zoning classification.

At the request of the client, our valuation scenarios are as follows:

- Hypothetical Land Value – As If Unrestricted

- Hypothetical Ground Rent – As If Unrestricted

- As Is, accounting for legal, practical and political development constraints, including CHA's customary restrictions on the use of the Property and the density and height of the applicable improvements and other development requirements and conditions

The appraisal is intended to conform with the Uniform Standards of Professional Appraisal Practice (USPAP), the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, and applicable state appraisal regulations.

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have made the following value conclusion(s):

## Value Conclusions

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value Hypothetical Land Value – As if Unrestricted | Fee Simple | May 3, 2022 | $28,000,000 |
| Hypothetical Ground Rent – As If Unrestricted | N/A | May 3, 2022 | $1,400,000 |
| Market Value As Is Land Value – Subject to CHA Restrictions | Fee Simple | May 3, 2022 | $20,800,000 |

Your attention is directed to the Limiting Conditions and Assumptions section of this report. Acceptance of this report constitutes an agreement with these conditions and assumptions. In particular, we note the following:

## Extraordinary Assumptions & Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

1. None.


The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. The subject is currently owned by the CHA, and if sold, would be subject to typical CHA use restrictions. For the purposes of the Hypothetical Land Value - As If Unrestricted and the Hypothetical Ground Rent - As If Unrestricted, we have valued the subject as if the CHA restrictions are not in place.

If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

JLL Valuation & Advisory Services, LLC

Vytas V. Norusis, MAI
Executive Vice President
Certified General Appraiser
IL Certificate #: 553.002350
Telephone: (708) 280-0487
Email: vytas.norusis@am.jll.com

# Contents

Certification Statement   1

Summary of Salient Facts and Conclusions   3

Introduction   4
    Ownership and Transaction History   4

Scope of Work   5
    Applicable Requirements   6
    Client, Intended Use, and User(s)   6
    Purpose of the Appraisal   6
    Approaches to Value   7
    Prior Services   7
    Report Option   8
    Definition of Values   8
    Definition of Property Rights Appraised   9
    Chicago MSA Area Demographics   10
    Multi-Family Market Area Analysis   23
    Surrounding Area Analysis   32

Property Description   35
    Site Description   35
    Assessment and Taxes   42
    Highest and Best Use   43

Valuation Methodology   45
    Hypothetical Land Valuation – As If Unrestricted   47
    Hypothetical Ground Rent Analysis   53
    Land Valuation – Subject to CHA Restrictions   55
    Final Reconciliation   61

Limiting Conditions and Assumptions   63

# Appendices

A. Appraiser Qualifications
B. Definitions
C. Financials and Property Information
D. Comparable Data
E. Engagement Letter

# Certification Statement

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions and conclusions.

3. We have no present or prospective future interest in the property that is the subject of this report and have no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report, or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP).

8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. We certify sufficient competence to appraise this property through education and experience, in addition to the internal resources of the appraisal firm.

11. We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

12. Vytas V. Norusis, MAI, has not made a personal inspection of the subject property.

13. No one provided significant real property appraisal assistance to the persons signing this certification.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal

14. As of the date of this report, Vytas V. Norusis, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

Vytas V. Norusis, MAI
Executive Vice President
Certified General Appraiser
IL Certificate #: 553.002350
Telephone: (708) 280-0487
Email: vytas.norusis@am.jll.com

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Summary of Salient Facts and Conclusions

| | |
|---|---|
| Property Name | Addams Medill Park |
| Address | 1301 W 14th Street |
| | Chicago, Cook County, Illinois 60608 |
| Property Type | Other |
| Owner of Record | Chicago Housing Authority |
| Tax ID | See Site Section |
| Land Area | 23.83 acres; 862,052 SF |
| Zoning Designation | PD 896 - Subarea A-5, Planned Development 896 |
| Highest & Best Use - As If Vacant | Commercial/Multifamily Use |
| Highest & Best Use - As Improved | Development Of Commercial/Multifamily Use |
| Exposure Time; Marketing Period | 3-6 months; 3-6 months |
| Date of Report | May 9, 2022 |

## Value Conclusions

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value Hypothetical Land Value – As if Unrestricted | Fee Simple | May 3, 2022 | $28,000,000 |
| Hypothetical Ground Rent – As If Unrestricted | N/A | May 3, 2022 | $1,400,000 |
| Market Value As Is Land Value – Subject to CHA Restrictions | Fee Simple | May 3, 2022 | $20,800,000 |

The values reported above are subject to definitions, assumptions and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than the client and intended users may use or rely on the information, opinions and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions and limiting conditions contained therein.

## Extraordinary Assumptions & Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

1.  None.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1.  The subject is currently owned by the CHA, and if sold, would be subject to typical CHA use restrictions. For the purposes of the Hypothetical Land Value - As If Unrestricted and the Hypothetical Ground Rent - As If Unrestricted, we have valued the subject as if the CHA restrictions are not in place.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Introduction

The subject is an existing land property that consists of an irregularly shaped site with a gross site area of 7.35 acres or 320,166 square feet. The subject is currently owned by the Chicago Housing Authority and utilized as Addams/Medill Park. The subject does not include the park areas with frontage on Roosevelt Road or Ashland Avenue. The park is currently part Residential-Business Planned Development 896, subarea A-5, which allows for uses based on the uses permitted in the R4, General Residence District zoning classification.

## Subject Identification

| | |
|---|---|
| Name | Addams Medill Park |
| Address | 1301 W 14th Street, Chicago, Cook County, IL 60608 |
| Tax ID | See site section |
| Owner of Record | Chicago Housing Authority |
| Legal Description | Lengthy - see appendix |

# Ownership and Transaction History

To the best of our knowledge, no sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date. Additionally, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Scope of Work

According to the Uniform Standards of Professional Appraisal Practice, it is the appraiser's responsibility to develop and report a scope of work that results in credible results that are appropriate for the appraisal problem and intended user(s).

Scope of work is the type and extent of research and analyses involved in an assignment. To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and other pertinent factors. Our concluded scope of work is summarized below, and in some instances, additional scope details are included in the appropriate sections of the report.

## Summary

| | |
|---|---|
| Research | ■ We have not inspected the property and its environs. Physical information on the subject was obtained from the property owner's representative, public records, and/or third-party sources. |
| | ■ Regional economic and demographic trends, as well as the specifics of the subject's local area were investigated. Data on the local and regional property market (supply and demand trends, rent levels, etc.) was also obtained. This process was based on interviews with regional and/or local market participants, primary research, available published data, and other various resources. |
| | ■ Other relevant data was collected, verified, and analyzed. Comparable property data was obtained from various sources (public records, third-party data-reporting services, etc.) and confirmed with a party to the transaction (buyer, seller, broker, owner, tenant, etc.) wherever possible. It is, however, sometimes necessary to rely on other sources deemed reliable, such as data reporting services. |
| Analysis | ■ Based upon the subject property characteristics, prevailing market dynamics, and other information, we developed an opinion of the property's Highest and Best Use. |
| | ■ We analyzed the data gathered using generally accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. |
| | ■ The results of each valuation approach are considered and reconciled into a reasonable value estimate. |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal

# Applicable Requirements

This appraisal is intended to conform to the requirements of the following:

- Uniform Standards of Professional Appraisal Practice (USPAP);
- Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute;
- Applicable state appraisal regulations;
- Appraisal guidelines of Mansueto Office.

# Client, Intended Use, and User(s)

Client:                        Mansueto Office

Intended Use:             The intended use of the appraisal is for internal valuation.

Intended User(s):        The intended user(s) of the appraisal is Mansueto Office. The appraisal is not intended for any other use or user. No party or parties other than Mansueto Office may use or rely on the information, opinions, and conclusions contained in this report.

# Purpose of the Appraisal

The purpose of the appraisal is to estimate the Subject's:

| Appraisal Premise | Interest Appraised | Date of Value |
|---|---|---|
| Market Value Hypothetical Land Value – As if Unrestricted | Fee Simple | May 3, 2022 |
| Hypothetical Ground Rent – As If Unrestricted | N/A | May 3, 2022 |
| Market Value As Is Land Value – Subject to CHA Restrictions | Fee Simple | May 3, 2022 |

The date of the report is May 9, 2022. The appraisal is valid only as of the stated effective date or dates.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Approaches to Value

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. Applicability and utilization of the approaches in this assignment is described as follows.

| Approach | Description | Applicability | Utilization |
|---|---|---|---|
| Cost | A cost approach is most applicable in valuing new or proposed construction when the improvements represent the highest and best use of the land and the land value, cost new and depreciation are well supported. | Not Applicable | Not Utilized |
| Sales Comparison | A sales approach is most applicable when sufficient data on recent market transactions is available and there is an active market for the property type. | Applicable | Utilized |
| Income | An income approach is most applicable when the subject is an income producing property or has the ability to generate income in the future as an investment. | Not Applicable | Not Utilized |

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services.

- We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

## Report Option

Based on the intended users understanding of the subject's physical, economic and legal characteristics, and the intended use of this appraisal, an appraisal report format was used, as defined below.

| | |
|---|---|
| Appraisal Report | This is an Appraisal Report as defined by Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2(a). This format provides a summary or description of the appraisal process, subject and market data and valuation analyses. |

## Definition of Values

| | |
|---|---|
| Market Value | The most probable price which a property should bring in a competitive and open market under all condition's requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: |

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also, Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)

| | |
|---|---|
| As Is Market Value | The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date. |

Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015); also, Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77471

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Definition of Property Rights Appraised

Fee simple estate            Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

*Source*: Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015)

## Inspection

Vytas V. Norusis, MAI, has not performed an inspection.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Chicago MSA Area Demographics

The subject is located in the Chicago-Naperville-Elgin, IL-IN-WI Metropolitan Statistical Area, hereinafter called the Chicago MSA, as defined by the U.S. Office of Management and Budget. The Chicago MSA is 7,196 square miles in size and is the third most populous metropolitan area in the nation.

## Population

The Chicago MSA has an estimated 2021 population of 9,506,045, which represents about the same population compared to the 2010 census amount of 9,461,105 over the 2010 - 2021 period, and its annual growth rate is similar to that of the State of Illinois.

### Population Trends

| Area | 2010 Census | Population 2021 Est. | 2026 Est. | Compound Ann. % Chng 2010 - 2021 | 2021 - 2026 |
|---|---|---|---|---|---|
| 1 mi. radius | 42,173 | 43,737 | 44,718 | 0.3% | 0.4% |
| 3 mi. radius | 398,043 | 443,325 | 458,410 | 1.0% | 0.7% |
| 5 mi. radius | 949,932 | 1,004,143 | 1,017,218 | 0.5% | 0.3% |
| Cook County | 5,194,675 | 5,149,152 | 5,097,773 | -0.1% | -0.2% |
| Chicago MSA | 9,461,105 | 9,506,045 | 9,498,830 | 0.0% | 0.0% |
| Illinois | 12,830,632 | 12,762,130 | 12,665,480 | 0.0% | -0.2% |
| United States | 308,745,538 | 333,934,112 | 345,887,495 | 0.7% | 0.7% |

Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

Looking forward, the Chicago MSA's population will remain essentially the same from 2021 - 2026 without any appreciable growth or decline. The Chicago MSA growth rate is expected to exceed that of Illinois, which is projected to be 0.2%.

## Employment

The current estimate of total employment in the Chicago MSA is 4,514,517 jobs. Since 2012, employment grew by 143,292 jobs, equivalent to a 3.3% gain over the entire period. There were gains in employment in eight of the past ten years despite the national economic downturn and slow recovery.

The Chicago MSA's rate of change in employment outperformed the State of Illinois, which experienced an increase in employment of 1.1% or 62,217 over this period.

### Employment Trends

| Year | Cook County | Change | Chicago MSA | Change | Illinois | Change | United States | Change | Cook County | Chicago MSA | Illinois | United States |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Employment (Annual Average) | | | | | | | | Unemployment Rate (Ann. Avg.) | | | |
| 2007 | 2,529,579 | - | 4,549,475 | - | 5,977,233 | - | 137,981,250 | - | 5.4% | 5.0% | 5.1% | 4.6% |
| 2008 | 2,501,435 | -1.1% | 4,521,117 | -0.6% | 5,946,400 | -0.5% | 137,223,833 | -0.5% | 6.7% | 6.3% | 6.5% | 5.8% |
| 2009 | 2,375,779 | -5.0% | 4,283,850 | -5.2% | 5,654,708 | -4.9% | 131,296,083 | -4.3% | 10.5% | 10.2% | 10.2% | 9.3% |
| 2010 | 2,345,507 | -1.3% | 4,238,308 | -1.1% | 5,609,617 | -0.8% | 130,345,000 | -0.7% | 11.0% | 10.6% | 10.5% | 9.6% |
| 2011 | 2,377,242 | 1.4% | 4,298,800 | 1.4% | 5,677,542 | 1.2% | 131,914,417 | 1.2% | 10.6% | 10.0% | 9.8% | 9.0% |
| 2012 | 2,405,633 | 1.2% | 4,371,225 | 1.7% | 5,750,942 | 1.3% | 134,157,417 | 1.7% | 9.7% | 9.1% | 9.0% | 8.1% |
| 2013 | 2,426,450 | 0.9% | 4,439,858 | 1.6% | 5,803,233 | 0.9% | 136,363,833 | 1.6% | 9.7% | 9.1% | 9.1% | 7.4% |
| 2014 | 2,468,453 | 1.7% | 4,506,983 | 1.5% | 5,878,683 | 1.3% | 138,939,750 | 1.9% | 7.6% | 7.2% | 7.2% | 6.2% |
| 2015 | 2,531,066 | 2.5% | 4,592,150 | 1.9% | 5,966,442 | 1.5% | 141,824,917 | 2.1% | 6.3% | 6.0% | 6.0% | 5.3% |
| 2016 | 2,561,922 | 1.2% | 4,655,125 | 1.4% | 6,012,567 | 0.8% | 144,335,833 | 1.8% | 6.2% | 5.8% | 5.9% | 4.9% |
| 2017 | 2,572,191 | 0.4% | 4,694,408 | 0.8% | 6,055,083 | 0.7% | 146,607,583 | 1.6% | 5.1% | 4.9% | 4.9% | 4.4% |
| 2018 | 2,592,847 | 0.8% | 4,730,533 | 0.8% | 6,101,667 | 0.8% | 148,908,417 | 1.6% | 4.2% | 4.1% | 4.4% | 3.9% |
| 2019 | 2,609,154 | 0.6% | 4,758,983 | 0.6% | 6,124,608 | 0.4% | 150,904,750 | 1.3% | 3.9% | 3.9% | 4.0% | 3.7% |
| 2020 | 2,388,964 | -8.4% | 4,414,458 | -7.2% | 5,698,517 | -7.0% | 142,186,000 | -5.8% | 10.4% | 9.5% | 9.2% | 8.1% |
| 2021 | 2,395,289 | 0.3% | 4,514,517 | 2.3% | 5,813,158 | 2.0% | 146,124,000 | 2.8% | 7.1% | 6.2% | 6.1% | 5.4% |
| **10 Yr Change** | **-10,344** | **-0.4%** | **143,292** | **3.3%** | **62,217** | **1.1%** | **11,966,583** | **8.9%** | | | | |
| Avg Unemp. Rate 2012-2021 | | | | | | | | | 7.0% | 6.6% | 6.6% | 5.7% |
| Unemployment Rate - Mar 2022 | | | | | | | | | 4.9% | 4.5% | 4.7% | 3.8% |

Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES).
Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal



Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES). Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

Addams Medill Park Real Estate Appraisal



Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES). Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

A comparison of unemployment rates is another way of gauging an area's economic health, where a higher unemployment rate is a negative indicator. Over the past decade, the Chicago MSA unemployment rate of 6.6% has been comparable to the Illinois rate. In the latter half of the decade the Chicago MSA has continued to perform similarly to Illinois. Recent data shows that the Chicago MSA unemployment rate is 4.5%, and while this was a comparable rate to Illinois, it also must be considered that the Chicago MSA has outperformed Illinois in the rate of job growth over the past two years.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Employment Sectors

The composition of the Chicago MSA job market is illustrated in the chart below, paired with that of Illinois. Total employment for the areas is stratified by eleven major employment sectors, ranked from largest to smallest based on the percentage of Chicago MSA jobs in each sector.





Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

The Chicago MSA has a greater percentage employment than Illinois in the following categories:

1. Trade, Transportation, Utilities - which accounts for 20.4% of Chicago MSA payroll employment compared to 20.3% for Illinois as a whole. This sector includes jobs in retail trade, wholesale trade, trucking, warehousing, and electric, gas, and water utilities.

2. Professional, Business Services - which accounts for 10.2% of Chicago MSA payroll employment compared to 8.9% for Illinois as a whole. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.

3. Other Services - which accounts for 8.3% of Chicago MSA payroll employment compared to 8.0% for Illinois as a whole. This sector includes establishments that do not fall within other defined categories, such as private households, churches, and laundry and dry-cleaning establishments.

4. Financial Activities - which accounts for 8.2% of Chicago MSA payroll employment compared to 7.9% for Illinois as a whole. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

The Chicago MSA is underrepresented in the following categories:

1. Education, Health Services - which accounts for 23.1% of Chicago MSA payroll employment compared to 24.1% for Illinois as a whole. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.

2. Natural Resources, Mining - which accounts for 0.3% of Chicago MSA payroll employment compared to 1.0% for Illinois as a whole. Agriculture, mining, quarrying, and oil and gas extraction are included in this sector.

3. Government - which accounts for 3.7% of Chicago MSA payroll employment compared to 4.2% for Illinois as a whole. This sector includes public administration at the federal, state, and county level, as well as other government positions.

4. Manufacturing - which accounts for 11.4% of Chicago MSA payroll employment compared to 11.7% for Illinois as a whole. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.

## Major Employers

The table below contains major employers in the Chicago MSA.

### Major Employers - Chicago MSA

| | Name | Employees |
|---|---|---|
| 1 | Advocate Health Care System | 25,917 |
| 2 | Northwestern Memorial Healthcare | 21,264 |
| 3 | Amita Health | 20,046 |
| 4 | University of Chicago | 18,276 |
| 5 | JPMorgan Chase & Co. | 16,000 |
| 6 | Amazon | 14,610 |
| 7 | United Continental Holdings Inc. | 14,520 |
| 8 | Walgreens Boots Alliance Inc. | 12,751 |
| 9 | Abbvie Inc. | 11,000 |
| 10 | Northwestern University | 10,847 |
| 11 | Presence Health | 10,225 |
| 12 | Walmart Inc. | 10,220 |
| 13 | Abbott Laboratories | 9,860 |
| 14 | Jewel-Osco Stores | 9,660 |
| 15 | University of Illinois | 9,566 |
| 16 | American Airlines | 9,520 |
| 17 | Rush University Medical Center | 9,402 |
| 18 | Chicago Transit Authority | 9,373 |
| 19 | AT&T | 9,200 |
| 20 | University of Chicago Medical Center | 9,161 |

Sources(s): Crain's Chicago Business Book of Lists, 2018; Crain's Chicago Business Journal, 2018; Crains Book of Lists, 2020; DeKalb County Economic Development Corp., 2018; DeKalb County, 2016; Elgin IL top employers search; Kane County, 2016; Go Hammond, 2018; Go Hammond, 2019; Choose Milwaukee, 2018; Kenosha Area Business Alliance, 2017; Lake County , 2020; Lake County Partners, 2016; Lake County, 2018

## Gross Domestic Product

Based on Gross Domestic Product (GDP), the Chicago MSA ranks #3 out of all metropolitan area economies in the nation.

Economic growth, as measured by annual changes in GDP, has been somewhat higher in the Chicago MSA than Illinois overall during the past nine years. The Chicago MSA has expanded at a 0.7% average annual rate while the State of Illinois has grown at a 0.4% rate. As the national economy improves, that trend has reversed, with the Chicago MSA lagging Illinois. GDP for the Chicago MSA rose by 5.4% in 2020 while Illinois's grew by 5.1%.

The Chicago MSA has a per capita GDP of $62,510, which is 8.0% greater than Illinois's GDP of $57,771. This means that the Chicago MSA industries and employers are adding relatively more value to the economy than their peers in Illinois.

### Gross Domestic Product

| Year | Gross Domestic Product ($ mil) | | | | | | GDP per Capita ($) | | |
|------|------------|--------|----------|--------|---------------|--------|-------------|----------|---------------|
| | Chicago MSA | Change | Illinois | Change | United States | Change | Chicago MSA | Illinois | United States |
| 2011 | $556,699 | - | $711,283 | - | $15,891,534 | - | $58,815 | $55,463 | $51,092 |
| 2012 | $570,955 | 2.6% | $726,399 | 2.1% | $16,253,970 | 2.3% | $60,296 | $56,669 | $51,876 |
| 2013 | $571,812 | 0.2% | $726,125 | 0.0% | $16,553,348 | 1.8% | $60,360 | $56,676 | $52,448 |
| 2014 | $585,491 | 2.4% | $741,194 | 2.1% | $16,932,051 | 2.3% | $61,777 | $57,880 | $53,261 |
| 2015 | $598,224 | 2.2% | $751,755 | 1.4% | $17,390,295 | 2.7% | $63,094 | $58,733 | $54,312 |
| 2016 | $600,346 | 0.4% | $749,334 | -0.3% | $17,680,274 | 1.7% | $63,290 | $58,572 | $54,825 |
| 2017 | $607,938 | 1.3% | $755,595 | 0.8% | $18,079,084 | 2.3% | $64,063 | $59,091 | $55,667 |
| 2018 | $623,870 | 2.6% | $774,065 | 2.4% | $18,606,787 | 2.9% | $65,714 | $60,565 | $56,890 |
| 2019 | $628,061 | 0.7% | $777,654 | 0.5% | $19,032,672 | 2.3% | $66,126 | $60,875 | $57,788 |
| 2020 | $593,967 | -5.4% | $737,644 | -5.1% | $18,384,687 | -3.4% | $62,510 | $57,771 | $55,435 |
| 10 Yr Change | $37,268 | 0.7% | $26,360 | 0.4% | $2,493,153 | 1.6% | $3,695 | $2,308 | $4,343 |

Source: Bureau of Economic Analysis. The release of state and local GDP data has a longer lag time than national data. The data represents inflation-adjusted 'real' GDP stated in 2012 dollars. Per Capita GDP data are calculated by dividing the area GDP by its estimated population for the year shown.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal



Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES). Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.



Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES). Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

Gross Domestic Product is a measure of economic activity based on the total value of goods and services produced in a specific geographic area. The figures in the table above represent inflation adjusted "real" GDP stated in 2012 dollars.

## Household Income

The Chicago MSA has a much higher level of household income than Illinois. Median household income for the Chicago MSA is $76,081, which is 10.8% higher than Illinois.

## Median Household Income

| Area | Med. Household Income | | Compound Ann. % Chng |
|------|-----------|-----------|-----------|
| | 2021 Est. | 2026 Est. | 2021 - 2026 |
| Cook County | $69,476 | $78,334 | 2.4% |
| Chicago MSA | $76,081 | $84,091 | 2.0% |
| Illinois | $68,663 | $76,848 | 2.3% |
| United States | $64,730 | $72,932 | 2.4% |

Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.



### 2021 Median Household Income Area Comparison

Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

The Chicago MSA has a smaller concentration of households in the lower income levels than Illinois. Specifically, 23% of the Chicago MSA households are below the $35,000 level in household income as compared to 25% of Illinois households. A greater concentration of households exists in the higher income levels, as 51% of the Chicago MSA households are at the $75,000 or greater levels in household income versus 47% of Illinois households.

Addams Medill Park Real Estate Appraisal

## 2021 Median Household Income Distribution



Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Education and Age

Residents of the Chicago MSA have a higher level of educational attainment than those in Illinois. An estimated 39.8% of the Chicago MSA residents are college graduates with four-year degrees or higher, while Illinois residents have an estimated 36.3% with at least a four-year degree. People in the Chicago MSA are similar in age to their peers in Illinois. The median age of both the Chicago MSA and Illinois is 38 years.



Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

## Conclusion

The Chicago MSA's economy will benefit from a stable to slightly growing population base, and higher income and education levels. The Chicago MSA saw an increase in the number of jobs in the past 10 years, and it can be anticipated that employment growth will continue in the future. Furthermore, the Chicago MSA is well-positioned from being the third most populous metropolitan area in the country and having both a higher rate of GDP growth in the past nine years and a higher level of GDP per capita than Illinois overall. We project that the Chicago MSA's economy will improve, and employment will grow, strengthening the demand for real estate overall.

## Area Map



# Multi-Family Market Area Analysis

## Chicago Metro Area Trends and Analysis

The subject is located in the Chicago metro area, as defined by REIS. Supply and demand metrics, including inventory levels, vacancy, completions, absorption, and rental rates for all classes of space are presented in the following table.

## Chicago Multi-Family Market Trends (All Classes of Space)

| Year | Inventory (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) |
|---|---|---|---|---|---|---|
| 2011 | 403,218 | 18,735 | 4.6% | 262 | 4,583 | $1,081 |
| 2012 | 403,944 | 16,039 | 4.0% | 726 | 3,422 | $1,108 |
| 2013 | 408,946 | 15,644 | 3.8% | 5,002 | 5,397 | $1,139 |
| 2014 | 411,939 | 14,632 | 3.6% | 2,993 | 4,005 | $1,176 |
| 2015 | 417,253 | 17,261 | 4.1% | 5,314 | 2,685 | $1,217 |
| 2016 | 423,530 | 17,176 | 4.1% | 6,332 | 6,362 | $1,254 |
| 2017 | 431,686 | 21,599 | 5.0% | 8,156 | 3,733 | $1,319 |
| 2018 | 441,098 | 21,935 | 5.0% | 9,183 | 9,076 | $1,384 |
| 2019 | 450,662 | 24,091 | 5.3% | 8,869 | 7,408 | $1,448 |
| 2020 | 456,399 | 26,839 | 5.9% | 5,737 | 2,989 | $1,410 |
| 2021 | 460,413 | 23,689 | 5.1% | 4,014 | 7,164 | $1,614 |
| 2022 | 512,734 | 26,661 | 5.2% | 6,023 | 5,969 | $1,668 |
| 2023 | 517,053 | 26,992 | 5.2% | 4,319 | 3,988 | $1,721 |
| 2024 | 520,834 | 26,486 | 5.1% | 3,781 | 4,287 | $1,771 |
| 2025 | 523,552 | 26,282 | 5.0% | 2,718 | 2,922 | $1,822 |
| 2026 | 525,773 | 25,319 | 4.8% | 2,221 | 3,184 | $1,872 |
| 2011 - 2021 Avg. | 428,099 | 19,785 | 4.6% | 5,144 | 5,166 | $1,286 |

Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- The most recent data shows 4,014 units were added to the market. On average 5,144 units have been added to the market over the last eleven complete years and increased 1432.1%. During the same period, completions rose from a minimum of 262 units in 2011 and experienced a maximum of 9,183 units in 2018.
- Looking forward, it is expected that in five years completions will show a drop of 56.8% from the 11-year average of 5,144 units, representing a change of 2,923 units by year-end 2026.
- The most recent data shows asking rent is $1,614/unit. Over the last eleven complete years, asking rent had an annual average of $1,286/unit and increased 49.3%. During the same period, asking rent rose from a minimum of $1,081/unit in 2011 and achieved a peak of $1,614/unit in 2021.
- Looking forward, it is expected that in five years asking rent will show an increase of 16.0% from the present amount of $1,614/unit, representing a change of $258/unit by year-end 2026.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

<span style="color:red">Addams Medill Park</span> Real Estate Appraisal



Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.



Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

Addams Medill Park Real Estate Appraisal

- Vacancy rates are presently 5.1%. Over the past eleven complete years, vacancy rates had an annual average of 4.6% and rose 50 bps. During the same period, vacancy rates saw a low of 3.6% in 2014 and experienced a maximum of 5.9% in 2020.
- Projecting five years into the future, vacancy rates will show a drop of 33 bps from the present amount of 5.1%.
- Currently, absorption is 7,164 units. During the past eleven complete years, absorption averaged 5,166 units annually and rose 56.3%. Over that same time frame, absorption experienced a minimum of 2,685 units in 2015 and experienced a maximum of 9,076 units in 2018.
- Five-year forecasts demonstrate that absorption will be 3,184 units by the end of 2026, equivalent to a decline of 38.4% compared to the eleven-year average of 5,166 units.

## City West Submarket Synopsis

The subject is located in the City West submarket, as defined by REIS. To effectively gauge investor interest in the subject's submarket, we evaluate key supply and demand metrics in comparison to other areas for all classes of space in the following table.

## Chicago Submarket Overview (All Classes of Space)

| Submarket | Inventory (Units) | Asking Rent ($/Unit) | Vacancy (%) | Vacancy (Units) | Completions (Units) | Absorption (Units) |
|---|---|---|---|---|---|---|
| South Shore | 43,331 | $1,588 | 5.1% | 2,223 | 0 | 726 |
| Gold Coast | 41,878 | $3,001 | 7.4% | 3,115 | 866 | 667 |
| City West | 32,024 | $1,955 | 5.7% | 1,839 | 422 | 649 |
| Glenview/Evanston | 25,434 | $1,840 | 7.0% | 1,773 | 40 | 266 |
| Southwest Cook County | 23,902 | $1,050 | 1.8% | 432 | 0 | 49 |
| East Lake County | 23,307 | $1,395 | 3.6% | 844 | 0 | 418 |
| Lincoln Park | 23,066 | $1,571 | 5.1% | 1,183 | 0 | 43 |
| The Loop | 22,491 | $2,457 | 11.3% | 2,532 | 401 | 355 |
| Aurora/Naperville | 22,482 | $1,714 | 6.2% | 1,394 | 735 | 449 |
| Wheeling | 21,657 | $1,519 | 6.3% | 1,362 | 873 | 818 |
| Southeast Cook County | 20,113 | $1,221 | 3.0% | 603 | 0 | 21 |
| Schaumburg/Hoffman | 19,948 | $1,464 | 3.4% | 688 | 0 | 39 |
| Oak Park | 18,977 | $1,563 | 4.1% | 772 | 0 | 530 |
| Glendale Heights/Lombard | 18,034 | $1,872 | 5.4% | 976 | 467 | 254 |
| Glen Ellyn/Wheaton | 15,586 | $1,408 | 4.4% | 690 | 210 | 173 |
| Woodridge/Lisle | 14,773 | $1,395 | 3.3% | 488 | 0 | 148 |
| Palatine | 14,366 | $1,587 | 4.4% | 637 | 0 | 378 |
| Downers Grove | 13,824 | $1,584 | 3.4% | 474 | 0 | 33 |
| O'Hare | 13,131 | $1,303 | 4.3% | 564 | 0 | 451 |
| Kane County | 10,976 | $1,480 | 4.2% | 464 | 0 | 393 |
| Joliet | 10,033 | $1,329 | 3.3% | 331 | 0 | 282 |
| West Lake County | 5,670 | $1,515 | 2.9% | 163 | 0 | 15 |
| McHenry County | 5,410 | $1,314 | 2.6% | 142 | 0 | 7 |
| Market Totals/Averages | 460,413 | $1,614 | 5.1% | 23,689 | 4,014 | 7,164 |

Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- The City West submarket is the third-largest in inventory out of the 23 submarkets in the Chicago metro area. It contains 32,024 units, which represents 7.0% of the unit inventory.
- The submarket's asking rent is $1,955/unit, which is 21.1% greater than the metro area average of $1,614/Unit.

### Chicago Submarket Overview (All Classes of Space)



Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- The submarket's vacancy rate is 5.7%, which is greater than the average of 5.1% across the metro area.
- The submarket has vacancy averaging 1,839 units, which is 7.8% of the metro area total 23,689 units.
- The submarket has completions averaging 422 units, which is 10.5% of the metro area total 4,014 units.
- The submarket has absorption averaging 649 units, which is 9.1% of the metro area total 7,164 units.

When evaluated in comparison to the other submarkets in the area, City West receives the following ratings:

## City West Submarket Attribute Ratings

| Metric | Rating |
|---|---|
| Market Size/Stature | Average |
| Market Demand | Stable |
| Vacancy Trends | Stable |
| Threat of New Supply | Average |
| Rental Trends | Increasing |

## City West Submarket Trends and Analysis

Supply and demand statistics, for all classes of space in the City West submarket are presented in the following table.

## Chicago: City West Submarket Trends (All Classes of Space)

| Year | Inventory (Units) | Vacancy (Units) | Vacancy (%) | Completions (Units) | Absorption (Units) | Asking Rent ($/Unit) |
|---|---|---|---|---|---|---|
| 2011 | 22,675 | 2,165 | 9.5% | 202 | 534 | $1,060 |
| 2012 | 22,749 | 1,718 | 7.6% | 74 | 521 | $1,084 |
| 2013 | 23,325 | 1,574 | 6.7% | 576 | 720 | $1,120 |
| 2014 | 23,672 | 1,574 | 6.6% | 347 | 347 | $1,159 |
| 2015 | 24,496 | 1,627 | 6.6% | 824 | 771 | $1,253 |
| 2016 | 25,428 | 1,898 | 7.5% | 932 | 661 | $1,329 |
| 2017 | 26,877 | 2,495 | 9.3% | 1,449 | 852 | $1,536 |
| 2018 | 28,558 | 2,476 | 8.7% | 1,681 | 1,700 | $1,727 |
| 2019 | 29,708 | 2,167 | 7.3% | 1,150 | 1,459 | $1,863 |
| 2020 | 31,602 | 2,066 | 6.5% | 1,894 | 1,995 | $1,887 |
| 2021 | 32,024 | 1,839 | 5.7% | 422 | 649 | $1,955 |
| 2022 | 33,031 | 2,252 | 6.8% | 1,007 | 594 | $2,076 |
| 2023 | 33,722 | 2,476 | 7.3% | 691 | 467 | $2,170 |
| 2024 | 34,307 | 2,618 | 7.6% | 585 | 443 | $2,285 |
| 2025 | 34,570 | 2,742 | 7.9% | 263 | 139 | $2,395 |
| 2026 | 34,795 | 2,616 | 7.5% | 225 | 351 | $2,500 |
| 2011 - 2021 Avg. | 26,465 | 1,964 | 7.4% | 868 | 928 | $1,452 |

Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- The most recent data shows 422 units were added to the market. On average 868 units have been added to the market over the last eleven complete years and rose 108.9%. During the same period, completions reached a low of 74 units in 2012 and attained a high of 1,894 units in 2020.
- Looking forward, it is expected that in five years completions will show a decrease of 74.1% from the 11-year average of 868 units, representing a change of 643 units by year-end 2026.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.



## Supply and Demand Trends



Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

## Vacancy Rate vs. Asking Rent



Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- Vacancy rates are presently 5.7%. Over the past eleven complete years, vacancy rates had an annual average of 7.4% and declined 381 bps. During the same period, vacancy rates experienced a minimum of 5.7% in 2021 and fell from a maximum of 9.5% in 2011.
- Projecting five years into the future, vacancy rates will show an increase of 178 bps from the present amount of 5.7%.
- Currently, absorption is 649 units. During the past eleven complete years, absorption averaged 928 units annually and increased 21.5%. Over that same time frame, absorption experienced a minimum of 347 units in 2014 and attained a high of 1,995 units in 2020.
- Five-year forecasts demonstrate that absorption will be 351 units by the end of 2026, equivalent to a drop of 62.2% compared to the eleven-year average of 928 units.

## Chicago Construction Activity

The ensuing table contains a snapshot of proposed, planned, and under construction activity for all multi-family properties in the Chicago metro area.

### Chicago Multi-Family New Construction Overview

|  | Under Construction | | Planned | | Proposed | |
|---|---|---|---|---|---|---|
|  | Properties | Units | Properties | Units | Properties | Units |
| Chicago | 31 | 4,928 | 126 | 24,077 | 43 | 25,610 |
| Apartment | 23 | 4,471 | 94 | 17,299 | 27 | 15,820 |
| Condominiums | 6 | 218 | 12 | 940 | 4 | 749 |
| Mixed Income | 1 | 206 | 14 | 4,486 | 6 | 2,541 |
| Other | 0 | 0 | 3 | 452 | 0 | 0 |
| Townhomes | 1 | 33 | 2 | 100 | 1 | 100 |
| City West Submarket | 18 | 1,718 | 64 | 9,467 | 18 | 9,805 |
| Apartment | 12 | 1,498 | 45 | 5,197 | 10 | 3,865 |
| Condominiums | 5 | 187 | 7 | 316 | 1 | 6 |
| Mixed Income | 0 | 0 | 10 | 3,111 | 3 | 734 |
| Other | 0 | 0 | 1 | 43 | 0 | 0 |
| Townhomes | 1 | 33 | 0 | 0 | 0 | 0 |

Source: ©REIS Services, LLC 2022. Reprinted with the permission of REIS Services, LLC. Compiled by JLL Valuation & Advisory Services, LLC.

- There are a total of 200 properties of new supply in the Chicago market. This ranks seventh of the 87 markets covered by REIS for the Multi-Family property type.
- Of these, 31 are under construction, 126 are planned and 43 are proposed.
- As a percentage of total new construction units, under construction properties account for 9%, planned properties account for 44% and proposed properties account for 47% of the volume in the market.
- Considering the top three property subtypes as a percent of the total units of new supply, 69% are Apartment, 13% are Mixed Income and 3% are Condominiums.

## Chicago Construction Activity

The following table shows potential new supply within a radius of 2 miles around the subject property.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal

**Multi-Family New Construction, 2 Mi. Radius Around Subject**

| Name/Address | City/State | Submarket | Property Subtype | Mi. from Subj. | Units | Constr. Start | Constr. End |
|---|---|---|---|---|---|---|---|
| Under Construction: 8 Properties | | | | | 1,998 | | |
| CA6 Condos | Chicago, IL | City West | Condominiums | 1.0 | 72 | | Dec-22 |
| The Gateway Apartments | Chicago, IL | City West | Apartment | 1.1 | 161 | Mar-21 | May-22 |
| Madison and Carpenter | Chicago, IL | City West | Condominiums | 1.4 | 13 | | |
| Parq Fulton | Chicago, IL | City West | Apartment | 1.5 | 278 | | Apr-22 |
| EVO Union Park | Chicago, IL | City West | Apartment | 1.5 | 242 | | Apr-22 |
| 345 North Union | Chicago, IL | City West | Apartment | 1.8 | 373 | | |
| 1000M | Chicago, IL | The Loop | Apartment | 1.9 | 653 | | |
| Southbridge Ph 1 | Chicago, IL | South Shore | Mixed Income | 1.9 | 206 | Aug-20 | Jun-22 |
| Planned: 50 Properties | | | | | 11,533 | | |
| 1257 West Roosevelt Road | Chicago, IL | City West | Apartment | 0.3 | 70 | | |
| 1357 West Roosevelt Road | Chicago, IL | City West | Apartment | 0.3 | 70 | | |
| 1002 South Racine Avenue | Chicago, IL | City West | Apartment | 0.4 | 67 | | |
| 1900 West 17th Street | Chicago, IL | City West | Apartment | 0.8 | 11 | | |
| 1061 West Van Buren | Chicago, IL | City West | Apartment | 1.0 | 351 | | |
| 1050 West Van Buren | Chicago, IL | City West | Apartment | 1.0 | 201 | | |
| Residential Tower | Chicago, IL | City West | Apartment | 1.1 | 90 | | |
| Atrio Ph 3 | Chicago, IL | City West | Apartment | 1.1 | 120 | | |
| 1026 West Jackson Boulevard | Chicago, IL | City West | Apartment | 1.1 | 72 | | |
| 133 South Ashland Avenue | Chicago, IL | City West | Apartment | 1.2 | 89 | | |
| Atrio Ph 2 | Chicago, IL | City West | Apartment | 1.2 | 279 | | Nov-23 |
| 812 West Adams Street | Chicago, IL | City West | Apartment | 1.3 | 80 | | |
| 37 South Sangamon Street | Chicago, IL | City West | Condominiums | 1.3 | 80 | | |
| Embry | Chicago, IL | City West | Condominiums | 1.4 | 58 | | |
| 1227 W Washington Boulevard | Chicago, IL | City West | Mixed Income | 1.4 | 288 | | |
| 1325 West Randolph Street | Chicago, IL | City West | Apartment | 1.4 | 430 | | |
| Station Square | Libertyville, IL | East Lake County | Apartment | 1.5 | 90 | | |
| Hamilton Multi Residential | Chicago, IL | City West | Apartment | 1.5 | 6 | | |
| River Beech Tower | Chicago, IL | The Loop | Apartment | 1.5 | 300 | | |
| Lincoln Yards South South Riverfront District | Chicago, IL | City West | 0 | 1.5 | 800 | | |
| Amylu Collection | Chicago, IL | City West | Mixed Income | 1.5 | 484 | | |
| The 78 Ph 1 | Chicago, IL | The Loop | Apartment | 1.5 | 400 | | |
| 166 North Aberdeen | Chicago, IL | City West | Apartment | 1.5 | 224 | | Feb-23 |
| 140 North Ashland Aveune | Chicago, IL | City West | Apartment | 1.6 | 210 | | |
| 160 North Morgan Street | Chicago, IL | City West | Mixed Income | 1.6 | 282 | | |
| 906 West Randolph Street | Chicago, IL | City West | Apartment | 1.6 | 300 | | |
| 2127 West Madison Street | Chicago, IL | City West | Apartment | 1.6 | 40 | | |
| 210 North Aberdeen Street | Chicago, IL | City West | Apartment | 1.6 | 414 | | |
| Riverline Chicago Ph 2 | Chicago, IL | The Loop | Apartment | 1.6 | 300 | | |
| Riverline Chicago Future Phases | Chicago, IL | The Loop | Apartment | 1.6 | 298 | | |
| 725 West Randolph | Chicago, IL | City West | Apartment | 1.6 | 370 | | |
| Bell Avenue Residential Development | Chicago, IL | City West | Apartment | 1.6 | 9 | | |
| 1201 West Fulton Market | Chicago, IL | City West | Mixed Income | 1.6 | 433 | | |
| 633 South LaSalle | Chicago, IL | Gold Coast | Other | 1.6 | 381 | | |
| 210 North Morgan Street | Chicago, IL | City West | Mixed Income | 1.6 | 204 | | |
| 2139 West Madison Street | Chicago, IL | City West | Apartment | 1.6 | 48 | | |
| Ogden Commons Future Phases | Chicago, IL | City West | Mixed Income | 1.7 | 221 | | |
| 1300 West Carroll Avenue Ph 1 | Chicago, IL | City West | Apartment | 1.7 | 388 | | |
| 629 West Lake Street | Chicago, IL | The Loop | Apartment | 1.7 | 49 | | |
| Big Deahl Apartments Ph 1 | Chicago, IL | Gold Coast | Apartment | 1.9 | 162 | | |
| 4301 North Milwaukee | Chicago, IL | City West | Condominiums | 1.9 | 9 | | |
| 3204 North Lawndale Avenue | Chicago, IL | City West | Apartment | 1.9 | 11 | | |
| The Reed | Chicago, IL | The Loop | Apartment | 1.9 | 440 | | Aug-23 |
| 1233 West Pratt Boulevard | Chicago, IL | Rogers Park/Uptown | Apartment | 1.9 | 78 | | |
| 160 North Elizabeth Street | Chicago, IL | City West | Apartment | 1.9 | 383 | | |
| 4050 North Hermitage Avenue | Chicago, IL | City West | Apartment | 1.9 | 19 | | |
| 336 East Pershing Road | Chicago, IL | South Shore | Apartment | 1.9 | 49 | | |
| Big Deahl Apartments Ph 2 | Chicago, IL | Gold Coast | Apartment | 1.9 | 327 | | |
| 525 South Wabash Avenue | Chicago, IL | The Loop | Apartment | 1.9 | 777 | | |
| Southbridge Ph 2 & 3 | Chicago, IL | South Shore | Mixed Income | 1.9 | 671 | | |
| Proposed: 14 Properties | | | | | 5,188 | | |
| The Gladys Apartments | Chicago, IL | The Loop | Apartment | 1.4 | 69 | | |
| Union Station Redevelopment Phase 1 - Apartments | Chicago, IL | The Loop | Apartment | 1.5 | 404 | | |
| 625 West Monroe Street | Chicago, IL | The Loop | Apartment | 1.6 | 1,053 | | |
| Bridgford Foods | Chicago, IL | City West | Apartment | 1.6 | 275 | | |
| 1245 West Fulton Market | Chicago, IL | City West | Mixed Income | 1.6 | 350 | May-22 | |
| 1300 West Carroll Avenue Ph 2 | Chicago, IL | City West | Apartment | 1.7 | 633 | | |
| 14th & Wabash | Chicago, IL | South Shore | Apartment | 1.7 | 292 | | |
| 1112 West Carroll Avenue | Chicago, IL | City West | Mixed Income | 1.7 | 377 | Jun-22 | Jun-24 |
| Printer's Row Parking Lot | Chicago, IL | The Loop | Apartment | 1.8 | 170 | | |
| 375 North Morgan Street | Chicago, IL | City West | Apartment | 1.8 | 400 | | |
| 640 West Washington Boulevard | Chicago, IL | The Loop | Apartment | 1.9 | 413 | | |
| 1713 West Sunnyside Avenue | Chicago, IL | Rogers Park/Uptown | Apartment | 1.9 | 70 | | |
| One Grant Park Ph 2 | Chicago, IL | South Shore | Condominiums | 1.9 | 648 | | |
| 2548 South Federal Street | Chicago, IL | South Shore | Apartment | 2.0 | 34 | | |
| **Total Properties: 72** | | | | **Total Units** | **18,719** | | |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

- There are a total of 72 properties of potential new supply within a 2-mile radius around the subject.
- Of these, 8 are under construction, 50 are planned and 14 are proposed, according to REIS.
- As a percentage of total new construction units, under construction properties account for 11%, planned properties account for 62% and proposed properties account for 28% of the volume in a 2-mile radius.
- Considering the top three property subtypes as a percent of the total units of new supply, 70% are Apartment, 18% are Mixed Income and 5% are Condominiums.

## Multi-Family Market Summary and Conclusions

A summary of vacancy rates across various market segments analyzed is shown in the ensuing table:

### Vacancy Rate Summary

| Market Segment | Vacancy Rate |
| --- | --- |
| Chicago Metro Area | 5.1% |
| City West Submarket Area | 5.7% |

Based on influential overall market and submarket area trends, construction outlook, and the performance of competing properties, JLL expects the mix of property fundamentals and economic conditions in the Chicago metro area to have a neutral impact on the subject property's performance in the near-term.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Surrounding Area Analysis

## Boundaries

The subject is located in the South Chicago submarket, which is generally bound as follows:

North    W Ida B. Wells Drive

South    East 138th Street

East      South Lake Shore Drive

West     South Harlem Avenue

## Surrounding Demographics

A snapshot of the surrounding area demographics, including population, households, and income data, is displayed in the following table.

### Surrounding Area Demographics

|  | 1 mi. radius | 3 mi. radius | 5 mi. radius | Cook County | Chicago MSA | Illinois | United States |
|---|---|---|---|---|---|---|---|
| **Population** | | | | | | | |
| 2010 | 42,173 | 398,043 | 949,932 | 5,194,675 | 9,461,105 | 12,830,632 | 308,745,538 |
| 2021 | 43,737 | 443,325 | 1,004,143 | 5,149,152 | 9,506,045 | 12,762,130 | 333,934,112 |
| 2026 | 44,718 | 458,410 | 1,017,218 | 5,097,773 | 9,498,830 | 12,665,480 | 345,887,495 |
| Compound Chg 2010 - 2021 | 0.33% | 0.98% | 0.51% | -0.08% | 0.04% | -0.05% | 0.72% |
| Compound Chg 2021 - 2026 | 0.44% | 0.67% | 0.26% | -0.20% | -0.02% | -0.15% | 0.71% |
| Density | 13,933 | 15,683 | 12,787 | 5,447 | 1,321 | 230 | 95 |
| **Households** | | | | | | | |
| 2010 | 16,346 | 167,441 | 382,672 | 1,966,356 | 3,475,726 | 4,836,972 | 116,716,292 |
| 2021 | 17,157 | 195,835 | 418,544 | 1,977,385 | 3,536,711 | 4,872,625 | 126,470,675 |
| 2026 | 17,590 | 205,862 | 428,721 | 1,965,408 | 3,545,004 | 4,849,536 | 131,047,364 |
| Compound Chg 2010 - 2021 | 0.44% | 1.43% | 0.82% | 0.05% | 0.16% | 0.07% | 0.73% |
| Compound Chg 2021 - 2026 | 0.50% | 1.00% | 0.48% | -0.12% | 0.05% | -0.09% | 0.71% |
| **Other Demographics** | | | | | | | |
| Med. Household Income | $54,702 | $81,250 | $72,765 | $69,476 | $76,081 | $68,663 | $64,730 |
| Avg. Household Size | 2.4 | 2.1 | 2.3 | 2.6 | 2.6 | 2.6 | 2.6 |
| College Graduate % | 51.7% | 56.1% | 49.9% | 40.9% | 39.8% | 36.3% | 33.6% |
| Median Age | 31 | 34 | 33 | 37 | 38 | 38 | 39 |
| Owner Occupied % | 27% | 34% | 36% | 57% | 65% | 66% | 65% |
| Renter Occupied % | 73% | 66% | 64% | 43% | 35% | 34% | 35% |
| Med. Home Value | $344,615 | $376,722 | $361,396 | $275,460 | $267,259 | $225,007 | $264,021 |

Source: Esri 2022. Compiled by JLL Valuation & Advisory Services, LLC.

As illustrated above, the current population within a three-mile radius of the subject is 443,325, and the average household size is 2.1. Population in the area has risen since the 2010 census, and this trend is expected to continue in the ensuing five years. Despite the population growth within a three-mile radius, it is estimated the Chicago MSA overall will remain steady.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Median household income is $81,250, which is higher than the household income for the Chicago MSA as a whole. The populace within a three-mile radius has a notably higher level of formal college education than residents in the Chicago MSA, and median home values in the area are also substantially higher.

## Demand Generators

Major employers in the area include U.S. Government, Chicago Public Schools, and City of Chicago. The closest major commercial corridors to the subject are W Taylor Street and W 18th Street, providing an above average supporting retail and entertainment services. Development activity in the immediate area has been increasing in recent years with the majority of new construction dedicated towards industrial uses. One notable project to come online in recent years is 1432 S Clinton St. This development, constructed in 2020, features a 176,000 square foot industrial building. Looking forward, development activity is expected to remain steady as there are several projects under construction or proposed for development. Finally, the subject has an above average area linkages providing access to Chicago MSA job centers and surrounding commercial districts.

## Access and Linkages

Interstate 290 West provides access to the subject from the greater Chicago metro area. The subject has an above average access to public transportation including bus. The nearest bus stop is located at Roosevelt & Laflin, which is within a 2-minute walk from the subject. Additionally, the subject has a walk score of 82 indicating an above average walkability factor. The subject is most commonly accessed via bus.

The nearest commercial airport is Chicago Midway International Airport and is located within 7.7 miles of the subject property.

## Safety and Support Services

The nearest police and fire stations are within 0.6 and 0.7 miles, respectively.

## Outlook and Conclusion

The subject's area has experienced recent employment growth and construction activity has been strong contributing to our conclusion that the subject's area is in the stable stage of its life cycle.

Addams Medill Park Real Estate Appraisal

## Surrounding Area Map



Addams Medill Park Real Estate Appraisal

# Property Description

## Site Description

### Aerial Map



The subject property is outlined in yellow in the aerial above.

## Land Summary

| Parcel ID | Gross Land Area (Acres) | Gross Land Area (Sq Ft) | Usable Land Area (Acres) | Usable Land Area (Sq Ft) | Topography | Shape |
|---|---|---|---|---|---|---|
| 1720100042 | 0.91 | 39,640 | 0.91 | 39,640 | Level | Rectangular |
| 1720100043 | 0.28 | 12,197 | 0.28 | 12,197 | Level | Square |
| 1720101039 | 0.97 | 42,253 | 0.97 | 42,253 | Level | Rectangular |
| 1720104047 | 2.64 | 114,998 | 2.64 | 114,998 | Level | Rectangular |
| 1720104048 | 1.12 | 48,787 | 1.12 | 48,787 | Level | Rectangular |
| 1720104049 | 1.20 | 52,272 | 1.20 | 52,272 | Level | Rectangular |
| 1720105020 | 0.07 | 3,049 | 0.07 | 3,049 | Level | Rectangular |
| 1720105021 | 0.05 | 2,178 | 0.05 | 2,178 | Level | Rectangular |
| 1720105022 | 0.06 | 2,614 | 0.06 | 2,614 | Level | Rectangular |
| 1720105023 | 0.05 | 2,178 | 0.05 | 2,178 | Level | Rectangular |
| 1720105024 | 0.07 | 3,049 | 0.07 | 3,049 | Level | Rectangular |
| 1720105025 | 0.05 | 2178 | 0.05 | 2178 | Level | Rectangular |
| 1720105026 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105027 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105028 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105029 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105030 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105031 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105032 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105033 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105034 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720105045 | 1.31 | 57,064 | 1.31 | 57,064 | Level | Irregular |
| 1720108044 | 2.60 | 113,256 | 2.60 | 113,256 | Level | Rectangular |
| 1720109021 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109022 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109023 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109024 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109025 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109026 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109027 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109028 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109029 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109030 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109031 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109032 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved. 36

## Land Summary - Continued

| Parcel ID | Area (Acres) | Area (Sq Ft) | Area (Acres) | Area (Sq Ft) | Topography | Shape |
|---|---|---|---|---|---|---|
| 1720109033 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109034 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109035 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109001 | 0.18 | 7,841 | 0.18 | 7,841 | Level | Rectangular |
| 1720109002 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109003 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109004 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109005 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109006 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109007 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109008 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109009 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109010 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109011 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109012 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109013 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720109014 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720112040 | 0.87 | 37,897 | 0.87 | 37,897 | Level | Irregular |
| 1720112041 | 1.58 | 68,825 | 1.58 | 68,825 | Level | Irregular |
| 1720113001 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113002 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113003 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113004 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113005 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113006 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113007 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113008 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113009 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113010 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113011 | 0.45 | 19,602 | 0.45 | 19,602 | Level | Rectangular |
| 1720113012 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113013 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113014 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113015 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113016 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113017 | 0.18 | 7,841 | 0.18 | 7,841 | Level | Rectangular |
| 1720113018 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113019 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720113020 | 0.09 | 3,920 | 0.09 | 3,920 | Level | Rectangular |
| 1720116046 | 1.83 | 79,715 | 1.83 | 79,715 | Level | Irregular |
| 1720-113-045 | 2.41 | 104,980 | 2.41 | 104,980 | Level | Irregular |
| **Totals** | **23.83** | **902,999** | **23.83** | **834,174** | | |

Source: Public Records

## Land Description

| | |
|---|---|
| Shape | Rectangular |
| Average Depth (Feet) | 125 |
| Average Width (Feet) | 321 |
| Corner Location | Yes |
| Primary Street Frontage | W Washburne Ave |
| Access Rating | Average |
| Visibility Rating | Average |
| Functional Utility | Average |
| Topography | The subject has level topography at grade and no areas of wetlands. |
| Landscaping | The subject has average landscaping. |
| Drainage | No drainage problems were observed or disclosed to us during our inspection. This appraisal assumes that surface water collection is adequate. |
| Soil Conditions | Adequate for development |
| Wetlands/Watershed | No wetlands were observed during our site inspection. |
| Flood Zone Designation | X |
| Flood Zone | The subject is outside the 500-year flood plain. The appraiser is not an expert in this matter and is reporting data from FEMA maps. |
| FEMA Map Number | 17031C0506J |
| FEMA Map Date | 8/19/2008 |
| Utilities | All public utilities are available to the site including public water and sewer, gas, electric, and telephone. |
| Utilities Adequacy | The subject's utilities are typical and adequate for the market area. |

## Environmental Hazards

An environmental assessment was not provided for review. No environmental hazards were apparent from inspection, and it is assumed the Subject is free and clear of any environmental hazards including, without limitation, hazardous waste, toxic substances and mold.

## Zoning Summary

| | |
|---|---|
| Zoning Jurisdiction | City of Chicago |
| Zoning Code | PD 896 - Subarea A-5 |
| Zoning Description | Planned Development 896 |
| Permitted Uses | A variety of residential and intuitional uses such as detached housing, townhouses, multi-unit residential, group living, public and civic uses, small-scale lodging, and educational uses. |
| Zoning Density/FAR | 1.10 |
| Actual Density of Use | 0.00 |
| Current Use Legally Conforming | The subject is a legal and conforming use. |
| Zoning Change Likely | A zoning change is unlikely. |
| Maximum Building Height | 35 feet and 45 feet |
| Maximum Site Coverage | Per site plan approval |
| Set Back Distance (Feet) | 10 feet |
| Side Yard Distance (Feet) | 5 feet |
| Rear Yard Distance (Feet) | 30 feet |
| Other Land Use Regulations | We are not aware of any other land use regulations that would affect the property. |
| Zoning Comments | We are not aware of any other land use regulations that would affect the property. |
| Source | City of Chicago Department of Planning and Development |

According to the local planning department, there are no pending or prospective zoning changes.

We are not experts in the interpretation of zoning ordinances. An appropriately qualified land use attorney should be engaged if a determination of compliance is required.

At the request of the client, we have valued the subject to its highest and best use with the current zoning, as well as subject to the customary Chicago Housing Authority development restrictions. The following paragraph contains the permitted uses for the subject.

The following uses shall be permitted at the Project: office, indoor and outdoor participant sports and recreation, entertainment and spectator sports (small, medium, and large venues), and indoor special event including incidental liquor sales where permitted by law, parks and recreation, restaurants (limited, general, and outdoor patios located at grade level), retail sales, single-family, two-flat, townhouse, and multi-unit residential units, group living, food and beverage retail sales, co-located wireless communication facilities; accessory parking, accessory uses (including medical and personal services provided to users of the Project, on-premises and sponsorship and sponsorship recognition signage, and such other uses permitted by law and permitted pursuant to the Proposed PD. The sale of CBD products and package liquors is not permitted on the

Property or Phase II Properties. Massage parlors, tanning facilities, automotive repair facilities, and casinos and the sale of second-hand goods by a pawnbroker are not permitted on the Property or Phase II Properties. To the extent permitted by law, the Project may permit off-site betting and gambling facilities, including incidental legal lottery sales.

## Encumbrance/Easements/Restrictions

We were not provided a current title report to review. We are not aware of any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## Overall Site Utility

Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses including those permitted by zoning.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Survey



## Assessment and Taxes

Real estate taxes are administered by Cook County and are estimated by jurisdiction on a county basis for the subject. Real estate taxes in this state and this jurisdiction represent ad valorem taxes, meaning a tax applied in proportion to value. The real estate taxes for an individual property may be determined by multiplying the assessed value for a property by the equalization factor and then multiplying the equalized value by the composite rate. The composite rate is based on a consistent state tax rate throughout this state, in addition to one or more local taxing district rates.

The Cook County Assessor assesses commercial properties at 25% of market value effective for the 2010 tax year and after. The Cook County Assessor assesses residential and vacant land properties at 10% of market value effective for the 2010 tax year and after. The equalization factor for the 2020 Payable 2021 tax year is 3.2234. We note the equalization factor increased approximately 10.5% since the 2019 Payable 2020 tax year equalization rate of 2.9160.

Please note that as the subject is owned by the Chicago Housing Authority, the parcels are tax exempt.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Highest and Best Use

Highest and best use may be defined as the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.

- **Legally Permissible**: What uses are permitted by zoning and other legal restrictions?
- **Physically Possible**: To what use is the site physically adaptable?
- **Financially Feasible**: Which possible and permissible use will produce any net return to the owner of the site?
- **Maximally Productive**: Among the feasible uses which use will produce the highest net return, (i.e., the highest present worth)?

## Highest and Best Use of the Site

### Legally Permissible

The site is zoned PD 896 - Subarea A-5, Planned Development 896. To our knowledge, there are no legal restrictions such as easements or deed restrictions that would effectively limit the use of the property. Given prevailing land use patterns in the area, only commercial/multifamily use is given further consideration in determining highest and best use of the site, as though vacant.

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for commercial/multifamily use in the subject's area. It appears that a newly developed commercial/multifamily use on the site would have a value commensurate with its cost. Therefore, commercial/multifamily use is considered to be financially feasible.

### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than commercial/multifamily use. Accordingly, it is our opinion that commercial/multifamily use, developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

### Conclusion

Development of the site for commercial/multifamily use is the only use that meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as if vacant.

## Highest and Best Use as Improved

No improvements are situated on the subject. Therefore, a highest and best analysis as improved is not applicable.

## Most Probable Buyer

Taking into account the functional utility of the site and area development trends, the probable buyer is a developer.

# Valuation Methodology

Three basic approaches may be applicable and utilized, then reconciled to arrive at an estimate of market value. An approach to value is included or eliminated based on its applicability to the property type being valued and the information available. The reliability of each approach depends on the availability and comparability of market data as well as the motivation and thinking of purchasers. Applicable approaches and whether or not they were utilized are summarized below:

## Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciation from physical, functional and external causes. The land value, entrepreneurial profit and depreciated improvement costs are then added, resulting in indication of value.

## Sales Comparison Approach

The Sales Comparison Approach compares sales of similar properties with the subject property. Each comparable sale is adjusted for its inferior or superior characteristics. The values derived from the adjusted comparable sales form a range of value for the subject. A gross income multiplier and / or effective gross income multiplier may also be analyzed. By process of correlation and analysis, a final indicated value is derived.

## Income Approach

In the Income Capitalization Approach the income-producing capacity of a property is estimated by using contract rents on existing leases and by estimating market rent from rental activity at competing properties for the vacant space. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Yield Capitalization Method. In this method periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted to a present value using a discount rate or an internal rate of return.

The Income Approach converts the anticipated flow of future benefits (income) to a present value estimate through a capitalization and or a discounting process.

## Final Reconciliation

The appraisal process concludes with the Final Reconciliation of the values derived from the approaches applied for a single estimate of market value. Different properties require different means of analysis and lend themselves to one approach over the others.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Analyses Applied

Applicability and utilization of the approaches in this assignment is described as follows.

| Approach | Description | Applicability | Utilization |
|---|---|---|---|
| Cost | A cost approach is most applicable in valuing new or proposed construction when the improvements represent the highest and best use of the land and the land value, cost new and depreciation are well supported. | Not Applicable | Not Utilized |
| Sales Comparison | A sales approach is most applicable when sufficient data on recent market transactions is available and there is an active market for the property type. | Applicable | Utilized |
| Income | An income approach is most applicable when the subject is an income producing property or has the ability to generate income in the future as an investment. | Not Applicable | Not Utilized |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Hypothetical Land Valuation – As If Unrestricted

The subject's land value has been developed via the sales comparison approach.

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. This approach compares sales of similar properties with the subject property. Each comparable sale is adjusted for its inferior or superior characteristics. The values derived from the adjusted comparable sales form a range of value for the subject. By process of correlation and analysis, a final indicated value is derived.

We have researched comparables for this analysis, which are documented on the following pages followed by a location map and analysis grid. All sales have been researched through numerous sources and, when possible, verified by a party to the transaction.

In researching comparable land sales, we searched for residential or mixed-use land sales greater than 5 acres across comparable areas near the Chicago CBD over the past five years. As the subject is in a highly developed area, there were no available residential or mixed-use land sales that were comparable. We then expanded our search parameters to include sales of other zoning classifications, and adjusted for the zoning based on our conversations with market participants. The primary buyers of large land sites similar to the subject have been industrial developers, which is reflected in our comparable selection.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

Addams Medill Park Real Estate Appraisal

## Land Sales Summary

| No. | Name;<br>Address | Sale Date;<br>Status;<br>Prop. Rights | Square Feet;<br>Acres | Zoning | Utilities | Topography;<br>Shape;<br>Flood Zone | Sale Price;<br>Effective Price | $/SF;<br>$/Acre |
|---|---|---|---|---|---|---|---|---|
| 1 | 2750 W 35th Street<br>2750 W 35th Street<br>Chicago, IL 60632 | 9/14/2021<br>Closed Sale<br>Fee Simple | 370,260<br>8.50 | Industrial | All to site | Level<br>Irregular<br>X | $7,191,000<br>$7,191,000 | $19.42<br>$846,000 |

Sale Comments: This is an industrial land sale. The property was marketed as a development site for a distribution facility.

| 2 | 2500 S Corbett Street<br>2500 S Corbett Street<br>Chicago, IL 60608 | 4/6/2021<br>Closed Sale<br>Fee Simple | 516,622<br>11.86 | Industrial | All to site | Level<br>Irregular<br>X | $13,500,000<br>$13,500,000 | $26.13<br>$1,138,280 |

Sale Comments: This is the sale of an 11.86-acre lot that was zoned for an industrial use. The property was previously improved with several industrial buildings. However, these buildings were demolished in 2011 leaving an open lot. Prologis purchased the property and plans to develop a 112,000-square foot distribution facility on the site, slated to deliver in 2022.

| 3 | 3700 S Morgan Street<br>3700 S Morgan Street<br>Chicago, IL 60609 | 3/30/2021<br>Closed Sale<br>Fee Simple | 484,823<br>11.13 | Industrial | All to site | Level<br>Rectangular<br>X | $8,250,000<br>$8,250,000 | $17.02<br>$741,240 |

Sale Comments: This is the sale of an 11.13-acre industrial land site. The previously existing industrial improvements had been demolished prior to the sale. The buyer, IDI Logistics, purchased the property to construct a 178,850-square foot distribution

| 4 | Illinois Brick Yard #47<br>2217 S. Loomis Avenue<br>Chicago, IL 60608 | 1/12/2021<br>Closed Sale<br>Fee Simple | 565,409<br>12.98 | PMD-11 | All Available | Level<br>Irregular<br>X | $10,500,000<br>$10,500,000 | $18.57<br>$808,937 |

Sale Comments: On January 12th, 2021 the 12.98 acre parcel of land sold for $10,500,000. The property was previously owner occupied by the Illinois Brick Company and sold as a value add opportunity to an investor. At the time of sale there was a 65,965 square foot industrial building located on the property that was available for lease. However, the buyer, Dayton Street Partners LLC, is a development firm that will likely redevelop the site. No plans have for the site have been released. We have estimated

| S | **Addams Medill Park**<br>**1301 W 14th Street**<br>**Chicago, IL 60608**<br>**Cook** | | **1,038,035**<br>**23.83** | **PD 896** | | **Level**<br>**Rectangular**<br>**X** | | |

*If applicable, prices per SF/unit and capitalization rates and/or income multipliers based on effective sale price.

## Land Sales Map



| No. | Name | Location | Miles From Subject | SF | Price/SF |
|---|---|---|---|---|---|
| 1 | 2750 W 35th Street | Chicago, IL | 2.8 | 370,260 | $19.42 |
| 2 | 2500 S Corbett Street | Chicago, IL | 1.1 | 516,622 | $26.13 |
| 3 | 3700 S Morgan Street | Chicago, IL | 2.6 | 484,823 | $17.02 |
| 4 | Illinois Brick Yard #47 | Chicago, IL | 0.8 | 565,409 | $18.57 |
| S | Addams Medill Park | Chicago, IL | | 1,038,035 | |

## Analysis and Adjustment of Sales

On the following page is a sales comparison grid displaying the subject property, the comparables and the adjustments applied.

## Land Grid

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| Name | Addams Medill Park | 2750 W 35th Street | 2500 S Corbett Street | 3700 S Morgan Street | Illinois Brick Yard #47 |
| Address | 1301 W 14th Street | 2750 W 35th Street | 2500 S Corbett Street | 3700 S Morgan Street | 2217 S. Loomis Avenue |
| City | Chicago | Chicago | Chicago | Chicago | Chicago |
| County | Cook | Cook | Cook | Cook | Cook |
| State | IL | IL | IL | IL | IL |
| Date | May-2022 | Sep-2021 | Apr-2021 | Mar-2021 | Jan-2021 |
| Price | | $7,191,000 | $13,500,000 | $8,250,000 | $10,500,000 |
| Price Adjustment | | $0 | $0 | $0 | $0 |
| Adjusted Price | | $7,191,000 | $13,500,000 | $8,250,000 | $10,500,000 |
| Acres | 23.83 | 8.50 | 11.86 | 11.13 | 12.98 |
| Land SF | 1,038,035 | 370,260 | 516,622 | 484,823 | 565,409 |
| Land SF Unit Price | | $19.42 | $26.13 | $17.02 | $18.57 |
| FAR | 1.10 | 3.00 | 1.00 | 1.20 | 3.00 |
| Flood Zone | X | X | X | X | X |
| Zoning | PD 896 | M2-3 | PMD 1485 A | PMD 8 A | PMD-11 |
| Shape | Rectangular | Irregular | Irregular | Rectangular | Irregular |
| Topography | Level | Level | Level | Level | Level |
| Transaction Adjustments | | | | | |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| % Adjustment | | – | – | – | – |
| Financing | | Conventional | Conventional | Conventional | Cash to Seller |
| % Adjustment | | – | – | – | – |
| Conditions of Sale | | Normal | Normal | Normal | None |
| % Adjustment | | – | – | – | – |
| Market Trends Through | May-22  3.0% | 2% | 3% | 3% | 4% |
| Adjusted Land SF Unit Price | | $19.79 | $26.97 | $17.58 | $19.30 |
| Location | | 15% | 15% | 15% | 15% |
| Access/Exposure | | -10% | -10% | -10% | -10% |
| Size | | -5% | -5% | -5% | -5% |
| Shape/Topography | | – | – | – | – |
| Zoning | | 20% | 20% | 20% | 20% |
| Flood Zone | | – | – | – | – |
| Utilities | | – | – | – | – |
| Entitlements | | – | – | – | – |
| Adjusted Land SF Unit Price | | $23.75 | $32.37 | $21.09 | $23.16 |
| Net Adjustments | | 22% | 24% | 24% | 25% |
| Gross Adjustments | | 52% | 53% | 53% | 54% |

| Summary Indicators | Range | Average | Median |
|---|---|---|---|
| Comparables - Unadjusted | $17.02 - $26.13 | $20.28 | $19.00 |
| Comparables - Adjusted | $21.09 - $32.37 | $25.09 | $23.45 |

**Reconciled Unit Value: $27.00**

## Comparable Land Sale Adjustments

### Property Rights

No adjustments for real property rights were required.

### Financing

No adjustments for financing terms were required.

### Conditions of Sale

No adjustments for conditions of sale were required.

### Expenditures After Sale

No adjustments for expenditures after sale were required.

### Economic Trends

The land sales took place from January 2021 to September 2021. Market conditions generally have been strengthening over this period through the effective date of value. As a result, we apply upward adjustments of 3.0% per year to account for this trend.

### Location

All four comparables have been adjusted upward due to their inferior location when compared to the subject property. Please note that our location adjustments take into consideration the highest and best use of the subject, which is as a multifamily/mixed-use development. As such, the sites that are considered superior for industrial use are adjusted downward for their inferior locations for multifamily/mixed-use developments.

### Access/Exposure

All four comparables have been adjusted downward due to their superior access/exposure when compared to the subject property.

### Size

All four comparables have been adjusted downward due to their smaller size when compared to the subject property.

### Shape/Topography

No adjustments for shape/topography were required.

### Zoning

All four comparables have been adjusted upward due to their inferior zoning when compared to the subject property.

### Flood Zone

No adjustments for flood zone status were required.

### Utilities

No adjustments for utilities were required.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Entitlements

No adjustments for entitlements were required.

In addition to the comparables presented above, we are also aware of the City of Chicago's recent purchase 6.3 acres of vacant land in Pilsen on the 1600 and 1700 block of South Peoria Street. The property consists of former industrial land that was purchased in March 2022 for $12 million, or $43.73 per square foot. The Chicago Department of Housing will spend an additional $1.5 million on environmental remediation, which will increase the cost basis for the land to $13.5 million, or $49.19 per square foot. The City of Chicago plans to partner with a developer to develop a series of mixed-use projects that could include more than 280 affordable residential units.

This site is considered to be superior to the subject in terms of location, as the Pilsen neighborhood has seen superior growth to the subject's neighborhood over the past three years, and as a smaller site, the price per square foot would generally be higher than a larger site such as the subject. Nevertheless, this recent transaction reflects the most similar land site in terms of size and development potential to the subject, and is considered to represent the upper end of the range of reasonableness for the subject.

## Land Valuation Conclusion

All of the value indications have been considered, and in the final analysis, a value at the upper end of the range is considered reasonable given the subject's size and development potential.

## Land Value Reconciliation

| Premise | Value |
|---|---|
| Hypothetical As Is | May 3, 2022 |
| Indicated Value per Land SF | $27.00 |
| Subject Land SF | 1,038,035 |
| Indicated Value | $28,026,940 |
| **Rounded Value** | **$28,000,000** |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Hypothetical Ground Rent Analysis

To estimate market rent, we analyze comparable rentals most relevant to the subject in terms of location, building class, size, and transaction date. As there have been no recent ground leases for mixed-use development sites such as the subject, we have researched the rates of return that are required for land lease investments in the subject's market, and derived our ground rent calculation from the concluded market value of the subject. The following table contains market information regarding the cap rates attributable to ground lease transactions and market participant surveys.

## Cap Rate Analysis

| Realty Rates | Min | Max | Average | |
|---|---|---|---|---|
| Apartments | 2.04% | 8.87% | 6.00% | |
| Health Care/Senior Housing | 2.26% | 10.06% | 6.55% | |
| Office | 2.26% | 9.26% | 6.06% | |
| Restaurant | 2.65% | 14.54% | 7.87% | |
| Retail | 2.26% | 10.46% | 6.47% | |
| All Properties | 2.04% | 16.16% | 7.01% | |

| Boulder Group | Q1 2021 | | Q1 2022 | |
|---|---|---|---|---|
| Bank of America | 5.00% | | 4.60% | |
| Chase Bank | 4.60% | | 4.25% | |
| PNC Bank | 4.97% | | 4.65% | |
| TD Bank | 4.40% | | 4.25% | |
| Other Banks | 5.25% | | 4.80% | |
| All Bank Ground Leases | 4.90% | | 4.72% | |

| Cap Rate Comparables | City | Price PSF | Date | Cap Rate |
|---|---|---|---|---|
| Chase Ground Lease | Chicago | $104.94 | Dec-2021 | 5.69% |
| CIBC Ground Lease | Chicago | $54.52 | Feb-2021 | 4.73% |
| 737 N LaSalle | Chicago | $143.48 | Apr-2019 | 6.00% |
| Bank of America Ground Lease | Chicago | $564.89 | Apr-2018 | 5.22% |

| Source | Min | Max | Average | Median |
|---|---|---|---|---|
| Realty Rates | 2.04% | 16.16% | 6.66% | 6.51% |
| Boulder Group | 4.25% | 4.80% | 4.55% | 4.63% |
| Cap Rate Comparables | 4.73% | 6.00% | 5.41% | 5.46% |

| JLL Projection | 5.00% |
|---|---|

As previously noted, there have been no recent ground leases for comparable projects in the Chicago market. The cap rate comparables represent ground leased commercial properties in the Chicago market, while the surveys reflect the spread between cap rates for commercial properties and mixed-use or multifamily properties. Based on the survey data, we conclude to a cap rate of 5.00%, which is generally in line with the cap rate comparables and Boulder Group survey.

The following table contains our calculation of the market ground rent for the subject.

## Calculation of Ground Rent

| | |
|---|---|
| Concluded Land Value | $28,000,000 |
| Cap Rate | 5.00% |
| Concluded Ground Rent | $1,400,000 |
| | |
| Ground Rent PSF | $1.35 |

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Land Valuation – Subject to CHA Restrictions

We have researched comparables for this analysis, which are documented on the following pages followed by a location map and analysis grid. All sales have been researched through numerous sources and, when possible, verified by a party to the transaction.

As previously noted, there have been no large land sales of residentially zoned land in the City of Chicago in the past five years. For this reason, we have researched and included sales of other zoning classifications, and adjusted for the zoning based on our conversations with market participants.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Land Sales Summary

| No. | Name; Address | Sale Date; Status; Prop. Rights | Square Feet; Acres | Zoning | Utilities | Topography; Shape; Flood Zone | Sale Price; Effective Price | $/SF; $/Acre |
|---|---|---|---|---|---|---|---|---|
| 1 | 2750 W 35th Street<br>2750 W 35th Street<br>Chicago, IL 60632 | 9/14/2021<br>Closed Sale<br>Fee Simple | 370,260<br>8.50 | Industrial | All to site | Level<br>Irregular<br>X | $7,191,000<br>$7,191,000 | $19.42<br>$846,000 |

Sale Comments: This is an industrial land sale. The property was marketed as a development site for a distribution facility.

| 2 | 2500 S Corbett Street<br>2500 S Corbett Street<br>Chicago, IL 60608 | 4/6/2021<br>Closed Sale<br>Fee Simple | 516,622<br>11.86 | Industrial | All to site | Level<br>Irregular<br>X | $13,500,000<br>$13,500,000 | $26.13<br>$1,138,280 |

Sale Comments: This is the sale of an 11.86-acre lot that was zoned for an industrial use. The property was previously improved with several industrial buildings. However, these buildings were demolished in 2011 leaving an open lot. Prologis purchased the property and plans to develop a 112,000-square foot distribution facility on the site, slated to deliver in 2022.

| 3 | 3700 S Morgan Street<br>3700 S Morgan Street<br>Chicago, IL 60609 | 3/30/2021<br>Closed Sale<br>Fee Simple | 484,823<br>11.13 | Industrial | All to site | Level<br>Rectangular<br>X | $8,250,000<br>$8,250,000 | $17.02<br>$741,240 |

Sale Comments: This is the sale of an 11.13-acre industrial land site. The previously existing industrial improvements had been demolished prior to the sale. The buyer, IDI Logistics, purchased the property to construct a 178,850-square foot distribution

| 4 | Illinois Brick Yard #47<br>2217 S. Loomis Avenue<br>Chicago, IL 60608 | 1/12/2021<br>Closed Sale<br>Fee Simple | 565,409<br>12.98 | PMD-11 | All Available | Level<br>Irregular<br>X | $10,500,000<br>$10,500,000 | $18.57<br>$808,937 |

Sale Comments: On January 12th, 2021 the 12.98 acre parcel of land sold for $10,500,000. The property was previously owner occupied by the Illinois Brick Company and sold as a value add opportunity to an investor. At the time of sale there was a 65,965 square foot industrial building located on the property that was available for lease. However, the buyer, Dayton Street Partners LLC, is a development firm that will likely redevelop the site. No plans have for the site have been released. We have estimated

| S | **Addams Medill Park**<br>**1301 W 14th Street**<br>**Chicago, IL 60608**<br>**Cook** | | **1,038,035**<br>**23.83** | **PD 896** | | **Level**<br>**Rectangular**<br>**X** | | |

*If applicable, prices per SF/unit and capitalization rates and/or income multipliers based on effective sale price.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Land Sales Map



| No. | Name | Location | Miles From Subject | SF | Price/SF |
|-----|------|----------|-------------------|-----|----------|
| 1 | 2750 W 35th Street | Chicago, IL | 2.8 | 370,260 | $19.42 |
| 2 | 2500 S Corbett Street | Chicago, IL | 1.1 | 516,622 | $26.13 |
| 3 | 3700 S Morgan Street | Chicago, IL | 2.6 | 484,823 | $17.02 |
| 4 | Illinois Brick Yard #47 | Chicago, IL | 0.8 | 565,409 | $18.57 |
| S | Addams Medill Park | Chicago, IL | | 1,038,035 | |

## Analysis and Adjustment of Sales

On the following page is a sales comparison grid displaying the subject property, the comparables and the adjustments applied.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Land Grid

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 |
|---|---|---|---|---|---|
| Name | Addams Medill Park | 2750 W 35th Street | 2500 S Corbett Street | 3700 S Morgan Street | Illinois Brick Yard #47 |
| Address | 1301 W 14th Street | 2750 W 35th Street | 2500 S Corbett Street | 3700 S Morgan Street | 2217 S. Loomis Avenue |
| City | Chicago | Chicago | Chicago | Chicago | Chicago |
| County | Cook | Cook | Cook | Cook | Cook |
| State | IL | IL | IL | IL | IL |
| Date | May-2022 | Sep-2021 | Apr-2021 | Mar-2021 | Jan-2021 |
| Price | | $7,191,000 | $13,500,000 | $8,250,000 | $10,500,000 |
| Price Adjustment | | $0 | $0 | $0 | $0 |
| Adjusted Price | | $7,191,000 | $13,500,000 | $8,250,000 | $10,500,000 |
| Acres | 23.83 | 8.50 | 11.86 | 11.13 | 12.98 |
| Land SF | 1,038,035 | 370,260 | 516,622 | 484,823 | 565,409 |
| Land SF Unit Price | | $19.42 | $26.13 | $17.02 | $18.57 |
| FAR | 1.10 | 3.00 | 1.00 | 1.20 | 3.00 |
| Flood Zone | X | X | X | X | X |
| Zoning | PD 896 | M2-3 | PMD 1485 A | PMD 8 A | PMD-11 |
| Shape | Rectangular | Irregular | Irregular | Rectangular | Irregular |
| Topography | Level | Level | Level | Level | Level |
| Transaction Adjustments | | | | | |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| % Adjustment | | – | – | – | – |
| Financing | | Conventional | Conventional | Conventional | Cash to Seller |
| % Adjustment | | – | – | – | – |
| Conditions of Sale | | Normal | Normal | Normal | None |
| % Adjustment | | – | – | – | – |
| Market Trends Through | May-22 3.0% | 2% | 3% | 3% | 4% |
| Adjusted Land SF Unit Price | | $19.79 | $26.97 | $17.58 | $19.30 |
| Location | | 15% | 15% | 15% | 15% |
| Access/Exposure | | -10% | -10% | -10% | -10% |
| Size | | -5% | -5% | -5% | -5% |
| Shape/Topography | | – | – | – | – |
| Zoning | | 10% | 10% | 10% | 10% |
| Flood Zone | | – | – | – | – |
| Utilities | | – | – | – | – |
| Entitlements | | – | – | – | – |
| Adjusted Land SF Unit Price | | $21.77 | $29.67 | $19.33 | $21.23 |
| Net Adjustments | | 12% | 14% | 14% | 14% |
| Gross Adjustments | | 42% | 43% | 43% | 44% |

| Summary Indicators | Range | Average | Median |
|---|---|---|---|
| Comparables - Unadjusted | $17.02 - $26.13 | $20.28 | $19.00 |
| Comparables - Adjusted | $19.33 - $29.67 | $23.00 | $21.50 |
| Reconciled Unit Value: | $20.00 | | |

## Comparable Land Sale Adjustments

### Property Rights

No adjustments for real property rights were required.

### Financing

No adjustments for financing terms were required.

### Conditions of Sale

No adjustments for conditions of sale were required.

### Expenditures After Sale

No adjustments for expenditures after sale were required.

### Economic Trends

The land sales took place from January 2021 to September 2021. Market conditions generally have been strengthening over this period through the effective date of value. As a result, we apply upward adjustments of 3.0% per year to account for this trend.

### Location

All four comparables have been adjusted upward due to their inferior location when compared to the subject property. Please note that our location adjustments take into consideration the highest and best use of the subject, which is as a multifamily/mixed-use development. As such, the sites that are considered superior for industrial use are adjusted downward for their inferior locations for multifamily/mixed-use developments.

### Access/Exposure

All four comparables have been adjusted downward due to their superior access/exposure when compared to the subject property.

### Size

All four comparables have been adjusted downward due to their smaller size when compared to the subject property.

### Shape/Topography

No adjustments for shape/topography were required.

### Zoning

All four comparables have been adjusted upward due to their inferior zoning when compared to the subject property. Based on our discussions with market participants, the CHA restrictions on the site would limit the development potential for the subject as typically, CHA developments require a higher percentage of affordable housing units than developments not subject to CHA restrictions.  As a result, the adjustment for zoning is lower than the hypothetical land valuation adjustment.

### Flood Zone

No adjustments for flood zone status were required.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Utilities

No adjustments for utilities were required.

## Entitlements

No adjustments for entitlements were required.

In addition to the comparables presented above, we are also aware of the City of Chicago's recent purchase 6.3 acres of vacant land in Pilsen on the 1600 and 1700 block of South Peoria Street. The property consists of former industrial land that was purchased in March 2022 for $12 million, or $43.73 per square foot. The Chicago Department of Housing will spend an additional $1.5 million on environmental remediation, which will increase the cost basis for the land to $13.5 million, or $49.19 per square foot. The City of Chicago plans to partner with a developer to develop a series of mixed-use projects that could include more than 280 affordable residential units.

This site is considered to be superior to the subject in terms of location, as the Pilsen neighborhood has seen superior growth to the subject's neighborhood over the past three years, and as a smaller site, the price per square foot would generally be higher than a larger site such as the subject. Nevertheless, this recent transaction reflects the most similar land site in terms of size and development potential to the subject, and is considered to represent the upper end of the range of reasonableness for the subject.

## Land Valuation Conclusion

All of the value indications have been considered, and in the final analysis, a value near the middle of the range is considered reasonable given the subject's size and location.

## Land Value Reconciliation

| Premise | Value |
|---|---|
| As Is | May 3, 2022 |
| Indicated Value per Land SF | $20.00 |
| Subject Land SF | 1,038,035 |
| Indicated Value | $20,760,696 |
| **Rounded Value** | **$20,800,000** |

# Final Reconciliation

The process of reconciliation involves the analysis of each approach to value. The quality of data applied, the significance of each approach as it relates to market behavior and defensibility of each approach are considered and weighed. Finally, each is considered separately and comparatively with each other.

As discussed previously, we use only the sales comparison approach in developing an opinion of value for the subject. The cost and income approaches are not applicable, and are not used.

Based on the preceding valuation analysis and subject to the definitions, assumptions, and limiting conditions expressed in the report, our value opinion follows:

## Value Indications

### Summary of Value Indications

|  | Market Value Hypothetical Land Value – As if Unrestricted | Market Value As Is Land Value – Subject to CHA Restrictions |
|---|---|---|
| Cost Approach | Not Utilized | Not Utilized |
| Sales Comparison Approach | $28,000,000 | $20,800,000 |
| Income Capitalization Approach | Not Utilized | Not Utilized |
| **Reconciled** | **$28,000,000** | **$20,800,000** |

## Value Conclusion

Based on the data and analyses developed in this appraisal, we have reconciled to the following value conclusion(s), subject to the Limiting Conditions and Assumptions of this appraisal.

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Market Value Hypothetical Land Value – As if Unrestricted | Fee Simple | May 3, 2022 | $28,000,000 |
| Hypothetical Ground Rent – As If Unrestricted | N/A | May 3, 2022 | $1,400,000 |
| Market Value As Is Land Value – Subject to CHA Restrictions | Fee Simple | May 3, 2022 | $20,800,000 |

## Extraordinary Assumptions & Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

1.  None.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1.  The subject is currently owned by the CHA, and if sold, would be subject to typical CHA use restrictions. For the purposes of the Hypothetical Land Value - As If Unrestricted and the Hypothetical Ground Rent - As If Unrestricted, we have valued the subject as if the CHA restrictions are not in place.

## Exposure Time

Exposure time is the length of time the subject property would have been exposed for sale in the market had it sold on the effective valuation date at the concluded market value. Exposure time is always presumed to precede the effective date of the appraisal. Based on our review of recent sales transactions for similar properties and our analysis of supply and demand in the local Land market, it is our opinion that the probable exposure time for the subject at the concluded market values stated previously is 3-6 months.

## Marketing Time

Marketing time is an estimate of the amount of time it might take to sell a property at the concluded market value immediately following the effective date of value. *Given the market uncertainty and volatility, marketing times are currently difficult to predict.* It is our opinion that a reasonable marketing period for the subject is likely to be the same as the exposure time. Accordingly, we estimate the subject's marketing period at 3-6 months.

Our estimate is supported by the following national investor survey data.

### Investor Survey 2021 Q4 Multifamily Marketing Time

| Property Type | | Marketing Time |
|---|---|---|
| US | | |
| Multifamily | Range | 1.0 – 12.0 |
| | Average | 4.2 |

*Source: PwC Real Estate Investor Survey. MSAs with various data points have been averaged.*

# Limiting Conditions and Assumptions

1. All reports and work product we deliver to you (collectively called "report") represent an opinion of value, based on historical information and forecasts of market conditions. Actual results may vary from those forecast in the report. There is no guaranty or warranty that the opinion of value reflects the actual value of the property.

2. The conclusions stated in our report apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events. Assessed values may change significantly and unexpectedly over short periods. We are not liable for any conclusions in the report that may be different if there are subsequent changes in value. We are not liable for loss relating to reliance upon our report more than three months after its date.

3. There may be differences between projected and actual results because events and circumstances frequently do not occur as predicted, and those differences may be material.  We are not liable for any loss arising from these differences.

4. We are not obligated to predict future political, economic or social trends.  We assume no responsibility for economic factors that may affect or alter the opinions in the report if the economic factors were not present as of the date of the letter of transmittal accompanying the report.

5. The report reflects an appraisal of the property free of any liens or encumbrances unless otherwise stated.

6. We assume responsible ownership and competent property management.

7. The appraisal process requires information from a wide variety of sources. We have assumed that all information furnished by others is correct and complete, up to date and can be relied upon, but no warranty is given for its accuracy. We do not accept responsibility for erroneous information provided by others. We assume that no information that has a material effect on our appraisal has been withheld.

8. We assume the following, unless informed to the contrary in writing: Each property has a good and marketable title. All documentation is satisfactorily drawn and that there are no encumbrances, restrictions, easements or other adverse title conditions, which would have a material effect on the value of the interest under consideration.  There is no material litigation pending involving the property.  All information provided by the Client, or its agents, is correct, up to date and can be relied upon. We are not responsible for considerations requiring expertise in other fields, including but not limited to: legal descriptions, interpretation of legal documents and other legal matters, geologic considerations such as soils and seismic stability, engineering, or environmental and toxic contaminants.  We recommend that you engage suitable consultants to advise you on these matters.

9. We assume that all engineering studies are correct. The plot plans and illustrative material in the report are included only to help the reader visualize the property.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

10. We assume that there are no hidden or unapparent conditions of the property, subsoil or structures that render it more or less valuable. We are not responsible for such conditions or for obtaining the engineering studies that may be required to discover them.

11. We assume that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the report. We have not made or requested any environmental impact studies in conjunction with the report. We reserve the right to revise or rescind any opinion of value that is based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the report assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

12. Unless otherwise stated in the report, you should assume that we did not observe any hazardous materials on the property.  We have no knowledge of the existence of such materials on or in the property; however, we are not qualified to detect such substances, and we are not providing environmental services.  The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property.  Our report assumes that there is no such material on or in the property that would cause a loss in value.  We do not assume responsibility for such conditions or for any expertise or engineering knowledge required to discover them.  We encourage you to retain an expert in this field, if desired. We are not responsible for any such environmental conditions that exist or for any engineering or testing that might be required to discover whether such conditions exist. We are not experts in the field of environmental conditions, and the report is not an environmental assessment of the property.

13. We may have reviewed available flood maps and may have noted in the report whether the property is generally located within or out of an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property.  Any opinion of value we include in our report assumes that floodplain and/or wetlands interpretations are accurate.

14. The Americans with Disabilities Act (ADA) became effective January 26, 1992. We have not made a specific survey or analysis of the property to determine whether it is in compliance with the ADA. We claim no expertise in ADA issues, and render no opinion regarding compliance of the property with ADA regulations.

15. We assume that the property conforms to all applicable zoning and use regulations and restrictions unless we have identified, described and considered a non-conformity in the report.

16. We assume that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in the report is based.

17. We assume that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

18. We have not made any investigation of the financial standing of actual or prospective tenants unless specifically noted in the report. Where properties are valued with the benefit of leasing, we assume, unless we are informed otherwise, that the tenants are capable of meeting their financial obligations under the leases, all rent and other amounts payable under the leases have been paid when due, and that there are no undisclosed breaches of the leases.

19. We did not conduct a formal survey of the property and assume no responsibility for any survey matters. The Client has supplied the spatial data, including sketches and/or surveys included in the report, and we assume that data is correct, up to date and can be relied upon.

20. Unless otherwise stated, the opinion of value included in our report excludes any additional value attributable to goodwill, or to fixtures and fittings which are only of value, in situ, to the present occupier. We have made no allowance for any plant, machinery or equipment unless they form an integral part of the building and would normally be included in a sale of the building. We do not normally carry out or commission investigations into the capacity or condition of services being provided to the property. We assume that the services, and any associated controls or software, are in working order and free from defect. We also assume that the services are of sufficient capacity to meet current and future needs.

21. In the case of property where construction work is in progress, such as refurbishment or repairs, or where developments are in progress, we have relied upon cost information supplied to us by the Client or its appointed experts or upon industry accepted cost guides. In the case of property where construction work is in progress, or has recently been completed, we do not make allowance for any liability already incurred, but not yet discharged, in respect of completed work, or obligations in favor of contractors, subcontractors or any members of the professional or design team. We assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

22. Any allocation in the report of value between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

23. The report is confidential to the party to whom it is addressed and those other intended users specified in the report for the specific purpose to which it refers. Use of the report for any other purpose or use by any party not identified as an intended user of the report without our prior written consent is prohibited, and we accept no responsibility for any use of the report in violation of the terms of this Agreement.

24. We are not required to testify or provide court-related consultation or to be in attendance in court unless we have agreed to do so in writing.

25. Neither the whole report, nor any part, nor reference thereto, may be published in any manner without our prior written approval.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

26. We may rely on, and will not verify, the accuracy and sufficiency of documents, information and assumptions provided to it by the Client or others. We will not verify documents, information and assumptions derived from industry sources or that JLL or its affiliates have prepared in the regular course of business. We are not liable for any deficiency in the report arising from the inaccuracy or insufficiency of such information, documents and assumptions. However, our report will be based on our professional evaluation of all such available sources of information.

27. JLL IS NOT LIABLE TO ANY PERSON OR ENTITY FOR LOSS OF PROFITS, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR SIMILAR DAMAGES IN CONNECTION WITH THIS AGREEMENT. IN NO EVENT SHALL THE LIABILITY OF JLL AND ITS AFFILIATES IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEE PAID TO JLL HEREUNDER.

28. Unless expressly advised to the contrary, we assume that appropriate insurance coverage is and will continue to be available on commercially acceptable terms.

29. We assume that no material changes in any applicable federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.



# *Appendix A*

## Appraiser Qualifications

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

## Qualifications



# Vytas Norusis, MAI

**Executive Vice President**
**Valuation Advisory, U.S.**



**Current responsibilities**
As Executive Vice President with JLL Valuation Advisory, Vytas Norusis is responsible for performing various appraisal and consulting services for commercial lending, litigation, and tax protest purposes. His responsibilities include client communications, appraisal review, and mentoring junior appraisers. Mr. Norusis is also the leader of JLL's Midwest industrial team which focuses on the valuation of industrial properties including business parks, distribution centers, manufacturing buildings, cold storage facilities, truck terminals, container yards, and special use industrial properties.

**Experience**
Prior to joining JLL in 2021, Vytas served as Vice President for CBRE Valuation and Advisory Services in Chicago and was a member of the CBRE Industrial specialty practice. Mr. Norusis has worked in the commercial real estate industry since 2010 primarily in commercial real estate appraisal and valuation. His background includes the valuation of real estate for multiple applications including market value appraisals, portfolio valuations and investment advisory services. His focus was in industrial properties, and has completed assignments for a variety of asset types including business parks, distribution centers, manufacturing buildings, cold storage facilities, truck terminals, container yards, and special use industrial properties.

Prior to joining the CBRE valuation team, Vytas worked as a Senior Financial Analyst supporting the CBRE National Partners brokerage team. In this role, he underwrote industrial assets for disposition, and coordinated due diligence and closing for sale transactions across the United States.

**Education and affiliations**
Bachelor's Degree | Business Administration | Dominican University
Masters of Business Administration | Arizona State University
Appraisal Institute, Designated Member

**Contact**
T +1 708 280 0487
vytas.norusis@am.jll.com

[1] U.S. property valuation and tax consulting services are performed by JLL Valuation & Advisory Services, LLC, a wholly owned indirect subsidiary of Jones Lang LaSalle Incorporated.

*Certified General Real Estate Appraiser:*

- *Illinois*
- *Indiana*
- *Michigan*
- *Wisconsin*

COPYRIGHT © JONES LANG LASALLE IP, INC. 2021. All Rights Reserved



# State of Illinois

**Department of Financial and Professional Regulation**
Division of Real Estate

LICENSE NO.
553.002350

The person, firm, or corporation whose name appears on this certificate has complied with the provisions of the Illinois Statutes and/or rules and regulations and is hereby authorized to engage in the activity as indicated below:

EXPIRES:
09/30/2023

## CERTIFIED GENERAL REAL ESTATE APPRAISER

VYTAUTAS V NORUSIS

MARIO TRETO, JR.
ACTING SECRETARY

LAURIE MURPHY
ACTING DIRECTOR

The official status of this license can be verified at www.idfpr.com

15797941

Cut on Dotted Line

For future reference, IDFPR is now providing each person/business a unique identification number, 'Access ID', which may be used in lieu of a social security number, date of birth or FEIN number when contacting the IDFPR. Your Access ID is: 3606940



LICENSE NO.
553.002350

**Department of Financial and Professional Regulation**
Division of Real Estate

CERTIFIED GENERAL REAL
ESTATE APPRAISER

VYTAUTAS V NORUSIS

EXPIRES:
09/30/2023

MARIO TRETO, JR.
ACTING SECRETARY

LAURIE MURPHY
ACTING DIRECTOR

The official status of this license can be verified at www.idfpr.com

Cut on Dotted Line



# *Appendix B*

## Definitions

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Definitions

The source of the following definitions is the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), unless otherwise noted.

**Amenity**

A tangible or intangible benefit of real property that enhances its attractiveness or increases the satisfaction of the user. Natural amenities may include a pleasant location near water or a scenic view of the surrounding area; man-made amenities include swimming pools, tennis courts, community buildings, and other recreational facilities.

**As Is Market Value**

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date.

**Class of Apartment Property**

For the purposes of comparison, apartment properties are grouped into three classes. These classes represent a subjective quality rating of buildings, which indicates the competitive ability of each building to attract similar types of tenants. Combinations of factors such as rent, building finishes, system standards and efficiency, building amenities, location/accessibility, and market perception are used as relative measures.

Class A apartment properties are the most prestigious properties competing for the premier apartment tenants, with rents above average for the area. Buildings have high-quality standard finishes, architectural appeal, state-of-the-art systems, exceptional accessibility, and a definite market presence.

Class B apartment properties compete for a wide range of users, with rents in the average range for the area. Class B buildings do not compete with Class A buildings at the same price. Building finishes are fair to good for the area, and systems are adequate.

Class C apartment properties compete for tenants requiring functional space at rents below the average for the area. Class C buildings are generally older, and are lower in quality and condition.

(Adapted from "Class of Office Building" in The Dictionary of Real Estate Appraisal.)

**Deferred Maintenance**

Needed repairs or replacement of items that should have taken place during the course of normal maintenance.

**Depreciation**

A loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date.

**Discounted Cash Flow (DCF) Analysis**

The procedure in which a discount rate is applied to a set of projected income streams and a reversion. The analyst specifies the quantity, variability, timing, and duration of the income streams and the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

**Disposition Value**

The most probable price that a specified interest in real property should bring under the following conditions:

1. Consummation of a sale within a future exposure time specified by the client.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. An adequate marketing effort will be made during the exposure time specified by the client.
8. Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
10. This definition can also be modified to provide for valuation with specified financing terms.

**Effective Date of Appraisal**

The date to which the appraiser's analyses, opinions, and conclusions apply; also referred to as date of value.

**Entrepreneurial Profit**

A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses.

In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called entrepreneurial return or entrepreneurial reward.

**Excess Land; Surplus Land**

*Excess Land:* Land that is not needed to serve or support the existing improvement. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land may have the potential to be sold separately and is valued independently.

*Surplus Land:* Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

**Exposure Time**

An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

**Extraordinary Assumption**

An assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

**Fee Simple Estate**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**Floor Area Ratio (FAR)**

The relationship between the above-ground floor area of a building, as described by the building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

**Gross Building Area (GBA)**

Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the region.

**Highest and Best Use**

The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.

**Hypothetical Condition**

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

**Lease**

A contract in which rights to use and occupy land or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

**Leased Fee Interest**

A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e, a lease).

**Leasehold Interest**

The tenant's possessory interest created by a lease.

**Liquidation Value**

The most probable price that a specified interest in real property should bring under the following conditions:

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in U.S. dollars, or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.
10. This definition can also be modified to provide for valuation with specified financing terms.

**Marketing Time**

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

**Market Rent**

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements.

**Market Value**

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

**Multifamily Property Type**

Residential structure containing five or more dwelling units with common areas and facilities. (Source: Appraisal Institute Commercial Data Standards and Glossary of Terms, Chicago, Illinois, 2004 [Appraisal Institute])

**Multifamily Classifications**

***Garden/Low Rise Apartments:*** A multifamily development of two- or three-story, walk-up structures built in a garden-like setting; customarily a suburban or rural-urban fringe development. *(Source: Appraisal Institute)*

**Mid/High-Rise Apartment Building:** A multifamily building with four or more stories, typically elevator-served. (Source: Appraisal Institute)

**Prospective Opinion of Value**

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.

**Rentable Floor Area (RFA)**

Rentable area shall be computed by measuring inside finish of permanent outer building walls or from the glass line where at least 50% of the outer building wall is glass. Rentable area shall also include all area within outside walls less stairs, elevator shafts, flues, pipe shafts, vertical ducts, air conditioning rooms, fan rooms, janitor closets, electrical closets, balconies and such other rooms not actually available to the tenant for his furnishings and personnel and their enclosing walls. No deductions shall be made for columns and projections unnecessary to the building. *(Source: Income/Expense Analysis, 2013 Edition – Conventional Apartments, Institute of Real Estate Management, Chicago, Illinois)*

**Replacement Cost**

The estimated cost to construct, at current prices as of the effective appraisal date, a substitute for the building being appraised, using modern materials and current standards, design and layout.

**Reproduction Cost**

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, superadequacies, and obsolescence of the subject building.

**Room Count**

A unit of comparison used primarily in residential appraisal. No national standard exists on what constitutes a room. The generally accepted method is to consider as separate rooms only those rooms that are effectively divided and to exclude bathrooms.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

**Stabilized Income**

Income at that point in time when abnormalities in supply and demand or any additional transitory conditions cease to exist and the existing conditions are those expected to continue over the economic life of the property; projected income that is subject to change, but has been adjusted to reflect an equivalent, stable annual income.

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.



# *Appendix C*

## Financials and Property Information

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.



Prepared for: JLL
**1542 W Washburne Ave**
Chicago, IL 60608-1371

| MAP DATA | MAP LEGEND | | Powered by CoreLogic® |
|---|---|---|---|
| FEMA Special Flood Hazard Area: **No** | Areas inundated by 500-year flooding | | Protected Areas |
| Map Number: **17031C0506J** | Areas inundated by 100-year flooding | | Floodway |
| Zone: **X** | Velocity Hazard | | Subject Area |
| Map Date: **August 19, 2008** | | | |
| FIPS: **17031** | | | |



a la mode, inc.®
The leader in real estate technology

Follow us on Twitter . Like us on Facebook .

a la mode and its products are trademarks or registered trademarks of a la mode technologies, llc.
Other brand and product names are trademarks or registered trademarks of their respective owners.
Copyright © 2022 a la mode technologies, llc. 1-800-ALAMODE (252-6633) | Terms of Use



# *Appendix D*

## Comparable Data

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

# Land Sale Comparables

# Land Sale Comparable 1

## Property Information

| | |
|---|---|
| Property Name | 2750 W 35th Street |
| Address | 2750 W 35th Street |
| City | Chicago |
| State | IL |
| Zip | 60632 |
| ID | 398451 |



## Transaction Details

| | |
|---|---|
| Price | $7,191,000 |
| Date | 9/14/2021 |
| Price Per Acre | $846,000 |
| Price Per Land SF | $19.42 |
| Price Per Usable Acre | $846,000 |
| Price Per Usable Land SF | $19.42 |
| Grantee | Thor Interstate 55 LLC |
| Property Rights | Fee Simple |
| Financing | Conventional |
| Conditions of Sale | Normal |
| Transaction Type | Closed Sale |

| | |
|---|---|
| Acres | 8.50 |
| Land SF | 370,260 |
| Usable Acres | 8.50 |
| Usable Land SF | 370,260 |
| Zoning | Industrial |
| Topography | Level |
| Shape | Irregular |

## Property Information

## Site Data

## Operating Data / Key Indicators

| | |
|---|---|
| Utilities | All to site |

## Comments

This is an industrial land sale. The property was marketed as a development site for a distribution facility.

# Land Sale Comparable 2

## Property Information

| | |
|---|---|
| Property Name | 2500 S Corbett Street |
| Address | 2500 S Corbett Street |
| City | Chicago |
| State | IL |
| Zip | 60608 |
| ID | 385458 |



## Transaction Details

| | |
|---|---|
| Price | $13,500,000 |
| Date | 4/6/2021 |
| Price Per Acre | $1,138,280 |
| Price Per Land SF | $26.13 |
| Price Per Usable Acre | $1,138,280 |
| Price Per Usable Land SF | $26.13 |
| Grantor | Yard Crowleys Yacht |
| Grantee | Prologis |
| Property Rights | Fee Simple |
| Financing | Conventional |
| Conditions of Sale | Normal |
| Transaction Type | Closed Sale |

## Site Data

| | |
|---|---|
| Acres | 11.86 |
| Land SF | 516,622 |
| Usable Acres | 11.86 |
| Usable Land SF | 516,622 |
| Zoning | Industrial |
| Topography | Level |
| Shape | Irregular |

## Operating Data / Key Indicators

| | |
|---|---|
| Utilities | All to site |

## Property Information

## Comments

This is the sale of an 11.86-acre lot that was zoned for an industrial use. The property was previously improved with several industrial buildings. However, these buildings were demolished in 2011 leaving an open lot. Prologis purchased the property and plans to develop a 112,000-square foot distribution facility on the site, slated to deliver in 2022.

# Land Sale Comparable 3

## Property Information

| | |
|---|---|
| Property Name | 3700 S Morgan Street |
| Address | 3700 S Morgan Street |
| City | Chicago |
| State | IL |
| Zip | 60609 |
| ID | 385459 |



## Transaction Details

| | |
|---|---|
| Price | $8,250,000 |
| Date | 3/30/2021 |
| Price Per Acre | $741,240 |
| Price Per Land SF | $17.02 |
| Price Per Usable Acre | N/A |
| Price Per Usable Land SF | N/A |
| Grantor | Joslyn Manufacturing Co. |
| Grantee | IDI Logistics |
| Property Rights | Fee Simple |
| Financing | Conventional |
| Conditions of Sale | Normal |
| Transaction Type | Closed Sale |

## Site Data

| | |
|---|---|
| Acres | 11.13 |
| Land SF | 484,823 |
| Zoning | Industrial |
| Topography | Level |
| Shape | Rectangular |

## Operating Data / Key Indicators

| | |
|---|---|
| Utilities | All to site |

## Property Information

## Comments

This is the sale of an 11.13-acre industrial land site. The previously existing industrial improvements had been demolished prior to the sale. The buyer, IDI Logistics, purchased the property to construct a 178,850-square foot distribution facility,

# Land Sale Comparable 4

## Property Information

| | |
|---|---|
| Property Name | Illinois Brick Yard #47 |
| Property Type | Industrial |
| Address | 2217 S. Loomis Avenue |
| City | Chicago |
| State | IL |
| Zip | 60608 |
| ID | 278875 |



## Transaction Details

| | |
|---|---|
| Price | $10,500,000 |
| Date | 1/12/2021 |
| Price Per Acre | $808,937 |
| Price Per Land SF | $18.57 |
| Price Per Usable Acre | $808,937 |
| Price Per Usable Land SF | $18.57 |
| Grantor | Illinois Brick Co |
| Grantee | Dayton Street Partners LLC |
| Property Rights | Fee Simple |
| Financing | Cash to Seller |
| Conditions of Sale | None |
| Transaction Type | Closed Sale |
| Verification | Public Records |

## Property Information

| | |
|---|---|
| Tax ID | 17-29-102-045-0000, 17-29-102-049-0000 |

## Site Data

| | |
|---|---|
| Acres | 12.98 |
| Land SF | 565,409 |
| Usable Acres | 12.98 |
| Usable Land SF | 565,409 |
| Zoning | PMD-11 |
| Topography | Level |
| Shape | Irregular |

## Operating Data / Key Indicators

| | |
|---|---|
| Utilities | All Available |

## Comments

On January 12th, 2021 the 12.98 acre parcel of land sold for $10,500,000. The property was previously owner occupied by the Illinois Brick Company and sold as a value add opportunity to an investor. At the time of sale there was a 65,965 square foot industrial building located on the property that was available for lease. However, the buyer, Dayton Street Partners LLC, is a development firm that will likely redevelop the site. No plans have for the site have been released. We have estimated demolition costs of $5.00 per square foot, or $329,825.



# *Appendix E*

## Engagement Letter

Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.



Vytas Norusis, MAI
Executive Vice President
200 East Randolph Street, 47th Floor
Chicago, IL 60601
1+ 708 280 0487
Vytas.norusis@am.jll.com

April 7, 2022

Ari Glass
Mansueto Office
Ari.Glass@mansuetooffice.com

RE:  Valuation & Advisory Services for the Property: Addams/Medill Park, 1301 W. 14th Street, Chicago, IL 60608

Dear Mr. Glass,

JLL Valuation & Advisory Services, LLC (JLL VA) is pleased to provide this proposal and engagement letter for valuation and advisory services regarding the Property.

| | |
|---|---|
| PROPERTY IDENTIFICATION: | Addams/Medill Park, 1301 W. 14th Street, Chicago, IL 60608 |
| PROPERTY TYPE: | Land |
| INTEREST APPRAISED: | Fee Simple |
| PURPOSE: | Market Value |
| INTENDED USERS: | Mansueto Office  [NO OTHER USERS ARE INTENDED BY JLL VALUATION & ADVISORY SERVICES, LLC.] |
| INTENDED USE: | Internal Valuation |
| VALUES PROVIDED: | As Is Land Value – Subject to CHA Restrictions<br>Hypothetical Land Value – As if Unrestricted<br>Hypothetical Ground Rent – As If Unrestricted |
| APPRAISAL STANDARDS: | Uniform Standards of Professional Appraisal Practice (USPAP) by the Appraisal Foundation, the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute |
| PROPERTY INSPECTION: | JLL VA  will not conduct a physical inspection of the Property |
| VALUATION APPROACHES: | All applicable approaches to value. |
| REPORT OPTION: | Appraisal Report |
| FEE: | $7,000 |
| EXPENSES: | The fee includes the expenses related to this engagement. There will be no added charges for travel, delivery fees or report production costs. |
| RETAINER: | No retainer |
| FINAL PAYMENT: | The fee is considered earned upon delivery of the first report. |
| DELIVERY DATE: | 3 weeks from receiving the executed engagement letter and retainer (if applicable). Delays in obtaining the data needed to complete this assignment or delays in accessing the property for inspection (if applicable) may result in delays in the date our analysis is completed and delivered. |
| DELIVERY METHOD: | A PDF of the report(s) will be delivered to the client contact identified on this engagement letter. Two hard copies are available at client's request. Additional copies can be requested at $150 per copy. |



JLL Valuation & Advisory Services, LLC
Mansueto Office │ Engagement Letter

This engagement letter is subject to the General Terms and Conditions attached to this letter as Exhibit A, the Statement of Assumptions and Limiting Conditions attached to this letter as Exhibit B.

Upon your acceptance of this Agreement, we will forward our information request and coordinate a property inspection, if applicable. Per USPAP, we are required to analyze any current purchase for the subject property and request that copies of these, or a term sheet be provided with other applicable information. We will update you within 48 hours of receiving the signed engagement to confirm our information request was provided and a property inspection is scheduled, if applicable.

We appreciate the opportunity to be of service.  Providing white-glove service and the least amount of disruption at the property is our top priority.

Sincerely,

**JLL VALUATION & ADVISORY SERVICES, LLC**

Vytas Norusis, MAI
Executive Vice President
1+ 708 280 0487
Vytas.norusis@am.jll.com

2



**AGREED AND ACCEPTED BY:**

Mansueto Office

| | |
|---|---|
| | April 12, 2022 |
| Signature | Date |
| Ari F. Glass | ari.glass@mansuetooffice.com |
| Printed Name | Email Address |
| Head of Real Estate | 312-925-1468 |
| Title | Phone Number |

**PROPERTY CONTACT:**

| | |
|---|---|
| Printed Name | Email Address |
| Company | Phone Number |

3



Exhibit A
## Terms and Conditions

### 1. INTRODUCTION

**1.1** These Terms and Conditions supplement the proposal, agreement, letter of engagement or email (the "engagement") between JLL Valuation and Advisory Services, LLC and the Client indicated in the engagement that sets out details of the Services to be provided to the Client. All capitalized terms in this exhibit have the meanings given to them in the engagement unless given a different meaning in this exhibit. These Terms and Conditions, together with the engagement and all other exhibits, schedules and riders to the engagement, are collectively called the "agreement".

### 2. SERVICES

**2.1** We will provide the Services using reasonable care and skill.

**2.2** We may make changes to the Services if necessary to comply with any law or safety requirement. We will notify you if that happens. Otherwise, JLL and the Client must agree in writing to any changes to the Services, the Fees, or any other provision of the agreement.

### 3. CLIENT OBLIGATIONS

**3.1** You agree to give us all documents and other information that we advise you are reasonably necessary for us to provide the Services.

**3.2** You will maintain adequate property and public liability insurance to reasonably insure property that you own or occupy and any activities on that property. You will obtain all necessary licenses, permissions and consents which may be required to enable us to perform the Services (other than professional licenses that we are required to maintain to perform the Services). You are responsible to keep your property in a safe condition so that we may perform the Services in reasonable safety.

**3.3** You will notify us promptly if you believe any information you have provided is incomplete or inaccurate.

### 4. DELAY

We are not responsible for any delay in our performance of the Services if caused by any event beyond our reasonable control, or for any delay caused by your failure to comply with the agreement.

### 5. FEES, EXPENSES AND PAYMENT

**5.1** Our fee in its entirety is earned upon delivery of the first report. We will invoice you at time of delivery for any outstanding balance.

**5.2** You agree that your obligation to pay the Fee is not contingent upon the results, conclusions or recommendations we provide.

**5.3** If we are asked to invoice any other party, you agree to settle our invoice immediately if the other party does not do so within 30 days of the date of the invoice.

**5.4** Delinquent payments under the agreement will earn interest at the rate of one and one-half percent (1-1/2%) per month from the date due until paid, or if lower, the maximum rate permitted by law. If the Fee or any part of it remains unpaid 30 days after it was due, you may not use any report or work product we have delivered to you for any reason.

**5.5** If you terminate this agreement before the Services are completed, you will pay us, no later than the termination date, a reasonable fee proportionate to the part of the Services performed to the date of termination.

**5.6** Our rights under Section 5.3 and 5.4 are in addition to, and will not limit, our right to pursue any other rights and remedies under the agreement or at law or in equity.

### 6. INDEMNITY

You agree to indemnify and defend us and hold us harmless from any loss, liability or expense (including attorneys' fees) arising from a third party action, claim or proceeding ("Loss") that we suffer arising out of the agreement or the Services, other than Loss that a court of competent jurisdiction has determined was the result of our negligence or willful misconduct. We agree to indemnify and defend you and hold you harmless from any Loss that you suffer arising out of our negligent performance of Services under the

2



agreement, other than Loss that is found by a court of competent jurisdiction to result from your negligence or willful misconduct.

**7. EXCLUSIONS OF, AND LIMITATIONS ON, LIABILITY**

7.1 EACH OF JLL AND THE CLIENT WAIVES ANY CLAIMS AGAINST EACH OTHER FOR LOSS OF PROFITS, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR SIMILAR DAMAGES IN CONNECTION WITH THE AGREEMENT. IN NO EVENT SHALL JLL'S LIABILITY IN CONNECTION WITH THE AGREEMENT EXCEED THE FEE PAID TO JLL HEREUNDER.

**8. TERMINATION**

8.1 Either of us may terminate the agreement without reason by giving 30 days' advance written notice to the other.

8.2 Either of us may terminate the agreement immediately if the other breaches the agreement and fails to remedy the breach within 10 days of notice by the non-breaching party.

8.3 We may terminate the agreement immediately for any of the following reasons:

(a) We cannot provide any of the Services due to conditions beyond our reasonable control.

(b) In our reasonable opinion, there is insufficient information available to provide a report or other work product that meets our standards.

(c) A conflict of interest arises which prevents us from acting for you.

(d) You have asked us to provide reports or work product that we do not consider to be accurate.

**9. ASSUMPTIONS AND LIMITATIONS**

9.1 Any report or other work product we deliver as part of the Services will be subject to our standard Statement of Assumptions and Limiting Conditions, provided as an exhibit and as part of the agreement, which will be incorporated into the report or work product.

9.2 We understand that you may wish to use the report or other work product we deliver as part of the Services to support your Stark law and Anti-Kickback compliance process. Our reports and work product are appraisals prepared

pursuant to Uniform Standards of Professional Appraisal Practice, and do not undertake to evaluate any such compliance. You acknowledge that many factors in addition to property value must be considered to determine Stark or anti-kickback law compliance, and agree that any reports and work product we deliver make no opinion or representation that any transaction involving property we appraise is compliant with Stark law or any anti-kickback law.

**10. CONFIDENTIALITY**

10.1 We each agree to maintain the confidentiality of each other's confidential information and will not disclose any information received in confidence from each other, until two years after termination or expiration of the agreement, except where required to do so by law.

10.2 Any report or other work product that we deliver to you in connection with the Services is confidential and may be used by only you, unless we agree otherwise in writing.

**11. INTELLECTUAL PROPERTY RIGHTS**

11.1 We retain all copyright (and other intellectual property rights) in all materials, reports, systems and other deliverables which we produce or develop for the purposes of the agreement, or which we use to provide the Services.

11.2 You will not reproduce or copy any part of any report or other work product we produce as part of the Services without our prior written consent.

**12. GENERAL**

12.1 The agreement may be modified only by a written agreement signed by both of us. Liability accruing before the agreement terminates or expires will survive termination or expiration.

12.2 The agreement states the entire agreement, and supersedes all prior agreements, between you and JLL with respect to the matters described in the agreement.

12.3 If a court determines that any part of the agreement is unenforceable, the remainder of the agreement will remain in effect.

12.4 The agreement is governed by the laws of the State of Illinois. Each of us irrevocably submits



to the exclusive jurisdiction of the courts of that State.

**12.5** The agreement may be executed in multiple counterparts.

**12.6** No director, officer, agent, employee or representative of either of us has any personal liability in connection with the agreement.

**12.7** Neither of us may assign or transfer any rights or obligations under the agreement without the prior written approval of the other. We each agree to be reasonable in evaluating such a request for approval.

**12.8** If there is any conflict between the terms of the letter and this exhibit, the terms of the letter will prevail.

**12.9** If either of us fails to enforce any provision or exercise any right under the Agreement at any time, that failure will not operate as a waiver to enforce that provision or to exercise that right at any other time.

**12.10** The agreement does not establish any partnership or joint venture between us, or make either of us the agent of the other.

**12.11** A person who is not a party to the agreement does not have any rights to enforce its terms unless specifically agreed in writing.

**12.12** Neither of us may publicize or issue any specific information to the media about the Services or the agreement without the written consent of the other.

**12.13** Each of us represents to the other that it is not a person or entity with whom U.S. entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action. Each of us agrees to comply with all applicable laws, statutes, and regulations relating to anti-bribery and anti-corruption.

**12.14** If either party does not comply with the obligations under the agreement and legal action is commenced to enforce the rights under the agreement, the losing party will reimburse the prevailing party reasonable costs (including attorneys' fees), associated with such action. **THE PARTIES HEREBY WAIVE TRIAL BY JURY.**

**12.15** Upon request by you, we will provide commercial general liability additional insured coverage to the property owner or its affiliates to

the extent a loss is attributable to JLL VA's negligence.

**12.16** Sections 5, 6, 7, 10, 11, 12.1, 13, 17 and 18 will survive termination of the agreement.

### 13. USE OF DATA AND DATA PROTECTION

**13.1** You agree as follows: (i) The data we collect in connection with the agreement will remain our property. (ii) We and our affiliates may utilize, sell and include data you have provided (either in the aggregate or individually) in the databases of JLL and its affiliates and for use in derivative products. (iii) We may utilize all data already in the public domain on an unrestricted basis.

**13.2** In order for us to provide the Services, we may need to record and maintain in hard copy and/or in electronic form, information regarding the Client, its officers and any other individuals connected with the Client (collectively "Data Subjects"). We may also verify the identity of Data Subjects, which could include carrying out checks with third parties such as credit reference, anti-money laundering or sanctions checking agencies.

**13.3** We may use all information that we hold regarding Data Subjects to provide the Services. We may also use and share it with third parties for other purposes as described in our Privacy Statement available at www.jll.com. We may use both commercially available and proprietary software programs to perform the Services (web based and others).

### 14. SPECIAL EXPERTS

**14.1** If you request our assistance in hiring a special expert to contribute to any assignment (such as a surveyor, environmental consultant, land planner, architect, engineer, business, personal property, machinery and equipment appraiser, among others), you will perform your own due diligence to qualify the special expert. You will be responsible to pay for the services of the special expert.

**14.2** We not responsible for the actions and findings of any special expert. You agree to indemnify and defend us and hold us harmless from all damages that may arise out of your reliance on any special expert.

4



**15. CONFLICTS POLICY**

JLL adheres to a strict conflict of interest policy. If we learn of a conflict of interest, we will notify you and recommend a course of action to resolve the conflict. If we learn of a conflict that we do not believe can be resolved, we may terminate the agreement without penalty.

**16. FIRREA REQUIREMENTS**

Federal banking regulations require banks and other lending institutions to engage appraisers where FIRREA compliant appraisals must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions. Given that requirement, any report produced by JLL under the agreement, if ordered independent of a financial institution or agent, might not be FIRREA compliant or acceptable to a federally regulated financial institution.

**17. USPAP REQUIREMENTS**

The Ethics Rule of the Uniform Standards of Professional Appraisal Practice ("USPAP") requires us to disclose to you any prior services (appraisal or otherwise) performed within three years prior to the date of this letter by the individual JLL appraiser who will be performing Services for the Property. We represent that to our knowledge, that JLL has not provided prior services within the designated disclosure period, outside of what we have identified.

**18. USE OF WORK PRODUCT AND RELIANCE**

18.1    You agree that any report or other work product we produce in connection with the Services are for your use only, and only for the purpose indicated in the agreement. No person or entity other than the Client may use or rely on any such report or work product unless we consent otherwise in writing, even if such reliance is foreseeable. Any person who receives a copy of any report or other work product we produce as a consequence of disclosure requirements that apply to the Client, does not become an intended user of this report unless the Client specifically identified them at the time of the engagement.

18.2    You will not use any such report or work product in connection with any public documents. You will not refer to JLL in any public documents without our prior written consent. We may give or withhold our consent in our sole discretion for any purpose under this Section 18.

18.3    Notwithstanding the foregoing, JLL understands that applicable law in eminent domain proceedings may require you to disclose our reports and work product to landowners and to otherwise make our reports and work product available to the public. To the extent required by applicable law, JLL consents to such disclosure. However, you and only you, and no such landowner or other person or entity, may rely on our reports or our work product.

**19. LITIGATION MATTERS**

19.1    We are not required to testify or provide court-related consultation or to be in attendance in court unless we have agreed to do so in the agreement or otherwise in writing, or if required by law.

19.2    If we receive a subpoena or other judicial command to produce documents or to provide testimony in a lawsuit or proceeding regarding the agreement, we will notify you if allowed by law to do so. However, if we are not a party to these proceedings, you agree to compensate us for our professional time at the then prevailing hourly rates of the personnel responding to the subpoena or providing testimony, and to reimburse us for our actual expenses incurred in responding to any such subpoena or judicial command, including attorneys' fees, if any, as they are incurred.

v. 10_22_2020

5



Exhibit B

## Statement of Assumptions and Limiting Conditions

1.  All reports and work product we deliver to you (collectively called "report") represents an opinion of value, based on historical information and forecasts of market conditions. Actual results may vary from those forecast in the report. There is no guaranty or warranty that the opinion of value reflects the actual value of the property.

2.  The conclusions stated in our report apply only as of the effective date of the appraisal, and no representation is made as to the effect of subsequent events. Assessed values may change significantly and unexpectedly over short periods. We are not liable for any conclusions in the report that may be different if there are subsequent changes in value. We are not liable for loss relating to reliance upon our report more than three months after its date.

3.  There may be differences between projected and actual results because events and circumstances frequently do not occur as predicted, and those differences may be material.  We are not liable for any loss arising from these differences.

4.  We are not obligated to predict future political, economic or social trends.  We assume no responsibility for economic factors that may affect or alter the opinions in the report if the economic factors were not present as of the date of the letter of transmittal accompanying the report.

5.  The report reflects an appraisal of the property free of any liens or encumbrances unless otherwise stated.

6.  We assume responsible ownership and competent property management.

7.  The appraisal process requires information from a wide variety of sources. We have assumed that all information furnished by others is correct and complete, up to date and can be relied upon, but no warranty is given for its accuracy. We do not accept responsibility for erroneous information provided by others. We assume that no information that has a material effect on our appraisal has been withheld.

8.  We assume the following, unless informed to the contrary in writing: Each property has a good and marketable title. All documentation is satisfactorily drawn and that there are no encumbrances, restrictions, easements or other adverse title conditions, which would have a material effect on the value of the interest under consideration.  There is no material litigation pending involving the property.  All information provided by the Client, or its agents, is correct, up to date and can be relied upon. We are not responsible for considerations requiring expertise in other fields, including but not limited to: legal descriptions, interpretation of legal documents and other legal matters, geologic considerations such as soils and seismic stability, engineering, or environmental and toxic contaminants.  We recommend that you engage suitable consultants to advise you on these matters.

9.  We assume that all engineering studies correct. The plot plans and illustrative material in the report are included only to help the reader visualize the property.

10.  We assume that there are no hidden or unapparent conditions of the property, subsoil or structures that render it more or less valuable. We are not responsible for such conditions or for obtaining the engineering studies that may be required to discover them.

11.  We assume that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the report. We have not made or requested any environmental impact studies in conjunction with the report. We reserve the right to

6



revise or rescind any opinion of value that is based upon any subsequent environmental impact studies. If any environmental impact statement is required by law, the report assumes that such statement will be favorable and will be approved by the appropriate regulatory bodies.

12. Unless otherwise stated in the report, you should assume that we did not observe any hazardous materials on the property. We have no knowledge of the existence of such materials on or in the property; however, we are not qualified to detect such substances, and we are not providing environmental services. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. Our report assumes that there is no such material on or in the property that would cause a loss in value. We do not assume responsibility for such conditions or for any expertise or engineering knowledge required to discover them. We encourage you to retain an expert in this field, if desired. We are not responsible for any such environmental conditions that exist or for any engineering or testing that might be required to discover whether such conditions exist. We are not experts in the field of environmental conditions, and the report is not an environmental assessment of the property.

13. We may have reviewed available flood maps and may have noted in the report whether the property is generally located within or out of an identified Special Flood Hazard Area. However, we are not qualified to detect such areas and therefore do not guarantee such determinations. The presence of flood plain areas and/or wetlands may affect the value of the property. Any opinion of value we include in our report assumes that floodplain and/or wetlands interpretations are accurate.

14. We have not made a specific survey or analysis of the property to determine whether it is in compliance with the Americans with Disabilities Act ("ADA"), Stark law or any anti-kickback laws. We claim no expertise in such issues and render no opinion regarding compliance of you or the property with ADA, Stark law or anti-kickback law or regulations.

15. We assume that the property conforms to all applicable zoning and use regulations and restrictions unless we have identified, described and considered a non-conformity in the report.

16. We assume that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in the report is based.

17. We assume that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

18. We have not made any investigation of the financial standing of actual or prospective tenants unless specifically noted in the report. Where properties are valued with the benefit of leasing, we assume, unless we are informed otherwise, that the tenants are capable of meeting their financial obligations under the leases, all rent and other amounts payable under the leases have been paid when due, and that there are no undisclosed breaches of the leases.

19. We did not conduct a formal survey of the property and assume no responsibility for any survey matters. The Client has supplied the spatial data, including sketches and/or surveys included in the report, and we assume that data is correct, up to date and can be relied upon.

20. Unless otherwise stated, the opinion of value included in our report excludes any additional value attributable to goodwill, or to fixtures and fittings which are only of value, in situ, to the present occupier. We have made no allowance for any plant, machinery or equipment unless they form an integral part of the building and would normally be included in a sale of the building. We do not normally carry out or commission investigations into the capacity or condition of services being provided to the property. We assume that the services, and any



associated controls or software, are in working order and free from defect. We also assume that the services are of sufficient capacity to meet current and future needs.

21. In the case of property where construction work is in progress, such as refurbishment or repairs, or where developments are in progress, we have relied upon cost information supplied to us by the Client or its appointed experts or upon industry accepted cost guides. In the case of property where construction work is in progress, or has recently been completed, we do not make allowance for any liability already incurred, but not yet discharged, in respect of completed work, or obligations in favor of contractors, subcontractors or any members of the professional or design team. We assume the satisfactory completion of construction, repairs or alterations in a workmanlike manner.

22. Any allocation in the report of value between the land and the improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

23. The report is confidential to the party to whom it is addressed and those other intended users specified in the report for the specific purpose to which it refers. Use of the report for any other purpose or use by any party not identified as an intended user of the report without our prior written consent is prohibited, and we accept no responsibility for any use of the report in violation of the terms of this Agreement.

24. We are not required to testify or provide court-related consultation or to be in attendance in court unless we have agreed to do so in writing.

25. Neither the whole report, nor any part, nor reference thereto, may be published in any manner without our prior written approval.

26. We may rely on, and will not verify, the accuracy and sufficiency of documents, information and assumptions provided to it by the Client or others. We will not verify documents, information and assumptions derived from industry sources or that JLL or its affiliates have prepared in the regular course of business. We are not liable for any deficiency in the report arising from the inaccuracy or insufficiency of such information, documents and assumptions. However, our report will be based on our professional evaluation of all such available sources of information.

27. JLL IS NOT LIABLE TO ANY PERSON OR ENTITY FOR LOSS OF PROFITS, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR SIMILAR DAMAGES IN CONNECTION WITH THIS AGREEMENT. IN NO EVENT SHALL THE LIABILITY OF JLL AND ITS AFFILIATES IN CONNECTION WITH THIS AGREEMENT EXCEED THE FEE PAID TO JLL HEREUNDER.

28. Unless expressly advised to the contrary, we assume that appropriate insurance coverage is and will continue to be available on commercially acceptable terms.

29. We assume that no material changes in any applicable federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated.

30. We may determine during the course of the assignment that additional Hypothetical Conditions and Extraordinary Assumptions may be required in order to complete the assignment. The report will be subject to those Hypothetical Conditions and Extraordinary Assumptions. Each person that is permitted to use the report agrees to be bound by all the Assumptions and Limiting Conditions and any Hypothetical Conditions and Extraordinary Assumptions stated in the report.



JLL Valuation Advisory
200 E. Randolph, 47th Floor
Chicago, IL 60601
+1 312 252 8930
+1 312 252 8914



Copyright © Jones Lang LaSalle IP, Inc. 2022. All Rights Reserved.

| Inventory Removals Application HUD-52860 | U.S. Department of Housing and Urban Development Office of Public and Indian Housing | OMB Approval No. 2577-0075 (exp. 08/31/2023) Revised 10/21/22 |
|---|---|---|

*The information collection requirements contained in this document have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) and assigned OMB control number 2577-0075. There is no personal information contained in this application. Information on activities and expenditures of grant funds is public information and is generally available for disclosure. Recipients are responsible for ensuring confidentiality when disclosure is not required. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a currently valid OMB control number.*

This general information is required to request HUD approval to remove public housing property (residential or non-residential) from public housing requirements, including use restrictions imposed under the Annual Contributions Contract (ACC) and the Declaration of Trust (DOT)/Declaration of Restrictive Covenants (DoRC). PHAs may request such HUD approval under the following laws: demolition and disposition (Section 18 of the 1937 Act and 24 CFR part 970); voluntary conversion (Section 22 of the 1937 Act and 24 CFR part 972); required conversion (Section 33 of the 1937 Act and 24 CFR part 972); homeownership (Section 33 of the 1937 Act and 24 CFR part 906); retentions under 2 CFR 200.311 (PIH Notice 2016-20 or subsequent notice); and eminent domain (PIH Notice 2012-8, or subsequent notice).

**Note**: This form requests general information only and PHAs are required to submit an additional addendum for the specific type of proposed removal. This form in addition to the applicable addendum are collectively known as the SAC application since these applications are processed by HUD's Special Applications Center (SAC). HUD will use this information to review PHA requests, as well as to track removals for other record keeping requirements. Responses to this collection of information are statutory and regulatory to obtain a benefit. The information requested does not lend itself to confidentiality. PHAs are required to submit this information electronically to HUD through the Inventory Removals Submodule of the Inventory Management System/PIH Information Center (IMS/PIC) system (or a later electronic system prescribed by HUD). IMS/PIC will assign each SAC application a "DDA" number.

This form does not apply to proposed removals (conversions) under HUD's Rental Assistance Demonstration (RAD) program; and the instructions for RAD application submissions via IMS/PIC is provided and governed by a separate OMB-approved HUD form.

| Section 1: General Information | | |
|---|---|---|
| 1. | Date of Application: | 09/15/2022 |
| 2. | Name of Public Housing Agency (PHA): | Chicago Housing Authority |
| 3. | PHA Identification Number: | IL-002 |
| 4. | PHA Address: | 60 East Van Buren, Chicago, IL 60605 |
| 5. | Contact Person Name at PHA: | Michelle Harrington |
| 6. | Contact Person Phone No.: | 312-786-3279 |
| 7. | Contact Person Email: | mharrington@thecha.org |
| 8. | Is the PHA operating under any remedial order, compliance agreement, final judgment, consent decree, settlement agreement or other court order or agreement, including but not limited to those related to a fair housing or other civil rights finding of noncompliance? *If yes, attach a narrative description of explaining how the proposed removal is consistent with such order, agreement or other document* | ☑ Yes ☐ No |
| 9. | Name of Local HUD Field Office | Chicago |
| 10. | Name of Expeditor at Local HUD Field Office who assisted PHA with application | A. Acosta |

| Section 2: N/A |
|---|

| Section 3: PHA Plan, Board Resolution, Environmental Review and Local Government Consultation | | |
|---|---|---|
| 1. | **PHA Plan**: Year of PHA Plan that includes the removal action and approval date: | Year: 2022 Approval Date: **3/17/2022** |

| | |
|---|---|
| *Attach evidence that the removal action is included in the approved PHA Plan and approval date* | |
| **2. Board Resolution** that approves the removal action; and PHA's submission of removal application to HUD: | 05/17/2022 |
| Board Resolution Number:       Board Resolution Date: | |
| *Attach a copy of signed PHA Board Resolution* 2022-CHA-23 | |

| | |
|---|---|
| **3. Environmental Review:** Check the box for the entity that conducted the Environmental Review (ER): | ☐ HUD under 24 CFR part 50<br>☑ Responsible Entity (RE) under 24 CFR part 58<br>Name of RE:<br>Date ER was conducted: |

*Attach a copy of HUD's approval of the Environmental Review (i.e. HUD-7015.16). See instructions.*

| | |
|---|---|
| **4. Local Government Consultation:** The PHA covers the following jurisdiction(s): | City of Chicago |
| **5. Date(s) of letter(s) of support from (local) government officials:** | 05/10/2022 |

*Attach copies of all letters of support from local government officials, along with a narrative description of the PHA's consultation (if applicable)*

*The information below is for Brooks Homes, which is across the street from subject property and will not be impacted.

## Section 4: Description of Existing Development

1. Name of Development: ABLA
2. Development Number: IL002001000
3. Date of Full Availability (DOFA): 07/26/1981
4. Number of Residential Buildings: 44
5. Number of Non-Residential Buildings: 4
6. Date Constructed:
7. Is the Development Scattered Site?  ☐ Yes  ☑ No
8. Number of Buildings (single family, duplexes, 3-plexes, 4-plexes, other):
9. Number of Types of Structures (row houses, walk-up units, high-rise unit):   Row Houses- 330, High Rise -0
10. Total Acres in Development: 67

| 11. Existing Unit Distribution | General Occupancy | Elderly/Disabled Designated Units | Total Units Being Used for Non-Dwelling Purposes | Total Units in Development |
|---|---|---|---|---|
| 0 – Bedroom | 0 | 0 | 0 | 0 |
| 1 – Bedroom | 63 | 0 | 0 | 63 |
| 2 – Bedrooms | 160 | 0 | 0 | 160 |
| 3 – Bedrooms | 70 | 0 | 0 | 70 |
| 4 - + Bedrooms | 37 | 0 | 0 | 37 |
| Total | 330 | 0 | 0 | 330 |

*Attach a description of the distribution of UFAS accessible units (bedroom size; unit type, e.g., mobility or sensory)*

## Section 5: Description of Proposed Removal

1. **Type of Removal Action(s)**
   (e.g., Demolition, Disposition, Disposition to allow for Public Housing Mixed-Finance Modernization, Demolition and Disposition. DeMinimis Exception under Demolition, Voluntary Conversion, Required Conversion, Homeownership, Eminent Domain, Retention under 2 CFR part 200)

2. **Proposed Action by Unit Type (e.g. bedroom size)**

| Existing Unit Distribution | General Occupancy | Elderly/Disabled Designated Units | UFAS Mobility Units | UFAS Sensory Units | Total Units Being Used for Non-Dwelling Purposes | Total Units in Development |
|---|---|---|---|---|---|---|
| 0 – Bedroom | | | | | | |
| 1 – Bedroom | | | | | | |
| 2 – Bedrooms | | | | | | |
| 3 – Bedrooms | | | | | | |
| 4 - + Bedrooms | | | | | | |
| Total | | | | | | |

| 3. **Proposed Action by Building Type** | Buildings to be Demolished Only | Buildings to be Disposed of Only |
|---|---|---|
| Residential Buildings | | |
| Non-Residential Buildings | | |
| Total Buildings | | |

*If the removal action is for only a portion of property at a contiguous site, attach a site map*

| 4. **Total Acreage Proposed for Removal (if applicable)** | 23.226 |
|---|---|

    (a) *Attach a description of the land (e.g. survey, copy of the legal description)*
    (b) *Attach a copy of the recorded Declaration of Trust (DOT)/Deed of Restrictive Covenant (DoRC)*
    (c) *If the removal action is for only a portion of property at a contiguous site, attach a site map.*

| 5. **Estimated Value of the Proposed Property** | $ 21,246,215.76. | |
|---|---|---|
| (a) Was an independent appraisal conducted to determine the estimated Fair Market Value? | ☑ Yes | ☐ No |
| (b) If yes, date of appraisal and name of appraiser: | Date: 04/29/22   Name: Randal Dawson, CBRE | |
| (c) If not, describe other form of valuation used: | | |

*Attach an executive summary of the appraisal or other form of valuation*

| 6. **Timetable** | | |
|---|---|---|
| Activity | | Estimated Number of <u>Days</u> After HUD Approval: |
| (a)Begin Relocation of Residents: | N/A ☐ -if vacant or for non-dwelling building | |
| (b)Complete Relocation of Residents: | N/A ☐ -if vacant or for non-dwelling building | |
| (c) Execute Contract for Removal | | 60 |
| (d) Removal of the property | | 90 |

---

| **Section 6: Relocation** | | |
|---|---|---|
| 1. Number of Units Proposed for Removal that are Occupied as of the Submission Date of this SAC application: (Note: These numbers are not editable and automatically populated when application is submitted) | | |
| 2. Number of individual residents that the PHA estimates will be displaced by this removal action: | | |

*Attach a summary of the number of individual residents estimated to be displaced by race and national origin and a summary of households estimated by be displaced by who have a member who is a person with a disability*

| 3. Who will provide relocation counseling and advisory services to residents? | ☐ PHA staff ☐ Another Entity contracted by the PHA Describe: |
|---|---|

*Attach a description of the relocation counseling and advisory services that the will be provided to residents who will be displaced by this action*

| 4. What is the estimated costs of relocation and moving expenses (including advisory services)? | $ |
|---|---|
| 5. What is the anticipated source of funds for relocation and moving expenses (including advisory services)? | ☐ Capital Funds ☐ Operating Funds ☐ Funding Source Year: ☐ Non-1937 Act Funds (describe: ) |
| 6. What comparable housing resources does the PHA expect to offer to displaced residents? | ☐ Public Housing. If checked, number: ☐ Section 8 HCV (existing resources. If checked, number: ☐ Section 8 HCV (new award of TPVs) (see question #7). If checked, number: ☐ PBV Unit. If checked, number: ☐ Other (attach description). If checked, number: |

*Attach a summary of the comparable housing resources that the PHA expects to offer to be displaced residents.*

| 7. Tenant Protection Vouchers (TPVs): If the PHA is eligible to receive TPVs in connection with the proposed removal action, how many TPVs is the PHA requesting? | ☐ Yes - Replacement TPVs. If checked, number: ☐ Yes - Relocation TPVs. If checked, number: ☐ No TPVs will be requested |
|---|---|

*Attach a brief explanation supporting the TPV request. See PIH Notice 2017-10 and PIH Notice 2018-04 (or any successor notices). If the PHA is a public housing only-PHA, the PHA must partner with a PHA that administers an HCV program.*

## Section 7: Resident Consultation

| 1. Will any residents be displaced or otherwise affected by the proposed removal action? If yes, date(s) PHA consulted with residents? | ☐ Yes   ☑ No Date(s): |
|---|---|

*Attach a narrative description of consultation process, along with supporting documentation (e.g., agenda, meeting notices; sign-in sheets; meeting minutes, print-out of written or email consultation)*

| 2. Is there a Resident Council (at affected development)? If yes, name of Resident Council and dates PHA consulted it: | ☑ Yes   ☐ No Name:  ABLA LAC   Date(s): ☐ N/A to removal action |
|---|---|

*Attach a narrative description of consultation process, along with supporting documentation e.g. meeting notices; sign-in sheets; meeting minutes, print-out of written or email consultation)*

| 3. Is there a Resident Council (PHA-wide jurisdiction)? If yes, name of Resident Council and dates PHA consulted it: | ☑ Yes   ☐ No Name:  ABLA LAC   Date(s): ☐ N/A to removal action |
|---|---|

*Attach a narrative description of consultation process, along with supporting documentation e.g. meeting notices; sign-in sheets; meeting minutes, print-out of written or email consultation)*

| 4. Date(s) PHA consulted with the Resident Advisory Board (RAB) (as defined in 24 CFR 903.13) | Name of RAB:  ABLA LAC Date(s):  03/29,04/05,04/12 ☐ N/A to removal action |
|---|---|

*Attach a narrative description of consultation process, along with supporting documentation e.g. meeting notices; sign-in sheets; meeting minutes, print-out of written or email consultation)*

| 5. Did the PHA receive any written comments from residents or resident groups/organizations during the consultation process? | ☑ Yes   ☐ No |
|---|---|

*If yes, attach comments received, along with an evaluation by the PHA*

## Section 8: N/A

## Section 9: PHA Certification of Compliance

*Acting on behalf of the Board of Commissioners of the PHA, as its Chairman, Executive Director, or other authorized PHA official, I approve the submission of this SAC Application known as DDA #          for removing public housing property from public housing use restriction, of which this document is a part, and make the following certifications, agreements with, and assurances to the Department of Housing and Urban Development (HUD) in connection with the submission of this SAC application and the implementation thereof:*

1. All information contained in this SAC application (including all supporting documentation, attachments and required form HUD-52860 addendums) is true and correct as of today's date.
2. Resident demographic data in the IMS/PIC system is updated and current as of the date of the submission of this SAC application.
3. The PHA will comply with all applicable fair housing and other civil rights requirements, including but not limited to HUD's general non-discrimination and equal opportunity requirements listed at 24 CFR 5.105(a), as well as the duty to affirmatively further fair housing (AFFH) related to this SAC application. AFFH includes ensuring that the proposed inventory removal development is not in conflict with fair housing goals and strategies in my agency's PHA or MTW Plan, and is consistent with my agency's obligation to AFFH, certification and supporting activities. The PHA conducted the submission requirements of this SAC application (including removal justification; resident consultation, etc.) in conformity with Title

Provide attachments as needed. All attachments must reference the Section and line number to which they apply
Previous versions obsolete

Page 5 of 9

form HUD-52860 (08/2019)

VI of the Civil Rights Act of 1964, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, title II of the Americans with Disabilities Act of 1990, state or local accessibility requirements, and other applicable civil rights laws. If HUD approves this SAC application, the PHA will carry out and implement this removal action (including relocation, if applicable), in conformity with all applicable civil rights requirements. The requirements for AFFH can be found at 24 CFR §§ 5.150-5.152, 5.154, 5.156, 5.158, 5.160, 5.162, 5.164, 5.166, 5.168, and 5.169-5.180.

4. The removal action proposed in this SAC application does not violate any remedial civil rights order or agreements, conciliation agreements, voluntary compliance agreements, final judgments, consent decrees, settlement agreements or other court orders or agreements to which the PHA is a party. If the PHA is operating under such a document, it must indicate this by uploading a document to the SAC application that provides a citation to the document and explains how the proposed demolition or disposition is consistent with such document.

5. If the PHA is a non-qualified PHA under the Housing and Economic Recovery Act of 2008 (HERA), it has complied with the PHA Plan requirements regarding the proposed removal action at 24 CFR part 903 and the applicable statutory removal authority. For instance, if the removal action is a demolition or disposition, the PHA must describe the demolition or disposition in its PHA Plan or in a Significant Amendment to that PHA Plan and that description must be substantially identical to the description in the SAC application. If the PHA is a qualified PHA, the PHA certifies that it has discussed the removal action at a public hearing.

6. The PHA has conducted all applicable resident consultation and will conduct all relocation activities associated with this SAC application in a manner that is effective for persons with hearing, visual, and other communication-related disabilities consistent with Section 504 of the Rehabilitation Act of 1973 (24 CFR 8.6) and with 49 CFR 24.5, and as applicable, the Americans with Disabilities Act of 1990. The PHA will take reasonable steps to ensure meaningful access to their programs and activities for persons who have limited ability to read, speak, or understand English – i.e., individuals who have limited English proficiency (LEP).

7. The PHA will comply with all applicable Federal statutory and regulatory requirements and other HUD requirements, including applicable PIH Notices, in carrying out the implementation this SAC application, as approved by HUD. The PHA specifically certifies that the property proposed for removal in this SAC application is in compliance with Declaration of Trust (DOT) or Declaration of Restrictive Covenants (DoRC) requirements.

8. The PHA will comply with the terms and conditions of any HUD approval that HUD may issue for this SAC application, including requirements applicable to future use, record-keeping and reporting; and will specifically retain records of the SAC application and its implementing actions of HUD's approval of this SAC application for a period of not less than 3 years following the last required action of HUD's approval. The PHA further certifies that it will make such records available for inspection by HUD, the General Accountability Office and the HUD Office of Inspector General. If the PHA wants to make any material changes from what it described in its SAC application and/or HUD's approval of the SAC application, it will request HUD approval for such changes, in accordance with applicable HUD guidance.

9. The PHA will not take any action to remove or otherwise operate the property proposed for removal outside of public housing requirements until it receives written approval of this SAC application from HUD.

10. If any units proposed for removal by this SAC application are subject to an Energy Performance Contracting (EPC), the PHA agrees to comply with additional instructions provided by HUD regarding the EPC and will not take any steps to implement this SAC application (if approved by HUD), without receiving confirmation from HUD that all applicable EPC requirements are satisfied.

11. If any units proposed for removal by this SAC application are subject to a Capital Fund Financing Plan (CFFP) or other Section 30 debt, the PHA agrees to comply with additional instructions provided by HUD regarding the CFFP or other Section 30 and will not take any steps to implement this application (if approved by HUD), without receiving confirmation from HUD that all applicable CFFP or other Section 30 requirements are satisfied.

12. If the PHA is in the process of removing all of its public housing units from its ACC low-rent inventory through this or other SAC applications and/or other pending removal actions, including the Rental Assistance Demonstration (RAD) program, the PHA agrees to comply with additional instructions provided by HUD regarding the close-out of its public housing portfolio.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

**Warning:** HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| Name of Authorized Official | Tracey Scott |
|---|---|
| Official Title: | Chief Executive Officer |
| Signature: | |
| Date: | |

**Form HUD-52860 Instructions**

Provide attachments as needed. All attachments must reference the Section and line number to which they apply
Previous versions obsolete

Page 6 of 9

form HUD-52860 (08/2019)

**Refer to SAC website at** www.hud.gov/sac **for more information**

This form request general information from PHAs about proposed removal actions under the following laws: demolition and disposition (Section 18 of the 1937 Act and 24 CFR part 970); voluntary conversion (Section 22 of the 1937 Act and 24 CFR part 972); required conversion (Section 33 of the 1937 Act and 24 CFR part 972); homeownership (Section 32 of the 1937 Act and 24 CFR part 906); retentions (PIH Notice 2016-20 and 2 CFR 200.311); and eminent domain (PIH Notice 2012-8, or replacement notice). This form is the first part of a SAC application that must be submitted via the fields in the Inventory Removal Submodule of IMS/PIC (or replacement system).

PHAs must complete the sections of this form where there is no field in the IMS/PIC SAC application for the requested information. PHAs must then upload this form and other supporting documentation requested by this form to the IMS/PIC SAC application. PHAs must label that supporting documentation by section number of this form and/or by name (e.g. Resident Consultation). PHAs must complete and submit applicable addendums as indicated below as part of a SAC application. PHAs must refer to the applicable regulations, PIH notices and other program guidance noted above for detailed requirements on the submissions required for the specific removal action proposed in the SAC application at SAC web site.

| Proposed Removal Action | Additional HUD Form Required |
|---|---|
| Section 18 Disposition and/or Demolition | HUD-52860-A |
| Section 18 Demolition Rehab Needs and Cost-Test | HUD-52860-B |
| Section 32 Homeownership | HUD-52860-C |
| Section 33 Required Conversion | HUD-52860-D |
| Section 22 Voluntary Conversion | HUD-52860-E |
| Eminent Domain | HUD-52860-F |
| Part 200 Retention | HUD-52860-G |

NOTE: The removal of public housing units from the PHA's inventory through these actions will impact (decrease) the PHA's Operating and Capital Fund subsidy from HUD. See 24 CFR 990.190 and PIH Notice 2017-22 (or successor notice) for impacts on Operating Fund. Capital Funds for units will terminate at the time the units are removed from ACC via IMS/PIC. However, PHAs may be eligible for Demolition Disposition Transition Funding (DDTF) pursuant to 24 CFR 905.400(j).

**Section 1: General Information**

Some fields will automatically populate from IMS/PIC. If not, complete all fields.

**Section 2: N/A**

**Section 3: PHA Plan, PHA Board Resolution, Environmental Review and Local Government Consultation**

Refer to the regulation, PIH Notice or other HUD guidance document for guidance on these requirements for the specific removal action proposed, but generally the following apply:

PHA Plan: PHAs must include the removal action in their approved PHA plan for all SAC applications.

Board Resolution: PHAs must obtain a board resolution approving the removal action for all SAC applications. For demolitions and dispositions proposed under 24 CFR part 970, the board resolution must be dated after the date of resident and local government consultation.

Environmental Clearance: HUD will not process or approve a SAC application without evidence that the proposed removal action has received Environmental Clearance. This evidence will generally be a copy of a HUD signed Authority to Use Grant Funds (HUD-7015.16 form or subsequent form) for the proposed removal action (including future use, if known) to evidence an environmental review acceptable to HUD was completed under 24 CFR part 58. In some instances, evidence of Environmental Clearance may be a letter from the Responsibly Entity stating the activity was exempt or categorically excluded under 24 CFR part 58. The only exception to obtaining Environmental Clearance under 24 CFR part 58 is if HUD, in its sole discretion, decides to complete the environmental review itself under 24 CFR part 50. In this case, the applicable local HUD Office of Public Housing must have actually completed the environmental review and determined the action has Environmental Clearance before HUD will process or approve a SAC application.

Local Government Consultation: PHAs must consult with their local government officials and obtain a letter of support for all SAC applications (except for eminent domain and homeownership). For demolitions and dispositions proposed under 24 CFR part 970, PHAs must include a narrative description of its consultation with local government officials.

**Sections 4-9 must be completed and submitted separately for each Development covered by this Application**

**Section 4: Description of Existing Development(s)**

Most information should automatically populate from IMS/PIC information, except for Section 4, Line item 10 (Total Acres of the Development) which the **PHA must complete**. If line 10 is not completed or less than proposed for disposition under Section 5, PHA will not be able to fill in Section 5, line 4. The development number should be the HUD development number. All development numbers are at least 8 characters long (and may be up to 11 characters for AMP developments).

**Section 5: Description of Proposed Removal**

Unlike section 4, this information will not automatically populate. PHAs must complete the fields of this form where there is no field in the IMS/PIC SAC application for the requested information (i.e. UFAS information).

Removal Action Type: PHAs must select removal action type as the first step to creating the electronic SAC application in IMS/PIC. Property description (Unit, Building, Acreage): PHAs identify the property by development number(s) and buildings by their IMS/PIC building PHAs provide the total acreage (refer to instructions for Section 4, line 10) and physical address of the property proposed for removal. If the removal action includes land (i.e., not just buildings), PHAs should attach a description of the land (e.g. survey, copy of the legal description), along with a copy of the DOT/DoRC that is recorded against the property, if available. If the proposed removal action (including demolition) is for only a portion of the property at a contiguous site, PHAs must attach a site map.
Estimated Value of Property: Attach an independent appraiser's appraisal summary or other valuation method.
Timetable: PHAs indicates the number of days after HUD approval of a SAC application that they estimate they will complete these activities.

**Section 6: Relocation**

PHAs complete this section for all proposed removal action where relocation will be required. PHAs may be required to complete additional relocation information in the applicable addendums (e.g. right of first refusal for homeownership applications; evidence of compliance with all applicable federal, state, and local laws for eminent domain actions).

For question #3, the summary of the type of counseling and advisory services should include a description of how the services will promote fair housing, including but not limited to how they will assist residents in obtaining housing in opportunity areas.

For question #6, the relocation summary should provide sufficient detail about the comparable housing that the PHA will offer to the displaced residents (i.e. based on available resources and resident preferences) Indicate how the PHA will identify and offer comparable housing to (a) displaced residents who have a family member who is a person with a disability; and (b) displaced residents who are not eligible for Section 8 HCV assistance (e.g. because they are over-income).

Note that a PHA's eligibility to receive TPVs is based on statutory Appropriations laws, and other HUD guidance, including but not limited to PIH Notice 2017-10and PIH Notice 2018-04 (or any successor or replacement notices).

If the PHA is a public housing only-PHA and will partnering with a PHA that administers an HCV program for the TPVs, the partnering PHA must have jurisdictional authority and administrative capacity to administer the TPVs. PHAs should contact their local HUD Office of Public Housing for more information.

**Section 7: Resident Consultation**

Refer to the regulation, PIH Notice or other HUD guidance document for guidance on resident consultation for the specific removal action proposed.

**Section 8: N/A**

**Section 9: PHA Certification of Compliance**

The Executive Director, Board Chairperson, or other authorized agent of the PHA, should complete, sign and date the Certification and submit it (as a scanned PDF file) as part of its submission of the SAC application.

Provide attachments as needed. All attachments
must reference the Section and line number to which they apply
Previous versions obsolete

Page 8 of 9

form HUD-52860 (08/2019)

**De Minimis Demolition**

PHAs do not need HUD approval to demolish units under Section 18 de minimis authority. PHAs do need to submit information to HUD described at 970.7(a)(1), (2), (12), (13), and (15), which includes PHA plan, description of the property, board resolution, and environmental requirements. Thus, for purposes of de minims demolitions, PHAs are submitting information and not a SAC application through this form.

Provide attachments as needed. All attachments must reference the Section and line number to which they apply
Previous versions obsolete

Page 9 of 9

form **HUD-52860** (08/2019)

| Demolition and Disposition Addendum | U.S. Department of Housing and Urban Development Office of Public and Indian Housing | OMB Approval No. 2577-0075 (exp. 08/31/2023) |
|---|---|---|
| HUD-52860-A | | Revised 10/21/22 |

The information collection requirements contained in this document have been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501-3520) and assigned OMB control number 2577-0075. There is no personal information contained in this application. Information on activities and expenditures of grant funds is public information and is generally available for disclosure. Recipients are responsible for ensuring confidentiality when disclosure is not required. In accordance with the Paperwork Reduction Act, HUD may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection displays a currently valid OMB control number.

| Section 1. Demolition | |
|---|---|
| 1. Does the removal action include the demolition of all or a portion of a development (AMP) or other public housing property? | ☐ Yes ☑ No<br>If yes:<br>☐ All units at a development site<br>☐ A portion of units at a development site<br>☐ Non-dwelling property at a development site<br>☐ Non-dwelling property not at a development site (e.g. central PHA administrative building) |
| *If yes, complete questions 2-6 of this section. If no, move on to section 2.* | |
| 2. What is the estimated demolition cost? | $ |
| 3. What is the anticipated source of funds for the demolition cost? | ☐ Capital Funds ☐ CDBG<br>☐ Operating Funds<br>☐ Fiscal Year: _____<br>☐ Non-Public Housing Funds (describe: ) |
| 4. What is the justification for the demolition? | ☐ Obsolete - Physical Condition<br>☐ Obsolete - Location<br>☐ Obsolete - Other Factors<br>☐ De Minimis Demolition (the lesser of 5 units or 5 percent of the total public housing units in any 5-year period) |
| *Attach a narrative statement describing the justification for demolition, along with other supporting documentation, in accordance with 24 CFR part 970 and PIH Notice 2018-04 (or any successor notice). If the demolition is for a portion of a development, the narrative statement must specifically address how the demolition will help to ensure the viability of the remaining portion of the development.* | |
| 5. Cost-test: | The PHA must certify and present supporting evidence that no reasonable program of modifications is cost-effective to return the public housing development (or portion thereof) to useful life. |
| *Attach a completed HUD-52860-B, narrative statement, and other supporting documentation as described in the instructions* | |

| Section 2. Disposition | | |
|---|---|---|
| 1. What is the justification for the disposition? | ☐ Conditions in Surrounding Area: 24 CFR 970.17(a)<br>　　☐ Health and/or Safety<br>　　☐ Infeasible Operation<br>☐ More Efficient/Effective Low-Income Housing: 24 CFR 970.17(b)<br>☐ Best Interests of PHA and Residents & Consistent with PHA Plan & 1937 Act: 970.17(c)<br>☑ The Non-Dwelling Structure or Land Exceeds the Needs of the Development (after Date of Full Availability "DOFA")<br>☐ The Disposition of the Non-Dwelling Property is Incidental to, or does not Interfere with, the Continued Operation of the Remainder of the Development | |

*Attach a narrative statement describing the justification for disposition, along with other supporting documentation, in accordance with 24 CFR part 970 and PIH Notice 2018-04(or any successor notice).*

*If disposition is based on physical obsolescence under the demolition criteria, complete Section 1 (Demolition) of this form.*

| 2. Method of Disposition | a. ☐ Public Bid FMV Sale<br>b. ☐ Negotiated Sale at FMV<br>c. ☑ Negotiated Lease or other Transfer at FMV<br>d. ☐ Negotiated Sale or other Transfer at FMV<br>e. ☐ Negotiated Sale at below FMV<br>f. ☐ Negotiated Lease or other Transfer at below FMV<br>g. ☐ Land-Swap |
|---|---|

*Attach a description of the method of disposition (e.g. sale or ground lease terms; below FMV disposition).*

*If the disposition is proposed via negotiation, attach a Certificate of Good Standing (under applicable State law) of the proposed acquiring entity, or other evidence that the entity is recognized under State law.*

| 3. Is the proposed acquiring entity the PHA's instrumentality as defined by 24 CFR 905.604(b)(3)? | ☐ Yes | ☑ No |
|---|---|---|

| 4. Commensurate Public Benefit:<br>If the method of disposition is at or below FMV, the PHA must demonstrate a commensurate public benefit | | |
|---|---|---|

*Attach a narrative description of commensurate public benefit in accordance with 24 CFR 970.19 and PIH Notice 2018-04 (or any successor notice).*

| Section 3. Proceeds | | |
|---|---|---|
| 1. Will the PHA realize proceeds from this disposition? | ☑ Yes　☐ No | |
| 2. If PHA answered yes to question #1, indicate the estimated amount of gross and net proceeds | Gross $ 21,246,215.76.　Net $ | |
| 3. Is the PHA requesting to use gross proceeds for relocation costs? | ☐ Yes $　　　　(estimated amount)<br>☑ No | |
| 4. Is the PHA requesting to use gross proceeds for reasonable costs of disposition? | ☐ Yes $　　　　(estimated amount)<br>☑ No | |

*If yes, attach a brief narrative, budget, or other supporting documentation describing the reasonable costs*

| 5. If the PHA will realize net proceeds from this disposition, how does the PHA propose to use the proceeds? | ☑ Public Housing Capital Fund (CFP) Uses<br>　　☐ Loan for development of Public Housing Units<br>☑ Section 8 PBV Unit Development<br>　　☐ Loan for development of PBV units<br>☐ Supportive Services for Residents<br>☐ Costs of Converting Public Housing Units to Project-Based Section 8 under the Rental Assistance Demonstration (RAD) Program<br>☐ Section 8 HCV Shortfalls<br>☐ Operation of Section 8 program<br>☐ Operation of Public Housing program<br>☑ Modernization of Section 8 Units<br>　　☐ Loan for modernization of PBV Units<br>☐ Other Statutorily Eligible Uses:　　(describe)<br>☐ To Be Determined (TBD) (PHA must request approval from HUD when it determines a proposed use) |
|---|---|

*Attach a brief narrative, budget, or other supporting documentation describing the proposed use of proceeds.*

*If loan is checked, include the loan term, interest rate, and type (i.e. permanent, bridge, construction).*

| Section 4.  Offer of Sale to Resident Organization (Disposition Only) | |
|---|---|
| 1. If this action is for a disposition, is the PHA exercising any of the exceptions to the offer of sale requirements? | ☑ Yes ☐ No<br>☐ 970.9(b)(3)(i): local government requests to acquire vacant land less than 2 acres in order to build or expand public services<br>☐ 970.9(b)(3)(ii): PHA seeks disposition to develop a facility to benefit low-income families<br>☐ 970.9(b)(3)(iii): the units have been legally vacated (HOPE VI, 24 CFR part 971 or 972)<br>☐ 970.9(b)(3)(iv): the units are distressed units subject to Section 33 required conversion<br>☑ 970.9(b)(3)(v): property proposed for disposition is non-dwelling<br>☐ Other: PHA requests that HUD consider another exception to 970.9(b)(1) |
| *If exercising an exception, attach a narrative statement or documentation supporting the exception in accordance with 970.9(b)(4).  If not exercising an exception, complete questions #2-6 of this Section 4.* | |
| 2. Name(s) of all established eligible organizations as defined by 24 CFR 970.11 (e.g. resident organizations, eligible resident management corporations as defined in 24 CFR part 964, and nonprofit organization acting on behalf of residents at a development. | ABLA Local Advisory Council |
| *Attach a narrative explanation of how the PHA determined the entities identified* | |
| 3. Date(s) the PHA sent an initial written notification to each established eligible organization in accordance with 24 CFR 970.11 | 01/27/22 |
| *Attach a copy of the initial written notification to each established eligible organization* | |
| 4. Did the PHA receive a written expression of interest in accordance with 24 CFR 970.11 by an established eligible organization? | ☐ Yes ☑ No |
| *If yes, attach a copy of the expression of interest by any eligible established organization* | |
| 5. Did the PHA receive a proposal to purchase from an established eligible organization within 60-days of receiving the established eligible organization's expression of interest? | ☐ Yes ☑ No |
| *If yes, attach a copy of the proposal to purchase from an established eligible organization* | |
| 6. Did the PHA accept the proposal to purchase? | ☐ Yes ☐ No<br>☑ N/A (PHA did not receive a proposal to purchase) |
| *Attach a narrative explanation of why the PHA accepted or rejected the proposal to purchase* | |

## Section 5. PHA Certification

**For SAC applications submitted under 24 CFR part 970:**

1) If this SAC application includes a demolition action, I certify that the proposed development (units or other property) meets the obsolescence criteria of 24 CFR 970.15 as specifically described in this SAC application. I further certify that such obsolescence makes any units proposed for demolition unsuitable for housing purposes and that no reasonable program of modification is cost-effective to return the development to its useful life;

2) If this SAC application includes a demolition for only a portion of the buildings/units at a development on a contiguous site, the PHA certifies that the partial demolition will help to ensure the viability of the remaining portion of the development;

3) If this SAC application includes a disposition action for public housing units, the PHA is justified in disposing of the development or other public housing property in accordance with the specific criteria of 24 CFR 970.17, as specifically described in this SAC application;

4) The PHA will comply with all applicable relocation requirements of 24 CFR 970.21; and

5) The PHA will use gross and net proceeds it receives from the disposition in accordance with the requirements of 24 CFR 970.19 and the HUD approval.

**For De Minimis Demolitions:**

1) The units proposed for demolition meet the criteria of Section 18 because they are beyond repair or the space occupied by the units will be used for meeting the service or other needs of public housing residents; and

2) The units proposed for demolition do not exceed the statutory maximums of five percent of my PHA's total housing stock, or five dwelling units, whichever is less, in any 5-year period.

I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate.

**Warning:** HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)

| | |
|---|---|
| Name of Authorized Official | Tracey Scott |
| Title | Chief Executive Officer |
| Signature | |
| Date | |

## Form HUD-52860-A Instructions

This form is required when a PHA proposes a demolition or disposition under 24 CFR part 970 and when a PHA proposes a de minimis demolition under Section 18 of the 1937 Act. This information is required as a supplement to the HUD-52860 form. PHAs must complete this form and upload it as an attachment to the IMS/PIC SAC application. Also, PHAs must upload the supporting documentation requested by this form as part of the IMS/PIC SAC application. PHAs must label that supporting documentation by section number of this form and/or by name (e.g. use of proceeds). PHAs refer to 24 CFR part 970 and all applicable PIH Notices in completing this form, including PIH Notice 2018-04 (or any successor notice). PHAs must label All defined terms not defined in this form have the meaning in those regulations and notices.

### Section 1: Demolition

Justification (Question 4). In completing their narrative statements describing the justification for demolition, PHAs should refer to the guidance at 24 CFR part 970 and PIH Notice 2012-7 (or any successor notice). In the case of a SAC application for demolition of portion of a development (e.g. SAC application is for less than all units on a contiguous site) the PHA's narrative must describe how the demolition will help to ensure the viability of the remaining portion of the development. This requirement shall not apply for demolitions of units on scattered non-contiguous sites.

Obsolete-Physical Condition: 24 CFR 970.15(b)(1)(i). A PHA must demonstrate serious and substantial physical deterioration of the buildings/units at the development. HUD strongly encourages PHAs to submit a physical needs assessment (PNA), government inspection, or independent architect or engineer's report as supporting documentation.

Obsolete-Location: 24 CFR 970.15(b)(1)(ii). A PHA must demonstrate that the location of the units causes obsolescence. HUD may consider the physical deterioration of the neighborhood; change in neighborhood from residential to industrial or commercial development; or environmental conditions which jeopardize the suitability of the site or a portion of the site and its housing structures for residential use.

Obsolete-Other Factors: 24 CFR 970.15(b)(1)(iii). A PHA must generally demonstrate that factors at the development have impacted the marketability, usefulness, or management of the units so seriously that, notwithstanding due diligence and its best efforts in marketing and leasing the units, the PHA is unable to operate the development for residential purposes for an extended period of time (generally more than 5 years). HUD may consider factors such as turnover rate, historic vacancy rate, access to transportation, crime rates, site plan and density issues, neighborhood infrastructure, and unit size. HUD strongly encourages PHAs to submit third party documentation.

De Minimis Demolition: 24 CFR 970.27. In any 5-year period, a PHA may demolish not more than the lesser of 5 dwelling units or 5 percent of the total public housing dwelling units owned by the PHA without the need to obtain HUD approval under 24 CFR part 970 provided the PHA can meet one of the following criteria: (a) The PHA will use the space occupied by the unit(s) for meeting the service or other needs of the residents (e.g. laundry facility; community center; child care center); or (b) The PHA has determined the unit(s) are beyond repair.

Cost-Test (Question 5). HUD generally shall not consider a program of modifications to be cost-effective if the costs of such program exceed 62.5 percent of total development cost (TDC) for elevator structures and 57.14 percent of TDC for all other types of structures in effect at the time the SAC application is submitted to HUD.

Obsolete-Physical Condition: 24 CFR 970.15(b)(1)(i). PHAs must complete and submit the HUD-52860-B form.

Obsolete-Location: 24 CFR 970.15(b)(1)(ii). HUD will consider the PHA's cost of curing the cause of the obsolescence (e.g. nearby industrial or commercial development. environmental conditions).

Obsolete-Other Factors: 24 CFR 970.15(b)(1)(iii). HUD will consider the PHA's cost of curing the cause of the obsolescence (e.g. site plan, crime, turnover).

De Minimis Demolition. Cost-test requirements are not applicable.

### Section 2: Disposition

Justification (Question 1). In completing their narrative statements describing the justification for disposition, PHAs should refer to the guidance at 24 CFR part 970 and PIH Notice 2018-04 (or any successor notice).

Conditions in Surrounding Area: 24 CFR 970.17(a). A PHA must demonstrate the location of the units (e.g. industrial or commercial development) jeopardizes the health and/or safety of the residents and/or the feasible operation of the units by the PHA based on external conditions outside the control of the PHA; and the condition is beyond the scope of the PHA to mitigate or cure in a cost-effective manner. To support a SAC application based on health and/or safety, PHAs must generally provide relevant third-party documentation that evidences the external conditions that present serious obstacles to the PHA maintaining the units as healthy and/or safe housing.

<u>More Efficient/Effective Low-Income Housing: 24 CFR 970.17(b).</u> A PHA must demonstrate the retention of the units is not in the best interests of the residents or the PHA because the disposition allows the acquisition, development, or rehabilitation of units that will be more efficiently or effectively operated as other low-income housing units. PHAs must generally demonstrate why other low-income units are preferable (e.g., more energy efficient, better unit configuration, better location for resident in terms of transportation, jobs, schools or racial or economic concentration). See PIH Notice 2012-7 (or any successor notice).

<u>Best Interests of PHA and Residents & Consistent with PHA Plan & 1937 Act: 970.17(c).</u> See PIH Notice 2018-04 (or any successor notice).

<u>Third-Party Agreement</u>. Certain third-party agreements may require HUD review and approval under 24 CFR part 970. In this case, the PHA must submit a SAC disposition application under this form to obtain HUD approval for the third-party agreement (including completing and attaching justification narrative of the agreement under 970.17(c) or other applicable section of 24 CFR 970). In the SAC application, the PHA must clearly indicate it is requesting HUD approval of a third-party agreement and attach the draft form of third-party agreement to the application. If the PHA is not requesting that HUD release the ACC or Declaration of Trust (DOT) or DORC from the property, it should put "0" in all fields for units, buildings and acreage. See PIH Notice 2018-04 (or any successor notice).

<u>Non-Dwelling Property: 970.17(d).</u> A PHA must demonstrate that the non-dwelling structure or land exceeds the needs of the development (after DOFA); or the disposition is incidental to, or does not interfere with, the continued operation of the remainder of the development.

<u>Method of Disposition (Question 2).</u> In completing this section, PHAs should refer to the guidance at 24 CFR part 970 and PIH Notice 2018-04 (or any successor notice). PHAs may propose different methods of disposition in their SAC applications, including:
  (a) <u>Public Bid Fair Market Value (FMV) Sale (Cash).</u> The PHA lists the public housing property on the open and competitive market and solicits bids. Actual FMV may be more or less than the appraised value, depending on the market and may reflect negotiations during the due diligence period.
  (b) <u>Negotiated Sale at FMV (Cash).</u> The PHA negotiates a sale with an identified buyer based on the appraised value of the public housing property. The PHA receives cash for the sale.
  (c) <u>Negotiated Lease or other Transfer at FMV (Cash).</u> The PHA negotiates a lease (e.g. ground lease, capital lease) with an identified entity based on the appraised value (leasehold and/or fee value) of the public housing property. The PHA receives cash for the lease payments.
  (d) <u>Negotiated Sale or other Transfer at FMV (Seller-Financing).</u> The PHA negotiates a sale with an identified buyer but instead of receiving cash proceeds, the PHA receives a promissory note and/or mortgage or deed of trust. Payments are generally made from deferred loan payments.
  (e) <u>Negotiated Sale at below FMV.</u> The PHA negotiates a sale with an identified buyer for below FMV (often nominal value).
  (f) <u>Negotiated Lease or other Transfer at below FMV.</u> The PHA negotiates a lease with an identified entity for below FMV (often nominal value).
  (g) <u>Land-Swaps.</u> The PHA negotiates a "land swap". In addition to meeting the requirements for a Negotiated Sale at FMV in B above, the PHA must generally evidences that HUD has approved the acquisition of the property to be acquired in the "land-swap" under 24 CFR part 905. If the property that PHA is proposing to acquire is valued less than public housing property proposed for disposition, the PHA receives cash proceeds to make up the difference.

If the disposition is proposed via negotiation, the PHA must evidence the entity is a valid entity under State law and is in good standing.

<u>Commensurate Public Benefit (Question 3).</u> In completing this section, PHAs should refer to the guidance at 24 CFR 970.19 and PIH Notice 2018-04 (or any successor notice). HUD determines commensurate public benefit on a case-by-case basis. However, generally the public housing property must be developed for affordable housing purposes serving low-income families (incomes at or below 80% of area median). HUD does not consider general public benefits (e.g., schools, libraries, fire stations, police stations and bridges) to be approvable non-dwelling uses that primarily serve low-income families. A PHA may propose a preferred form of use restriction (e.g., LIHTC extended use agreement, HOME agreement, reversion clause in transfer documents, provision in ground lease, separate use agreement).

If applicable, PHAs may, but are not required, to complete the following table and submit with their SAC applications in order to evidence the proposed commensurate public benefit, purpose and other disposition details:

| Development Name | Development Number | | | |
|---|---|---|---|---|
| Proposed for Disposition: Building/s: ; Units: ; Acres: | | | | |
| Total number of units to be developed (or preserved) on property: | Less than 80% of Area Median Income | | | |
| Total number of non-dwelling buildings to be developed (or preserved) on property: | ACC | Non-ACC | PBV | Market Rate |
| Rental | | | | |
| For Sale | | | | |
| Name of Acquiring Entity (Rental Units) | R | | | |
| Name of Acquiring Entity (initial developer) (For Sale Units) | | | | |
| Method of Disposition | (e.g. 99-year ground lease; fee simple sale; Fair Market Value) | | | |
| Lease Price | $ per year | | | |
| Sale Price | $ | | | |
| Purpose and or summary of Commensurate Public Benefit (short description of units and non-dwelling property to be developed/preserved) | | | | |

## Section 3: Proceeds

In completing this section, PHAs should refer to the guidance at 24 CFR part 970, PIH Notice 2018-04 (or any successor notice) and any other HUD guidance on proceeds. In accordance with 24 CFR 970.19, PHAs describe their proposed use of estimated proceeds (gross and net) in the SAC application.

Relocation Costs (Question 3). Pursuant to 24 CFR 970.21(e)(2), PHAs must pay for the actual and reasonable relocation expenses for all residents who will be displaced from their public housing units as a result of a demolition and/or disposition action. HUD considers the following to be eligible costs of relocation that can be deducted from gross proceeds: counseling and advisory services to residents (including mobility counseling), moving expenses (including housing search costs), payment of a security and/or utility deposits at a comparable housing, and costs of providing any necessary reasonable accommodations to residents in accordance with Section 504 of the Rehabilitation Act of 1973 and other HUD guidance.

Reasonable Costs of Disposition (Question 4). Reasonable costs of disposition may include the following (although HUD may disapprove any costs it deems unreasonable): (i) costs that PHAs incur in preparing the SAC application (e.g. environmental studies, engineering costs of rehab estimates under 24 CFR 970.15, appraisal fees); and (ii) transactional (seller) closing costs (e.g., local customary split of any brokerage fees, appraisal fees, survey costs, tax certificates fees, fees for recording the DOT/DORC release, notary fees, title insurance fees, title company document preparation and closing fees, mailing and wire transfer fees, and reasonable attorney fees), provided such costs are listed on the HUD-1 or other applicable settlement statement document.

Net Proceeds (Question 5). Net proceeds means proceeds realized after deducting relocation and disposition costs.

## Section 4: Offer of Sale to Resident Organizations

In completing this section, PHAs should refer to the guidance at 24 CFR part 970 and PIH Notice 2018-04 (or any successor notice). PHAs are eligible to exercise the exception from the offer of sale described at 970.9(b)(3)(ii) only in cases where the PHA has firm plans to replace substantially all of the units proposed for disposition with the housing units for low-income families (even if those housing units are not low-income housing units as defined by Section 3 of the 1937 Act). Note that a PHA cannot forgo giving applicable resident entities an offer of sale based on speculation or general plans to build a facility to benefit low-income families.

## Section 5: Certification

The Executive Director, Board Chairperson, or other authorized agent of the PHA, should sign and date this Certification.

**Supplement to HUD-52860, Section 5, 5.**

Re: Analysis of Land Valuation

The Chicago Housing Authority (CHA )is providing further analysis of land valuations for a proposed lease with the Chicago Fire Football Club (CFFC). CHA and the CFFC arrived at the negotiated rates for market-rate lease payments by considering the following factors.

**Change in Acreage**. When the transaction was originally proposed, CHA and the CFFC were discussing a a larger site plan that required more than 25 acres. Using that larger acreage, CHA obtained an appraisal from CBRE in April 2022, valuing the land at $21 per square feet. CFFC supplied an appraisal from JLL valued at $20 per quare foot. Since those appraisals, the plan for the site has changed. The revised footprint shrunk to 23.226 acres and removed key street fronts that CHA plans to use for housing in future development phases. CHA and CFFC continued to use the same per-square-foot value for negotiations based on the advice of the surveyors.

**Environmental Contamination Affects Value**. CBRE notes in its appraisal that for purposes of the evaluation, it assumed the property is not affected by any hazardous materials that may be present on the property. However, CFFC's environmental contractor performed a soil analysis of the site and determined that significant remediation work is necessary. It will require enrollment in the Illinois Environmental Protection Agency's Site Remediation Program (SRP) for the entire leased area. CHA has confirmed that the estimates are commercially reasonable and that the additional remediation and SRP requirements will add significant cost to the overall project.

**Negotiated Payment Exceeds Land Value**. Negotiations with CFFC were based on the two appraisals and an assumption of at least $3.8 million in remediation costs. CFFC offered to cover remediation provided that the lease payments be reduced over the first 30 years of the lease amortized at 5%. In essence, CFFC is financing the remediation of CHA-owned land, and CHA will subsequently own land free of contaminants. In addition to an annual rent, CFFC will be paying CHA $8 million  which will be paid as follows: $250,000 good faith payment, $2,750,000 in improvements to CHA property (if the improvements cost less, the difference will be paid to CHA), and $5,000,000 in three payments.  All of this $8 million will be paid in the first ten years of the lease term.   The CFFC lease payments are linked to a Consumer Price Index (CPI), which we anticipate will increase over time. For example, when calculated over the first 20 years, the lease payments minus the environmental allowance plus the $8 million would total almost $23 million if CPI is 0%; if CPI is 2% per year, that total will be more than $27 million. Therefore, payments to CHA will exceed the value calculated by both appraisers.

**Community Investments for CHA Residents.** In addition to the monetary payments, CFFC is making significant other community investments, including jobs, internships, and youth programming for CHA residents. Presently, the land remains vacant and underutilized, and activating the site with programming and opportunities for CHA families adds considerable value and aids CHA in our efforts to serve our residents and participants in federally-assisted housing programs.

**Demolition/Disposition**
**Field Office Certification**

TO:              The HUD Special Applications Center (SAC)

ATTENTION:     Andres Acosta (*primary SAC contact*) *(see email)* SAC, PIA

FROM:          Director,      Office of Public Housing, ___PH

               _____     _____ _____
                      *Signature*                  *Date*

SUBJECT:      Demolition/Disposition application DDA0012060 submitted by the Chicago Housing Authority for the disposition of 23.23 acres of land at the development known as ABLA, IL002001000

This Field Office (FO) Certification is being submitted to assist HUD's Special Applications Center (SAC) in processing the above referenced demolition and/or disposition application.

**Please complete and return this FO Certification (by scanning and emailing to the SAC point of contact) within 5 business days.** Please do not delay the return of the FO Certification.

**You may need to submit more than one FO Certification to the SAC, to provide updates (i.e. on the Environmental Review, PHA Plan requirements, EPC requirements).**

**Please do not modify this FO Certification.**

This FO Certification will become part of the official application file. SAC will not approve an application without this certification. If you have concerns about the application, please raise them both with the SAC and the PHA.

| **History of FO Certifications** |
| --- |

☐     **Updated FO Certification.** This FO previously submitted a FO Certification for this application on the date of     but all requirements were not satisfied at that time. Accordingly, this FO is submitting this updated FO Certification based on new information received (i.e. updated Environmental Review or PHA Plan information). Please disregard all prior FO Certifications dated:   .

| **FO Point of Contact (POC)** |
| --- |

**FO POC.** All questions concerning this application should be directed to:

     Name: Zill A Khan_____     _____
     Email: _zille.a.khan@hud.gov____     _____
     Phone: 312-913-8666_____     _____

| Repositioning Panel |
|---|

☐      This PHA received technical assistance (TA) from HUD, related to this application through a Repositioning Panel on _____*date* _____.  The notes from that panel discussion are available on the SharePoint site.

☒      This PHA did not receive technical assistance (TA) from HUD related to this application through a Repositioning Panel.

| Small PHA Technical Assistance (Enterprise) |
|---|

☐      This PHA received technical assistance (TA) from Enterprise related to this application on _____*date* _____.  The notes from that TA assistance is attached.

☐      This PHA did not receive technical assistance (TA) from Enterprise related to this application.

| Agency Plan Compliance |
|---|

☒      **PHA Plan or MTW Plan <u>approved</u>.**  The PHA submitted the following document to HUD on the date of October 16, 2020 (revised plan submitted April 30, 2021, second revised plan submitted on June 3, 2021)          .  This document includes a description of the proposed demolition and/or disposition.  HUD approved this document on the date of June 3, 2021.

> ☐      Agency Annual Plan
> ☐      Significant Amendment to Annual Plan
> ☒      Moving to Work Plan
> **OR**

☐      **PHA Plan or MTW Plan <u>submitted but not approved</u>.**  The PHA submitted the following document to HUD on the date of         .  This document includes a description of the proposed demolition and/or disposition.  HUD has not yet approved the submission.  We expect HUD will approve this submission by the date of         .

> ☐      Agency Annual Plan
> ☐      Significant Amendment to Annual Plan
> ☐      Moving to Work Plan
> **OR**

☐      **PHA Plan or MTW Plan <u>not submitted</u>.** The PHA did not submit a PHA or MTW Plan documentation that includes a description of the proposed demolition and/or disposition.

> **OR**

☐      **Qualified PHA.**  The PHA is a Qualified PHA, as defined by the Housing and Economic Recovery Act of 2008 (HERA) and therefore is not required to submit an Annual Plan to HUD.  As part of the SAC application, and pursuant to 24 CFR part 903, the PHA must certify that it has discussed the proposed demolition and/or disposition during its required annual public hearing.

> ☐      This FO has <u>no information</u> that is inconsistent with the PHA's certification that it has complied with the public hearing requirement.

☐      This FO has <u>information</u> that is inconsistent with the PHA's certification that it has complied with the public hearing requirement as follows:      (attach additional documentation as necessary).

| Environmental Review Compliance |
|:---:|

☐      **Environmental Review not yet completed**.  This FO is aware that the Environmental Review is in process (under part 58 or part 50) but not yet completed.  The FO estimates the Environmental Review will be completed on the date of      and will submit an updated FO Certification or a confirmation via email that the Environmental Review has been completed in HEROS, to the SAC at that time.

☐      **Environmental Review completed under 24 CFR part 50**.  HUD performed the Environmental Review in accordance with 24 CFR part 50 on the date of      for the proposed demolition and/or disposition action.

       ☐      HUD found the proposed action <u>compliant</u> with the requirements of 24 CFR part 50; or

       ☐      HUD found the proposed action <u>not compliant</u> with the requirements of 24 CFR part 50.

*NOTE: The SAC Director is the authorized HUD official for approving environmental reviews that have been done by HUD under 24 CFR part 50 for demolition and/or dispositions.  This FO will work with the SAC to coordinate the part 50 approval process in HEROS.*

☒      **Environmental Review completed under 24 CFR part 58**.  The Environmental Review was performed by the local Responsible Entity (RE): City of Chicago, Department of AIS, Division of Environment      (name of responsible entity) on July 13, 2022      (date).

       ☒      A Request for Release of Funds/Environmental Certification (RROF/C), form HUD-7015.15 was submitted to this FO, preferably through HEROS, on the date of September 19, 2022      .  This FO <u>accepted</u> the RROF/C and approved an Authority to Use Grant Funds, form HUD-7015.16 on the date of September 29, 2022      ;

       ☐      A Request for Release of Funds/Environmental Certification (RROF/C), form HUD-7015.15 was submitted to this FO, preferably through HEROS, on the date of      . This FO <u>accepted</u> the RROF/C but has not approved the Authority to Use Grant Funds, form HUD-7015.16 because the objection period has not ended.  The objection period will end on the date of      and this FO expects to sign the form HUD-7015.16 at that time;

       ☐      A Request for Release of Funds/Environmental Certification (RROF/C), form HUD-7015.15 was submitted to this FO, preferably through HEROS, on the date of      . This FO <u>did not accept</u> the RROF/C because      (i.e. the project description and scope did not include the future use of the property, and as a result, the Environmental Review did not take into consideration the future use of the property as required by 24 CFR 970.13 and PIH Notice 2018-04) (attach additional documentation as necessary)

       ☐      The RE made a determination in a clearance letter or output record from HEROS dated      that the project or activity is exempt under 24 CFR 58.34(a)(-) or categorically excluded not subject to the related federal environmental laws and

authorities at Part 58.5 (CENST) under 24 CFR 58.35(b)(X).  This FO <u>accepts</u> this determination.

☐      The RE made a determination that the project or activity converted to exempt under 24 CFR 58.34(a)(12), because the project or activity is categorically excluded under 24 CFR 58.35(a)(X) and there are no circumstances requiring  compliance with any of the related federal environmental laws and authorities at Part 58.5.  This FO accepts this determination.

---

### Removal of all Public Housing Units

☐    **Other Public Housing Units Remain.** After the demolition and/or disposition of the proposed units, other public housing units will remain in the PHA's inventory.

OR

☐    **Removal of all Public Housing Units.**  After the demolition and/or disposition of the proposed units, the PHA will have no remaining public housing units in its inventory.

*NOTE: If this FO checks the above box, the PHA must <u>include</u> a completed HUD-5837 as an attachment to the PIC application.  If it has not done this, SAC staff will request that the PHA submit a completed HUD-5837 (Notification of Future Development) and upload that form in PIC before approving the application.  Depending on the type of disposition proposed, the PHA may be required to close-out its public housing program.*

---

### Energy Performance Contracting (EPC)

☒ The PHA does <u>**not**</u> have an approved Energy Performance Contracting (EPC)

☐ The PHA has an approved Energy Performance Contracting (EPC)

*If the box above is checked, the FO will work with the PHA and the HUD Energy Center to ensure all EPC debt associated with the units proposed for the demolition and/or disposition is resolved.  This may involve:*

*(1) Confirming the amount, if any, of EPC debt that must be paid off or assumed based on the demolition and/or disposition (i.e. amount is commensurate with the projected savings initially underwritten as part of the EPC approval);*
*(2) Working with the PHA to determine how the PHA will pay off or assume the EPC debt as part of the demolition and/or disposition (i.e. could be assumed if asset will continue to be used of as affordable or local PBV housing)*
*(3) Determining if the demolition and/or disposition will trigger a revised EPC approval letter from the Energy Center, and if so, to work with the PHA and Energy Center to secure that letter.  A revised EPC approval letter is generally required for changes in the contract costs or savings (as a result of the demolition and/or disposition) of 10% or more, but FOs should check with the Energy Center for all changes for 5% or more since this policy is under reconsideration.*

*The answers to these questions will likely depend on whether the demolition and/or disposition removes all of the PHA's public housing units that are covered by an EPC.*

☐    This FO has confirmed with the Energy Center that the PHA may proceed with the proposed demolition or disposition.

☐ This FO is working with the Energy Center to confirm that the PHA may proceed with the proposed demolition or disposition but does not have final approval yet. Therefore, SAC should not issue its approval until this FO confirms in writing that all EPC debt issues are resolved.

---

**Capital Fund Financing Program (CFFP)**
**& Other Public Housing Financial Commitments**

---

This FO is aware that the PHA has an approved transaction from the following Public Housing Program:
    ☐ Capital Fund Financing Program (CFFP)
    ☐ Section 30 (including PHA Mortgaged Transaction (PMT)
    ☐ Operating Fund Financing Program (OFFP)

If any of the above are checked, the SAC will work with the respective HUD-HQ office, to ensure the existing financing agreement will not be put at risk if the units in this application are demolished or disposed of.

---

**Community Supportive Services (CSS) Programs**
**(ROSS, FSS, Jobs-Plus, and EDSC)**

---

☐ **Family Self-Sufficiency (FSS) Grant.** The PHA has an FSS grant that impacts the units and/or families living in the units proposed for demolition and/or disposition.

☐ **Resident Opportunity and Self Sufficiency Service Coordinators (ROSS-SC) Grants.** The PHA has a ROSS grant that impacts the units and/or families living in the units proposed for demolition and/or disposition.

☐ **Elderly/Disabled Service Coordinator (EDSC).** The PHA has an EDSC grant that impacts the units and/or families living in the units proposed for demolition and/or disposition.

☐ **Jobs Plus**. The PHA has a Jobs Plus grant that impacts the units and/or families living in the units proposed for demolition and/or disposition.

If any of the above are checked, this FO will work with the PHA and the respective HUD-HQ office to determine the implications of the proposed demolition and/or disposition on the residents and services.

---

**Settlement Agreement or Court Order (Civil Rights)**

---

The demolition and/or disposition application requires PHAs to certify if it is operating under any remedial civil rights order or agreements, voluntary compliance agreements, final judgments, consent decrees, settlement agreements or other court orders or agreements to which the PHA is a party, including but not limited to those related to a fair housing or other civil rights finding of noncompliance. The PHA certified that it either that (1) it is not operating under any such agreement; or (2) that it if is operating under any such agreement, it included a narrative description of explaining how the demolition/disposition is consistent with such order, agreement or other document (and FHEO will review this information as part of its civil rights compliance review of the application).

☒ This FO has reviewed the PHA's certification under this section and has <u>no information</u> inconsistent with such certification.
☐ This FO has reviewed the PHA's certification under this section and has the following information that is inconsistent with such certification:        (attach additional information if necessary).

| **Public Housing Repayment Agreements** |
|---|

☒      This FO has confirmed that this PHA is not subject to any active Public Housing program repayment agreement(s).

☐      This FO has identified one or more outstanding Public Housing program repayment agreement(s) and has worked with the applicable program office (i.e., FMD or OCI) to confirm the PHA may remove these public housing units without violating the repayment agreement(s).

If the PHA has a public housing repayment agreement, the PHA may be expected to pay off an amount of the outstanding program debt that is proportional to the units being removed. The purpose of this prepayment is to avoid leaving a few public housing units to shoulder any remaining program debt. Please contact the Office of Capital Improvements (OCI) for any debt related to the Public Housing Capital Fund, and the Financial Management Division for any debt related to the Public Housing Operating Subsidy.

| **TPV Request and HCV Agency Capacity to Administer Additional Vouchers** |
|---|

The PHA has indicated it plans to request TPVs connection with this demolition or disposition.

☐      **PHA is Public Housing Only Agency.**

     If the above is checked, the Public Housing Only Agency must partner with a Section 8 HCV Agency to administer the TPV award. Assistance from the FO may be required in finding an administering HCV agency. The FO must approve the administering HCV agency before SAC will approve the demolition and/or disposition that authorizes a TPV award.

     ☐      As of the date of this certification, the applicant PHA has proposed an HCV agency to administer the TPVs and this FO has reviewed the utilization rate and other relevant aspects of that HCV's agency voucher program, has confirmed that the agency has the capacity to administer the TPVs, and has approved the written agreement between the two PHAs with respect to the TPV award. Name of HCV agency:

     ☐      As of the date of this certification, this FO has not approved an HCV agency to administer the TPVs.

☒      **PHA operates both a Public Housing Program and a Section 8 Program.**

     ☒      This FO has reviewed the utilization rate and other relevant aspects of the PHA's administration of its HCV program, and has confirmed the PHA has the capacity to administer the additional HCVs/TPVs.

| **Additional Field Office Comments** |
|---|

☐ This FO has the additional comments and/or documentation about this application and is attaching them separately as part of this certification.

*Note: The SAC is especially interested in additional comments and/or documentation from the FO that provides information that is inconsistent with the PHA's certifications for this application (primarily the justification). For instance, if the PHA is proposing the application based on obsolescence, SAC is interested in knowing if there have been large amounts of Capital Fund expenditures at the property (beyond routine maintenance) in recent years.*

| **Coordination with FHEO** |
|---|

The SAC requests information sharing from FHEO on applications for the demolition and/or disposition of units. In addition, the FO may wish to coordinate with FHEO when a PHA submits a PHA Annual Plan that includes a PHA's plan to demolish or dispose of units.

FHEO's receipt of a SAC application may trigger FHEO to open up an investigation of a PHA or conduct a monitoring or compliance review. If this FO is aware of any potential civil rights issues that may be of concern to FHEO, it should contact FHEO directly.

| **Concluding Certification** |
|---|

This FO will continue to work with the SAC in connection with HUD's review of this application and will provide the SAC with any data or information available to this FO that I believe may be relevant or that the SAC may request (especially information that it may have that may be inconsistent with a PHA certification). Data and information may include, but is not limited to, reviews, inspection reports, modernization records, voluntary compliance agreements, and memoranda of understanding.

## ISAACS, JAMES A

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Friday, March 03, 2023 2:20 PM |
| **To:** | ISAACS, JAMES A; Acosta, Andres |
| **Subject:** | RE: <External Message> CHA - Loomis Land Disposition |

James-
Thanks for the clarifying question. Yes, this means <u>CHA's</u> affordable housing plan.

**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

**From:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Sent:** Friday, March 3, 2023 2:17 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>; Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Disposition

Thanks Ann! Just a clarification question, I presume the statement is meant to make clear that the increased density now allowed by the City, will be sufficient for the CHA to accomplish the CHA's affordable housing commitment?

James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, March 03, 2023 2:10 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** <External Message> CHA - Loomis Land Disposition

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-

Please allow this email to serve as a supplement to the CHA disposition application.

CHA does not need the land described in the disposition application because changes in zoning allow density in the surrounding areas to satisfy the affordable housing planned for this community.

See attached exhibit from the approved planned development (zoning) update.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**Chicago Housing Authority Responses to the**
**U.S. Department of Housing and Urban Development**
**Office of Fair Housing and Equal Opportunity**
**Questions Dated: February 6, 2023**

**February 10, 2023**

FHEO's questions in bold.

**1. Describe any obligations CHA has under an existing agreement with HUD to develop additional public housing and affordable housing units under a revitalization plan, including the breakdown of units by size and type if available, as well as the location for any proposed additional units. Include in this description any remaining HOPE VI obligations associated with the ABLA development or its component buildings, including any unit obligations or unobligated funds, or any obligations relating to former ABLA residents.**

**CHA Response:**

The 1998 Hope VI revitalization plan called for 2,441 mixed-income units of which 755 units would be set aside for CHA families. The plan anticipated that units would be on CHA land or within the general vicinity. There are no unobligated HOPE VI funds remaining. Please see responses to question 8 regarding former ABLA residents.

**2. Describe any factors that led the City of Chicago and the Chicago Fire Football Club (CFFC) to choose the ABLA site over the two other sites identified as options for the practice facility, including any estimated market rate leases for either site: (1) Madden Wells/Oakwood Shores (Madden), and (2) Taylor Homes/Legends South (Taylor).**

**CHA Response:**

CHA did not participate in any discussions the City may have had with CFFC regarding the three sites, and CHA did not discuss alternate sites with CFFC. However, CHA agrees with the City's position that the proposed Chicago Fire training facility and youth academy will complement housing and development efforts in the area, while securing substantial funds to improve public housing assets and creating employment opportunities that will benefit CHA residents.

**3. Describe the process the City and CHA used to identify the three properties presented to CFFC and whether any other CHA properties were considered.**

**CHA Response:**

CHA believes that strong communities are composed of more than just housing – they need quality public schools, green space and outdoor recreation, jobs and career opportunities, healthcare access, grocery stores, public transportation, and more. With this in mind, upon the City of Chicago's request, CHA provided sites with vacant land that exceeded 20 acres where CHA knew that ample vacant land existed to build committed mixed-income housing. CHA is not aware of any other sites presented to CFFC by the City.

**4. Describe how CHA plans to utilize the Madden or Taylor sites that were not selected by CFFC.**

**CHA Response:**

CHA is committed to a thoughtful and balanced approach to community development. CHA and its development partners will continue to create mixed-income, mixed-use developments at both

Oakwood Shores and Legends South. Both sites already have a mix of housing and commercial uses that add amenities and services to the community. CHA anticipates that this mixed-use balance will continue to be the case in all future phases. For example, at Oakwood Shores, a portion of the site was disposed for construction of a grocery store, and at Legends South, a portion of the site was disposed for construction of an indoor non-profit tennis facility that serves youth from the community with athletic training and scholarships. Both uses complement the adjacent housing and provide jobs and opportunities for CHA residents.

**5. Explain how the CHA arrived at the decision for how it would use the proceeds of the CFFC lease, including why units at Brooks Homes and Loomis Courts would be rehabilitated when those units were recently updated through HOPE VI grants, as opposed to other potential eligible activities, such as the creation of new units.**

**CHA Response:**

CHA recognized that it was important that the initial revenue from this lease directly benefit CHA residents living in the vicinity of the project. Both Brooks Homes and Loomis Courts have aged and require ongoing investment. Brooks Homes is roughly 80 years old while Loomis Courts is approximately 70 years old. Brooks Homes was rehabilitated more than 20 years ago, therefore, some of the building systems, such as roofs and furnaces, are reaching the end of their useful life and need to be replaced. Loomis Courts is not a public housing site, and did not qualify for inclusion in the HOPE VI grant. Loomis Courts has significant capital needs that must be addressed. Absent this lease, CHA would not otherwise have funding identified to undertake either project in the near future.

**6. As a result of the proposed disposition, CHA may be required to develop new units at the ABLA site at a higher density than previously planned. Describe the planned density and location of the anticipated units at the ABLA sites, including the breakdown of the 3,070 proposed units on the site by unit type.**

**CHA Response**:

Prior to the Chicago Fire lease proposal, CHA and development partner Related Midwest were already re-evaluating the density in Roosevelt Square. For example, in a previous development phase of Roosevelt Square, Taylor Street Apartments was made denser than the original plan for the site.

This general area in the Near West Side has changed significantly since original city zoning plans were created in the early 2000s. Some of the busier streets that already house newer mid-rise buildings and larger commercial spaces have vacant parcels that were zoned for two and three-story walk-up buildings. These areas, particularly the CHA parcels on Roosevelt Road, Racine Avenue, Blue Island Avenue, 15th Street, and Taylor Street, are opportunities for mixed-use developments in multi-story elevator buildings in addition to smaller walk-ups. As an example, the current phase of Roosevelt Square which broke ground on January 23, 2023 includes elevator buildings with ground-floor grocery store and restaurants. This phase will provide 222 mixed-income units which vary from one to three-bedroom homes for different family sizes.

The area under the lease proposal was always considered the last phase. It was not fully planned and was never intended to be exclusively used for housing.

**7. Describe how CHA evaluates the feasibility of constructing new units on a site, including the evaluation of both current and future conditions, density of units, accessibility of units and of the site, and the size of units to be included in the development. If available, provide any documentation of this analysis at ABLA and other HOPE VI grant sites in the City of Chicago.**

**CHA Response**:

At each site, CHA works with the City of Chicago and an engaged site-specific working group comprised of relevant stakeholders, including representatives of the City, CHA resident leadership, BPI and the community, to select the developer or co-developer for larger sites. The working group is consulted on a regular basis as each phase of development is planned or any changes are proposed. Beyond the working group, CHA, in conjunction with the City of Chicago and local elected officials, holds community meetings before each phase is constructed.

CHA's open waiting list provides real-time insight into the demand for various sized units. To determine the unit mix in any new phase of development, CHA reviews both local and Chicago-wide demographics as well as the waiting list regularly to understand the demand for different sizes of units. CHA makes sure that accessible units are distributed through sites in a manner that provides choice to residents who need accommodations.

The land proposed for the CFFC lease was always planned to be the last phase of the Roosevelt Square redevelopment. CHA and its development partner worked closely with City's Department of Planning and Development and community leadership to determine the density and best plan for the development. The site plan and planned development (zoning) was adjusted to provide more housing at the southeast corner and northern end of the site in response to recent market rate development in the area and the demand for housing in the amenity-rich Taylor Street area.

8. **Provide the following information about the displacement of former ABLA residents:**

    a. **Describe CHA's efforts to track displaced ABLA residents, including residents that want to move back to the ABLA development.**

    **CHA Response**

    CHA has consistently tracked the original families with a Right of Return to ABLA since the inception of the Plan for Transformation in 2000. Initially, CHA created a database to store electronic records for all original families with a Right of Return and track any specific notices sent to those families. As of December 31, 2022, only 10 families (1% of original ABLA families) still maintain a Right of Return.

    Efforts to engage families with a Right of Return include:

    i. **CHA Housing Program Specialists** provide outreach to families with a Right of Return to advise them of Relocation Rights and inform them of available housing options. Contact information for Housing Program Specialists, organized by original development, is located on CHA's website.
    ii. **FamilyWorks Program.** In past years, CHA's contracted FamilyWorks service providers have been required to conduct outreach to all 10/1/99 families with a Right of Return who reside in their service areas and connect interested families with CHA Housing Program Specialists.
    iii. **Email and Phone.** Families who think they may be eligible for Right of Return can contact CHA via email at rightofreturn@thecha.org or by phone at (312) 786-3104.
    iv. **Public Notice.** In past years, CHA attempted to engage former CHA leaseholders with a Right of Return through an annual public notice. CHA utilized up to seven local newspapers each year to print and/or digitally print the Public Notice over three consecutive weeks.
    v. **CHA Website.** As a result of discussions with the Central Advisory Council, CHA discontinued the public notice process in 2022. Instead, former CHA leaseholders with a Right of Return can contact CHA year-round by using the established contact information, which is located on CHA's website.

vi.  **Social Media.** CHA has conducted outreach through social media such as Facebook, Twitter and other digital marketing.

vii.  **Local Advisory Council.** CHA has provided lists of names of families with a Right of Return to Local Advisory Council Presidents to conduct additional outreach.

The table below shows relocation status of ABLA households who were granted a Right of Return as of October 1, 1999. There are 1,153 families who originally lived ABLA properties who were granted a Right of Return. As of December 31, 2022, 63% of these families had moved to their final housing choice to satisfy their Right of Return; 1% had not yet made their final housing choice; 25% are deceased or have been evicted; and 11% have been unresponsive to CHA outreach and thus their location is unknown. Families who are non-responsive have an option for reinstatement should they ever contact CHA.

| Relocation Status of 10.1.99 ABLA Households As of 12/31/2022 | | | | | |
|---|---|---|---|---|---|
| **10.1.99 Development** | **Total Number of Families who had a Right of Return** | **Satisfied Right of Return** | **Awaiting Right of Return** | **Evicted, Deceased, No HCS (Loss of Right of Return)** | **Option for Reinstatement** |
| | Total Number of Families | Number of Families | Number of Families | Number of Families | Number of Families |
| ABLA Homes (not including Loomis Courts) | 1,153 | 729 | 10 | 286 | 128 |

b.  **Provide all information relating to ABLA residents who have been able to return to ABLA units, including family size and demographics.**

**CHA Response:**

The tables below provide demographics for those original ABLA families as of October 1, 1999, who are still current participants in CHA programs. CHA cannot provide current demographic information for original ABLA families who are no longer in CHA programs. However, CHA will continue to reinstate former leaseholders who wish to return to CHA housing programs and exercise their Right of Return. CHA would include their household and demographic information at that time.

| Gender of 10.1.99 ABLA Households who are still current CHA tenants As of 12/31/2022 | | | | | |
|---|---|---|---|---|---|
| **Gender** | **Total Number of Families who had a Right of Return** | **Satisfied Right of Return** | **Awaiting Right of Return** | **Evicted, Deceased, No HCS (Loss of Right of Return)** | **Option for Reinstatement** |
| | Total Number of Families | Number of Families | Number of Families | Number of Families | Number of Families |
| **Female** | 312 | 294 | 9 | 7 | 2 |
| **Male** | 46 | 38 | 1 | 5 | 2 |

| Race of 10.1.99 ABLA Households who are still current CHA tenants<br>As of 12/31/2022 | | | | | |
|---|---|---|---|---|---|
| **Race** | **Total Number of Families who had a Right of Return** | **Satisfied Right of Return** | **Awaiting Right of Return** | **Evicted, Deceased, No HCS (Loss of Right of Return)** | **Option for Reinstatement** |
| | Total Number of Families | Number of Families | Number of Families | Number of Families | Number of Families |
| **African American** | 357 | 331 | 10 | 12 | 4 |
| **Other/Unknown Race** | 1 | 1 | 0 | 0 | 0 |
| Age of 10.1.99 ABLA Households who are still current CHA tenants<br>As of 12/31/2022 | | | | | |
| **Age Range** | **Total Number of Families who had a Right of Return** | **Satisfied Right of Return** | **Awaiting Right of Return** | **Evicted, Deceased, No HCS (Loss of Right of Return)** | **Option for Reinstatement** |
| | Total Number of Families | Number of Families | Number of Families | Number of Families | Number of Families |
| **Age 37 to 49** | 58 | 52 | 4 | 1 | 1 |
| **Age 50 to 59** | 97 | 92 | 3 | 1 | 1 |
| **Age 60 to 69** | 119 | 105 | 3 | 9 | 2 |
| **Age 70 to 79** | 57 | 56 | 0 | 1 | 0 |
| **Age 80 to 89** | 19 | 19 | 0 | 0 | 0 |
| **Age 90 to 99** | 8 | 8 | 0 | 0 | 0 |

| Family Size of 10.1.99 ABLA Households who are still current CHA tenants As of 12/31/2022 | | | | | |
|---|---|---|---|---|---|
| **Family Size** | **Total Number of Families who had a Right of Return** | **Satisfied Right of Return** | **Awaiting Right of Return** | **Evicted, Deceased, No HCS (Loss of Right of Return)** | **Option for Reinstatement** |
| | Total Number of Families | Number of Families | Number of Families | Number of Families | Number of Families |
| **1 family member** | 193 | 177 | 3 | 11 | 2 |
| **2 family members** | 85 | 80 | 4 | 0 | 1 |
| **3 family members** | 49 | 45 | 2 | 1 | 1 |
| **4 family members** | 15 | 14 | 1 | 0 | 0 |
| **5 family members** | 10 | 10 | 0 | 0 | 0 |
| **6 family members** | 2 | 2 | 0 | 0 | 0 |
| **7 family members** | 4 | 4 | 0 | 0 | 0 |

**c. Describe where ABLA residents were moved during the initial demolition using HOPE VI funding and where former ABLA residents currently reside who have not returned to the former ABLA site.**

**CHA Response**

During the relocation process, ABLA families were asked to complete Housing Choice Surveys which allowed options for relocation, including:

- A temporary transfer to another available public housing unit;
- A temporary move to the private market with a Housing Choice Voucher (HCV)
- Satisfying their Right of Return in a rehabbed public housing unit, mixed income development or through the HCV program.

As stated above, there are 10 families from ABLA who maintain a Right of Return. Of these families, 9 are current participants in the Housing Choice Voucher Program and 1 remains in a family housing development.

**9. Provide the following information about CHA's FY1998 HOPE VI Revitalization grant of $35,000,000 to revitalize components of the ABLA public housing development:**

**a. How many of the initially planned 1,052 units of public housing, 580 affordable rental and for-sale units, and 966 market rate rental and for-sale units included within CHA's FY1998 HOPE VI Revitalization grant were completed?**

**CHA Response**

CHA continues to make progress on delivering new mixed-income, mixed-use housing to Roosevelt Square. Just last month, CHA and Related Midwest broke ground on Roosevelt Square Phase 3B, the largest rental phase to date, which represents a $175 million dollar investment. A summary of all housing in the area is below:

| Hope VI Grant Funded Units | | | Rental & Homeownership | | | |
|---|---|---|---|---|---|---|
| Phase | Closing Date | Completed | CHA | Affordable | Market | Total |
| Roosevelt Square I* | 9/10/2004 | 2006 | 125 | 59 | | 184 |
| Roosevelt Square I For Sale | 6/6/2005 | 2007 | 7 | 67 | 159 | **233** |
| Roosevelt Square IIA* | 7/20/2007 | 2009 | 120 | 57 | | **177** |
| Taylor St. Apt.* | 6/11/2018 | 2019 | 37 | 29 | 7 | **73** |
| Roosevelt Square 3B | 1/13/2023 | | 75 | 40 | 92 | **207** |
| NPHM - PBV | 1/13/2023 | | 5 | 10 | | **15** |
| New Units to Date | | | 369 | 262 | 258 | 889 |

**b.   Describe any amendments, if any, to this grant that were approved by HUD, including the current unit breakdown approved by HUD for the ABLA development.**

**CHA Response:**

There are no amendments. Please see chart for unit breakdown.

| 1998 Revitalization Plan | |
|---|---|
| CHA Public Housing | 755 |
| Affordable/Market Rental | 335 |
| CHA/Affordable/Market Homeownership | 1,351 |
| Total | 2,441 |

**c.   How much of the grant funds remain unobligated?**

**CHA Response:**

Grant funds have been exhausted and $0 remain.

**d.   Are there existing plans to shift replacement units under the grant to a different development or site, and if yes, where?**

**CHA Response:**

CHA continues to develop mixed-income housing at this site, and throughout the neighborhood, there are a number of additional vacant parcels owned by CHA and the City of Chicago. CHA and its

development partner Related Midwest have commissioned a feasibility study to demonstrate that the committed replacement units can be located on vacant CHA-owned land on the footprint of the former ABLA Homes. In addition, there is other vacant property in the immediate area that is owned by the City of Chicago or otherwise available to CHA where more housing can be added in future phases.

**e. Provide all documentation relating to the existing obligations under the FY1998 HOPE VI Revitalization grant.**

**CHA Response:**

CHA continues to work with HUD to close-out the Hope VI Grant. HUD also is working with CHA to revise the plan because the grant funds have been exhausted and CHA is committed to developing more new housing in this area. Specifically, CHA has just closed Roosevelt Square that will deliver 222 units.

Attachments:
  i. Map of the area from 2019.
  ii. Recent presentation provided for planned development (zoning) amendment.

**Acosta, Andres**

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Tuesday, October 18, 2022 12:15 PM |
| **To:** | Acosta, Andres; Harrington, Michelle |
| **Subject:** | RE: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses |
| **Categories:** | Green Category |

Andres-
We have a couple of questions. Can we set up a phone call?



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Friday, October 7, 2022 2:22 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>; Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

Hi Ann and Michelle,

Thank you again for making the time to discuss the application yesterday. Based on our call yesterday, I wanted to note that we can expect the following items:

- Updated narratives for justification, use of proceeds and Section 1.8 of the 52860.
- Matching clarifications on the 52860 and 52860-A forms including changing the timing to # of days and justification
- Clarification/statement that the HUD process was discussed at the resident meetings and sign-in sheets from resident meetings and LAC meetings if you have them

Also, after some internal discussion, we'd like to request an additional appraisal from an additional 3rd party that just relates to the 23.226-acre parcel. I know this will add some time, but I'm hoping that in the meantime I can have much of the letter prepared on my end.

We are also discussing adding a condition of the approval to ensure that the FMV is met during the lease term. I don't foresee this as a problem, although we still need to nail down exactly what we believe FMV is, but I wanted to run this by you in case you have additional thoughts. I'm not sure if this is something we would just have in our approval letter or if it's something we may like to see in an agreement with the CHA and lessee, but I will keep you posted.

Thanks for your help,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Wednesday, October 5, 2022 1:24 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Mr. Acosta-
Thank you for your review comments provided last week.  Attached are revised documents and explanatory narratives:

- 52860 Form
    - Section 1.8 asks for additional information if the PHA is operating under an order, agreement, judgement or decree. Can you provide the narrative requested here explaining how the removal is consistent with that requirement?
    **RESPONSE:  Narrative is attached in document titled '52860 Narrative'**
    - Can you complete Section 4? It should include all the information pertaining to the entire AMP (it should be consistent with the PIC application, Section 4).
    **RESPONSE:  Attached is the updated 52860 form.  Note that this information pertains to Brooks Homes, an existing public housing development across the street, not the land in question due to limitations in the PIC system.   No units will be removed.**
    - Timing – Can you complete Section 5.6 in the 52860? For a vacant parcel we're looking only at lines c and d. Also, can I have your permission to make the matching change to PIC?
    **RESPONSE:  See updated 52860. Yes, you have permission to make the change in PIC.**
- Justification
    - Can you provide a justification narrative for the disposition? Also, the 52860-A, Section 2, had selected 970.17(c) as the justification but for vacant land the next two options are typically more appropriate under 970.17(d). Can you correct if needed?
    **RESPONSE:  The justification narrative is attached in the document titled "52860-A". The correction under Section 2 has been made on the attached form.**
- Use of Proceeds
    - Can you provide information on what the use of proceeds from the lease payments will be? I need to include a short narrative on this in the approval letter.
    **RESPONSE:  The narrative is on the attached document titled "52860-A"**
- Offer of Sale to Resident Organization
    - 52860-A page 3 notes that an offer of sale was made to the resident organization on 1/27/22, however the 1/27/22 letter I'm seeing doesn't include an offer of sale. Is there another letter? If this was an error

and no offer was made, please let me know. I need to confirm the latest requirements, but I believe an offer may not be required for a vacant parcel with no dwelling units.

**RESPONSE:  This was an error.  The land is vacant and no letter is required.  The correction has been made on the 52860-A.**

- Land Ownership/Tenancy
  - The site, or an adjacent site, appears to be listed as a Chicago Park District operated space. Is the Park District currently leasing this land from the CHA? Are there any issues with terminating this if that's the case?

    **RESPONSE:  No, the Park District is not leasing this land from CHA, it is adjacent to the Chicago Park District operated site. There is an error on Google Maps and CHA has notified them to make this correction.**

- Legal description – can you provide in Word Format? Having trouble pulling from the survey.

  **RESPONSE:  The legal description in Word is attached.**

- Acreage
  - Confirming that this is just for Parcel 1 in the survey? For 23.226 acres. Please note that PIC needs acreage rounded to 2 decimal places. Is it ok to enter 23.23 acres into Section 5 of PIC?

    **RESPONSE: Correct, this is for Parcel 1 in the survey. Yes, you can make the change to 23.23 acres into Section 5 of PIC.**

- Ground Lease
  - What is the full term of the ground lease? 99 years?

    **RESPONSE: The lease term is for 41 years with two 10 year extensions.  The entire term could be 61 years.**

  - Is the lease unencumbered?

    **RESPONSE: The ground lease will lay out what the improvements will be and CHA will maintain design and approval rights.  CHA is limiting the improvements to permitted uses specifically excluding things like the sale of cannabis.**

  - Lease Price – I'm going to need some help walking through this
    - Is the $8MM contribution included in the ground lease or any other agreement as part of the disposition?

      **RESPONSE;  The $8MM contribution will be documented in a legally binding agreement.**

    - Lease is set at $1MM per year, but will never actually be at $1MM, at least through Y30, because the Y1-30 will be discounted by $250,000 (a $7.5MM savings) to offset the $4MM in estimated environmental remediation.
    - It may also never actually be $1MM because it will be renegotiated in Y21 and again in Y31.
    - As far as guaranteed, after discount payments, the CHA can expect to receive $15MM in the first 20 years (at $750,000), but beyond that it's impossible to say?

      **RESPONSE: CHA will receive at least $23 MM over the first 20 years ($8MM contribution which will be a combination of improvements to the site and funding over a number of years + $15MM over 20 years if CPI is 0% each year).  Although there is a $250,000 credit per year, the $1MM initial lease rent will increase by CPI annually and therefore the annual payment will go up each year.**

- Value
  - At the appraisal's $21 per square foot, for 23.226 acres (to be 23.23 in PIC), I'm getting $21,246,215.76. However, the value listed in PIC and in the 52860 is $ 20,234,500.00. Can you walk me through your figure? This could be simple math and rounding errors on my part.

    **RESPONSE:  CHA received conflicting appraisals, one from CFFC and the one from our appraiser, CBRE. The parties agreed that $20 per square foot would be used to calculate the annual payment, 1,011,725 sq ft (rounded up) x $20 = $20,234,500.  The $8MM contribution more than makes up the difference.**

We look forward to any other questions that you might have.

Best,
Ann



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Wednesday, September 21, 2022 5:51 PM
**To:** Perez, Olivia <operez@thecha.org>; Scott, Tracey <TScott@thecha.org>; McKenzie, Ann <amckenzie@thecha.org>
**Subject:** RE: IL002 / IL002001000 / DDA0012060

Hello,

My name is Andres Acosta and I'll be reviewing this disposition application on behalf of HUD. Can you please provide me with the name and email for your point of contact for this application?

I'll be in touch, likely early next week, with an initial set of comments.

Thank you,



**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
Ralph H. Metcalfe Federal Building
77 West Jackson Boulevard, Suite 2401
Chicago, Illinois 60604-3507
312-913-8003 (phone) – *email or Teams teleconference preferred*
andres.acosta@hud.gov

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov
Check out our new repositioning website: HUD Repositioning Web Site
Visit our website: HUD SAC
Check out our Section 18 Notice: HUD Notice 2018-04
Helpful Videos Link
New HUD Proceeds Notice 2020-23 Link
For technical assistance or submission of amendments please email SACTA@hud.gov

**From:** Gardiner, Donald D <Donald.D.Gardiner@hud.gov>
**Sent:** Wednesday, September 21, 2022 2:44 PM
**To:** operez@thecha.org; tscott@thecha.org; McKenzie, Ann <amckenzie@thecha.org>
**Cc:** SACTA <SACTA@hud.gov>; Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A
<JAMES.A.ISAACS@hud.gov>; Dawson III, William O <William.O.DawsonIII@hud.gov>
**Subject:** IL002 / IL002001000 / DDA0012060

This is to notify you that the Special Applications Center has received the above application.
Andres Acosta has been assigned to review the application and he will reach out to you as he has questions.
Please note, it typically takes about sixty days to process a SAC application.
In the interim, if you have questions, please contact your Field Office or write to SACTA@HUD.gov.

Sincerely



**Don Gardiner** | Program Analyst
Phone 312.913.8605 | Fax 312.913.8892
U.S. Department of Housing and Urban Development
Special Applications Center
Ralph H. Metcalfe Federal Building
77 West Jackson Boulevard, Suite 2401, Cube # 24-57
Chicago, Illinois 60201
donald.d.gardiner@hud.gov

**Acosta, Andres**

---

| | |
|---|---|
| **From:** | ISAACS, JAMES A |
| **Sent:** | Tuesday, October 25, 2022 12:23 PM |
| **To:** | McKenzie, Ann |
| **Cc:** | Acosta, Andres; Harrington, Michelle; DiPietro, Steven; Macon, Towanda S |
| **Subject:** | RE: <External Message>  IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses |
| | |
| **Categories:** | Purple Category |

Please reach out to Towanda Macon and Steven DiPietro copied herein.  They will need to know which annual plan you believe the proposed disposition is mentioned pursuant to 24 CFR 970.7(a)(1).  The SAC does not independently verify annual plans.

James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Monday, October 24, 2022 6:01 PM
**To:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Acosta, Andres <Andres.Acosta@hud.gov>; Harrington, Michelle <MHarrington@thecha.org>
**Subject:** Re: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

Who should I call at the field office?

Ann McKenzie
Chief of Development
Chicago Housing Authority
312.913.7656 (office)
312.523.8818 (cell)

Sent from my iPhone.  Please excuse any typos.

> On Oct 24, 2022, at 5:54 PM, ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov> wrote:

Thanks Anne.

The Field Office who certify for us if an item is in any annual plan said that they are waiting for the relevant annual plan to be approved.  This was told to me today.

James Isaacs
Division Director
Special Application Center

(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Monday, October 24, 2022 5:03 PM
**To:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Acosta, Andres <Andres.Acosta@hud.gov>; Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

James-
Thanks so much.  Response below.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Sent:** Monday, October 24, 2022 4:49 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** RE: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

Anne some quick questions:

1. The timetable needs number of days after approval (assuming we approve) would the PHA take certain actions.  Your office used dates which unfortunately the system will not take.  Can you give us actual number of days (best estimates – more of an issue when its dwelling units).  See chart below (need info for C and D):

| | Milestone | Number of Days after Approval |
|---|---|---|
| A | Begin relocation of residents | - |
| B | Complete relocation of residents | - |
| C | Execution of contract for removal (e.g. sales contract) | XX30 days |

| D | Actual Removal Action (e.g. sale closing) | XX90 days |

2. FYI: I am told the relevant MTW annual plan is under review. The SAC can't complete its review without the local Field office sign off on it (with MTW office concurrence). We had this land in our 2022 plan which was approved. There is an appendix with our vacant land.

3. Still need info on proposed use of proceeds, revised justification narrative, info on FMV analysis, etc. We are getting updated 5860 and 5860A signed. Will send the analysis with those.

4. I might have more but that is it for today. Keep me posted.


James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Wednesday, October 05, 2022 4:11 PM
**To:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** FW: <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

FYI

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Wednesday, October 5, 2022 1:24 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** <External Message> IL002 / IL002001000 / DDA0012060 - Chicago Housing Authority Responses

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Mr. Acosta-
Thank you for your review comments provided last week. Attached are revised documents and explanatory narratives:

1. 52860 Form

1. Section 1.8 asks for additional information if the PHA is operating under an order, agreement, judgement or decree. Can you provide the narrative requested here explaining how the removal is consistent with that requirement?
   **RESPONSE: Narrative is attached in document titled '52860 Narrative'**

2. Can you complete Section 4? It should include all the information pertaining to the entire AMP (it should be consistent with the PIC application, Section 4).
   **RESPONSE: Attached is the updated 52860 form. Note that this information pertains to Brooks Homes, an existing public housing development across the street, not the land in question due to limitations in the PIC system. No units will be removed.**

3. Timing – Can you complete Section 5.6 in the 52860? For a vacant parcel we're looking only at lines c and d. Also, can I have your permission to make the matching change to PIC?
   **RESPONSE: See updated 52860. Yes, you have permission to make the change in PIC.**

2. Justification
   1. Can you provide a justification narrative for the disposition? Also, the 52860-A, Section 2, had selected 970.17(c) as the justification but for vacant land the next two options are typically more appropriate under 970.17(d). Can you correct if needed?
      **RESPONSE: The justification narrative is attached in the document titled "52860-A". The correction under Section 2 has been made on the attached form.**

3. Use of Proceeds
   1. Can you provide information on what the use of proceeds from the lease payments will be? I need to include a short narrative on this in the approval letter.
      **RESPONSE: The narrative is on the attached document titled "52860-A"**

4. Offer of Sale to Resident Organization
   1. 52860-A page 3 notes that an offer of sale was made to the resident organization on 1/27/22, however the 1/27/22 letter I'm seeing doesn't include an offer of sale. Is there another letter? If this was an error and no offer was made, please let me know. I need to confirm the latest requirements, but I believe an offer may not be required for a vacant parcel with no dwelling units.
      **RESPONSE: This was an error. The land is vacant and no letter is required. The correction has been made on the 52860-A.**

5. Land Ownership/Tenancy
   1. The site, or an adjacent site, appears to be listed as a Chicago Park District operated space. Is the Park District currently leasing this land from the CHA? Are there any issues with terminating this if that's the case?
      **RESPONSE: No, the Park District is not leasing this land from CHA, it is adjacent to the Chicago Park District operated site. There is an error on Google Maps and CHA has notified them to make this correction.**

6. Legal description – can you provide in Word Format? Having trouble pulling from the survey.
   **RESPONSE: The legal description in Word is attached.**

7. Acreage
   1. Confirming that this is just for Parcel 1 in the survey? For 23.226 acres. Please note that PIC needs acreage rounded to 2 decimal places. Is it ok to enter 23.23 acres into Section 5 of PIC?
      **RESPONSE: Correct, this is for Parcel 1 in the survey. Yes, you can make the change to 23.23 acres into Section 5 of PIC.**

8. Ground Lease
   1. What is the full term of the ground lease? 99 years?
      **RESPONSE: The lease term is for 41 years with two 10 year extensions. The entire term could be 61 years.**
   2. Is the lease unencumbered?

**RESPONSE: The ground lease will lay out what the improvements will be and CHA will maintain design and approval rights. CHA is limiting the improvements to permitted uses specifically excluding things like the sale of cannabis.**

3. Lease Price – I'm going to need some help walking through this
   1. Is the $8MM contribution included in the ground lease or any other agreement as part of the disposition?
      **RESPONSE; The $8MM contribution will be documented in a legally binding agreement.**
   2. Lease is set at $1MM per year, but will never actually be at $1MM, at least through Y30, because the Y1-30 will be discounted by $250,000 (a $7.5MM savings) to offset the $4MM in estimated environmental remediation.
   3. It may also never actually be $1MM because it will be renegotiated in Y21 and again in Y31.
   4. As far as guaranteed, after discount payments, the CHA can expect to receive $15MM in the first 20 years (at $750,000), but beyond that it's impossible to say?
      **RESPONSE: CHA will receive at least $23 MM over the first 20 years ($8MM contribution which will be a combination of improvements to the site and funding over a number of years + $15MM over 20 years if CPI is 0% each year). Although there is a $250,000 credit per year, the $1MM initial lease rent will increase by CPI annually and therefore the annual payment will go up each year.**

9. Value
   1. At the appraisal's $21 per square foot, for 23.226 acres (to be 23.23 in PIC), I'm getting $21,246,215.76. However, the value listed in PIC and in the 52860 is $ 20,234,500.00. Can you walk me through your figure? This could be simple math and rounding errors on my part.
      **RESPONSE: CHA received conflicting appraisals, one from CFFC and the one from our appraiser, CBRE. The parties agreed that $20 per square foot would be used to calculate the annual payment, 1,011,725 sq ft (rounded up) x $20 = $20,234,500. The $8MM contribution more than makes up the difference.**

We look forward to any other questions that you might have.

Best,
Ann



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Wednesday, September 21, 2022 5:51 PM
**To:** Perez, Olivia <operez@thecha.org>; Scott, Tracey <TScott@thecha.org>; McKenzie, Ann <amckenzie@thecha.org>
**Subject:** RE: IL002 / IL002001000 / DDA0012060

Hello,

My name is Andres Acosta and I'll be reviewing this disposition application on behalf of HUD. Can you please provide me with the name and email for your point of contact for this application?

I'll be in touch, likely early next week, with an initial set of comments.

Thank you,



**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
Ralph H. Metcalfe Federal Building
77 West Jackson Boulevard, Suite 2401
Chicago, Illinois 60604-3507
312-913-8003 (phone) – *email or Teams teleconference preferred*
andres.acosta@hud.gov

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov
Check out our new repositioning website: HUD Repositioning Web Site
Visit our website: HUD SAC
Check out our Section 18 Notice: HUD Notice 2018-04
Helpful Videos Link
New HUD Proceeds Notice 2020-23 Link
For technical assistance or submission of amendments please email SACTA@hud.gov

**From:** Gardiner, Donald D <Donald.D.Gardiner@hud.gov>
**Sent:** Wednesday, September 21, 2022 2:44 PM
**To:** operez@thecha.org; tscott@thecha.org; McKenzie, Ann <amckenzie@thecha.org>
**Cc:** SACTA <SACTA@hud.gov>; Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>; Dawson III, William O <William.O.DawsonIII@hud.gov>
**Subject:** IL002 / IL002001000 / DDA0012060

This is to notify you that the Special Applications Center has received the above application.
Andres Acosta has been assigned to review the application and he will reach out to you as he has questions.
Please note, it typically takes about sixty days to process a SAC application.
In the interim, if you have questions, please contact your Field Office or write to SACTA@HUD.gov.

Sincerely



**Don Gardiner** | Program Analyst
Phone 312.913.8605 | Fax 312.913.8892
U.S. Department of Housing and Urban Development
Special Applications Center
Ralph H. Metcalfe Federal Building
77 West Jackson Boulevard, Suite 2401, Cube # 24-57
Chicago, Illinois 60201
donald.d.gardiner@hud.gov

## Acosta, Andres

| | |
|---|---|
| **From:** | Acosta, Andres |
| **Sent:** | Tuesday, November 8, 2022 11:37 AM |
| **To:** | McKenzie, Ann; ISAACS, JAMES A |
| **Cc:** | Harrington, Michelle |
| **Subject:** | RE: <External Message> CHA - Loomis Land Dispo |

Thanks Ann, I did get James up to speed. I do have another quick question on the roundtable consultation though. If you have a minute could your or Michelle give me a call at 312-913-8003? I'm available for a quick call anytime except for 1-2 and after 3:30pm today.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, November 8, 2022 8:43 AM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** <External Message> CHA - Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Did you update James?

We are set to send updated info if you did not have comments.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Thursday, November 3, 2022 2:00 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> Loomis Land Dispo

Thanks, and absolutely. I'm available almost anytime tomorrow, though James will be out. Monday morning between 9-10:30am also works or Tuesday after 3pm.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Thursday, November 3, 2022 1:46 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** <External Message> Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Welcome back. I want to send you final responses to questions this week but have a few of my own questions. Can we schedule a Teams call?



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**Acosta, Andres**

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Tuesday, December 20, 2022 12:09 PM |
| **To:** | Acosta, Andres |
| **Cc:** | Harrington, Michelle |
| **Subject:** | RE: <External Message> CHA - Loomis Land Dispo |
| | |
| **Categories:** | Green Category |

Andres-
Any news on timing?



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Friday, December 9, 2022 2:09 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann,

I do have a couple of questions while we're waiting on HUD confirmations:

- On resident groups, I've entered the following info for our approval letter. Can you confirm if #2 is correct, and there is no other "PHA-wide resident organization?"
  - Project(s) Specific Resident Organization(s): ABLA Brooks Local Advisory Council
  - PHA-wide Resident Organization: none
  - Resident Advisory Board (RAB) in accordance with 24 CFR 903.13: Central Advisory Committee
- Can you provide a summary of any comments or questions asked at the March 29, April 5 or April 22 roundtable meetings? I do have the summary comments/questions PDF provided but it doesn't cover these meetings

Thanks,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Thursday, December 8, 2022 1:39 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Andres-
The MTW plan for 2022 was submitted to HUD October 18, 2021.

Need anything else?



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Friday, December 2, 2022 2:21 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Thanks, Ann. Nothing else needed right now. I'm waiting on a few different internal confirmations.

I'll let you know once the letter has started our internal review and hopefully that will be enough time to confirm the entity on your end.

Have a good weekend!

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, December 2, 2022 12:06 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Andres-
Do you need anything else from us?

Please give us a heads up before issuing the letter.  We are double-checking the parties to the lease.



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Monday, November 28, 2022 4:37 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Thanks so much Ann.

**Andres Acosta** (he/him/his)
**Neighborhood & Community Investment Specialist**
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Monday, November 28, 2022 3:16 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Andres-
Additional supplemental information for the disposition application is attached.

Best,
Ann



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Monday, November 21, 2022 11:27 AM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann,

Are you available this afternoon for a quick call? Sometime after 1:30pm?

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, November 18, 2022 10:57 AM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** <External Message> CHA - Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Attached is the supplemental information that you requested.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Tuesday, November 8, 2022 11:37 AM
**To:** McKenzie, Ann <amckenzie@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Thanks Ann, I did get James up to speed. I do have another quick question on the roundtable consultation though. If you have a minute could your or Michelle give me a call at 312-913-8003? I'm available for a quick call anytime except for 1-2 and after 3:30pm today.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, November 8, 2022 8:43 AM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** <External Message> CHA - Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Did you update James?

We are set to send updated info if you did not have comments.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Thursday, November 3, 2022 2:00 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> Loomis Land Dispo

Thanks, and absolutely. I'm available almost anytime tomorrow, though James will be out. Monday morning between 9-10:30am also works or Tuesday after 3pm.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Thursday, November 3, 2022 1:46 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** <External Message> Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Welcome back. I want to send you final responses to questions this week but have a few of my own questions. Can we schedule a Teams call?



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

## Acosta, Andres

---

| | |
|---|---|
| **From:** | Acosta, Andres |
| **Sent:** | Tuesday, February 21, 2023 2:35 PM |
| **To:** | McKenzie, Ann |
| **Cc:** | Harrington, Michelle; ISAACS, JAMES A |
| **Subject:** | RE: <External Message> CHA - Loomis Land Dispo |
| | |
| **Categories:** | 5th Thread |

Just realized the only conflict I have Friday is from 2-3pm. Otherwise it looks like FHEO is generally available Friday.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** Acosta, Andres
**Sent:** Tuesday, February 21, 2023 2:34 PM
**To:** 'McKenzie, Ann' <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann, no go for today. Let's move forward with Friday. What time would work?

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, February 21, 2023 1:55 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Did any time open up today?

Ann

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Tuesday, February 21, 2023 1:23 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann and Michelle,

Do you have any availability on Thursday at all (before 4pm)? Unfortunately FHEO can't do tomorrow and next week is also out since they'll be in DC. Unfortunately Friday is no good either.

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, February 21, 2023 12:29 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Andres-
Can we talk at 4:30pm tomorrow?  Or Friday afternoon?

Ann



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient,
please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Tuesday, February 14, 2023 11:09 AM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann,

Thanks so much for sending the response. FHEO and the SAC would like to have a call to discuss. This week is no good
unfortunately, but would you happen to have any availability next week at the following times?

11:30am Tuesday
2pm or later on Wednesday
1pm – 3:30pm on Thursday

Thanks,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist

U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, February 10, 2023 5:26 PM
**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** <External Message> CHA - Loomis Land Dispo

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres –
Find attached CHA's response to the questions that you provided.  Also attached are a few supplemental documents.

We appreciate your continuing diligence as you work through the CHA's disposition application.

Best,
Ann



**Ann C. McKenzie**│ Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Thursday, February 2, 2023 4:37 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Dispo

Hi Ann,

We've received the questions below that our FHEO team would like the CHA to respond to. In addition, after some discussion on the justification narrative you had provided (attached), we're going to need some added explanation as to how this dispo fits with the justification noted in the 52860-A form (24 CFR 970.17(d)(1): *the non-dwelling facilities or land exceeds the needs of the development (after DOFA)*). For example, if the subject property exceeds the needs of the ABLA development because the development's needs (or requirements) are being met in another way, please expand on that.

I know the information below is quite a bit so I'd like to add that the staff in FHEO have also made themselves available for a call if that would be helpful. Please note that I'll be out of the office until 2/13, but I'm hoping James can set up a meeting for then or later in my absence if you would like to have a call.

FHEO's questions:

1. Describe any obligations CHA has under an existing agreement with HUD to develop additional public housing and affordable housing units under a revitalization plan, including the breakdown of units by size and type if available, as well as the location for any proposed additional units. Include in this description any remaining HOPE VI obligations associated with the ABLA development or its component buildings, including any unit obligations or unobligated funds, or any obligations relating to former ABLA displaced residents.

2. Describe any factors that led the City of Chicago and the Chicago Fire Football Club (CFFC) to choose the ABLA site over the two other sites identified as options for the practice facility, including any estimated market rate leases for either site: (1) Madden Wells/Oakwood Shores (Madden), and (2) Taylor Homes/Legends South (Taylor).

3. Describe the process the City and CHA used to identify the three properties presented to CFFC and whether any other CHA properties were considered.

4. Describe how CHA plans to utilize the Madden or Taylor sites that were not selected by CFFC.

5. Explain how the CHA arrived at the decision for how it would use the proceeds of the CFFC lease, including why units at Brooks Homes and Loomis Courts would be rehabilitated when those units were recently updated through HOPE VI grants, as opposed to other potential eligible activities, such as the creation of new units.

6. As a result of the proposed disposition, CHA may be required to develop new units at the ABLA site at a higher density than previously planned. Describe the planned density and location of the anticipated units at the ABLA sites, including the breakdown of the 3,070 proposed units on the site by unit type.

7. Describe how CHA evaluates the feasibility of constructing new units on a site, including the evaluation of both current and future conditions, density of units, accessibility of units and of the site, and the size of units to be included in the development. If available, provide any documentation of this analysis at ABLA and other HOPE VI grant sites in the City of Chicago.

8. Provide the following information about the displacement of former ABLA residents:
   a. Describe CHA's efforts to track displaced ABLA residents, including residents that want to move back to the ABLA development.
   b. Provide all information relating to ABLA residents who have been able to return to ABLA units, including family size and demographics.
   c. Describe where ABLA residents were moved during the initial demolition using HOPE VI funding and where former ABLA residents currently reside who have not returned to the former ABLA site.

9. Provide the following information about CHA's FY1998 HOPE VI Revitalization grant of $35,000,000 to revitalize components of the ABLA public housing development:
   a. How many of the initially planned 1,052 units of public housing, 580 affordable rental and for-sale units, and 966 market rate rental and for-sale units included within CHA's FY1998 HOPE VI Revitalization grant were completed?
   b. Describe any amendments, if any, to this grant that were approved by HUD, including the current unit breakdown approved by HUD for the ABLA development.
   c. How much of the grant funds remain unobligated?
   d. Are there existing plans to shift replacement units under the grant to a different development or site, and if yes, where?
   e. Provide all documentation relating to the existing obligations under the FY1998 HOPE VI Revitalization grant.

Thanks,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

## Acosta, Andres

| | |
|---|---|
| **From:** | ISAACS, JAMES A |
| **Sent:** | Friday, March 3, 2023 2:23 PM |
| **To:** | McKenzie, Ann; Acosta, Andres |
| **Subject:** | RE: <External Message> CHA - Loomis Land Disposition |

Thanks!

James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to <u>SACTA@hud.gov</u>

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, March 03, 2023 2:20 PM
**To:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>; Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Disposition

James-
Thanks for the clarifying question. Yes, this means <u>CHA's</u> affordable housing plan.


**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
<u>amckenzie@thecha.org</u> | <u>www.thecha.org</u>

---

**From:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Sent:** Friday, March 3, 2023 2:17 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>; Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** RE: <External Message> CHA - Loomis Land Disposition

Thanks Ann! Just a clarification question, I presume the statement is meant to make clear that the increased density now allowed by the City, will be sufficient for the CHA to accomplish the CHA's affordable housing commitment?

James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to <u>SACTA@hud.gov</u>

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Friday, March 03, 2023 2:10 PM

**To:** Acosta, Andres <Andres.Acosta@hud.gov>
**Cc:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** <External Message> CHA - Loomis Land Disposition

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-

Please allow this email to serve as a supplement to the CHA disposition application.

CHA does not need the land described in the disposition application because changes in zoning allow density in the surrounding areas to satisfy the affordable housing planned for this community.

See attached exhibit from the approved planned development (zoning) update.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter

**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

## Acosta, Andres

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Tuesday, October 11, 2022 6:24 PM |
| **To:** | Acosta, Andres |
| **Cc:** | Harrington, Michelle |
| **Subject:** | <External Message>  L002 / IL002001000 / DDA0012060 - Chicago Housing Authority - Resident Meeting Sign-in and Attendee list for community on-line meeting |
| **Attachments:** | 4.12.22 Sign in Sheet.pdf; 4.5.22 Sign in Sheet.pdf; 3.29.22 Sign in Sheet.pdf; 5.2.22 - Sign In Sheets Fire Meeting.pdf; 5.3.22 Attendee Listing.csv |
| **Categories:** | Purple Category |

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Andres-
Attached are sign-in sheets for a number of the meetings held with residents to discuss the proposed lease of land to the Chicago Fire.



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
**NOTICE:** This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

## Acosta, Andres

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Thursday, March 2, 2023 6:37 PM |
| **To:** | Acosta, Andres |
| **Cc:** | Harrington, Michelle |
| **Subject:** | RE: <External Message> Follow-up Letter Regarding CHA Disposition |
| | |
| **Categories:** | Purple Category |

Andres-
Do you have time tomorrow (Friday) to discuss how to make the justification clearer?



**Ann C. McKenzie** | Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

---

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Wednesday, March 1, 2023 3:36 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Subject:** RE: <External Message> Follow-up Letter Regarding CHA Disposition

Thanks, Ann. If FHEO doesn't reach out directly with a response I'll make sure to pass along any comments or decision. In the meantime, I'm just waiting on the adjusted justification narrative when you get a chance. I think James pointed to the latest Ickes dispo as a good example, but I don't have those details available. Let me know if you want me to do some digging on this.

Thank you,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, February 28, 2023 7:10 PM
**To:** Karnaukhov, Yana <Yana.Karnaukhov@hud.gov>; Meltesen, Lon D <Lon.D.Meltesen@hud.gov>

**Cc:** Long, David C <David.C.Long@hud.gov>; Hornstein, Jane B <Jane.B.Hornstein@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>; Acosta, Andres <Andres.Acosta@hud.gov>; tscott@thecha.org
**Subject:** <External Message> Follow-up Letter Regarding CHA Disposition

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Ms. Karnaukhov-
Thank you for meeting with us on Friday.  We hope that the discussion answered your questions.

Attached is a follow-up letter with additional information.

Please do not hesitate to reach out with any questions.

Best,
Ann



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

**Acosta, Andres**

| | |
|---|---|
| **From:** | McKenzie, Ann <amckenzie@thecha.org> |
| **Sent:** | Friday, March 3, 2023 12:06 PM |
| **To:** | ISAACS, JAMES A |
| **Cc:** | Acosta, Andres |
| **Subject:** | RE: <External Message> Follow-up Letter Regarding CHA Disposition |

Was just about to call you.

Ann

---

**From:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Sent:** Friday, March 3, 2023 12:04 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Cc:** Acosta, Andres <Andres.Acosta@hud.gov>
**Subject:** RE: <External Message> Follow-up Letter Regarding CHA Disposition

Ann

I am curious if you have had a chance to formulate a justification that speaks directly to 24 CFR 970.17(d)?

James Isaacs
Division Director
Special Application Center
(312)913-8306

**Problems with PIC?** Email your 52860 form(s) and attachments to SACTA@hud.gov

**From:** Acosta, Andres <Andres.Acosta@hud.gov>
**Sent:** Friday, March 03, 2023 10:38 AM
**To:** ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>
**Subject:** Fw: <External Message> Follow-up Letter Regarding CHA Disposition


**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

---

**From:** Acosta, Andres
**Sent:** Wednesday, March 1, 2023 3:35 PM
**To:** McKenzie, Ann <amckenzie@thecha.org>
**Subject:** RE: <External Message> Follow-up Letter Regarding CHA Disposition

Thanks, Ann. If FHEO doesn't reach out directly with a response I'll make sure to pass along any comments or decision. In the meantime, I'm just waiting on the adjusted justification narrative when you get a chance. I think James pointed to

the latest Ickes dispo as a good example, but I don't have those details available. Let me know if you want me to do some digging on this.

Thank you,

**Andres Acosta** (he/him/his)
Neighborhood & Community Investment Specialist
U.S. Department of Housing and Urban Development
Special Applications Center
andres.acosta@hud.gov

**From:** McKenzie, Ann <amckenzie@thecha.org>
**Sent:** Tuesday, February 28, 2023 7:10 PM
**To:** Karnaukhov, Yana <Yana.Karnaukhov@hud.gov>; Meltesen, Lon D <Lon.D.Meltesen@hud.gov>
**Cc:** Long, David C <David.C.Long@hud.gov>; Hornstein, Jane B <Jane.B.Hornstein@hud.gov>; ISAACS, JAMES A <JAMES.A.ISAACS@hud.gov>; Acosta, Andres <Andres.Acosta@hud.gov>; tscott@thecha.org
**Subject:** <External Message> Follow-up Letter Regarding CHA Disposition

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you have concerns about the content of the email, please send it to phishing@hud.gov or click the Report Phishing Button on the Outlook ribbon or Phishing option within OWA.

Ms. Karnaukhov-
Thank you for meeting with us on Friday. We hope that the discussion answered your questions.

Attached is a follow-up letter with additional information.

Please do not hesitate to reach out with any questions.

Best,
Ann



**Ann C. McKenzie**| Chief Development Officer
Phone 312.913.7656 | Cell 312.523.8818
Chicago Housing Authority | 60 E. Van Buren | Chicago, IL 60605
amckenzie@thecha.org | www.thecha.org

Like us on Facebook | Follow us on Twitter
NOTICE: This email message, including any attachments, may contain information that is confidential and/or proprietary. If you are not an intended recipient, please be advised that any review, use, reproduction or distribution of this message is prohibited.

52860

Section 1.8

CHA is subject to the Gautreaux settlement which provides that we must provide 509 non-elderly units on-site or within one-half mile. Our developer partner has engaged a planner to ensure this commitment can will be honored.

DDA 0012060 – Supplemental Information

11/15/2022

Form 52860-A, Section 2 - Justification

CHA believes this partnership with the Chicago Fire Football Club (CFFC) presents an opportunity to invest in our families and this community.

CHA is committed to bringing all of the previously planned new public and affordable housing units to the area in a mixed-income setting. The CFFC facility does not change that commitment.

Replacement housing at Roosevelt Square is well underway and CHA will continue working with our development partner, Related Midwest, to fulfill our commitment for housing in the area in mixed-income developments.  The revised planned development–Residential-Business Planned Development No. 896--illustrates that the committed units will fit with the new proposed facility.

The CFFC has also committed to significant investments requested by the community, above and beyond paying market-rate rent to lease the land. These include:
- o jobs and internships for CHA residents during construction of the facility as well as at the completed site;
- o open public space that can host recreational activities;
- o renewing CHA's Jane Addams Family Resource Center so that it can host more activities for CHA residents;
- o parking for tenants of CHA's William Jones Senior Apartments (which does not currently have adequate parking);
- o CHA youth will also have access to CFFC youth programing and soccer camps through enrollment preferences.

Form 52860-A, Section 3 - Use of Proceeds

This transaction will secure substantial funds to improve aging public housing including at Brooks Homes (public housing) and Loomis Courts (PBRA).

Meeting with Public Officials (24 CFR 970.7 (14))

CHA had many meetings with public officials regarding the CFFC project before the letter of support from the Mayor was issued in May. Specifically, meetings that included representatives from the Mayor's office, Department of Planning and Development, and the Chicago Park District were held on the following dates:  March 4, 2022 and April 13, 2022. Topics included zoning and community outreach.

Demetria McCain                                                                    March 6, 2023
U.S. Dept. of Housing and Urban Development
451 7th St., SW
Washington, DC 20410
Demetria.L.McCain@hud.gov

VIA EMAIL

Dear Ms. McCain:

We are writing on behalf of a coalition of community-based organizations, whose membership
includes ABLA residents, other public housing residents, and households in need of affordable
housing who have objected to the Chicago Housing Authority's ("CHA") Section 18 disposition
application to the U.S. Department of Housing and Urban Development ("HUD"), which would
dispose of 23 acres of highly valuable public housing land in a rapidly gentrifying community
and use it to create a practice facility for the Chicago Fire Football Club ("Chicago Fire").
Disposing of public housing land in this manner, at the expense of thousands of Black and Latinx
families and persons with disabilities in desperate need of affordable housing in communities of
opportunity, violates the letter and spirit of various civil rights laws.

HUD is currently reviewing the CHA's disposition application, which as you know, will include
a review by your office. The CHA and the City of Chicago, which has been central to supporting
this transfer of land to the Chicago Fire, are obligated to comply with federal civil rights laws,
including the duty to affirmatively further fair housing under the Fair Housing Act, Section 109
of the Housing and Community Development Act, and Title VI of the Civil Rights Act. Federal
funding recipients like the CHA and City of Chicago should not be allowed to give away land to
for-profit, non-housing ventures without a rigorous consideration of these civil rights obligations.

### CHA's Longstanding Obligation to Rebuild Family Public Housing Units

As part of its Plan for Transformation, CHA demolished, nearly 20 years ago, Addams and
Abbott Homes, rehabilitated Brooks Homes and Loomis Courts, and displaced thousands of
ABLA families to racially-segregated, economically depressed areas of the City. For years, CHA
promised those displaced ABLA families that they could return to new or rehabilitated units in
their former neighborhood, which was, even at that time, rapidly gentrifying.

CHA most recently committed to build 775 public housing replacement units on the ABLA
footprint in a development now known as Roosevelt Square, which is far fewer than the 2,441
new and 455 rehabbed public housing units CHA promised in 2013. To date, CHA and the
developer have delivered only 245 of the 775 promised replacement ABLA units.[1]

---

[1] City of Chicago Department of Housing, "Next Phase of ABLA Homes Redevelopment Approved for the Near
West Side" (July 20, 2022) *available at*
https://www.chicago.gov/city/en/depts/doh/provdrs/housing_resources/news/2022/july/next-phase-of-abla-homes-
redevelopment-approved-for-the-near-wes.html

As recently as 2016, an updated Master Plan proposed developing the land primarily for residential housing, with a mix of commercial and open space. This vision has been long promised to the displaced ABLA residents and other low-income current CHA residents, applicants, and persons in need seeking to live in an area of opportunity close to the Illinois Medical District, which offers a wide array of health care and disability services. In 2021, the City of Chicago and the CHA approved the next phase of development, which will include only 80 public housing units. When completed, this will bring the number of delivered replacement public housing units to 325, about 40% of the number most recently committed.

CHA's failure to meet its original goals under the landmark Plan for Transformation highlights the fair housing implications of its pending application for disposition. HUD gave CHA $1.5 billion to demolish 18,000 family public housing units and revitalize 25,000 total units. This would result in a net loss of more than 13,000 family public housing units.[2] CHA claims that it met its revitalization goal last year in the MTW 2022 Annual Report, but that claim is misleading. CHA's revitalization efforts have focused to a large extent not on the construction of new public housing—fewer than 2,800 were built in mixed-income developments—but on the expansion of its project-based voucher (PBV) program.[3] More than 5,000 of the revitalized units are in PBV buildings owned and managed by private entities and subject to expiring contracts.[4] These units already existed (and were often occupied) when CHA counted them toward its revitalization goal.

CHA has also failed to create enough appropriately-sized public housing units, which discriminates against families with children. The 18,000 high rise units that CHA demolished were family units, and more than 9,000 of the revitalized units are in senior housing developments, where the units are much smaller and not available to families with children.[5] Thus, displaced families need appropriately-sized units that CHA can build in opportunity areas like the one where ABLA is located.

**The Need for Affordable Housing in Opportunity and Gentrifying Areas**

The City's own data and findings confirm that there is a desperate lack of affordable housing in opportunity areas and gentrifying neighborhoods in Chicago. The majority of Chicago's low-income developments have been in majority Black neighborhoods on the South and West Sides.[6] The vast majority of individuals who live in low-income, under-resourced neighborhoods are Black or Latinx, and many are people with disabilities.[7] As a result, in recent years Chicago has

---

[2] Plan for Transformation, January 2000, pg. 2.

[3] FY2021 MTW Annual Report, pg. 67.

[4] *Id. See Also* FY2010 MTW Annual Report (Revised), pg. 56 http://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/2018-08/fy2010_annual_report_revised_hud_approved1.pdf (last visited March 2, 2023).

[5] *Public Housing,* CHA, https://www.thecha.org/residents/public-housing#:~:text=CHA%20provides%20just%20fewer%20than,14%20Family%20public%20housing%20properties (last visited Feb. 23, 2023); *See also* Grace del Vecchio, *The Chicago Housing Authority Explained*, South Side Weekly, Feb. 25, 2022

[6] Chicago Dept. of Housing, Racial Equity Impact Assessment, Qualified Allocation Plan, 12, https://www.chicago.gov/content/dam/city/depts/doh/qap/qap_2021/draft_reia_qap.pdf (last visited Feb. 23, 2023).

[7] Chicago Blueprint for Fair Housing, Oct. 2021, 3-9, https://www.chicago.gov/city/en/sites/blueprint-for-fair-housing/home.html (last visited Feb. 23, 2023).

experienced an exodus of Black Chicagoans.[8] The City must therefore pursue every available opportunity to create affordable, accessible housing in opportunity and gentrifying neighborhoods.

## CHA and the City Should Not Be Permitted to Dispose of Public Housing Land in a Gentrifying Area

ABLA/Roosevelt Square is surrounded by rapidly gentrifying neighborhoods on Chicago's Near West Side. To the North are University Village, Little Italy, and the campus of the University of Illinois at Chicago ("UIC"). To the northwest are the Illinois Medical District and Tri-Taylor neighborhood. To the east is the massive "South Campus" development of market rate housing and commercial businesses. To the south – in addition to the several luxury developments along 15th and 16th Streets – is the most rapidly gentrifying and whitest part of Chicago's Pilsen (Lower West Side) community. The ABLA area therefore offers easy access to good jobs, healthcare, shopping, parks, universities, and many other amenities in Chicago's booming central core – access that thousands of CHA families once had but lost over the past two decades as the Plan for Transformation pushed families out to the Far South and Far West Sides of Chicago.

The potential for this land to appreciate was recognized two decades ago. In 1998, at CHA's request, the court monitoring the housing authority's fair housing obligations in the *Gautreaux* litigation deemed ABLA/Roosevelt Square a "Revitalizing Area," recognizing that it was already likely to become racially and economically integrated.[9]

The Natalie M. Voorhees Center at the University of Illinois at Chicago ("Voorhees Center") completed a report analyzing the area in question.[10] In its report, the Voorhees Center found that "[w]hile land dispositions by the CHA have become common practice in Chicago at mixed-income redevelopments that are part of the Plan for Transformation, they are primarily being used on the South Side of Chicago in largely African American neighborhoods that have historically been disinvested and are having slower recovery of the housing market post-recession, such as Grand Boulevard and Washington Park."[11] The Voorhees Center noted that rebuilding efforts over the past 15 years have slowed due to the recovery of the real estate market, which has resulted in CHA using "its land for government or commercial facilities such as a non-profit tennis academy, charter schools, police station, medical facilities, movie production space, and supermarket."[12] The Chicago Fire proposal is different however, as there are stark differences in the market conditions in the ABLA area when compared to the other communities where they have been public housing land transfers. The ABLA area has only continued to develop, including with additional affordable housing units as recently as 2021. The

---

[8] *Who Can Live in Chicago? Investigating Housing Affordability Trends in Chicago Using 2020 Census Data*, April 21, 2022, https://voorheescenter.uic.edu/news-stories/who-can-live-in-chicago-investigating-housing-affordability-trends-using-2020-census-data/ (last visited March 2, 2023).

[9] *See* Settlement Agreement, Ex. A at 1-2, *Gautreaux v. Chi. Hous. Auth.*, 981 F. Supp. 1091 (No. 66-cv-1459), *available at* https://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/signed%20settlement%20agreement.pdf.

[10] Voorhees Center Memo Re: Chicago Fire Performance Centre Proposed Development ("Voorhees Center Memo"), attached as Exhibit A.

[11] *Id.* at 2.

[12] *Id.*, citing Dumke, M. (2022). This land was promised for housing. Instead it's going to a pro soccer team owned by a billionaire. Propublica. https://www.propublica.org/article/chicago-housing-abla-fire-soccer-cha.

Vorhees Center found that "in a community that is seeing significant neighborhood reinvestment resulting in gentrification and displacement [this pivot] is a significant shift in CHA and City of Chicago policy."[13]

The Voorhees Center also found that displacement of low-income households is highly likely, as "[a]ccording to the Institute for Housing Studies' Displacement Risk Index, the Near West Side, which includes Roosevelt Square, is considered to be at moderate to high risk of displacement.[14] Roosevelt Square is located within Chicago's Near West Side neighborhood, which is experiencing rapid gentrification." It is also surrounded by areas experiencing rapid gentrification, including University Village, Little Italy, and the University of Illinois Chicago (UIC) campus, the Illinois Medical District, the Tri-Taylor neighborhood, Pilsen,[15] and University Village, a 930-unit residential development with 120,000 square feet of retail space. The area is also proximate to "The 78," a 62-acre mixed-use development that will include a major innovation hub, the Discovery Partners Institute (DPI). With substantial ongoing public and private investment, access to jobs, healthcare, retail, and universities near the Chicago business district, the Voorhees Center found that "Roosevelt Square is poised to become one of the fastest growing and most coveted communities in Chicago" and that "now is the opportune time to build affordable housing."

The Voorhees Center also found that the Near West Side neighborhood, including the 137 acres making up Roosevelt Square, has experienced significant change, "with a steady increase in racial diversity over the past 20 years with public and private investments." At the same time, the Near West Side has experienced decreasing poverty and unemployment rates. While this area remains predominately rental housing, according to the City of Chicago's Affordable Requirements Ordinance Zone Map, "these areas are high opportunity areas for inclusionary affordable housing."

These economic circumstances in the Roosevelt Square neighborhood and surrounding areas present a prime opportunity for the CHA and City to create affordable housing opportunities in a way to counter past practices and instead begin moving in the direction of supporting more racially and economically inclusive neighborhoods.

**The City of Chicago and CHA's Actions Deprive Low-Income Persons with Disabilities and Majority Black and Latinx Residents of Affordable Housing Opportunities in an Increasingly White and Gentrifying Area.**

CHA and the City of Chicago may argue that they can satisfy their obligations so long as there will be sufficient replacement housing available to the remaining ABLA residents with a right of return. But that is not the standard under federal civil rights laws. CHA and the City have a duty to ensure that they do not deny, by intent or effect, affordable housing opportunities to protected

---

[13] Voorhees Center Memo, citing Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.

[14] Voorhees Center Memo at 2, citing Institute for Housing Studies at DePaul University. (2019). Mapping Displacement Pressure in Chicago. https://displacement-risk.housingstudies.org/.

[15] Voorhees Center Memo at 2, citing Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.

classes throughout Chicago, especially where housing can be built in opportunity areas and thereby start to reduce the pervasive racial segregation in the city.[16]

Because the City of Chicago and CHA receive federal housing-related funds, they likewise have a duty to affirmatively further fair housing. This obligation requires that "[a]ctions must be taken to fulfill, as much as possible, the goal of open integrated residential housing patterns and to prevent the increase of segregation."[17] A failure to comply with this duty jeopardizes the City and CHA's receipt of federal funds.[18]

As recipients of federal dollars, including federal housing and community development funds, the City of Chicago and CHA are also subject to Title VI of the Civil Rights Act of 1964 and Section 109 of the Housing and Community Development Act of 1974 and are prohibited from discriminating on the basis of protected class status in any program or activity that receives federal funds or other federal financial assistance.

In making housing-related decisions, the City and CHA must consider the civil rights implications of their actions. They should therefore have evaluated the ongoing need for affordable housing on the Near West Side by considering market rents, vacancy rates, household incomes, rates of housing cost burden, and public and subsidized housing waiting lists. They must also consider, as part of their analysis, the supply of affordable rental housing in opportunity areas with easy access to public transportation, good jobs and schools, and high-quality healthcare. Finally, the City and CHA should have considered how their decisions will affect people of color, families with children, people with disabilities, and other protected classes.[19] On information and belief, the City failed to adequately consider any of these factors in its amendment to the Planned Development. Had they conducted the proper analysis, the City and CHA could not convey valuable public housing land to a private, for-profit professional soccer team.

To the extent that the City's plan for the land at ABLA has been motivated by CHA's and Related Midwest's failure to timely build promised affordable replacement units at Roosevelt Square, the City should prioritize the creation of this affordable housing over a perceived need to make use of the land by leasing it to a soccer team. At a minimum, CHA should—as it has in other gentrifying neighborhoods, like those near the Cabrini and Lathrop developments—retain the land until development can occur.

---

[16] *Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.* 576 U. S. 519 (2015).

[17] *Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1134 (2nd Cir. 1973).

[18] *United States ex. Rel. Anti-Discrimination Center Inc. v. Westchester County*, 668 F. Supp. 2d 548, 569 (S.D.N.Y. 2009); *See generally* HUD's 2021 Interim Final Rule Restoring Affirmatively Furthering Fair Housing Definitions and Certifications *available at* https://public-inspection.federalregister.gov/2021-12114.pdf.

[19] See, e.g. *Access Living of Metropolitan Chicago v. City of Chicago*, No. 1:18-cv-03399 (N.D. Ill.) (challenging the City of Chicago's use of millions of dollars in federal funding on affordable housing development that is noncompliant with accessibility requirements under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act).

Rather than conducting the proper analysis and taking the steps necessary to create desperately-needed affordable housing in a gentrifying neighborhood, the City and CHA have joined forces to lease to a soccer team valuable land that should have been reserved for public housing residents. In the process, they ignored the significant role they have played in making unavailable land designated for future public and affordable housing. CHA and the City repeatedly departed from normal policies and procedures to give this land to the Chicago Fire. For example, after neighborhood opposition to an initial proposal to privatize City park land for the Chicago Fire's soccer practice facility and offices,[20] the City and CHA offered the Chicago Fire three potential public housing sites for its soccer facility.[21] Two of these sites, Madden Wells/Oakwood Shores and Taylor Homes/Legends South, are in racially-segregated, low-income communities with minimal potential for gentrification.[22] The presentation however attempted to obfuscate the growing diversity and increase in incomes for the ABLA community, making it appear as a high poverty, racially concentrated area of the City, rather than accurately showing its place within the Near West Side, as demonstrated by the Voorhees Center data. Not surprisingly, the Chicago Fire understood the true economic long term value of the ABLA land and chose this site, where it will enter into a long-term lease and build office space in addition to the soccer field. The City also departed from normal policy and practices on zoning matters by serving as the applicant for the Planned Development request.

In March 2022, the City of Chicago created talking points for a meeting with Related Midwest and the Chicago Fire detailing why the City should not be the applicant for the Planned Development amendment, including that this decision would violate internal guidance against the City applying for profit-generating developments.[23] Then, in May, after the Chicago Fire revived its advocacy for the City to serve as the applicant, the City changed its position, now stating that it "strongly believes" it can act as the applicant.[24] Among other things, this allowed the Chicago Fire to benefit from these zoning changes without submitting the requisite economic disclosure statement. When a journalist inquired about the anomaly, the City could not justify this as a usual practice, as the city is "rarely" the applicant in these circumstances, and had to draft talking points post-hoc.[25]

Once DPD agreed to be the applicant, DPD took over coordinating and facilitating all the internal review processes and deadlines throughout July, August, and September. This included setting internal deadlines for the private partners and asking other departments, such as CDOT and the Park District, to review the application quickly and sometimes in outdated forms while other revisions were in process, a benefit that other for-profit developers would be unlikely to obtain. DPD also allowed the private partners to break routine deadlines throughout, including

---

[20] Hernandez, A. (2021). Belmont Cragin Neighbors Blast Chicago Fire's Plan For New Hanson Park Facility: 'Where Are We Supposed To Play?' Block Club Chicago. https://blockclubchicago.org/2021/06/11/belmont-cragin-neighbors-blast-chicago-fires-plan-for-new-hanson-park-facility-where-are-we-supposed-to-play/.
[21] PowerPoint Presentation attached as Exhibit B.
[22] University of Illinois at Chicago Natalie P. Voorhees Center for Neighborhood and Community Improvement. *The Gentrification Index: Socioeconomic Change of Chicago's Community Areas* (1970-2010), p. 19-20, *available at* https://voorheescenter.uic.edu/what-we-do/areas-of-research/gentrification-index/
[23] Correspondence attached as Exhibits C and D.
[24] Correspondence attached as Exhibits E and F.
[25] Correspondence attached as Exhibit G.

working on planning decisions up to and after the Plan Commission required other applicants to have their presentations submitted for Commissioner review for the September meeting.[26]

The City's actions are consistent with its larger pattern and practice of refusing to build affordable housing in white or gentrifying communities. The City is already under investigation for a multitude of civil rights violations. A pending HUD administrative complaint[27] alleges that the City's longstanding policy and practice of "aldermanic prerogative" – whereby the City of Chicago delegates to the City's 50 aldermen and alderwomen ("aldermen") unfettered discretion and power over zoning, land use, city lots, and public financing, in order to decide where, if, and how affordable housing is built in their wards – discriminates by allowing aldermen to block affordable housing in white and gentrifying neighborhoods. Ald. Ervin exercised his "aldermanic prerogative" by approving the use of the ABLA land for a soccer training facility.[28] This application is at odds with the City's claim that it lacks available land for affordable housing in predominantly white and gentrifying neighborhoods.

The City is also defending a federal lawsuit brought by Access Living of Metropolitan Chicago. It alleges that the City has funded and developed tens of thousands of affordable rental housing units (which, given the age of Chicago's existing rental housing stock, may be the only way to create accessible, affordable housing opportunities) without ensuring that a sufficient number are accessible to people with disabilities, as required by federal law.[29] The complaint alleges that "low-income people with disabilities struggle to find suitable housing and are often forced to live on the street, in their cars, nursing homes, in homeless shelters, or in other inadequate and dangerous housing."[30] Given this context and the specifics of the ABLA proposal, HUD should reject the civil rights certifications submitted as a part of the disposition application and deny the application.

The City was also recently issued a letter of finding of discrimination pursuant to Title VI of the Civil Rights Act of 1964 and Section 109 of the Housing and Community Development Act of 1974 in *Southeast Environmental Task Force et al. v. City of Chicago*. In that case, the complainants alleged that the City of Chicago's actions to move a waste recycling facility to majority Black and Latinx neighborhoods violated civil rights laws. HUD agreed, finding that the City of Chicago failed to consider less discriminatory alternatives and that the City's planning and zoning processes failed to follow their own procedures or consider the impact of their decisions. These findings speak to a pattern and practice by the City of Chicago of failing to consider the civil rights implications of its decisions and of freely skirting its own policies and procedures when advantageous to corporate or aldermanic interests.

---

[26] Correspondence attached as Exhibit H (decisions outstanding on 9/12) and Exhibit I (requiring applicants to meet 9/8 deadlines for final submissions).

[27] *Chicago Area Fair Housing Alliance, et al. v. City of Chicago,* HUD Administrative Complaint (Nov. 2018).

[28] See, e.g. David Roeder, *City Council approves fires' training center on Near West Side.* Chicago Sun Times (September 21, 2022) *Available at* https://chicago.suntimes.com/city-hall/2022/9/21/23365742/chicago-fire-training-center-near-west-side

[29] *Access Living of Metro. Chi. v. City of Chicago,* 372 F. Supp. 3d 663 (motion to dismiss denied) (N.D. Ill. 2019).

[30] *Id.*

Taken together, these violations of civil rights laws require HUD FHEO to recommend disapproval of the disposition application, and to consider if the CHA and the City's actions here are relevant to any pending compliance reviews or HUD complaint about the CHA or City, or to initiate a Secretary initiated complaint or compliance review against both entities. Please let us know if we can be of any further assistance. Please contact Emily Coffey at (312) 888-4195 if you require any additional information.

Sincerely,

Emily Coffey
Micaela Alvarez
MacKenzie Speer
**Chicago Lawyers' Committee for Civil Rights**

Lawrence Wood
Dan Schneider
Brigid Carmichael
**Legal Action Chicago**

Kate Walz
Lauren Song
**National Housing Law Project**


cc: Lynn M. Grosso
    Jacy D. Gage
    Sasha Samberg Champion

**Exhibit A**



October 12, 2022

Re: Chicago Fire Performance Centre Proposed Development

**About the Natalie P. Voorhees Center for Neighborhood and Community Improvement**

The Nathalie P. Voorhees Center for Neighborhood and Community Improvement (Voorhees Center) is a research and technical assistance unit in the College of Urban Planning and Public Affairs (CUPPA) at the University of Illinois at Chicago (UIC). Guided by the mission to improve the quality of life for all residents, the Center works in collaboration with faculty and graduate students in developing grounded research to support the revitalization of communities. The center is committed to problem solving within a context that is participatory, and in partnership with community groups, residents, government entities, and other stakeholders: its engagement with community partners empowers organizations with knowledge and information to advocate for policies and to promote development efforts, while its work with government provides data and analysis to inform policy decisions and help improve the way government does business with communities.

**Overview**

As part of its Plan for Transformation (PFT), the Chicago Housing Authority committed to build 775 public housing replacement units on the ABLA footprint as part of a mixed income development called Roosevelt Square – as well as retaining and renovating the Brooks Homes and Loomis Courts. Nearly 23 years later, Related Midwest and the CHA have delivered only 245 of the 775 promised public housing units – little more than one third.  In 2016, a new master plan was approved for Roosevelt Square, maintaining the primary use as residential with up to 175,000 sq. ft. of retail, commercial, and civic uses. Based on the master plan, the majority of the land now proposed for disposition and lease to the Chicago Fire soccer team remained zoned residential.  The plan called for mixed-use development along Ashland Avenue and along Taylor Street in phases three and four.

In 2021, the City of Chicago and the CHA approved the next phase of development that will include 80 public housing units; when completed, this will bring the number of delivered replacement public housing units to 325. With another 450 public housing units required to meet the 2016 PFT master plan, with an additional 1650 affordable and market rate units needed to fully build out the proposed Roosevelt Square mixed-income community, it is imperative that the largest remaining parcel (24.2 acres) be preserved for much needed public and affordable housing.

While land dispositions by the CHA have become common practice in Chicago at mixed-income redevelopments that are part of the PFT, they are primarily being used on the South Side of Chicago in largely African American neighborhoods that have historically been disinvested and are having slower recovery of the housing market post-recession, such as Grand Boulevard and Washington Park. Due to slow market recovery, rebuilding efforts over the past 15 years have slowed and the CHA has used its land for government or commercial facilities such as a non-profit tennis academy, charter schools, police station, medical facilities, movie production space, and supermarket.[1] The Chicago Fire Performance Centre proposal on 24.2-acres of undeveloped land with current plans as recent as 2021 for affordable housing in a community that is seeing significant neighborhood reinvestment resulting in gentrification and displacement is a significant shift in CHA and City of Chicago policy.

According to the Institute for Housing Studies' Displacement Risk Index, the Near West Side, which includes Roosevelt Square, is considered to be at moderate to high risk of displacement.[2] Roosevelt Square is located within Chicago's Near West Side neighborhood, which is experiencing rapid gentrification. To the north are University Village, Little Italy, and the University of Illinois Chicago (UIC) campus. To the northwest are the Illinois Medical District and Tri-Taylor neighborhood. Immediately to the east of the Brooks Homes and Loomis Courts buildings is University Village, a 930-unit residential development with 120,000 square feet of retail space. Further east is the "The 78," a 62-acre mixed-use development that will include a major innovation hub, the Discovery Partners Institute (DPI). To the south is one of Chicago's most rapidly gentrifying neighborhoods – Pilsen, located in the Lower West Side community.[3] With substantial ongoing public and private investment, access to jobs, healthcare, retail, and universities near the Chicago business district, Roosevelt Square is poised to become one of the fastest growing and most coveted communities in Chicago. Given, the potential for redevelopment that is mixed-income, mixed-use, now is the opportune time to build affordable housing that will accommodate former ABLA and existing residents to mitigate displacement. Creating site-based affordable housing in high opportunity communities such as Roosevelt Square on the proposed 24.2 acres is critical for the CHA and City to meet its obligations and uphold the "promise" of the PFT.

### Roosevelt Square and the larger Near West Side – Demographics and Economic and Housing Market Characteristics

The 137 acres of the Roosevelt Square site are part of a larger community. To understand the demographic, economic, and housing market characteristics of Roosevelt Square and the overall Near West Side, we mapped eight indicators using ArcGIS software. Examining both

---

[1] Dumke, M. (2022). This land was promised for housing. Instead it's going to a pro soccer team owned by a billionaire. Propublica. https://www.propublica.org/article/chicago-housing-abla-fire-soccer-cha.

[2] Institute for Housing Studies at DePaul University. (2019). Mapping Displacement Pressure in Chicago. https://displacement-risk.housingstudies.org/.

[3] Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.

Roosevelt Square and the broader Near West Side neighborhood that includes it underscores that the area is undergoing significant change.

**Racial Diversity.** Roosevelt Square and the overall Near West Side have both seen a steady increase in racial diversity over the past 20 years with public and private investments, including the PFT, leading to shifts in racial makeup. The racial diversity within Roosevelt Square – a site that remains largely undeveloped and lightly populated – is currently in stark contrast to the larger Near West Side neighborhood (See Table 2). But given the site's proximity to several neighborhoods experiencing rapid gentrification and displacement, this is likely to change.

**Table 2:** Roosevelt Square and Near West Side Demographics

| Demographic Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---|---|---|
| Hispanic / Latino/a/x | 12.2% | 17.1% | 33.4 |
| White Alone | 20.9% | 44% | 71.2 |
| Black or African American Alone | 53.8% | 19.6% | -93.2 |
| AAPI Alone | 9.4% | 15% | 45.9 |
| Other or Multiple Races | 3.8% | 4.4% | 14.6 |

According to the 2020 American Community Survey data from the U.S. census, while African Americans comprise 53.8% of Roosevelt Square, they represent only 19.6% of the entire Near West Side. This represents a -93.2% difference in the African American population. Whites make up only 20.9% of the population at Roosevelt Square, versus 44% on the Near West Side, representing a 71.2% difference. Likewise, there are fewer Latino (12.2%), AAPI (9.4%), and Other or Multiple Races (3.8%) residing within the Roosevelt Square boundaries compared to the Near West Side. Overall, racial diversity is more prevalent within the Near West Side compared to Roosevelt Square. (See Figure 1).

**Figure 1:** Race by Block Group: Roosevelt Square and Near West Side, 2020

Race by Block Group: Roosevelt Square and Near West Side, Chicago, 2020



**Economic Conditions.** Roosevelt Square and the Near West Side have comparable employment rates, however there are significant differences in median household income and poverty rates. The median household income in Roosevelt Square is significantly lower compared to the Near West Side, which is also reflected in greater poverty rates in Roosevelt Square compared to the Near West Side. Overall, the Near West Side has greater affluence and less poverty than Roosevelt Square. (See Table 3).

**Table 3:** Roosevelt Square and Near West Side Economic Indicators

| Economic Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---|---|---|
| Median Income | $ 42,177 | $ 76,554 | 57.9 |
| Employed | 93.1% | 94% | 1.0 |
| Unemployed | 6.9% | 6% | -14.0 |
| Poverty | 34.2% | 16.3% | -70.9 |

4

According to the 2020 American Community Survey data from the U.S. census, households in Roosevelt Square had a median household income of $42,177 versus $76,554 in the larger community area. Median household income on the Near West Side is 57.9% greater than households currently living in Roosevelt Square. Residents employed in Roosevelt Square and the Near West Side are similar at 93.1% and 94% respectively. However, there is a significant difference in the poverty rate, with Roosevelt Square having a poverty rate of 34.2% and the Near West Side having a much lower poverty rate of 16.3%, representing a difference of -70.9%. (See Figures 2-4). The highest concentration of medium household income are to the north and east of Roosevelt Square.

**Figure 2:** Median Income by Block Group: Roosevelt Square and Near West Side, 2020



Median Income by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

5

**Figure 3:** Unemployment by Block Group: Roosevelt Square and Near West Side, 2020





**Figure 4:** Poverty by Block Group: Roosevelt Square and Near West Side, 2020



Percent Poverty by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

**Housing Market.** Overall, both Roosevelt Square and the Near West Side are predominantly renter occupied neighborhoods, however median gross rent is significantly higher within the Near West Side neighborhood (37.6%) compared to Roosevelt Square (See Table 4). Also, median home values are similar at $384,000, which indicate according to the City of Chicago ARO Zone Map (See Figure 5) that these areas are high opportunity areas for inclusionary affordable housing. According to the City of Chicago, there is a shortage of 120,000 affordable housing units in Chicago.[4]  In combination with permanent public housing, Roosevelt Square shows potential for the CHA to take advantage of High Income Zones to deliver necessary affordable housing.

---

[4] Rockett, D. (2021). Chicago 120,000 units short on affordable housing: Here's how the City and developers hope to fix that gap. Chicago Tribune. https://www.chicagotribune.com/real-estate/ct-re-affordable-housing-in-chicago-0409-20210412-tzcbnjsslbdoxmnwdo27h7lehi-story.html

7

**Table 4:** Roosevelt Square and Near West Side Housing Market Indicators

| Housing Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---:|---:|---:|
| Owner Occupied | 28.1% | 40.4% | 35.9 |
| Renter Occupied | 71.9% | 59.6% | -18.7 |
| Median Gross Rent | $ 1,034 | $ 1,513 | 37.6 |
| Median Home Value | $ 384,900 | $ 384,300 | -0.2 |

**Figure 5:** City of Chicago ARO Zone Map



According to the 2020 American Community Survey data from the U.S. census, Roosevelt Square is predominantly renter occupied (71.9%) compared to an owner occupancy rate of 28.1%. The Near West Side also has a predominant renter population (59.6%) compared to 40.4% owner occupied housing units. This reflects an -18.7% difference in renter occupied units on the Near West Side compared to Roosevelt Square. Median gross rents are much lower in Roosevelt Square ($1,034) compared to the Near West Side ($1,513). Median home values are almost the same in both Roosevelt Square and the Near West Side at approximately ($384,000). (See Figures 6-8). The highest concentration of rents > $2,500 and home values greater than $500,00 are to the north of Roosevelt Square.

**Figure 6:** Owner-Occupied Housing by Block Group: Roosevelt Square and Near West Side, 2020



Percent Homeowner by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

10

**Figure 7:** Median Gross Rent by Block Group: Roosevelt Square and Near West Side, 2020



Median Gross Rent by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

11

**Figure 8:** Median Home Value by Block Group: Roosevelt Square and Near West Side, 2020



Median Home Value by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

Yittayih Zelalem, Director and Research Associate Professor
April Jackson, Ph.D, Associate Professor and Research Affiliate

Natalie P. Voorhees Center for Neighborhood and Community Improvement
College of Urban Planning and Public Affairs
412 S. Peoria Street, Suite 400
Chicago, IL 60607

**Exhibit B**



# Chicago Fire Facility-Opportunity Sites

Mayor's Office Working Group

# CHA Parcels Under Consideration

- Addams-Meddill Park, ABLA/Roosevelt Square
- Oakwood Shores (Former Madden Wells)
- Legends South (Former Robert Taylor)




# ABLA/Roosevelt Square – Opportunity Site

## Site Details
- Near West Side CCA
- 28th Ward – Ald. Ervin
- 28.5 acres of CHA, potential for 33.5 if CHA-owned community building/ storage is replaced

## Demographics
(Census Tract)

Race & Ethnicity (2020)
- 65.7% Black
- 14.4% Hispanic
- 14.4% White
- 2.6% Multi-racial
- 2.5% Asian

Median HH Income (2019)
- $17,100

Population Trend (2010-20)
- 5.9% growth






# ABLA/Roosevelt Square – Planning Context

**Current Zoning: PD 896**
- Requires 3,100 new mixed-income units, many unbuilt
- Three new planned buildings approved in 2021

**Planning Context**
- Roosevelt Square revised Master Plan completed by CHA in 2015 for ABLA site, Related Midwest is developer
- Site identified for later-phase development in plan

**Community Organization**
- ABLA Working Group

**Community Amenities**
- Taylor Street Library
- Jane Addams Community Center (CHA owned)
- Jewel Grocery Store
- Costco Superstore
- Fosco Park and Fieldhouse (1312 S. Racine)
- Comed Recreation Center (1301 W. 14th)






| Previous Plans for Site | Pros | Cons |
| --- | --- | --- |
| | | |



4

# ABLA/Roosevelt Square – Scale Comparison



# Madden Wells/Oakwood Shores – Opportunity Site

## Site Details
- Douglas CCA
- 4th Ward – Ald. King
- ~30 acres:
  - 21 ac CHA
  - 8.5 ac Park District

## Demographics
(Census Tract)

Race & Ethnicity (2020)
- 70.6% Black
- 14.3% Asian
- 7.4% White
- 3.6% Multi-racial

Median HH Income (2019)
- $43,800

Population Trend (2010-20)
- 11.4% growth






# Madden Wells/Oakwood Shores – Planning Context

## Current Zoning: RT-4, PD 1072

- Majority of site is RT-4 and POS-1, residential two-flat district and public open space
- PD 1072 is Oakwood Shores; a CHA redevelopment including 935 planned units of single-family, townhome and multi-family residential

## Planning Context

- Entirely CHA-owned site
- Not prioritized for development in CHA's Oakwood Shores redevelopment plan

## Community Organizations

- Oakwood Shores Working Group
- Quad Communities Development Corporation
- South East Chicago Commission

## Community Amenities

- Mariano's Grocery
- Ellis Park and Rec Center
- Mandrake Park



Zoning Map




| Previous Plans for Site | Pros | Cons |
|---|---|---|
|  |  |  |

7

# Madden Wells/Oakwood Shores – Scale Comparison



Oakwood Shores

Hanson Park Proposal

- **Stadium & outdoor fields**
- **Headquarters building**
- **Future retail potential**

# Taylor Homes/Legends South – Opportunity Site

## Site Details
- Grand Boulevard CCA
- 3rd Ward – Ald. Dowell
- 25 acres CHA land

## Demographics
(Census Tract)

### Race & Ethnicity (2020)
- 74.8% Black
- 20.4% Hispanic
- 2.1% Multi-racial

### Median HH Income (2019)
- $16,400

### Population Trend (2010-20)
- 25.1% decline




Department of Planning and Development


CHA
CHICAGO HOUSING AUTHORITY

# Taylor Homes/Legends South – Planning Context

**Current Zoning: RT-4**
- RT-4 zoning, residential two-flat district

**Planning Context**
- Entirely CHA-owned site
- Not prioritized in CHA's Taylor Home redevelopment plans

**Community Organizations**
- Robert Taylor Working Group

**Community Amenities**
- XS Tennis: indoor tennis facility (CHA Land)
- Charles A. Hayes Family Investment Center
- Taylor Park
- Metcalf Park



Zoning Map

| Previous Plans for Site | Pros | Cons |
|---|---|---|
| | | |



# Taylor Homes/Legends South – Scale Comparison





Hanson Park Proposal

- **Stadium & outdoor fields**
- **Headquarters building**
- **Future retail potential**



# COMPARISON ANALYSIS



 

# TIMELINE



 

# Exhibit C

| | |
|---|---|
| **From:** | Noah Szafraniec |
| **To:** | Brian Hacker; Patrick Murphey; Anna Furby |
| **Subject:** | Re: Fire PD App Talking Points |
| **Date:** | Friday, March 11, 2022 4:41:38 PM |

It is as we feared - but it raises some concerns over the last amendment too..... so once we get her proof we should consult Lisa/Michael G..   Thank you.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Friday, March 11, 2022 4:26 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Patrick Murphey
<Patrick.Murphey@cityofchicago.org>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** Re: Fire PD App Talking Points

I talked to Mariah Digrino after our Fire coordination meeting and this is now more complicated. DLA Piper reviewed the MDA between CHA and Related and their interpretation is that it only gives Related the ability to provide consent for CHA-owned properties, not privately owned properties in the PD. Therefore, they believe the only way to approach this without asking for consent from all private property owners in the affected subareas is for the City to be the applicant. I reiterated our concerns about this and asked her to send me the documentation in the MDA backing up her conclusion. When I get that from her I'll share it with you all and we should discuss our approach further. We should then set up something with the Fire, CHA and Related to resolve the issue. They want to file in April so I don't want this issue to hold that timeline up.

Thanks,

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development
312.744.7217

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Date:** Thursday, March 10, 2022 at 5:45 PM
**To:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>, Brian Hacker
<Brian.Hacker@cityofchicago.org>, Anna Furby <Anna.Furby@cityofchicago.org>

**Subject:** Re: Fire PD App Talking Points

Consent in general would be Related, CHA, and the City - need to check the developer agreement shared previously.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Sent:** Thursday, March 10, 2022 5:40 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** Re: Fire PD App Talking Points

Is no consent or concurrence from Parks or CHA necessary under any strategy?

Patrick Murphey
Zoning Administrator
City of Chicago
Department of Planning and Development
121 North LaSalle Street
Room 905
Chicago, IL 60602
T: (312) 744-5765
F: (312) 742-8548
patrick.murphey@cityofchicago.org

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Thursday, March 10, 2022 17:32
**To:** Brian Hacker; Anna Furby
**Cc:** Patrick Murphey
**Subject:** Re: Fire PD App Talking Points

Adding in Patrick as well for his comments, but I would slightly adjust language as shown below.

- In light of Related Midwest concurrently taking a comprehensive approach to amending PD 896 it would be the recommendation that the Related team coordinate with the Fire on their project for presentation to CPC, DPD recommends that Related be the PD applicant. Related

holds the Master Development Agreement for the PD therefore it's logical for them to lead any effort that will make broad changes to future development rights in the area. ███████ ████████████████████████████████████████████ ): ( true but not necessary)

- If it is determined that a proposed amendment will only focus on the Fire's development site and the future development concerns for Related Midwest and over CHA replacement housing are to be pushed to a separate PD amendment at a future date, then it's more appropriate for the Fire to be the applicant as their development is driving this legislative action ( this scenario might not necessarily be recommended due to the overal impact on the PD the large FIRE site has).
- DPD would open dialogue wuth IGA about a request for the City to be the applicant on an amendmnet at the site, however, the department would not recommend such and action based on preivous conversations and suggestions where the entity was a private for-profit entity. ██████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Thursday, March 10, 2022 3:54 PM
**To:** Anna Furby <Anna.Furby@cityofchicago.org>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Subject:** Fire PD App Talking Points

Anna,

I drafted some talking points below for Samir to reference in conversation with the Fire, Related and CHA. @Noah Szafraniec please take a look and make additions/revisions as needed.

- If we are taking a comprehensive approach to amending PD 896 when we take the Fire project to CPC, DPD recommends that Related be the PD applicant. Related holds the Master Development Agreement for the PD therefore it's logical for them to lead any effort that will make broad changes to future development rights in the area. Essentially they are the "landlord" of PD 896 (as Noah has previously said).
- If the amendment will only focus on the Fire's development site and the future development concerns over CHA replacement housing will be pushed to a separate PD amendment at a

future date, then it's more appropriate for the Fire to be the applicant as their development is driving this legislative action.

- DPD does not recommend that either the City or Alderman be the applicant based on precedent. DPD and IGA's guidance in the past has been that neither City departments or elected officials should file PD applications for private developments that will generate profit. Additionally, the Fire project is mainly a private facility with limited public access, which adds to the argument that it should come from a private entity involved in the project.

Feel free to reach out with any questions and please keep me in the loop as to any conversations that occur on this issue. Thanks!

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development
121 N. LaSalle Street, Suite 1006
312.744.7217



---

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

# Exhibit D

| | |
|---|---|
| **From:** | DiGrino, Mariah F. |
| **To:** | Lisa Misher |
| **Cc:** | Brian Hacker; Noah Szafraniec; James Harris |
| **Subject:** | FW: Roosevelt Square - MDA |
| **Date:** | Tuesday, March 15, 2022 10:13:44 AM |

[Warning: External email]

Hi Lisa – As we discussed, below is a link to the Master Development Agreement between CHA and LR ABLA. I appreciate your time this morning discussing the "consent" issue. As I mentioned, we have ordered surrounding taxpayer information in anticipation of the PD filing. We should have those results at the end of this week. That will include taxpayer info for property in PD 896, so that would identify private property owners.

As we discussed, PD 896 was established in 2004, with the City of Chicago as the "applicant" (per the PD statements). CHA has confirmed that the City was the applicant at that time because PD 896 included property owned by private parties. Fast forward to now, the training facility would require the reconfiguration of subareas to create a new subarea for the training facility. This would entail modifications to the bulk table and development allocations, and the reallocation of excess development rights away from the training facility site. (We expect there to be excess FAR and dwelling units that could be allocated elsewhere.) The subareas being affected by this include privately owned parcels. The team will own or control its training facility site, but will not own or control the privately owned parcels outside of the training facility site that will be affected by the new subarea configuration.

Given the efforts so far to engage at least one of the owners (they have not responded to multiple outreach attempts), we anticipate obtaining consents from all of the affected private owners would be infeasible or, at the very least, fatally time-consuming. Given that the City was the applicant in 2004 to create the PD, we see no other course than the City being the applicant again for this amendment, at least with respect to the subarea reconfiguration and reallocation of development rights. PD 896 is located in two wards (25th and 28th), and Alderman Ervin (in whose ward the facility would be located) has rebuffed the suggestion that he be the applicant.

I'm happy to discuss further, especially after you've had time to digest this!

## Mariah F. DiGrino (she, her, hers)
Partner

---

T  +1 312 368 7261
F  +1 312 251 5833
M  +1 773 343 5675
mariah.digrino@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Friday, March 4, 2022 2:01 PM

**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** FW: Roosevelt Square - MDA

⚠️ EXTERNAL MESSAGE

Hi Mariah,

Please see the link below to access the MDA, but let me know if it's expired. If it has I can reach out to Will Tippens to send another. I can't confirm which section addresses the consent question but please let me know what you find.

Thanks!

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Friday, February 25, 2022 12:00 PM
**To:** Nelson Chueng <Nelson.Chueng@cityofchicago.org>; Anna Furby <Anna.Furby@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Fw: Roosevelt Square - MDA

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

**From:** Tippens, Will <wtippens@relatedmidwest.com>
**Sent:** Friday, February 25, 2022 11:59 AM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Subject:** Roosevelt Square - MDA

[Warning: External email]

Here is a link to the document. As you'll see all the exhibits are separate files.

https://related.box.com/s/h88lee1f5dw8g0rd9leb53a9yjud7o1g

 **RELATED**

**William Tippens**
Vice President

**RELATED MIDWEST**
350 W Hubbard, Suite 300
Chicago, IL 60654
(312) 595-7400 Office
wtippens@relatedmidwest.com

 Please consider the environment before printing this e-mail.

The information contained in this message and any attachment(s) may be privileged, confidential, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. If you have received this message in error, please notify us immediately by replying to this email and permanently delete the message from your computer. Nothing contained in this message and/or any attachment(s) constitutes a solicitation or an offer to buy or sell any securities.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# Exhibit E

| | |
|---|---|
| **From:** | Julie O"Brochta |
| **To:** | Kaplan, Michael; DiGrino, Mariah F.; Noah Szafraniec; Tippens, Will; Brian Hacker; Parlato, Mike; Cacciato, Anthony; Ari Glass; Anna Furby |
| **Cc:** | James Harris; McKenzie, Ann; Amber McConnachie; Stubblefield, Carol; Sublett, Jeanette; Laura Warren; Paul Cadwell; Pryor, David; Andre Brumfield; Aaron May |
| **Subject:** | RE: Addams-Medill / PD 896: PD Application Process |
| **Date:** | Monday, May 23, 2022 10:28:03 AM |

---

> **[Warning: External email]**

Adding Andre Brumfield and Aaron May from Gensler to this email conversation.

**Julie O'Brochta, AIA**
+1 312.468.2010 Mobile

**Gensler**

---

**From:** Kaplan, Michael <mkaplan@relatedmidwest.com>
**Sent:** Saturday, May 21, 2022 12:33 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Noah Szafraniec <noah.szafraniec@cityofchicago.org>; Tippens, Will <wtippens@relatedmidwest.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren <lwarren@chicagofirefc.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David <David.Pryor@us.dlapiper.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

Noah – I apologize for the delay as both Will and I were out yesterday. The reason we didn't initially provide a comparison table is because most of the affected subareas also had boundary changes. Overall, though, you can see that the net impact is reduced density.

Attached is a spreadsheet that you may find helpful. I too am available to discuss all weekend or Monday.



**Michael Kaplan**

**RELATED MIDWEST**
350 W Hubbard, Suite 300
Chicago, IL 60654
(612) 720-6200 Mobile
(312) 274-3902 Office
mkaplan@relatedmidwest.com

 Please consider the environment before printing this e-mail.

**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Friday, May 20, 2022 5:39 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Tippens, Will
<wtippens@relatedmidwest.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Kaplan, Michael
<mkaplan@relatedmidwest.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony
<Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby
<Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren
<lwarren@chicagofirefc.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David
<David.Pryor@us.dlapiper.com>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

Noah - I am available tonight at/after 6:30, anytime this weekend, or we can find a time
Monday.  If you have questions about the bulk data table related to subareas other than the
Fire's, I would like to loop in Related and possibly Gensler, as they are better suited to speak
to those.

Get Outlook for Android [aka.ms]

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Friday, May 20, 2022 4:16:21 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Kaplan, Michael
<mkaplan@relatedmidwest.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony
<Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby
<Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren
<lwarren@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Paul Cadwell
<pcadwell@chicagofirefc.com>; Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

⚠ EXTERNAL MESSAGE

Good afternoon,

I was able to set aside some time this afternoon and conduct some of the analysis that was
left undone - I sent a seperate e-mail to your attorney Ms. Digrino asking for her to contact me.
I would like to go over some data point questions with her and have a few questions realted to
property ownership details for the non-cha owned pins that were submitted.

I feel better about the effect that the proposed changes would have on the remaining private

lots at the end of the exercise but would simply like to close a few concerns up with the legal team.

Thank you.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Friday, May 20, 2022 11:50 AM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Tippens, Will <wtippens@relatedmidwest.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren <lwarren@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

Hi Mariah,

We will be going over the information and providing comment - our Law Department was made aware of the new submitted information.  As soon as we are able to offer some commentary we will do so - unfortunately the information provided did not provide any comparative analaysis between the data for the PD as it exists today and to the new proposed information and data as proposed  - so we will have to look into that data and do the analysis which could take some time.

Thank you.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**

**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Friday, May 20, 2022 11:24 AM
**To:** Tippens, Will <wtippens@relatedmidwest.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren <lwarren@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Hi all – Following up on the materials delivered earlier this week. Please let us know the status of the City's review and decision regarding moving forward as we have proposed.

# Mariah F. DiGrino (she, her, hers)

Partner

---

T  +1 312 368 7261
F  +1 312 251 5833
M  +1 773 343 5675
mariah.digrino@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

---

**From:** Tippens, Will <wtippens@relatedmidwest.com>
**Sent:** Wednesday, May 18, 2022 5:11 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Laura Warren

<lwarren@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Paul Cadwell
<pcadwell@chicagofirefc.com>; Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

⚠ EXTERNAL MESSAGE

Hi Brian and Noah,

One quick note.  You'll notice the net site area has gone up.  This is because all of the proposed
streets and alleys that were to be dedicated in the Fires parcel are obviously not happening.
However, even with the increase in Net-Site-Area, as Mariah notes below the total development
rights drops by approximately 460,000 SF.

Thanks,

Will

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Wednesday, May 18, 2022 4:54 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Kaplan, Michael
<mkaplan@relatedmidwest.com>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Parlato,
Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass
<Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Laura Warren <lwarren@chicagofirefc.com>; Amber
McConnachie <lneal@nealandleroy.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David
<David.Pryor@us.dlapiper.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

Thanks, Mariah. Noah and I will begin reviewing right away.

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development

**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Wednesday, May 18, 2022 4:44 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Kaplan, Michael
<mkaplan@relatedmidwest.com>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Parlato,
Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass
<Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;

Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Laura Warren <lwarren@chicagofirefc.com>; Amber
McConnachie <lneal@nealandleroy.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Pryor, David
<David.Pryor@us.dlapiper.com>;
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Hi all – Attached are the proposed bulk table and corresponding subarea map.  A couple of notes:

- The overall development rights are being reduced, which should help the City overcome any concern about the amendment providing a windfall of development rights.
- The Fire team is working to modify the training facility layout to address the MWRD facility that runs down the middle of the site.  This may require shifting Subarea G slightly to the south, but it is not anticipated to affect overall numbers.
- The properties along Ashland are being removed from the PD boundaries.  These are privately owned properties, so the working assumption is that those owners would prefer to be carved out of the PD.  Our initial thought is that they could be rezoned to B3-2.

Let us know if you would like to discuss, and we can set something up.

Thanks!
Mariah

**Mariah F. DiGrino** (she, her, hers)
Partner

T  +1 312 368 7261
F  +1 312 251 5833
M  +1 773 343 5675
mariah.digrino@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Wednesday, May 11, 2022 11:09 AM
**To:** Kaplan, Michael <mkaplan@relatedmidwest.com>; Noah Szafraniec
<Noah.Szafraniec@cityofchicago.org>; DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>;
Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari
Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Laura Warren <lwarren@chicagofirefc.com>

**Subject:** RE: Addams-Medill / PD 896: PD Application Process

⚠ EXTERNAL MESSAGE

Hi Michael,

Thanks for sending this over. When you're ready, it'd be nice to have a meeting with your team and Gensler to walk through this work.

Regards,

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development

---

**From:** Kaplan, Michael <mkaplan@relatedmidwest.com>
**Sent:** Saturday, May 7, 2022 5:32 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will <wtippens@relatedmidwest.com>; Laura Warren <lwarren@chicagofirefc.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Noah – see attached for preliminary concepts from Gensler. This, of course, remains subject to stakeholder feedback and public comment. We will follow-up this week with proposed bulk tables.

Thanks,



**Michael Kaplan**

**RELATED MIDWEST**
350 W Hubbard, Suite 300
Chicago, IL 60654
(612) 720-6200 Mobile
(312) 274-3902 Office
mkaplan@relatedmidwest.com

 Please consider the environment before printing this e-mail.

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, May 3, 2022 5:37 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Brian Hacker
<Brian.Hacker@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony
<Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby
<Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Laura
Warren <lwarren@chicagofirefc.com>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

Mariah,

Thank you I will pass this along and continue the discussion with our Law Department in the
meantime do we have the massing for the proposed sub-area breakdowns and any impact it
might have on the resulting sub-areas or any of the existing land owners?   Ive had a
preliminary discussion with Will, but we do not have the data yet.  Thank you.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Tuesday, May 3, 2022 4:22 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Noah Szafraniec
<Noah.Szafraniec@cityofchicago.org>; Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony
<Anthony.Cacciato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby
<Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>; McKenzie, Ann <amckenzie@thecha.org>;
Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol
<cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; Tippens, Will
<wtippens@relatedmidwest.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Laura
Warren <lwarren@chicagofirefc.com>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Noah – Attached are a map and spreadsheet identifying private owners within PD 896. As noted in the documents, there are over 300 privately owned PINs, with over 260 unique private owners. We have removed PINs owned by public agencies and PINs owned by Roosevelt Square entities.

As we have discussed, there is no question that the City has the legal authority to be the applicant for the PD amendment. PD 896 itself is an example of that, as the City was the applicant when the PD was established in 2004. The reason for the City being the applicant in 2004 is the same reason the City needs to be the applicant again – PD 896 contains privately owned parcels, and only the City has the legal authority to initiate an application to amend privately owned parcels, in the absence of letters of authorization from each private owner. Given the number of private PINs and private owners noted above, I would hope all could agree that getting consent from over 260 owners would be burdensome.

With respect to PD 896 and the anticipated changes, we understood the group to be aligned regarding the need to adjust the existing subarea boundaries and modify the bulk table accordingly to create a new subarea with related uses and development rights to accommodate the training facility, and that it would require an amendment to PD 896. This is the action/application for which the City would be the applicant. There would be a separate, but concurrent, application for approval of the Fire's specific development plans. This could be accomplished through site plan approval, which is currently contemplated by PD 896. The Fire would be the applicant for site plan approval. The City would review the request for site plan approval concurrently with the PD amendment, the expectation being that the City would grant the site plan approval request immediately upon approval of the PD amendment. Related – at the City's and CHA's direction – is working with Gensler to create the new subareas and recalibrated bulk table, which would result in the delivery of the items requested in your item 2 below.

We are all working on all fronts to deliver the items that would be required for the PD amendment and the site plan approval request for introduction at the June City Council meeting. This is a critical path date in order to stay on track to receive the approvals (PD amendment and site plan approval) in time for construction. Please confirm the City is aligned in the process outlined above. Please also confirm that the community engagement plan that the parties have been undertaking, including last night's resident meeting and tonight's community meeting, will satisfy the City's requirements regarding community meetings for the PD amendment and site plan approval.

## Mariah F. DiGrino (she, her, hers)
Partner

T  +1 312 368 7261
F  +1 312 251 5833
M  +1 773 343 5675
mariah.digrino@us.dlapiper.com

**DLA Piper LLP (US)**
dlapiper.com

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>

**Sent:** Wednesday, April 20, 2022 9:14 AM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Parlato, Mike
<Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; DiGrino, Mariah F.
<Mariah.DiGrino@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby
<Anna.Furby@cityofchicago.org>
**Cc:** James Harris <James.Harris@cityofchicago.org>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

⚠ EXTERNAL MESSAGE

+ James Harris

Thanks for laying out the ask and potential paths forward, Noah. I can be available at all those times
next week.

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development
312.744.7217

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Date:** Wednesday, April 20, 2022 at 7:40 AM
**To:** "Parlato, Mike" <Mike.Parlato@am.jll.com>, "Cacciato, Anthony"
<Anthony.Cacciato@am.jll.com>, Brian Hacker <Brian.Hacker@cityofchicago.org>,
"mariah.digrino@dlapiper.com" <mariah.digrino@dlapiper.com>, Ari Glass
<Ari.Glass@mansuetoffice.com>, Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

Mike,

After losing a lot of sleep last night thinking about your team's request and concerns - I
decided to send this follow-up request (a meeting to discuss this is really not as important as
seeing the information).

Please provide the following so we can discuss internally with our Lawyers and the Inter-
Governmental Affairs members:

1.  A written request from the FIRE asking the City of Chicago to be the applicant for an
    amendment to PD #896. The request should inlcude the reasoning for the need for the
    CIty to be the applicant and should inlcude any supporting documentation as necessary
    ( for example if one of your reasons is that the ability to gain consent is too onerous a
    list of all property holders in the planned development boundary should be provided - as
    requested some time ago).

2. A bullet point and annotated list of any and all changes you are asking the city to make to the approved ordinance, including but not limited to the following:
   a. any changes to any of the approved PD statements
   b. any changes to any of the approved PD exhibits
   c. the inlcusion of any new PD exhibits.
   d. the change of any items listed on the bulk table
   e. the change to any of the exhibit sub-areas as defined in the current PD
   f. any data necessary for the creation of new sub-areas via exhibit and or bulk table.
3. Any other pertinent information that the development team and or your legal team feels is necessary for the Department to have an internal discussion about your request.

Once we receive the complete packet listed about we will discuss the legal authority of the City to be the applicant in this scenario and respond to the team accordingly, we would also discuss with our Commissioner and Zoning Administrator whether we agree with the planning/zoning reasoning behind any of the requests that derive from the above information.

I also wanted to add to this note that I recall at one of the last discussions when we spoke about whether this would happen as one application versus two applications some of the above information drove the discussion back to the need for this to be done at one time in a very complete and concises manner - the reason for this was that your request is going to inlcude FAR and boundary changes that have an impact on the remainder of the PD as a whole with some rights being moved from the land you wish to use back into other land controlled in other sub-areas.

I am sorry that I am too busy to meet with your team this week - as an alternative I went back to my calendar to try to find some time slots - I can meet Monday at 9:00 (25th) am for an hour, Tuesday (26th) at 8:00am for an hour, Wednesday (27th) between 3pm-5pm.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, April 19, 2022 8:07 PM
**To:** Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com <mariah.digrino@dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby

<Anna.Furby@cityofchicago.org>
**Subject:** Re: Addams-Medill / PD 896: PD Application Process

If the team is seeking process or zoning guidance I would suggest trying a Tuesday or Wednesday time on the 26th or 27th.

---

**From:** Parlato, Mike <Mike.Parlato@am.jll.com>
**Sent:** Tuesday, April 19, 2022 8:04:33 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com <mariah.digrino@dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Thanks.

Brian, what's your availability tomorrow?

Michael D. Parlato
Managing Director
Jones Lang LaSalle
Project and Development Services

200 East Randolph Drive, 45th Floor
Chicago, IL 60601
Tel +1 312 228 2487  Fax +1 312 416 8076
Mike.parlato@am.jll.com
www.us.jll.com [nam12.safelinks.protection.outlook.com]

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, April 19, 2022 8:02 PM
**To:** Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** [EXTERNAL] Re: Addams-Medill / PD 896: PD Application Process

I am unavailable until next week.

**From:** Parlato, Mike <Mike.Parlato@am.jll.com>
**Sent:** Tuesday, April 19, 2022 8:01:27 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com <mariah.digrino@dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

> [Warning: External email]

Noah, is there a better time that works for you and Brian tomorrow? We need to get everyone on the same page with this information.

Michael D. Parlato
Managing Director
Jones Lang LaSalle
Project and Development Services
200 East Randolph Drive, 45th Floor
Chicago, IL 60601
Tel +1 312 228 2487  Fax +1 312 416 8076
Mike.parlato@am.jll.com
www.us.jll.com [nam12.safelinks.protection.outlook.com]

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, April 19, 2022 6:04 PM
**To:** Parlato, Mike <Mike.Parlato@am.jll.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** [EXTERNAL] Re: Addams-Medill / PD 896: PD Application Process

Do you have the information I just referenced in the previous email?

---

**From:** Parlato, Mike <Mike.Parlato@am.jll.com>
**Sent:** Tuesday, April 19, 2022 6:02:17 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker <Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com <mariah.digrino@dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Anna Furby <Anna.Furby@cityofchicago.org>
**Subject:** RE: Addams-Medill / PD 896: PD Application Process

> [Warning: External email]

We need this group to be on the same page as there is a lot of information being prepared for this submission and at a minimum we should all be clear on the number of applications being submitted and who the applicants are. As Anthony stated in his email that was made clear to everyone on the Friday meeting several weeks back so if that is still under discussion, we need to make sure it doesn't impact our May filing date and everyone is aligned on who is responsible for what between Gensler and Crawford in terms of the package.

Noah, what packages and what attorneys are you referring to? I am confident that our legal team was operating under the plan that I just laid out above so it would be good to understand what other conversations we need to get aligned with.

Can this group jump on a call tomorrow at 11:45am to confirm this plan? Feel free to forward to anyone else you feel should be part of this. We will send out a calendar invite if that time works.

Michael D. Parlato
Managing Director
Jones Lang LaSalle
Project and Development Services
200 East Randolph Drive, 45th Floor
Chicago, IL 60601
Tel +1 312 228 2487  Fax +1 312 416 8076
Mike.parlato@am.jll.com
www.us.jll.com [nam12.safelinks.protection.outlook.com]

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, April 19, 2022 5:37 PM
**To:** Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Brian Hacker
<Brian.Hacker@cityofchicago.org>; mariah.digrino@dlapiper.com; Parlato, Mike
<Mike.Parlato@am.jll.com>; Ari Glass <Ari.Glass@mansuetoffice.com>
**Subject:** [EXTERNAL] Re: Addams-Medill / PD 896: PD Application Process

Not entirely true.   We agreed to revisit this request after various documents  were presented by the
attorneys and the teams but we have yet to receive the documentation for further internal
discussion to occur.

We have not received ownership information for all parcels within the PD boundaries, nor have we
received the proposed massing models and associated data for the proposed sub-areas plans.

---

**From:** Cacciato, Anthony <Anthony.Cacciato@am.jll.com>
**Sent:** Tuesday, April 19, 2022 5:33:27 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Noah Szafraniec
<Noah.Szafraniec@cityofchicago.org>; mariah.digrino@dlapiper.com
<mariah.digrino@dlapiper.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Ari Glass
<Ari.Glass@mansuetoffice.com>
**Subject:** Addams-Medill / PD 896: PD Application Process

[Warning: External email]

Good Evening Brian ,

I want to make sure that we are all clear on the strategy that we are taking to file our PD applications in
May. In our conversation today the topic came up and it was contrary to what I thought we were working
towards. We had been planning on submitting 2 separate applications. The first is the amendment for PD
896 that Gensler and Related are working on, where the city will be the applicant. The second is the new
CF Performance Center that Crawford and JLL are working on, where the Fire will be the applicant. This
is the direction that we have been working towards and want to make sure we are aligned.

Thank you

**Anthony M. Cacciato**
Project Manager, Project and Development Services

200 E. Randolph, 45th Floor, Chicago, IL 60601
M 708 738 9178
anthony.cacciato@am.jll.com  |  www.us.jll.com [nam12.safelinks.protection.outlook.com]

One of the 2021 World's Most Ethical Companies® [nam12.safelinks.protection.outlook.com]

Jones Lang LaSalle

For more information about how JLL processes your personal data, please click here
[nam12.safelinks.protection.outlook.com]

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this message and any attachment(s) may be privileged, confidential, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. If you have received this message in error, please notify us immediately by replying to this email and permanently delete the message from your computer. Nothing contained in this message and/or any attachment(s) constitutes a solicitation or an offer to buy or sell any securities.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this message and any attachment(s) may be privileged, confidential, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. If you have received this message in error, please notify us immediately by replying to this email and permanently delete the message from your computer.

Nothing contained in this message and/or any attachment(s) constitutes a solicitation or an offer to buy or sell any securities.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this message and any attachment(s) may be privileged, confidential, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. If you have received this message in error, please notify us immediately by replying to this email and permanently delete the message from your computer. Nothing contained in this message and/or any attachment(s) constitutes a solicitation or an offer to buy or sell any securities.

# Exhibit F

| | |
|---|---|
| **From:** | Noah Szafraniec |
| **To:** | Anna Furby; Samir Mayekar |
| **Cc:** | Lisa Misher; Patrick Murphey; Brian Hacker |
| **Subject:** | PD #896 - Fire |
| **Date:** | Monday, May 23, 2022 4:22:28 PM |

Anna,

I just wanted to confirm that we strongly believe we the City can be the applicant for the Planned Development application.

I had the chance to speak with Mariah (zoning attorney for both FIRE and Related Midwest) and Mike Kaplan ( Related Midwest) - I was then able to loop in both Patrick and then also Lisa Misher from Department of Law.

Everyone feels comfortable with the City being the applicant.

The PD as a whole will end up with roughly 500,000 less development rights and the only areas that show are sub-areas E, G and H.  Sub-Area G is the FIRE, Sub-Area H is the Chicago Park District and Sub-Area E has two development parcels one the is owned we think by UIC and one other - we have asked Mike Kaplan and Mariah to get us the exact ownership of that sub-area before we make the 100% final call.

Mariah indicated that they would be willing to provide the written notice and prepare the applcation documents.

Thank you.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or

copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

# Exhibit G

| | |
|---|---|
| **From:** | Peter Strazzabosco |
| **To:** | Lisa Misher; Anna Furby; Patrick Murphey; Noah Szafraniec |
| **Cc:** | Asha Binbek; Brian Hacker |
| **Subject:** | Re: Fire on agenda |
| **Date:** | Friday, September 16, 2022 5:45:25 PM |

Thanks all. I'll refine and circle back Monday.

Get Outlook for iOS

**From:** Lisa Misher <Lisa.Misher@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:18:39 PM
**To:** Anna Furby <Anna.Furby@cityofchicago.org>; Patrick Murphey
<Patrick.Murphey@cityofchicago.org>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Peter
Strazzabosco <Peter.Strazzabosco@cityofchicago.org>
**Cc:** Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

I like the direction this is going. Maybe it's also important to say (it's implied) that the project
is of city-wide importance, making it appropriate for the city to facilitate.

Get Outlook for iOS

**From:** Anna Furby <Anna.Furby@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:14:59 PM
**To:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>; Noah Szafraniec
<Noah.Szafraniec@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>; Peter
Strazzabosco <Peter.Strazzabosco@cityofchicago.org>
**Cc:** Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** RE: Fire on agenda

Proposed answer to Q2: [please edit] PD896 needed to be amended for numerous reasons
including: the ComEd Rec Center was straddling two subareas, CHA needed subareas that aligned
with its development plan for ABLA / Roosevelt Square, and the complicated nature of the PD. The
City collaborated with sister agencies CHA and Parks to accomplish this and Fire is working in parallel
on its newly delineated subarea. The number of owners in PD 896 made it impractical for a private
entity to undertake such an effort and none of the private owners' development rights were
impinged through this process.

Anna Furby
O: 312-744-7599
C: 773-720-8413

**From:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:12 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Anna Furby

<Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>; Peter Strazzabosco
<Peter.Strazzabosco@cityofchicago.org>
**Cc:** Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

@ Anna; I do not know that we could make any definitive statement about where this ranks in the
realm of plan developments and their respective quantity of private owners contained.

I think instead we should highlight, as Noah noted, the benefits to the two public agencies involved;
and, to Lisa's point, both the impracticality of coordinating all of the other private owners and that
to which, more importantly, none of their development rights were, in any way, shape, or form,
impinged through this process. Do we know if there are any homeowners associations in this PD?

Patrick Murphey
Zoning Administrator
City of Chicago
Department of Planning and Development
121 North LaSalle Street
Room 905
Chicago, IL 60602
T: (312) 744-5765
F: (312) 742-8548
patrick.murphey@cityofchicago.org

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:07:58 PM
**To:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>;
Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>; Patrick Murphey
<Patrick.Murphey@cityofchicago.org>
**Cc:** Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

I think we should make sure we highlight the needs of Park District and CHA as sister agencies
receiving the benefits of this thus the cooperative planning effort.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Anna Furby <Anna.Furby@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:06 PM
**To:** Lisa Misher <Lisa.Misher@cityofchicago.org>; Noah Szafraniec

<Noah.Szafraniec@cityofchicago.org>; Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>;
Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Cc:** Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** RE: Fire on agenda

Agreed re: Lisa's point about consent due to number of owners. Should we include language around
the scale of amending PD 896 not being reasonable for a private entity? Are we able to definitively
say it has the most private owners of any PD in the City? It must be in the top few at least. Thoughts
on the below?

Proposed answer to Q2: [please edit] This is a unique situation. A need had been identified for a
master PD amendment for PD 896 due to its complicated nature, the number of parcels and
property owners, and the need for subarea redefinition. The City worked with Related, CHA, and
Parks to accomplish this and Fire is working in parallel on its newly delineated subarea. The number
of owners in PD 896 made it impractical for a private entity to undertake such an effort.


Anna Furby
O: 312-744-7599
C: 773-720-8413

---

**From:** Lisa Misher <Lisa.Misher@cityofchicago.org>
**Sent:** Friday, September 16, 2022 5:03 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Peter Strazzabosco
<Peter.Strazzabosco@cityofchicago.org>; Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Asha Binbek <Asha.Binbek@cityofchicago.org>;
Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

It was impractical for the Fire to get consent from all the property owners given the size of the PD
and the number of owners. Noah: We have the number, right. I can't remember what it is. Isn't it
also important to say that no one's property rights changed?

Get Outlook for iOS

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Friday, September 16, 2022 4:54:37 PM
**To:** Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>; Patrick Murphey
<Patrick.Murphey@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>;
Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

First question is accurate.....  second question probably needs a legal scrub because he is
certainly working an angle there, we are rarely the applicant.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>
**Sent:** Friday, September 16, 2022 4:53 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>; Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

Mick Dumke/ProPublica's post-Fire meeting questions and a potential response are below:

Q: Who made the decision for the City to be the zoning applicant?
A: It was a collective decision involving CHA, CPD, the City and the soccer club.

Q: How often is the City the applicant for PD amendments involving private development projects?
A: (TBD)

---

**From:** Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>
**Sent:** Tuesday, September 13, 2022 5:44 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>; Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>; Asha Binbek <Asha.Binbek@cityofchicago.org>; Brian Hacker <Brian.Hacker@cityofchicago.org>
**Subject:** Re: Fire on agenda

See below for a proposed response to why the City is the zoning applicant.
- Given the scope of the proposed project involving City and CHA land exclusively, the City is serving as the applicant for the PD amendment. As a government entity, the city is exempt per the municipal code from filing an EDS.

The above does not address how a would-be private applicant would be onerously burdened by gaining consent of every property owner in the PD's impacted subareas. Do we have any TPs to address that issue if it comes up?

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>

**Sent:** Tuesday, September 13, 2022 4:45 PM
**To:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>; Peter Strazzabosco
<Peter.Strazzabosco@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>
**Subject:** Re: Fire on agenda

Well, where should I start:

We had many discussions on why the city should be the applicant - this is a huge PD and thus
has a very heavy obligation on searching for indivdual owners who have bought condo units
within the over 100 acre PD - so to do a title search and consent agreements with all parties
was going to be overburdensome - so the legal opinion was we could be the applicant to
facilitate what is in some form a city sponsored / supported project as well as having the
support of CHA and the Park District.

As for the EDS questions - here are the
instructions:  https://www.chicago.gov/city/en/depts/dps/provdrs/comp/svcs/economic_discl
osurestatementseds.html

With the city as the applicant there is not EDS obligation the specific exemption is snipped
below:

*1. The following entities listed in (a) through (i) shall not be required to file an EDS:*
*(a) any unit of government in the United States or any agency or instrumentality thereof;*
*(b) any unit of government of a foreign government recognized by the United States*
*government, or any agency or instrumentality of such unit of government;*
*etc...*


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Sent:** Tuesday, September 13, 2022 4:30 PM
**To:** Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>; Noah Szafraniec
<Noah.Szafraniec@cityofchicago.org>
**Cc:** Anna Furby <Anna.Furby@cityofchicago.org>; Lisa Misher <Lisa.Misher@cityofchicago.org>

**Subject:** Re: Fire on agenda

+ Anna and Lisa for consistent messages and collective awareness

Patrick Murphey
Zoning Administrator
City of Chicago
Department of Planning and Development
121 North LaSalle Street
Room 905
Chicago, IL  60602
T: (312) 744-5765
F: (312) 742-8548
patrick.murphey@cityofchicago.org

**From:** Peter Strazzabosco <Peter.Strazzabosco@cityofchicago.org>
**Sent:** Tuesday, September 13, 2022 4:28 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Cc:** Patrick Murphey <Patrick.Murphey@cityofchicago.org>
**Subject:** Fire on agenda

Getting questions from press:

Why is the city down as the applicant? Why doesn't the Fire have to submit economic disclosure paperwork?

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

# Exhibit H

| | |
|---|---|
| **From:** | DiGrino, Mariah F. |
| **To:** | Brian Hacker; Cacciato, Anthony; Parlato, Mike; Kaplan, Michael; Tippens, Will; Jahnke Dale, Katie; Ari Glass; Doug Osborn; Julie O'Brochta; Paul Cadwell; Amber McConnachie; Stubblefield, Carol; Sublett, Jeanette; McKenzie, Ann; Harrington, Michelle |
| **Cc:** | Pryor, David |
| **Subject:** | RE: Fire Coordination Call |
| **Date:** | Monday, September 12, 2022 6:29:40 PM |
| **Attachments:** | Roosevelt Square PD 896 PD Statements (Fire Amendment)-195842700-v1.docx |
| | Redline - Roosevelt Square PD Ordinance (Fire Amendment)-190650992-v7 and Roosevelt Square PD 896 PD Statements (Fire Amendment)-195842700-v1.pdf |
| | Roosevelt Square PD 896 (Fire Amendment) - Compiled PD Documents.pdf |

> **[Warning: External email]**

Hi Brian – We have resolved Statement 12. Attached is the revised set of PD statements (without the application form and list of taxpayers) – clean and redline showing changes. I updated the list of plans in Statement 4.

Also attached is the compiled set of PD statements, bulk table, and exhibits (Gensler + CFFC). Per your third bullet below, the statements may need to be updated, but we can make that substitution.

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Monday, September 12, 2022 1:14 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Cacciato, Anthony <Anthony.Cacciato@jll.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale, Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn <dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>; McKenzie, Ann <amckenzie@thecha.org>; Harrington, Michelle <MHarrington@thecha.org>
**Cc:** Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** RE: Fire Coordination Call

> ⚠ **EXTERNAL MESSAGE**

Thanks, Mariah. I have some minor follow-up requests for you and the rest of the group in my notes below. I'm also adding the CHA folks to the thread so they stay in the loop ahead of Thursday.

- **Mariah:** please include the CFFC floor plans in the exhibits and, as you referenced, update Statement 4 accordingly. Additionally, when you send the revised statement document it only needs to include the ordinance before it. The PD application form and Taxpayer list can be deleted.
- **Anthony/Doug:** the slide deck needs to be shortened so I made some revisions to reduce the number of slides (see attached); the project summary should be one slide so I hid all of those except the first one. It provides a good overview of the project, but if you want to capture any other information on the slides I removed I suggest you create a new text box with a bulleted list that truncates the info in the multiple slides you had previously added. The project

summary would also be a good location for the primary rendering showing the building from the front.
- **Related/Mariah:** we'll be meeting tomorrow morning to discuss the open space portion of the statements and will need to resolve it as soon as possible. It's our preference that the "public" requirements remain consistent with the current PD as these were the result of coordination between the City, Related, CHA and the Park District. Based on these differing preferences it's possible there will be further revisions to the relevant PD statement, but it should be a relatively quick fix once we talk this through further.

For the first two items on the list, please send them over to me by COB tomorrow. Feel free to reach out with any questions, I'm working at home today and forgot to forward my calls so you can reach me on my cell at 773-934-9798.

Brian Hacker, AICP (he/him)
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development

**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Friday, September 9, 2022 2:37 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Cacciato, Anthony <Anthony.Cacciato@jll.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale, Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn <dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>
**Cc:** Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** RE: Fire Coordination Call

[Warning: External email]

Brian – Attached are the CFFC PD exhibits.  These should be combined with the Gensler PD exhibits I sent earlier this week, to complete the set of PD exhibits for the PD ordinance.  I also noticed that the list of plans in Statement 4 should be updated to read as set forth below – not sure if you were planning to take the reins on final revisions to the PD statements.  I'm happy to keep the "pen" and provide the revisions.  Also let me know if you are going to create a master set of PD documents to submit to Plan Commission (statements, bulk table, exhibits), or if you would like us to create a single set.  Either way, might be good for the group to review the final set to make sure nothing slipped through the cracks.

"…(vii) the following plans prepared by Crawford Architects and dated September 15, 2022:  Subarea G Site Plan; Subarea G Landscape Site Plan; Subarea G Landscape Plan LS100; Subarea G Landscape Plan LS101; Subarea G Landscape Plan LS102; Subarea G Landscape Plan LS103; Subarea G Landscape Fence Detail; Subarea G Landscape Planting Details; Subarea G Landscape Plant Palette;

Subarea G Landscape Streetscape Section; Subarea G Performance Centre Façade Material Systems (South, North, East, and West Elevations); Subarea G Field Crew Building Elevations (West, East, South and North); Subarea G Seasonal Inflatable Dome Diagram – Illustrative Specifications; Subarea G Site Signage; Subarea G Site Fencing."

---

**From:** DiGrino, Mariah F.
**Sent:** Friday, September 9, 2022 1:02 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Cacciato, Anthony <Anthony.Cacciato@jll.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale, Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn <dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>
**Cc:** Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** RE: Fire Coordination Call

Brian – I should have the CFFC PD Exhibits shortly. Crawford is adding the September 15th Plan Commission date to the footer.

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Thursday, September 8, 2022 3:22 PM
**To:** Cacciato, Anthony <Anthony.Cacciato@jll.com>; DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale, Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn <dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>
**Cc:** Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** Re: Fire Coordination Call

⚠️ EXTERNAL MESSAGE

Sounds good and just to confirm, these will also have the Roosevelt Square Master Plan exhibits?

I will also need the exhibits of the CFFC plans to go along with the exhibits Mariah previously sent.

Brian Hacker, AICP
Planner V, West Region
City of Chicago | Department of Planning and Development
312.744.7217

**From:** "Cacciato, Anthony" <Anthony.Cacciato@jll.com>
**Date:** Thursday, September 8, 2022 at 2:59 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>, "DiGrino, Mariah F."
<Mariah.DiGrino@us.dlapiper.com>, "Parlato, Mike" <Mike.Parlato@am.jll.com>, "Kaplan,
Michael" <mkaplan@relatedmidwest.com>, "Tippens, Will"
<wtippens@relatedmidwest.com>, "Jahnke Dale, Katie" <katie.dale@us.dlapiper.com>, Ari
Glass <Ari.Glass@mansuetoffice.com>, Doug Osborn <dosborn@Crawford-USA.com>, Julie
O'Brochta <Julie_O'Brochta@gensler.com>, Paul Cadwell <pcadwell@chicagofirefc.com>,
Amber McConnachie <lneal@nealandleroy.com>, "Stubblefield, Carol"
<cstubblefield@nealandleroy.com>, "Sublett, Jeanette" <jsublett@nealandleroy.com>
**Cc:** "Pryor, David" <David.Pryor@us.dlapiper.com>
**Subject:** Re: Fire Coordination Call

[Warning: External email]

Hey Brian. We should be able to turn over the CPC slides in about an hour

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Thursday, September 8, 2022 2:28:07 PM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Cacciato, Anthony
<Anthony.Cacciato@jll.com>; Parlato, Mike <Mike.Parlato@am.jll.com>; Kaplan, Michael
<mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale,
Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn
<dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell
<pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield,
Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>
**Cc:** Pryor, David <David.Pryor@us.dlapiper.com>
**Subject:** [EXTERNAL] Re: Fire Coordination Call

**Caution: Message from external sender**

Hi Mariah & team,

Thanks for sending these over. Some follow-ups:
- For Anthony: please send the CPC slide deck as soon as possible so I can upload for the
  Commissioners' review.
- To the first response in red below, I have not received the updated set of plans from Doug,
  just the sustainability matrix materials. No comments on those fyi.
- This is more relevant to the Related team, but I will be deleting the second paragraph of
  Statement 12 on the request of the Zoning Administrator. The guidelines for administrative
  relief are clearly established by the Zoning Ordinance and this additional language is not
  preferred.

- We're still discussing the approach to how we're handling publicly accessible open space in the PD statements but I will reply tomorrow with further feedback.

Regards,

Brian Hacker, AICP
Planner V, West Region
City of Chicago | Department of Planning and Development
312.744.7217

---

**From:** "DiGrino, Mariah F." <Mariah.DiGrino@us.dlapiper.com>
**Date:** Wednesday, September 7, 2022 at 6:15 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>, "Cacciato, Anthony" <Anthony.Cacciato@am.jll.com>, "Mike Parlato (mike.parlato@am.jll.com)" <mike.parlato@am.jll.com>, "Kaplan, Michael" <mkaplan@relatedmidwest.com>, "Tippens, Will" <wtippens@relatedmidwest.com>, "Jahnke Dale, Katie" <katie.dale@us.dlapiper.com>, Ari Glass <Ari.Glass@mansuetoffice.com>, Doug Osborn <dosborn@Crawford-USA.com>, Julie O'Brochta <Julie_O'Brochta@gensler.com>, Paul Cadwell <pcadwell@chicagofirefc.com>, Amber McConnachie <lneal@nealandleroy.com>, "Stubblefield, Carol" <cstubblefield@nealandleroy.com>, "Sublett, Jeanette" <jsublett@nealandleroy.com>
**Cc:** "Pryor, David" <David.Pryor@us.dlapiper.com>
**Subject:** RE: Fire Coordination Call

[Warning: External email]

Hi Brian – Attached are (i) revised PD statements, adding "community centers" in Subarea A (clean and redline); (ii) revised bulk table, adding a bike parking requirement; and (iii) updated PD exhibits (not including the CFFC plans – those will be provided separately). The boundary of Subarea G has been confirmed, and no changes to the bulk table were required (the updated boundary was incorporated in a prior iteration). I have annotated your list below to indicate status.

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Friday, September 2, 2022 11:16 AM
**To:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>; Cacciato, Anthony <Anthony.Cacciato@am.jll.com>; Mike Parlato (mike.parlato@am.jll.com) <mike.parlato@am.jll.com>; Kaplan, Michael <mkaplan@relatedmidwest.com>; Tippens, Will <wtippens@relatedmidwest.com>; Jahnke Dale, Katie <katie.dale@us.dlapiper.com>; Ari Glass <Ari.Glass@mansuetoffice.com>; Doug Osborn <dosborn@Crawford-USA.com>; Julie O'Brochta <Julie_O'Brochta@gensler.com>; Paul Cadwell <pcadwell@chicagofirefc.com>; Amber McConnachie <lneal@nealandleroy.com>; Stubblefield, Carol <cstubblefield@nealandleroy.com>; Sublett, Jeanette <jsublett@nealandleroy.com>
**Subject:** RE: Fire Coordination Call

⚠ EXTERNAL MESSAGE

Hi all,

Glad we could all get together today to prep for CPC, thanks to Mariah for organizing the meeting. As we discussed, the remaining action items are outlined in the points below with the respective partner(s) in bold:

- Submit current set of plans and sustainability matrix to DPD **CFFC – due 9/6 by 9 am**

Done – See email from Doug Osborn 9/6 at 9:01 am.

- Revise PD statements to update uses in Subarea A and include bike parking requirements in bulk table **CFFC, Related – due by 9/8**; DPD will provide guidance on statement 12 and open space requirements.

Attached.

- Submit draft slide deck to DPD **CFFC, Related – due by 9/8 COB**

In progress.

- Revise PD exhibits with current CFFC plans, revise open space plan to specify planned *public* open spaces, and confirm boundary of Subarea G and update bulk table data, if necessary. **CFFC, Related – due by 9/12**

Subarea G boundaries confirmed, and revised open space plan attached as part of the attached PD exhibits.  This set of PD exhibits does <u>not</u> include the CFFC plans.  Those will be provided separately.

- Submit MBE/WBE documentation to DPD **CFFC – due by 9/12**

In progress.

- Submit letter of support from Alderman Ervin to DPD (he should also attend the meeting) **CFFC – due by 9/12**

In progress.

Please feel free to chime in if there's anything I missed or got wrong. Hope you all have a nice holiday weekend.

Brian Hacker, AICP (he/him)
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development

-----Original Appointment-----
**From:** DiGrino, Mariah F. <Mariah.DiGrino@us.dlapiper.com>
**Sent:** Thursday, September 1, 2022 2:52 PM
**To:** DiGrino, Mariah F.; Brian Hacker; Cacciato, Anthony; Mike Parlato (mike.parlato@am.jll.com); Kaplan, Michael; Tippens, Will; Jahnke Dale, Katie; Ari Glass; Doug Osborn; Julie O'Brochta; Paul Cadwell; Amber McConnachie; Stubblefield, Carol; Sublett, Jeanette
**Subject:** Fire Coordination Call
**When:** Friday, September 2, 2022 9:30 AM-10:30 AM (UTC-06:00) Central Time (US & Canada).
**Where:** Microsoft Teams Meeting

[Warning: External email]

A meeting to discuss and wrap up open items related to the PD exhibits, statements, and bulk table, and to discuss Plan Commission hearing logistics.

---

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

Meeting ID: 261 891 924 512
Passcode: 3Vayzz
Download Teams | Join on the web

**Join with a video conferencing device**
teams@cvc.dlapiper.com
Video Conference ID: 114 501 311 4
Alternate VTC instructions

**Or call in (audio only)**
+1 872-703-5059,,457601959#   United States, Chicago
Phone Conference ID: 457 601 959#
Find a local number | Reset PIN

Learn More | Meeting options

---

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

One of the 2022 World's Most Ethical Companies®

Jones Lang LaSalle

For more information about how JLL processes your personal data, please click **here**

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to **postmaster@dlapiper.com**. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# Exhibit I

| | |
|---|---|
| **From:** | Noah Szafraniec |
| **To:** | Brian Hacker |
| **Cc:** | Harrington, Michelle |
| **Subject:** | Re: September CPC |
| **Date:** | Tuesday, September 13, 2022 8:57:21 PM |

Its fine as long as the presentation is well oiled and things move fast - this will be a complicated one to present.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Tuesday, September 13, 2022 5:37 PM
**To:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Cc:** Harrington, Michelle <MHarrington@thecha.org>
**Subject:** Re: September CPC

Hey Noah,

Here's the list of speakers/attendees for PD 896
Paul Cadwell - pcadwell@chicagofirefc.com
Ari Glass - ari.glass@mansuetoffice.com
Mariah DiGrino - mariah.digrino@dlapiper.com
Doug Osborn - dosborn@crawford-usa.com
Anthony Cacciato - anthony.cacciato@am.jll.com
Will Tippens - wtippens@relatedmidwest.com
Michael Kaplan - mkaplan@relatedmidwest.com
Ann McKenzie - amckenzie@thecha.org
Michelle Harrington - mharrington@thecha.org

I know it's a lot but there are a lot of partners, let me know if you need me to trim it down. Thanks.

Get Outlook for iOS

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Tuesday, September 13, 2022 4:13:50 PM

**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Lisa Washington
<Lisa.Washington@cityofchicago.org>; Emily Thrun <Emily.Thrun@cityofchicago.org>; Joshua Son
<Joshua.Son@cityofchicago.org>; Justin Petersen <Justin.Petersen@cityofchicago.org>; Max Lyon
<Max.Lyon@cityofchicago.org>
**Cc:** Cynthia Roubik <Cynthia.Roubik@cityofchicago.org>; Gerardo Garcia
<Gerardo.Garcia@cityofchicago.org>
**Subject:** Re: September CPC

If you have not already done so - please make sure you send me your transfer memo and your
resolutions ASAP (revisions to ones preiovus sent if needed), as well as your list of speakers for
the CPC hearing.

I am trying to get the zoom meeting out this evening or tonight once I have the last few lists.

Thanks eveyrone.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Sent:** Thursday, September 8, 2022 11:31 AM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Lisa Washington
<Lisa.Washington@cityofchicago.org>; Emily Thrun <Emily.Thrun@cityofchicago.org>; Joshua Son
<Joshua.Son@cityofchicago.org>; Justin Petersen <Justin.Petersen@cityofchicago.org>; Max Lyon
<Max.Lyon@cityofchicago.org>
**Cc:** Cynthia Roubik <Cynthia.Roubik@cityofchicago.org>; Gerardo Garcia
<Gerardo.Garcia@cityofchicago.org>
**Subject:** Re: September CPC

Just re-sending the previously sent reminder - drafts of all the documents are due to share
point for Plan Commissioner review today.  Thank you everyone.


**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**

**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

---

**From:** Noah Szafraniec
**Sent:** Tuesday, August 30, 2022 2:24 PM
**To:** Brian Hacker <Brian.Hacker@cityofchicago.org>; Lisa Washington
<Lisa.Washington@cityofchicago.org>; Emily Thrun <Emily.Thrun@cityofchicago.org>; Joshua Son
<Joshua.Son@cityofchicago.org>; Justin Petersen <Justin.Petersen@cityofchicago.org>; Max Lyon
<Max.Lyon@cityofchicago.org>
**Cc:** Cynthia Roubik <Cynthia.Roubik@cityofchicago.org>; Gerardo Garcia
<Gerardo.Garcia@cityofchicago.org>
**Subject:** September CPC

Good Afternoon,

For those of you who have items on this month's agenda here are the next steps as we head
to home for the hearing!

1. Please make sure your as-filed applications are added here so Susan can
   post these ASAP.  S:\DHDATA\COMMUNICATIONS & OUTREACH\CPC for
   Posting\2022\09-2022\Applications
2. Final reviews of all documentation should be ocurring; by close of
   buisness 09-08-2022 in the sharepoint files for the plan commissioners
   you will need to have your draft documents uploaded [ DRAFTS of - Staff
   Report, One Page Fact Sheet, PD Statements, Bulk Table, Exhibits and CPC
   Power point]; also if you did not already add it there you should have the
   as-filed application for a point of reference. The items you are adding here
   and finalizing are going to be used for your final packets. Thank you.
3. Make sure you CALL and speak to your aldermen - make sure they are
   aware they have an item up on the agenda this month - do not leave a
   message or send an e-mail and hope they get it - we need to
   communicate and give them the courtesy to know something in their
   ward is on the agenda.  All the aldermen will get an emailed zoom invite
   as well.
4. Finalize your power point and script for CPC, talk to your teams to ensure
   who is going to present what so you can run the presentations smoothly.
   For those who have yet to present - yes you will be sharing your screen

and moving the presentation - NO the client/applicant cannot do it.

5. Make sure your final draft power points are added here by 09-12-2022 - Susan will be posting these Monday - this is the most important piece as this allows the public to see what is going on the agenda this week and to make decisions to speak or write comments about the items: **S:\DHDATA\COMMUNICATIONS & OUTREACH\CPC for Posting\2021\11-2021\Presentations**

6. Make sure you get a list of the intended speakers for your items by 09-12-2022 and then forward on to me so that they can be added to the zoom invite list.

7. Make sure you are ready to share your screen and go over your items QUICKLY for the chair woman briefing Wednesday (09-14-2022) and then also for Plan Commission on Thursday.

8. ***** ***Ill need these by the end of next week.*** Send to Noah by e-mail - your final draft resolutions and transfer memos via email preferably today - but no later than noon tomorrow - I will get them signed and back to you on Friday if possible.

9. ***** ***This will need to be done by the end of next week, I've added everyones entries to the sheet you just need to fill in the info.*** Make sure to update the project spreadsheet - I have already added all the items and filled in the first few columns for everyone. The file is located here for reference: S:\PLDATA\Zon\Plan Commission\aro cnn cps d district ic jobs ndb nob tpc & tsl

Please feel free to contact me with questions and/or concerns. Thank you.

**Noah Szafraniec**
**Assistant Commissioner - Planned Developments and Plan Commission**
**Department of Planning Development**
**1st Deputy's Office**
**City Hall, Room 1101**
**121 N. LaSalle St.**
**Chicago, IL 60602**
**312-744-5798**

# Exhibit J

| | |
|---|---|
| **From:** | James Harris |
| **To:** | Brian Hacker; Anna Furby; Noah Szafraniec |
| **Subject:** | RE: PD 896 Amendment |
| **Date:** | Friday, March 25, 2022 1:57:06 PM |

Brian,

Thank you for this summary of the issues. I agree with you that we should brief the Commissioner to make sure he is aware that this has been flagged and may present potential challenges in terms of public engagement and Plan Commission.

Best,

**JAMES M. HARRIS, AICP**
**West Planning Region - Lead Coordinating Planner**

City of Chicago - Department of Planning and Development (DPD)
121 North LaSalle Street, Suite 1000
Chicago, Illinois 60602

Phone: 1.312.744.9775
Email: james.harris@cityofchicago.org

---

**From:** Brian Hacker <Brian.Hacker@cityofchicago.org>
**Sent:** Friday, March 25, 2022 1:25 PM
**To:** James Harris <James.Harris@cityofchicago.org>; Anna Furby <Anna.Furby@cityofchicago.org>; Noah Szafraniec <Noah.Szafraniec@cityofchicago.org>
**Subject:** PD 896 Amendment

Hi all,

I'm starting this thread so we're in coordination on the outstanding issues for the Fire project and any next steps we may need to take. As you called out in today's meeting, Noah, and as I've voiced in past meetings, it's DPD's priority that we identify the implications the Fire facility will have on the rest of the PD – particularly as they relate to the subarea boundaries and changes to development rights. Obviously this is a large PD that will probably need to be amended periodically, but the larger question of which subareas will see an increase in development rights/FAR has to be addressed when we bring this project to CPC. Although I got mixed messages from CHA's comments in today's meeting, I'm not sure they're in agreement with us on this issue. Ann's desire to separate the "east of Loomis" issues from the "west of Loomis" issues sounds like they are looking to push the development rights issue to a later PD amendment. If that's the case then I foresee some vulnerability for this project in the public engagement process and in the Plan Commission hearing. We're proposing a major change in the planned land use for a large development site that was slated for hundreds of residential units. Someone needs to be able to address where/if those units will be replaced when we go before the public and legislative bodies.

For our approach going forward I think the first step is to confirm CHA's approach: are they going to

work with Related and Gensler to complete this planning exercise in time to address the "east of Loomis" issues in coordination with CPC hearing for the Fire project, or are we saving that for a future amendment? If it turns out that they want to push those issues to the future then I suggest we brief leadership (Samir, Commissioner Cox, IGA) on that approach and the potential downsides to it – just to be safe. Given the high-profile nature of this project and the broad desire to avoid the types of challenges that came up in Hansen Park, I want to stay ahead of any potential conflicts that have the potential to undermine this project.

I'm interested in hearing your thoughts, as well. Thanks…

Brian Hacker, AICP
Coordinating Planner, West Region
City of Chicago | Department of Planning and Development
121 N. LaSalle Street, Suite 1006
312.744.7217



This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail (or the person responsible for delivering this document to the intended recipient), you are hereby notified that any dissemination, distribution, printing or copying of this e-mail, and any attachment thereto, is strictly prohibited. If you have received this e-mail in error, please respond to the individual sending the message, and permanently delete the original and any copy of any e-mail and printout thereof.

September 16, 2022

City of Chicago Committee on Zoning, Landmarks, and Building Standards
121 N. LaSalle St.
Chicago, IL 60602

VIA EMAIL Nicole.Wellhausen@cityofchicago.org & Raymond.Valadez@cityofchicago.org

**RE: Comments in Opposition to Ordinance 2022-1838: Chicago Housing Authority and City of Chicago's Request to Amend the Planned Development #896 to facilitate the development of the Chicago Fire practice facility on public housing land**

Dear Members of the Zoning Committee:

We are writing on behalf of **Chicago Housing Initiative** and **Lugenia Burns Hope Center** in **opposition to the proposed amendment** to Residential Business Planned Development #896, submitted by the City of Chicago Department of Planning and Development at 1201-1285 W. Cabrini Street ("Planned Development").

This land, owned by the Chicago Housing Authority ("CHA") and subject to a declaration of trust, is to be used exclusively for public and affordable housing that has not yet been built. The proposal we are challenging will continue patterns of economic and racial segregation, contrary to the City of Chicago's obligations to comply with civil rights laws. The City could move towards more economic and racial integration, fighting historic trends of segregation. Instead, the City continues to make decisions that perpetuate these segregative patterns. **In this proposal, land that is promised for desperately needed affordable housing to predominantly serve the needs of Black families will be given to a billionaire with negligible benefits for the thousands of families of color seeking to live in Chicago's opportunity areas.**

**Chicago Housing Initiative ("CHI")** is a coalition of nine community organizations working directly with low-income renters to forge a citywide organizing vehicle to increase their social, economic, and political power and advocate for the creation of accessible, integrated affordable housing across the City. **Lugenia Burns Hope Center ("Hope Center")** works to develop the civic engagement and empowerment of residents through education, leadership development, and community organizing to empower residents to envision how they want their communities to be developed. **Both organizations have members who are ABLA/Roosevelt Square residents or who seek to move to ABLA/Roosevelt Square community when public housing becomes available.** CHI and Hope Center are a part of a civil rights complaint under investigation with HUD's Office of Fair Housing and Equal Opportunity concerning the City of Chicago's violations of the Fair Housing Act by blocking the development of family affordable housing in predominantly white and gentrifying neighborhoods. This action represents yet another example of the City's pattern of thwarting affordable housing development in opportunity areas.

## History of the Proposed Site

The parcels at issue are part of a former public housing development that included four separate projects—Jane **A**ddams Homes, Robert **B**rooks Homes, **L**oomis Courts, and Grace **A**bbott Homes—and almost 3,600 residential units and was known by the acronym ABLA. **As part of its Plan for Transformation, CHA demolished Addams and Abbott Homes, rehabilitated Brooks Homes and Loomis Courts, and displaced thousands of ABLA families to primarily racially segregated low opportunity areas of the city.** For years, the CHA has promised those families they could return to the new or rehabilitated units and to their historic community.

**CHA most recently committed to build 775 public housing replacement units on the ABLA footprint in a development now known as Roosevelt Square.** That is far fewer than the 2,441 new and 455 rehabbed public housing units CHA promised in 2013 as part of its Plan Forward, which followed the Plan for Transformation. To date, CHA and the developer (Related Midwest) have delivered only 245 of the 775 promised units.[1]

As recently as 2016, an updated Master Plan proposed developing the land primarily for residential housing, with a mix of commercial and open space. This vision has been long promised to the displaced ABLA residents and other CHA residents seeking to live in an opportunity area close to the Illinois Medical District, which offers a wide array of health care and disability services. The 2016 Master Plan included a balance of other affordable and market rate residential units, consistent with the long-standing goal of developing a mixed-income, residential community at the former ABLA site.[2]

Roosevelt Square as defined by the Plan for Transformation includes Brooks Homes, Loomis Courts, new construction completed to date, and future construction. The chart below outlines the strategy for new units only.

|  | Plan for Transformation/ Gautreaux Requirements for New Construction | New Units Built to Date (2015) | Remaining Units Required to be Built per Gautreaux | Recommended Number of Units Remaining to Built | Total New Construction at full build out (including built to date) |
|---|---|---|---|---|---|
| CHA/ACC | 755 | 245 | 510 | 510 | 755 |
| Affordable | 720 | 187 | 533 | 533 | 720 |
| Market Rate | 966 | 159 | 807 | up to 1,307 | up to 1,466 |
| **Total Units** | **2,441** | **591** | **1,850** | **2,350** | **2,941** |

FINAL REPORT March 2016

In 2021, the City of Chicago and CHA approved the next phase of development that will include 80 public housing units. When completed, this will bring the number of delivered replacement

[1] City of Chicago Department of Housing, **"**Next Phase of ABLA Homes Redevelopment Approved for the Near West Side" (July 20, 2022) *available at* https://www.chicago.gov/city/en/depts/doh/provdrs/housing_resources/news/2022/july/next-phase-of-abla-homes-redevelopment-approved-for-the-near-wes.html

[2] Chicago Housing Authority and Solomon Cordwell Buenz, "Greater Roosevelt Square Master Plan Framework Report," (March 2016), *available at* https://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/2018-08/CHA_Final_2016_March_0.pdf

public housing units to 325, about 40% of the promised 775 units, and representing a mere 9% of the original 3,600 units at ABLA.

## The Proposal

Last year, the Mayor's Office, the City's Department of Planning & Development, and the Chicago Housing Authority presented the Chicago Fire with three potential sites for a soccer training facility—all on CHA land that is subject to ongoing replacement public housing commitments that have been outstanding for more than two decades. This was after Chicago Fire's previous proposal to purchase and redevelop a park in the Belmont Cragin neighborhood faced neighborhood opposition and stalled.[3] The Chicago Fire selected ABLA/Roosevelt Square.

During a May 3, 2022 virtual public meeting, and again during the CHA's May 17 Board Meeting, CHA explained that the proceeds from the lease agreement with the Chicago Fire would fund (1) renovations to Loomis Courts and the already extensively renovated Brooks Homes, (2) a parking lot for the seniors of William Jones Apartments, a nearby CHA senior building, and (3) some green space. **The proposal does not include the creation or funding of a single affordable housing unit.**

## The Request to Amend the Planned Development

On September 15, 2022, the City's Department of Planning & Development presented a request to amend the zoning of the current Planned Development at the ABLA/Roosevelt Square site to the Chicago Plan Commission. The zoning amendment applies to 25 acres of land that the Chicago Fire would lease from CHA. It would allow the Chicago Fire to build a 5,100-square foot office building, a private parking lot, and private recreational space, instead of the mixed-income housing promised in the 2016 Roosevelt Square Master Plan.

The Department's presentation, which became available online just three days before the meeting, includes major proposed changes to the Roosevelt Square Master Plan. To account for the loss of the largest remaining vacant parcel at ABLA/Roosevelt Square, the presentation includes a proposed increased level of density in the peripheral areas of the ABLA footprint. It does not, however, specify how many residential units are planned or possible with the remaining parcels. **Without these specifics, it remains unclear from the City's presentation how CHA can or will meet its current obligation to build 775 public housing units at Roosevelt Square.** Additionally, the request to amend the planned development only covers the 25 acres for the Chicago Fire proposal; it does not include zoning changes necessary for increased residential density in the peripheral parcels at the ABLA/Roosevelt Square site.

Again, this proposal and rezoning request do not facilitate the creation or funding of a single affordable housing unit. CHA will use the unspecified sum from the long-term lease to rehabilitate existing units on the site. The "Public Benefits" listed in the presentation are, in full:

---

[3] Alex V. Hernandez, *Belmont Cragin Neighbors Blast Chicago Fire's Plan for New Hanson Park Facility: 'Where Are We Supposed to Play?'* BLOCK CLUB CHICAGO (June 11, 2021), *available at* https://blockclubchicago.org/2021/06/11/belmont-cragin-neighbors-blast-chicago-fires-plan-for-new-hanson-park-facility-where-are-we-supposed-to-play/

200 estimated temporary constructions jobs and youth soccer programming, internship programs, mentorship programs, and "community focused events."

**Resident and Community Engagement**

According to the presentation, CHA and the Chicago Fire started outreach to current residents at ABLA about these major changes in April 2022 and held a meeting in May 2022. CHA itself formally considered the proposal in May. There was one other community meeting in June, after the City submitted the requested amendment to the Planning Commission. This spring and summer, **Hope Center conducted outreach and over 70 current and former ABLA residents signed a petition in opposition to the proposed sports facility.**

At the Plan Commission Hearing, four members of the public, including a resident of ABLA, spoke during the comment period. Each voiced their opposition to the proposal to use this land for a private sports facility. **The resident and community members emphasized the need for affordable housing in the City, the 20-year delays in the promised return of public housing to this land, and the speed with which CHA and the City have pushed this sports facility proposal forward.** CHA, the City, and Related Midwest represented that there is no change to the promised number of redeveloped units at ABLA, but did not specify how many residential units—public housing or market rate—would be included in the new Master Plan. There were no members of the public or ABLA residents who testified in support of the proposal.

The City's presentation also failed to discuss the civil right implications of building a sports facility on the site or the resulting changes to the Master Plan. The Plan Commission likewise failed to consider our related, timely submitted comments and failed to publicly post them during the hearing as was done for other matters on the agenda.

**Chicago has an Obligation to Comply with Federal Civil Rights Laws**

The City of Chicago has a duty not to discriminate, and to comply with the Fair Housing Act, which prohibits policies and practices that have the intent or effect of discriminating against members of a protected class.[4] **The challenged proposal would allow more than 25 acres of CHA land, located in a rapidly gentrifying community and long intended to be used as affordable housing—which primarily serves Black families and people with disabilities—to be leased for development by a private sports team owned by a billionaire.** This action fails to address the ongoing needs for replacement housing in the ABLA community while offloading more than half of the remaining land available for redevelopment.

Because the City of Chicago receives federal housing-related funds, such as Community Development Block Grants and HOME funds, the City likewise has a duty to affirmatively further fair housing. Specifically, it must (as a condition of receiving the grants and funds) certify that its housing policies affirmatively further fair housing. 42 U.S.C. § 5304(b)(2). The duty to affirmatively further fair housing requires that "[a]ctions must be taken to fulfill, as much

---

[4] *Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.* 576 U.S. 519 (2015).

as possible, the goal of open integrated residential housing patterns and to prevent the increase of segregation."[5] A failure to comply with this duty jeopardizes the City's receipt of federal funds.[6]

Finally, as a recipient of federal dollars, the City of Chicago is also subject to Title VI of the Civil Rights Act of 1964 and has a duty not to discriminate on the basis of race, national origin, or color in any program or activity that receives federal funds or other federal financial assistance.

**In deciding whether to apply for the change to the Planned Development, the City should first consider the civil rights implications.** Specifically, the City should evaluate the ongoing need for affordable housing on the Near West Side by considering market rents, vacancy rates, household incomes, rates of housing cost burden, and public and subsidized housing waiting lists. This analysis should consider the supply of affordable rental housing in areas of opportunity with easy access to public transportation, good jobs and schools, and high-quality healthcare. Finally, the City should consider how its decision will affect people of color, families with children, people with disabilities, and other protected classes.[7] On information and belief, the City failed to undertake any of this analysis prior to serving as the applicant seeking an amendment to the Planned Development.

**Had the City done this analysis, all of these factors should have caused the City to elect to refuse to surrender valuable public housing land to a professional soccer team.** Here's what an analysis would have uncovered:

In 1998, at CHA's request, the court monitoring the housing authority's fair housing obligations in the *Gautreaux* litigation deemed ABLA/Roosevelt Square a "Revitalizing Area," recognizing that it will likely become racially and economically integrated in a short period of time.[8] The last twenty-plus years have borne that out. Surrounding ABLA/Roosevelt Square are rapidly gentrifying neighborhoods on Chicago's Near West Side: to the North are University Village, Little Italy, and the campus of the University of Illinois at Chicago (UIC). To the northwest are the Illinois Medical District and Tri-Taylor neighborhood. To the east is the massive "South Campus" development of market rate housing and commercial businesses. To the south—in addition to the several luxury developments along 15th and 16th Streets—is the most rapidly gentrifying and whitest part of Chicago's Pilsen (Lower West Side) community.

**The ABLA area offers easy access to good jobs, healthcare, shopping, parks, universities, and many other amenities in Chicago's booming central core—access that thousands of**

---

[5] *Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1134 (2nd Cir. 1973).

[6] *United States ex. Rel. Anti-Discrimination Center Inc. v. Westchester County*, 668 F. Supp. 2d 548, 569 (S.D.N.Y. 2009); *See generally* HUD's 2021 Interim Final Rule Restoring Affirmatively Furthering Fair Housing Definitions and Certifications *available at* https://public-inspection.federalregister.gov/2021-12114.pdf.

[7] See, e.g. *Access Living of Metropolitan Chicago v. City of Chicago*, No. 1:18-cv-03399 (N.D. Ill.) (challenging the City of Chicago's use of millions of dollars in federal funding on affordable housing development that is noncompliant with accessibility requirements under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act).

[8] *See* Settlement Agreement, Ex. A at 1-2, *Gautreaux v. Chi. Hous. Auth.*, 981 F. Supp. 1091 (No. 66-cv-1459), *available at* https://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/signed%20settlement%20agreement.pdf.

**CHA families once had but lost over the past two decades as the Plan for Transformation pushed families out to the Far South and Far West sides of Chicago.**

Further, the challenged proposal involves the largest vacant area, and more than half of the remaining land available, to complete the Roosevelt Square redevelopment of the former ABLA Homes. If the City Council approves the proposal, there would be fewer than 20 acres remaining for the development of 1,650 public housing, affordable housing, and market rate housing units plus public ways, green space, and other amenities.

To date, Related Midwest and the CHA have delivered barely a third of the promised public units at Roosevelt Square. The CHA and the City need to create more site-based affordable housing in communities of opportunity and ought to use this land to meet its obligations. The CHA successfully accomplished this at both the Cabrini Rowhouses and at Lathrop Homes. **The CHA and Related Midwest's delays in delivering replacement units cannot serve as the basis to jettison a vital supply of coveted, available, public housing land in a gentrifying community.**

Based upon the above, we therefore ask that the Zoning Committee do what the City and the Chicago Plan Commission should have done and **recommend that the City Council deny the challenged proposal to amend the Planned Development.**


Sincerely,


Emily Coffey
Micaela Alvarez
MacKenzie Speer
**Chicago Lawyers' Committee for Civil Rights**


John Bouman
Lawrence Wood
**Legal Action Chicago**


Kate Walz
**National Housing Law Project**

# Lugenia Burns Hope Center      Chicago Housing Initiative

c/o Don Washington, Executive Director, Chicago Housing Initiative
Don@chicagohousinginitiative.org, (773) 708-7472

August 22, 2022 – *by email to Jane.B.Hornstein@hud.gov and by certified mail*

Ms. Jane B. Hornstein
Director, Special Applications Center
U.S. Department of Housing and Urban Development (HUD)
Ralph H. Metcalfe Federal Building
77 W. Jackson Boulevard, Room 2401
Chicago, IL 60604-3507

**Re:   Chicago Housing Authority's request to dispose of 25 acres at ABLA Homes / Roosevelt Square in order to lease land to a professional soccer team**

Director Hornstein:

We are writing to you as a resident of the ABLA Homes and as leaders of two Chicago community organizations which work closely with public housing residents.

We strongly urge you to oppose the Chicago Housing Authority's request to dispose of more than 25 acres of ABLA Homes public housing land and lease the site to a Major League Soccer team for use as a practice facility and team headquarters.

The CHA wants to sign a 40- to 60-year lease with Chicago Fire FC, a professional soccer team owned by a billionaire. The site in question represents more than half of the remaining land available to complete the Roosevelt Square development, leaving fewer than 20 acres remaining for the development of some 1,650 public housing, affordable and market-rate units – not to mention public ways, amenities, and green space.

**We believe the proposed disposition would be contrary to the CHA's obligations to abide by civil rights laws. We have information critical to the Special Application Center's consideration of the CHA's disposition request and would like to meet with you to discuss this information and our concerns.**

*ABLA* is an abbreviation for the combined Addams, Brooks, Loomis and Abbott developments, which included a combined total of 3,596 family apartments prior to the start of the CHA's "Plan for Transformation" in 1999. *Roosevelt Square* is the ongoing mixed-income redevelopment within the ABLA footprint.

For more than two decades, former residents of the ABLA Homes have waited to exercise their Right of Return as Roosevelt Square has proceeded at a snail's pace. Under the Plan for Transformation, CHA committed to build 775 public housing replacement units on the ABLA footprint, as well as retaining and renovating the Brooks Homes and Loomis Courts. Nearly 23 years later, developer Related Midwest and the CHA have delivered only 245 of the 775 promised public housing units –

little more than one third.  In 2021, the City of Chicago and CHA approved a next phase of development that will include 80 public housing units; when completed, this will bring the number of delivered replacement public housing units to 325.

Adjacent to the ABLA site are high-opportunity, predominantly white and rapidly gentrifying areas. The planned lease of land would negatively impact current and former ABLA / Roosevelt Square residents without consideration of the surrounding area, the CHA's obligation to provide replacement housing for former ABLA residents, and the CHA's civil rights obligations.

**Related Midwest's and the CHA's delays in delivering the committed replacement units must not serve as a basis to jettison an important supply of coveted, available public housing land in a gentrifying community.**  Surrounding ABLA / Roosevelt Square are rapidly gentrifying neighborhoods on Chicago's Near West Side: to the north are University Village / Little Italy and the campus of the University of Illinois at Chicago (UIC).  To the northwest is the Illinois Medical District and the Tri-Taylor neighborhood.  To the east is the massive "South Campus" development of market-rate housing and storefronts.  And to the south – in addition to several luxury developments along 15th and 16th Streets – is the most rapidly gentrifying and whitest part of Chicago's Pilsen (Lower West Side) community.

The ABLA area offers quick transit access to jobs, shopping, parks, universities and many other amenities in Chicago's booming central core – access that thousands of CHA families once had but lost over the past two decades as the Plan for Transformation pushed families out to the Far South and Far West sides of Chicago.

There are also several concerns about the site selection process and proposed lease terms:

- The CHA cannot explain how the Chicago Fire building a practice facility, team headquarters and event space will deliver a substantial public good to the surrounding area that is in the best interests of the 17,000 displaced ABLA residents as outlined in PIH-2021-17

- As recently as 2016, an updated Master Plan showed this land being developed as housing and open space – as long promised to the displaced ABLA residents and other CHA residents seeking to live in an opportunity community proximate to the Illinois Medical District, which offers a wide array of health care and disability services.

- During a May 3, 2022, virtual public meeting – and again during the housing authority's May 17th Board of Directors meeting – CHA officials said the proceeds from the lease would fund 1) renovations at Loomis Courts and at the already-extensively-renovated Brooks Homes; 2) a parking lot for the William Jones Apartments, a nearby RAD senior citizen building; and 3) a few green space amenities.  As described by CHA, the deal would not produce a single replacement public housing unit.  (Indeed, it would not produce a single unit affordable to low-income families eligible for HUD subsidized housing.)

- The Mayor's Office, in conjunction with the City's Department of Planning & Development and CHA, presented *three potential sites* to the Chicago Fire – and all three involved CHA land subject to ongoing replacement public housing commitments.  In addition to ABLA, the sites were at Wells-Madden (Oakwood Shores) and Robert Taylor (Legends South).  Accompanying this letter are the partially redacted presentation slides dated October 28, 2021.

- The presentation describes the ABLA area as "65.7% Black."  While that may be correct for a handful of lightly populated census tracts, it obscures the demographics of the larger area,

which (as detailed above) differ dramatically from the equivalent areas around Wells-Madden and Taylor.

- ○ Thus, the City and CHA allowed the Chicago Fire to select a site abutting high-opportunity, predominantly white areas over sites in predominantly Black communities. Why is CHA prioritizing this site for disposition over housing, despite its obligations to comply with civil rights laws?

**We believe that the CHA cannot demonstrate a commensurate public benefit from the proposed disposition.** If anything, CHA has proven to be a less-than-reliable protector of the common public good. Given the CHA's recent history of deliberate segregation, mass displacement, dysfunctional waiting lists, and broken promises – from Hope VI, to the Plan for Transformation, and the complete collapse of the Moving to Work agreements – it is difficult to imagine how the CHA could qualify any special application.

Several Chicago organizations which share our concerns about the proposed ABLA-Chicago Fire lease are also presently plaintiffs in a lawsuit against the City of Chicago because the City's housing policies violate the Fair Housing Act by blocking the development of family affordable housing in predominately white and gentrifying neighborhoods. We are concerned that the City's and CHA's actions represent another example of this pattern.

The CHA has a billion-dollar budget to produce and manage low-income housing. Given CHA's past performance, paper promises to create housing in other parts of the ABLA footprint strain credulity.

**We would like to meet with you at your earliest convenience to discuss our concerns.** Please respond to Don Washington at Don@chicagohousinginitiative.org or (773) 708-7472. Thank you.

Sincerely,

_Laura Donaldson_
Laura Donaldson
Resident, ABLA Brooks Homes

_Rod Wilson_
Rod Wilson
Executive Director, Lugenia Burns Hope Center

_Etta Davis_
Etta Davis
Leader, Lugenia Burns Hope Center
Vice President, Dearborn Homes L.A.C.

_Don Washington_
Don Washington
Executive Director, Chicago Housing Initiative

cc:       Lon Meltesen, Director, HUD Fair Housing & Equal Opportunity, Region V Office
          U.S. Senator Richard J. Durbin; U.S. Senator Tammy Duckworth
          U.S. Representative Danny K. Davis (5th); U.S. Representative Jesus G. Garcia (4th)
          State Senator Patricia Van Pelt (5th); State Representative Lakesia Collins (9th)

Enclosure:   "Chicago Fire Facility – Opportunity Sites" (14-page presentation with redactions)

December 12, 2022

Via Email and First Class Mail: jane.hornstein@hud.gov

Jane B. Hornstein, Director
Special Applications Center
U.S. Dept. of Housing and Urban Development
Ralph H. Metcalfe Federal Building
77 W. Jackson Blvd., 24th Floor
Chicago, IL 60604-3507

**Re: Section 18 Disposition Application No. DDA0012060 for Chicago Housing Authority's Request to Dispose of Public Housing Land for a Chicago Fire Practice Facility**

Dear Ms. Hornstein:

We are writing on behalf of a coalition of community-based organizations, whose membership includes ABLA and other public housing residents, to object to the Chicago Housing Authority's ("CHA") disposition application, which would improperly dispose of 25 acres of highly valuable public housing land at the former ABLA development to facilitate a Chicago Fire Football Club ("Chicago Fire") practice facility. The application contains inaccurate statements and violates Section 18 of the United States Housing Act of 1937, as amended ("Section 18"), as well as violations by the CHA and the City of Chicago ("City") of their obligations under civil rights laws and CHA's obligations under its Moving to Work ("MTW") Agreement.[1] Before making a decision on CHA's disposition application, HUD must consider the information provided in this letter.

**<u>Criteria for Disapproval</u>**

The disposition of public housing land is governed by Section 18 of the United States Housing Act of 1937, as amended in 1998 ("USHA"), 42 U.S.C., 1437 *et seq.* and 24 C.F.R. Part 970.

---

[1] We plan to supplement our concerns once CHA and HUD respond to our Freedom of Information Act requests. Importantly, the CHA is withholding the full disposition application, claiming it is a draft, even though it was submitted to HUD for approval. The CHA also claims that it is exempt from disclosing records related to real estate <u>purchase</u> negotiations until the transaction occurs, although as discussed in this letter, the CHA has stated in various public forums and throughout its disposition application that the transaction is a ground lease, not a sale. We believe the information CHA is withholding is not protected under any exemption from disclosure, and its actions are improper and intended only to limit adverse information relevant to our review and necessary to share with HUD. Until such time as we are provided the opportunity to review the complete application with all supporting information, HUD should not issue a decision on the disposition application.

1

"Disposition" is defined to include the "conveyance or other transfer by the PHA, by sale or other transaction, of any interest in the real estate of a public housing project." 24 C.F.R. § 970.5. It includes leases for non-dwelling purposes for more than one year, and land where public housing was once sited. 24 C.F.R. § 970.5. MTW housing authorities are not exempt from and cannot waive the Section 18 requirements. Section 204 of the Omnibus Consolidated Rescissions and Appropriations Act of 1996 (Public Law 104-134).

HUD is required to deny a disposition application when, *inter alia*, the PHA's required certification is inconsistent with (1) the PHA's plan under Section 5A of USHA, 42 U.S.C., 1437c-1; (2) any information and data available to HUD and related to the disposition application, including the justification requirements at 970.17; (3) any information or data requested by HUD; or (4) the PHA's obligations to comply with the resident consultation and opportunity to purchase requirements at 970.9. 24 C.F.R. § 970.29. Further, both HUD and CHA are obligated to comply with federal civil rights laws, including the duty to affirmatively further fair housing under the Fair Housing Act, 42 U.S.C. 3601 *et seq.*, 24 CFR Parts 5, 91, 92, 570, 574, 476 and 903, and 86 FR 30779 (June 10, 2021). For the foregoing reasons, CHA's certification of compliance is clearly inconsistent with the contents of its disposition application, Moving to Work Agreement, and its obligations under civil rights laws, and HUD should therefore reject the application.

## CHA's Longstanding, Contractual Obligation to Rebuild Family Public Housing Units

As part of its Plan for Transformation, CHA demolished Addams and Abbott Homes, rehabilitated Brooks Homes and Loomis Courts, and displaced thousands of ABLA families to racially-segregated, economically depressed areas of the City. For years, CHA promised those displaced ABLA families that they could return to new or rehabilitated units in their former neighborhood.

CHA most recently committed to build 775 public housing replacement units on the ABLA footprint in a development now known as Roosevelt Square, which is far fewer than the 2,441 new and 455 rehabbed public housing units CHA promised in 2013 as part of its Plan Forward, which followed the Plan for Transformation. To date, CHA and the developer (Related Midwest) have delivered only 245 of the 775 promised replacement ABLA units.[2]

As recently as 2016, an updated Master Plan proposed developing the land primarily for residential housing, with a mix of commercial and open space. This vision has been long promised to the displaced ABLA residents and other low-income CHA residents seeking to live in an area of opportunity close to the Illinois Medical District, which offers a wide array of health care and disability services. In 2021, the City of Chicago and the CHA approved the next phase of development, which will include only 80 public housing units. When completed, this will bring the number of delivered replacement public housing units to 325, about 40% of the number originally committed.

---

[2] City of Chicago Department of Housing, "Next Phase of ABLA Homes Redevelopment Approved for the Near West Side" (July 20, 2022) *available at* https://www.chicago.gov/city/en/depts/doh/provdrs/housing_resources/news/2022/july/next-phase-of-abla-homes-redevelopment-approved-for-the-near-wes.html

CHA's failure to meet its original goals under the landmark Plan for Transformation highlights the fair housing implications of its pending application for disposition. HUD gave CHA $1.5 billion to demolish 18,000 units, and revitalize 25,000 units, of public housing. (This would result in a net loss of 13,000 public housing units.)[3] CHA claims that it met its revitalization goal last year in the MTW 2022 Annual Report, but that claim is misleading. CHA's revitalization efforts have focused to a large extent not on the construction of new public housing—fewer than 2,800 were built in mixed-income developments—but on the expansion of its project-based voucher (PBV) program.[4] More than 5,000 of the revitalized units are in PBV buildings owned and managed by private entities and subject to expiring contracts.[5] These units already existed (and were often occupied) when CHA counted them toward its revitalization goal. And while it is true that HUD authorized this action, that authorization does not change the fact that CHA has dramatically reduced the number of public housing units in Chicago—a loss that will only be exacerbated if CHA takes land that was supposed to be used for the construction of public housing and leases it to a soccer team. CHA has also failed to create enough appropriately-sized public housing units. The 18,000 high rise units that CHA demolished were family units, and more than 9,000 of the revitalized units are in senior housing developments, where the units are much smaller.[6] Most displaced families cannot live in these developments. They need appropriately-sized units that CHA can build in opportunity areas like the one where ABLA is located.

## The Need for Affordable Housing in Opportunity and Gentrifying Areas

The City's own data and findings confirm that there is a desperate lack of affordable housing in opportunity areas and gentrifying neighborhoods in Chicago. The majority of Chicago's low-income developments have been in majority Black neighborhoods on the South and West Sides.[7] The vast majority of individuals who live in low-income, under-resourced neighborhoods are Black or Latinx, and many are people with disabilities.[8] As a result, Chicago has experienced an exodus of Black Chicagoans, who are forced to move outside the City.[9] The City must therefore pursue every available opportunity to create affordable, accessible housing in opportunity and gentrifying neighborhoods.

---

[3] Plan for Transformation, January 2000, pg. 2.

[4] FY2021 MTW Annual Report, pg. 67.

[5] *Id. See Also* FY2010 MTW Annual Report (Revised), pg. 56 http://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/2018-08/fy2010_annual_report_revised_hud_approved1.pdf (last visited Dec. 12, 2022).

[6] *Public Housing,* CHA, https://www.thecha.org/residents/public-housing#:~:text=CHA%20provides%20just%20fewer%20than,14%20Family%20public%20housing%20properties (last visited Dec. 12, 2022); *See also* Grace del Vecchio, *The Chicago Housing Authority Explained*, South Side Weekly, Feb. 25, 2022

[7] Chicago Dept. of Housing, Racial Equity Impact Assessment, Qualified Allocation Plan, 12, https://www.chicago.gov/content/dam/city/depts/doh/qap/qap_2021/draft_reia_qap.pdf (last visited Dec. 11, 2022).

[8] Chicago Blueprint for Fair Housing, Oct. 2021, 3-9, https://www.chicago.gov/city/en/sites/blueprint-for-fair-housing/home.html (last visited Dec. 11, 2022).

[9] *Who Can Live in Chicago? Investigating Housing Affordability Trends in Chicago Using 2020 Census Data*, April 21, 2022, https://voorheescenter.uic.edu/news-stories/who-can-live-in-chicago-investigating-housing-affordability-trends-using-2020-census-data/ (last visited Dec. 11, 2022).

**CHA and the City Should Not Be Permitted to Dispose of Public Housing Land in a Gentrifying Area**

ABLA/Roosevelt Square is surrounded by rapidly gentrifying neighborhoods on Chicago's Near West Side. To the North are University Village, Little Italy, and the campus of the University of Illinois at Chicago ("UIC"). To the northwest are the Illinois Medical District and Tri-Taylor neighborhood. To the east is the massive "South Campus" development of market rate housing and commercial businesses. To the south – in addition to the several luxury developments along 15th and 16th Streets – is the most rapidly gentrifying and whitest part of Chicago's Pilsen (Lower West Side) community. The ABLA area therefore offers easy access to good jobs, healthcare, shopping, parks, universities, and many other amenities in Chicago's booming central core – access that thousands of CHA families once had but lost over the past two decades as the Plan for Transformation pushed families out to the Far South and Far West Sides of Chicago.

The potential for this land to appreciate was recognized two decades ago. In 1998, at CHA's request, the court monitoring the housing authority's fair housing obligations in the *Gautreaux* litigation deemed ABLA/Roosevelt Square a "Revitalizing Area," recognizing that it was already likely to become racially and economically integrated.[10]

The Natalie M. Voorhees Center at the University of Illinois at Chicago ("Voorhees Center") completed a report analyzing the area in question.[11] In its report, the Voorhees Center found that "[w]hile land dispositions by the CHA have become common practice in Chicago at mixed-income redevelopments that are part of the Plan for Transformation, they are primarily being used on the South Side of Chicago in largely African American neighborhoods that have historically been disinvested and are having slower recovery of the housing market post-recession, such as Grand Boulevard and Washington Park."[12] The Voorhees Center notes that rebuilding efforts over the past 15 years have slowed due to the recovery of the real estate market, which has resulted in CHA using "its land for government or commercial facilities such as a non-profit tennis academy, charter schools, police station, medical facilities, movie production space, and supermarket."[13] With the Chicago Fire proposal, there are stark differences in the market conditions, which allowed for additional affordable housing units to move forward as recently as 2021. "[I]n a community that is seeing significant neighborhood reinvestment resulting in gentrification and displacement [this pivot] is a significant shift in CHA and City of Chicago policy."[14]

---

[10] *See* Settlement Agreement, Ex. A at 1-2, *Gautreaux v. Chi. Hous. Auth.*, 981 F. Supp. 1091 (No. 66-cv-1459), *available at* https://cha-assets.s3.us-east-2.amazonaws.com/s3fs-public/signed%20settlement%20agreement.pdf.

[11] Voorhees Center Memo Re: Chicago Fire Performance Centre Proposed Development ("Voorhees Center Memo"), attached as Exhibit A.

[12] *Id.* at 2.

[13] *Id.*, citing Dumke, M. (2022). This land was promised for housing. Instead it's going to a pro soccer team owned by a billionaire. Propublica. https://www.propublica.org/article/chicago-housing-abla-fire-soccer-cha.

[14] Voorhees Center Memo, citing Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.

The Voorhees Center also finds that displacement of low-income households is highly likely, as "[a]ccording to the Institute for Housing Studies' Displacement Risk Index, the Near West Side, which includes Roosevelt Square, is considered to be at moderate to high risk of displacement.[15] Roosevelt Square is located within Chicago's Near West Side neighborhood, which is experiencing rapid gentrification." It is also surrounded by areas experiencing rapid gentrification, including University Village, Little Italy, and the University of Illinois Chicago (UIC) campus, the Illinois Medical District, the Tri-Taylor neighborhood, Pilsen,[16] and University Village, a 930-unit residential development with 120,000 square feet of retail space. The area is also proximate to "The 78," a 62-acre mixed-use development that will include a major innovation hub, the Discovery Partners Institute (DPI). With substantial ongoing public and private investment, access to jobs, healthcare, retail, and universities near the Chicago business district, the Voorhees Center finds that "Roosevelt Square is poised to become one of the fastest growing and most coveted communities in Chicago" and that "now is the opportune time to build affordable housing."

The Voorhees Center also found that the Near West Side neighborhood, including the 137 acres making up Roosevelt Square, has experienced significant change, "with a steady increase in racial diversity over the past 20 years with public and private investments." At the same time, the Near West Side has experienced decreasing poverty and unemployment rates. While this area remains predominately rental housing, according to the City of Chicago's Affordable Requirements Ordinance Zone Map, "these areas are high opportunity areas for inclusionary affordable housing."

### The City of Chicago and CHA's Actions Deprive Low-Income Persons with Disabilities and Majority Black and Latinx Residents of Affordable Housing Opportunities in an Increasingly White and Gentrifying Area.

CHA and the City of Chicago may argue that they can satisfy their obligations so long as there will be sufficient replacement housing available to the remaining ABLA residents with a right of return. But that is not the standard under federal civil rights laws. CHA and the City have a duty to ensure that they do not deny, by intent or effect, affordable housing opportunities to protected classes throughout Chicago, especially where housing can be built in opportunity areas and thereby start to reduce the pervasive racial segregation in the city.[17]

Because the City of Chicago and CHA receive federal housing-related funds, they likewise have a duty to affirmatively further fair housing. This obligation requires that "[a]ctions must be taken to fulfill, as much as possible, the goal of open integrated residential housing patterns and to

---

[15] Voorhees Center Memo at 2, citing Institute for Housing Studies at DePaul University. (2019). Mapping Displacement Pressure in Chicago. https://displacement-risk.housingstudies.org/.
[16] Voorhees Center Memo at 2, citing Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.
[17] *Texas Department of Housing & Community Affairs v. The Inclusive Communities Project, Inc.* 576 U.S. 519 (2015).

prevent the increase of segregation."[18] A failure to comply with this duty jeopardizes the City's receipt of federal funds.[19]

As recipients of federal dollars, the City of Chicago and CHA are also subject to Title VI of the Civil Rights Act of 1964 and are prohibited from discriminating on the basis of race, national origin, or color in any program or activity that receives federal funds or other federal financial assistance.

In making housing-related decisions, the City and CHA must consider the civil rights implications of their actions. They should therefore have evaluated the ongoing need for affordable housing on the Near West Side by considering market rents, vacancy rates, household incomes, rates of housing cost burden, and public and subsidized housing waiting lists. They must also consider, as part of their analysis, the supply of affordable rental housing in opportunity areas with easy access to public transportation, good jobs and schools, and high-quality healthcare. Finally, the City and CHA should have considered how their decisions will affect people of color, families with children, people with disabilities, and other protected classes.[20] On information and belief, the City failed to adequately consider any of these factors in its amendment to the Planned Development. Had they conducted the proper analysis, the City and CHA could not convey valuable public housing land to a private, for-profit professional soccer team.

To the extent that the City's plan for the land at ABLA has been motivated by CHA's and Related Midwest's failure to build in a timely manner the promised affordable replacement units at Roosevelt Square, the City should prioritize the creation of this affordable housing over a perceived need to make use of the land by leasing it to a soccer team. At a minimum, CHA should—as it has in other gentrifying neighborhoods, like those near the Cabrini and Lathrop developments—retain the land until development can occur.

Rather than conducting the proper analysis and taking the steps necessary to create desperately-needed affordable housing in a gentrifying neighborhood, the City and CHA have joined forces to lease to a soccer team valuable land that should have been reserved for public housing residents. In the process, they ignored the significant role they have played in making unavailable land designated for future public and affordable housing. CHA and the City repeatedly departed from normal policies and procedures to give this land to the Chicago Fire. For example, the City and CHA offered the Chicago Fire three potential sites for its soccer facility. Two of these sites, Madden Wells/Oakwood Shores and Taylor Homes/Legends South,

---

[18] *Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1134 (2nd Cir. 1973).

[19] *United States ex. Rel. Anti-Discrimination Center Inc. v. Westchester County*, 668 F. Supp. 2d 548, 569 (S.D.N.Y. 2009); *See generally* HUD's 2021 Interim Final Rule Restoring Affirmatively Furthering Fair Housing Definitions and Certifications *available at* https://public-inspection.federalregister.gov/2021-12114.pdf.

[20] See, e.g. *Access Living of Metropolitan Chicago v. City of Chicago*, No. 1:18-cv-03399 (N.D. Ill.) (challenging the City of Chicago's use of millions of dollars in federal funding on affordable housing development that is noncompliant with accessibility requirements under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Fair Housing Act).

are in racially-segregated, low-income communities with minimal potential for gentrification.[21] The presentation however attempted to obfuscate the growing diversity and increase in incomes for the ABLA community, making it appear as a high poverty, racially concentrated area of the City, rather than accurately showing its place within the Near West Side, as demonstrated by the Voorhees Center data. Not surprisingly, the Chicago Fire chose the site most likely to substantially increase in economic value. The City also departed from normal policy and practices on zoning matters by serving as the applicant for the Planned Development request.

In March 2022, the City of Chicago created talking points for a meeting with Related Midwest and the Chicago Fire detailing why the City should not be the applicant for the Planned Development amendment, including that this decision would violate internal guidance against the City applying for profit-generating developments.[22] Then, in May, after the Chicago Fire revived its advocacy for the City to serve as the applicant, the City changed its position, now stating that it "strongly believes" it can act as the applicant.[23] Among other things, this allowed the Chicago Fire to benefit from these zoning changes without submitting the requisite economic disclosure statement. When a journalist inquired about the anomaly, the City could not justify this as a usual practice, as the city is "rarely" the applicant in these circumstances, and had to draft talking points post-hoc.[24]

Once DPD agreed to be the applicant, DPD took over coordinating and facilitating all the internal review processes and deadlines throughout July, August, and September. This included setting internal deadlines for the private partners and asking other departments, such as CDOT and the Park District, to review the application quickly and sometimes in outdated forms while other revisions were in process, a benefit that other for-profit developers would be unlikely to obtain. DPD also allowed the private partners to break routine deadlines throughout, including working on planning decisions up to and after the Plan Commission required other applicants to have their presentations submitted for Commissioner review for the September meeting.[25]

The City's actions are consistent with its larger pattern and practice of refusing to build affordable housing in white or gentrifying communities. The City is already under investigation for a multitude of civil rights violations, including a pending HUD administrative complaint[26] which alleges that the City's longstanding policy and practice of "aldermanic prerogative" – whereby the City of Chicago delegates to the City's 50 aldermen and alderwomen ("aldermen") unfettered discretion and power over zoning, land use, city lots, and public financing, in order to decide where, if, and how affordable housing is built in their wards – discriminates by allowing

[21] University of Illinois at Chicago Natalie P. Voorhees Center for Neighborhood and Community Improvement. *The Gentrification Index: Socioeconomic Change of Chicago's Community Areas* (1970-2010), p. 19-20, *available at* https://voorheescenter.uic.edu/what-we-do/areas-of-research/gentrification-index/
[22] Correspondence attached as Exhibits C and D.
[23] Correspondence attached as Exhibits E and F.
[24] Correspondence attached as Exhibit G.
[25] Correspondence attached as Exhibit H (decisions outstanding on 9/12) and Exhibit I (requiring applicants to meet 9/8 deadlines for final submissions).
[26] *Chicago Area Fair Housing Alliance, et al. v. City of Chicago,* HUD Administrative Complaint (Nov. 2018).

aldermen to block affordable housing in white and gentrifying neighborhoods. Ald. Ervin exercised his "aldermanic prerogative" by approving the use of the ABLA land for a soccer training facility. This application is also oddly situated among City's claim that it lacks available land for affordable housing in predominantly white and gentrifying neighborhoods.

The City is also defending a federal lawsuit brought by Access Living of Metropolitan Chicago. It alleges that the City has funded and developed tens of thousands of affordable rental housing units (which, given the age of Chicago's existing rental housing stock, may be the only way to create accessible, affordable housing opportunities) without ensuring that a sufficient number are accessible to people with disabilities, as required by federal law.[27] The complaint alleges that "low-income people with disabilities struggle to find suitable housing and are often forced to live on the street, in their cars, nursing homes, in homeless shelters, or in other inadequate and dangerous housing."[28] Given this context and the specifics of the ABLA proposal, HUD should reject the civil rights certifications submitted as a part of the disposition application and deny the application.

## CHA's Application is Inconsistent with Its Representations

HUD should deny this disposition application because it is inconsistent with the information provided during the consultation process and to the public. These inconsistencies include but are not limited to the following:

- CHA's submission of HUD 52860A states that the method of disposition is a negotiated sale at Fair Market Value, rather than a negotiated lease at Fair Market Value. Throughout the application and consultation process, CHA has consistently referred to this disposition as a long-term lease, often describing it as a 40-year lease. Indeed, CHA's May 17, 2022 board resolution states that CHA will "execute a market rate commercial lease with the Chicago Fire Football Club or its designee." The July 13, 2022 HUD-7015.15 form's request for release of funds and certification further describes this as a "long-term lease of lands" involving a "long-term lease of approximately 25 acres" whereby CHA would receive $1,000,000 annually over the course of 40 years, plus a lump sum of $8,000,000, for a total of $48,000,000. The CHA then provides an appraisal report created by CBRE Valuation and Advisory Services for the purpose of estimating the "market rent" including the "leasehold value of the land; and fair market rent for the land." *CBRE Appraisal Report CHA Land – Chicago Fire Football Club Development*, p. 1.[29] Finally, throughout the meetings with community members and in public presentations to the City of Chicago Plan Commission, City of Chicago Committee on Zoning, Landmarks, and Building Standards, and the full City Council, CHA has consistently and repeatedly described this transaction as a long-term *lease,* not a sale. Thus, the application is clearly inconsistent with its representations during the

---

[27] *Access Living of Metro. Chi. v. City of Chicago,* 372 F. Supp. 3d 663 (motion to dismiss denied) (N.D. Ill. 2019).
[28] *Id.*
[29] As noted in footnote 1, CHA has refused to produce pages 3-12 of this report in response to a FOIA request so we are unable to analyze any additional inconsistencies that may be present.

consultation processes and internally inconsistent as a whole, and HUD should not approve it.

• Presuming that CHA did in fact intend to apply for a disposition for a long-term *lease* at fair market value, the May 17, 2022 board resolution contemplates that a discussion on the lease terms and the planning timeline for the rehabilitation of the Brooks Homes would take place at the September 2022 Board of Commissioners meeting. However, there is no agenda item indicating that such a discussion occurred at the July, September, or November 2022 Board of Commissioners meetings. Thus, to our knowledge, these lease terms, the rehabilitation timeline for the Brooks Homes, and the other concrete commensurate public benefits have never been discussed or approved by the CHA Board of Commissioners in a public forum, so the public has not had adequate opportunity to comment.

• The CHA states that this disposition meets the requirements outlined in 24 C.F.R. § 970.17. CHA attests that: (1) the disposition is in the best interests of the CHA and Residents and is consistent with the MTW Annual Plan, 1937 Act, and 24 C.F.R. 970.17(c), and (2) the disposition of the non-dwelling property is incidental to, or does not interfere with, the continued operation of the remainder of the development. The CHA cannot show that this plan is in the best interests of CHA and, more importantly, its residents. Nor can CHA demonstrate that this is incidental to the remainder of the development. As described above, the land subject to the disposition proposal is located in a rapidly gentrifying community and has been long intended for affordable housing, but now will be leased or sold to a wealthy, private sports team for a private facility. CHA is disposing of this valuable land, which was designated for public and affordable housing, in exchange for little commensurate public benefits (the development of a parking lot, capital for rehabilitation of Brooks Homes and Loomis Courts, and temporary contracting and programming opportunities for residents). The details of these commensurate public benefits have not fully been disclosed, made available for public comment, or contained within an enforceable Community Benefits Agreement.

• None of the reported benefits will increase the supply of affordable housing in opportunity or gentrifying neighborhoods. CHA may actually be able to cover the cost of providing the meager resources that have been exchanged. Furthermore, it may already be obligated to, for example, rehabilitate Brooks and Loomis Homes or ensure that construction employment opportunities are provided to public housing residents pursuant to Section 3. CHA's FY 2023 budget totals $1.195 billion, with a capital fund budget of more than $190 million.[30] In 2017, CHA was accused of stockpiling more than $370 million in cash reserves, as families languished for decades on the CHA's waitlists.[31] Based upon this information, HUD should determine whether CHA's representations that

---

[30] Chicago Housing Authority, FY 2023 Comprehensive Annual Budget, https://www.thecha.org/about/plans-reports-and-policies/cha-budget-and-financial-reports (last visited Dec. 11, 2022).

[31] *Chicago Housing Authority stockpiles cash, pays debts as families languish on waitlists*, Chicago Tribune, Jan. 13, 2017, https://www.chicagotribune.com/news/breaking/ct-cha-finances-report-met-20170112-story.html

it could not rehabilitate Brooks and Loomis, provide a parking lot to a nearby senior development, or construction jobs to public housing tenants are in fact true.

•     This disposition likewise fails to address the ongoing needs for (1) affordable housing in opportunity and gentrifying areas in Chicago, and (2) replacement housing for current and former CHA residents and waitlist households in the ABLA community. Offloading more than half of the remaining land available for redevelopment to a wealthy soccer owner for a private facility does not directly or indirectly benefit these families. The approved amendments to the Planned Development, discussed above, only directly addressed or facilitated the Chicago Fire's desire for recreational and office space in the primary vacant land at the site. The Plan Commission, Committee on Zoning, Landmarks, and Building Standards, and City Council did not consider or approve any of the amendments necessary for the replacement housing to be built within the remaining, more limited footprint. All three bodies will need to approve further plans and amendments before CHA and Related can start to build the remaining 450 public housing units, as well as the committed to affordable and market rate units. The bifurcation of these timelines casts doubt on CHA's commitment to and prioritization of residential housing–and concerned even City employees moving the Chicago Fire proposal forward.[32] The City, CHA, and its partners included some high-level updates to the Master Plan for Roosevelt Square in their presentations to community partners and the City Council, but only formally pushed forward the amendments to enable the soccer facility with none of the necessary amendments for the residential units and without making public statements about the number of units the remaining vacant land can or will accommodate. HUD cannot approve the disposition of half of the remaining land when the proposal for replacement housing is tenuous at best. This amount of land is clearly not incidental to the operation of the remainder of the development when there are outstanding questions about how and where CHA will increase density and if and when the necessary City bodies will approve the requisite rezoning.

•     The disposition application does not accurately explain how this proposal was developed. The CHA Board resolution attached to the application states that "the Fire approached CHA regarding redevelopment of approximately 25 acres of vacant land…".[33] In 2021, the Chicago Fire was in negotiations with the Chicago Public Schools to build its facility on vacant CPS park land in Chicago's Belmont Cragin neighborhood.[34] Faced with community opposition, the plan to build the facility there was scrapped. Then, on October 28, 2021, the Mayor's Office, the City's Department of Planning & Development, and the Chicago Housing Authority came together to present the Chicago Fire with three potential CHA sites for a soccer training facility. As described above, the Chicago Fire selected ABLA/Roosevelt Square.

---

[32] Correspondence attached as Exhibit J.

[33] *CHA May 17, 2022 Board Letter regarding Agenda #10*, p. 2.

[34] Alex V. Hernandez, *Belmont Cragin Neighbors Blast Chicago Fire's Plan for New Hanson Park Facility: 'Where Are We Supposed to Play?'* BLOCK CLUB CHICAGO (June 11, 2021), *available at* https://blockclubchicago.org/2021/06/11/belmont-cragin-neighbors-blast-chicago-fires-plan-for-new-hanson-park-facility-where-are-we-supposed-to-play/

Taken together, these inconsistencies, deficiencies, and violations of civil rights laws require HUD to deny the disposition application. Please let us know if we can be of any further assistance. Please contact Emily Coffey at (312) 888-4195 if you require any additional information.

Sincerely,

Emily Coffey
MacKenzie Speer
**Chicago Lawyers' Committee for Civil Rights**

Lawrence Wood
Dan Schneider
Brigid Carmichael
**Legal Action Chicago**

Kate Walz
Lauren Song
**National Housing Law Project**


cc: Lon Melteson, HUD Region V – Fair Housing and Equal Opportunity
    Yana Karnaukov, HUD Region V – Fair Housing and Equal Opportunity

11



October 12, 2022

Re: Chicago Fire Performance Centre Proposed Development

## About the Natalie P. Voorhees Center for Neighborhood and Community Improvement

The Nathalie P. Voorhees Center for Neighborhood and Community Improvement (Voorhees Center) is a research and technical assistance unit in the College of Urban Planning and Public Affairs (CUPPA) at the University of Illinois at Chicago (UIC). Guided by the mission to improve the quality of life for all residents, the Center works in collaboration with faculty and graduate students in developing grounded research to support the revitalization of communities. The center is committed to problem solving within a context that is participatory, and in partnership with community groups, residents, government entities, and other stakeholders: its engagement with community partners empowers organizations with knowledge and information to advocate for policies and to promote development efforts, while its work with government provides data and analysis to inform policy decisions and help improve the way government does business with communities.

## Overview

As part of its Plan for Transformation (PFT), the Chicago Housing Authority committed to build 775 public housing replacement units on the ABLA footprint as part of a mixed income development called Roosevelt Square – as well as retaining and renovating the Brooks Homes and Loomis Courts. Nearly 23 years later, Related Midwest and the CHA have delivered only 245 of the 775 promised public housing units – little more than one third. In 2016, a new master plan was approved for Roosevelt Square, maintaining the primary use as residential with up to 175,000 sq. ft. of retail, commercial, and civic uses. Based on the master plan, the majority of the land now proposed for disposition and lease to the Chicago Fire soccer team remained zoned residential. The plan called for mixed-use development along Ashland Avenue and along Taylor Street in phases three and four.

In 2021, the City of Chicago and the CHA approved the next phase of development that will include 80 public housing units; when completed, this will bring the number of delivered replacement public housing units to 325. With another 450 public housing units required to meet the 2016 PFT master plan, with an additional 1650 affordable and market rate units needed to fully build out the proposed Roosevelt Square mixed-income community, it is imperative that the largest remaining parcel (24.2 acres) be preserved for much needed public and affordable housing.

While land dispositions by the CHA have become common practice in Chicago at mixed-income redevelopments that are part of the PFT, they are primarily being used on the South Side of Chicago in largely African American neighborhoods that have historically been disinvested and are having slower recovery of the housing market post-recession, such as Grand Boulevard and Washington Park. Due to slow market recovery, rebuilding efforts over the past 15 years have slowed and the CHA has used its land for government or commercial facilities such as a non-profit tennis academy, charter schools, police station, medical facilities, movie production space, and supermarket.[1] The Chicago Fire Performance Centre proposal on 24.2-acres of undeveloped land with current plans as recent as 2021 for affordable housing in a community that is seeing significant neighborhood reinvestment resulting in gentrification and displacement is a significant shift in CHA and City of Chicago policy.

According to the Institute for Housing Studies' Displacement Risk Index, the Near West Side, which includes Roosevelt Square, is considered to be at moderate to high risk of displacement.[2] Roosevelt Square is located within Chicago's Near West Side neighborhood, which is experiencing rapid gentrification. To the north are University Village, Little Italy, and the University of Illinois Chicago (UIC) campus. To the northwest are the Illinois Medical District and Tri-Taylor neighborhood.  Immediately to the east of the Brooks Homes and Loomis Courts buildings is University Village, a 930-unit residential development with 120,000 square feet of retail space. Further east is the "The 78," a 62-acre mixed-use development that will include a major innovation hub, the Discovery Partners Institute (DPI). To the south is one of Chicago's most rapidly gentrifying neighborhoods – Pilsen, located in the Lower West Side community.[3] With substantial ongoing public and private investment, access to jobs, healthcare, retail, and universities near the Chicago business district, Roosevelt Square is poised to become one of the fastest growing and most coveted communities in Chicago. Given, the potential for redevelopment that is mixed-income, mixed-use, now is the opportune time to build affordable housing that will accommodate former ABLA and existing residents to mitigate displacement. Creating site-based affordable housing in high opportunity communities such as Roosevelt Square on the proposed 24.2 acres is critical for the CHA and City to meet its obligations and uphold the "promise" of the PFT.

## Roosevelt Square and the larger Near West Side – Demographics and Economic and Housing Market Characteristics

The 137 acres of the Roosevelt Square site are part of a larger community.  To understand the demographic, economic, and housing market characteristics of Roosevelt Square and the overall Near West Side, we mapped eight indicators using ArcGIS software.  Examining both

---

[1] Dumke, M. (2022). This land was promised for housing. Instead it's going to a pro soccer team owned by a billionaire. Propublica. https://www.propublica.org/article/chicago-housing-abla-fire-soccer-cha.
[2] Institute for Housing Studies at DePaul University. (2019). Mapping Displacement Pressure in Chicago. https://displacement-risk.housingstudies.org/.
[3] Betancur, J., and Kim, Y. (2016). Impact of ongoing gentrification in Pilsen. Natalie P. Voorhees Center for Neighborhood and Community Improvement.

2

Roosevelt Square and the broader Near West Side neighborhood that includes it underscores that the area is undergoing significant change.

**Racial Diversity.** Roosevelt Square and the overall Near West Side have both seen a steady increase in racial diversity over the past 20 years with public and private investments, including the PFT, leading to shifts in racial makeup. The racial diversity within Roosevelt Square – a site that remains largely undeveloped and lightly populated – is currently in stark contrast to the larger Near West Side neighborhood (See Table 2). But given the site's proximity to several neighborhoods experiencing rapid gentrification and displacement, this is likely to change.

**Table 2:** Roosevelt Square and Near West Side Demographics

| Demographic Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---|---|---|
| Hispanic / Latino/a/x | 12.2% | 17.1% | 33.4 |
| White Alone | 20.9% | 44% | 71.2 |
| Black or African American Alone | 53.8% | 19.6% | -93.2 |
| AAPI Alone | 9.4% | 15% | 45.9 |
| Other or Multiple Races | 3.8% | 4.4% | 14.6 |

According to the 2020 American Community Survey data from the U.S. census, while African Americans comprise 53.8% of Roosevelt Square, they represent only 19.6% of the entire Near West Side. This represents a -93.2% difference in the African American population. Whites make up only 20.9% of the population at Roosevelt Square, versus 44% on the Near West Side, representing a 71.2% difference. Likewise, there are fewer Latino (12.2%), AAPI (9.4%), and Other or Multiple Races (3.8%) residing within the Roosevelt Square boundaries compared to the Near West Side. Overall, racial diversity is more prevalent within the Near West Side compared to Roosevelt Square. (See Figure 1).

**Figure 1:** Race by Block Group: Roosevelt Square and Near West Side, 2020



Race by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

**Economic Conditions.** Roosevelt Square and the Near West Side have comparable employment rates, however there are significant differences in median household income and poverty rates. The median household income in Roosevelt Square is significantly lower compared to the Near West Side, which is also reflected in greater poverty rates in Roosevelt Square compared to the Near West Side. Overall, the Near West Side has greater affluence and less poverty than Roosevelt Square. (See Table 3).

**Table 3:** Roosevelt Square and Near West Side Economic Indicators

| Economic Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---|---|---|
| Median Income | $ 42,177 | $ 76,554 | 57.9 |
| Employed | 93.1% | 94% | 1.0 |
| Unemployed | 6.9% | 6% | -14.0 |
| Poverty | 34.2% | 16.3% | -70.9 |

4

According to the 2020 American Community Survey data from the U.S. census, households in Roosevelt Square had a median household income of $42,177 versus $76,554 in the larger community area. Median household income on the Near West Side is 57.9% greater than households currently living in Roosevelt Square. Residents employed in Roosevelt Square and the Near West Side are similar at 93.1% and 94% respectively. However, there is a significant difference in the poverty rate, with Roosevelt Square having a poverty rate of 34.2% and the Near West Side having a much lower poverty rate of 16.3%, representing a difference of -70.9%. (See Figures 2-4). The highest concentration of medium household income are to the north and east of Roosevelt Square.

**Figure 2:** Median Income by Block Group: Roosevelt Square and Near West Side, 2020



Median Income by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

5

**Figure 3:** Unemployment by Block Group: Roosevelt Square and Near West Side, 2020



Percent Unemployed by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

**Figure 4:** Poverty by Block Group: Roosevelt Square and Near West Side, 2020



Percent Poverty by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

**Housing Market.** Overall, both Roosevelt Square and the Near West Side are predominantly renter occupied neighborhoods, however median gross rent is significantly higher within the Near West Side neighborhood (37.6%) compared to Roosevelt Square (See Table 4). Also, median home values are similar at $384,000, which indicate according to the City of Chicago ARO Zone Map (See Figure 5) that these areas are high opportunity areas for inclusionary affordable housing. According to the City of Chicago, there is a shortage of 120,000 affordable housing units in Chicago.[4] In combination with permanent public housing, Roosevelt Square shows potential for the CHA to take advantage of High Income Zones to deliver necessary affordable housing.

---

[4] Rockett, D. (2021). Chicago 120,000 units short on affordable housing: Here's how the City and developers hope to fix that gap. Chicago Tribune. https://www.chicagotribune.com/real-estate/ct-re-affordable-housing-in-chicago-0409-20210412-tzcbnjsslbdoxmnwdo27h7lehi-story.html

**Table 4:** Roosevelt Square and Near West Side Housing Market Indicators

| Housing Indicators | Roosevelt Square site | Near West Side overall | % Difference |
|---|---|---|---|
| Owner Occupied | 28.1% | 40.4% | 35.9 |
| Renter Occupied | 71.9% | 59.6% | -18.7 |
| Median Gross Rent | $ 1,034 | $ 1,513 | 37.6 |
| Median Home Value | $ 384,900 | $ 384,300 | -0.2 |

8

**Figure 5:** City of Chicago ARO Zone Map



According to the 2020 American Community Survey data from the U.S. census, Roosevelt
Square is predominantly renter occupied (71.9%) compared to an owner occupancy rate of
28.1%. The Near West Side also has a predominant renter population (59.6%) compared to
40.4% owner occupied housing units. This reflects an -18.7% difference in renter occupied units
on the Near West Side compared to Roosevelt Square. Median gross rents are much lower in
Roosevelt Square ($1,034) compared to the Near West Side ($1,513). Median home values are
almost the same in both Roosevelt Square and the Near West Side at approximately ($384,000).
(See Figures 6-8). The highest concentration of rents > $2,500 and home values greater than
$500,00 are to the north of Roosevelt Square.

**Figure 6:** Owner-Occupied Housing by Block Group: Roosevelt Square and Near West Side, 2020

Percent Homeowner by Block Group: Roosevelt Square and Near West
Side, Chicago, 2020



10

**Figure 7:** Median Gross Rent by Block Group: Roosevelt Square and Near West Side, 2020



Median Gross Rent by Block Group: Roosevelt Square and Near West Side, Chicago, 2020

11

**Figure 8:** Median Home Value by Block Group: Roosevelt Square and Near West Side, 2020



Median Home Value by Block Group: Roosevelt Square and Near West Side, Chicago, 2020



Yittayih Zelalem, Director and Research Associate Professor
April Jackson, Ph.D, Associate Professor and Research Affiliate

Natalie P. Voorhees Center for Neighborhood and Community Improvement
College of Urban Planning and Public Affairs
412 S. Peoria Street, Suite 400
Chicago, IL 60607

12

Exhibit B



Chicago Fire Facility-Opportunity Sites

Mayor's Office Working Group

10/28/2021

DPD
Department of Planning
and Development

10/28/2021

# CHA Parcels Under Consideration

- Addams-Meddill Park, ABLA/Roosevelt Square

- Oakwood Shores (Former Madden Wells)

- Legends South (Former Robert Taylor)





DPD
Department of Planning
and Development

# ABLA/Roosevelt Square – Opportunity Site

## Site Details
- Near West Side CCA
- 28th Ward – Ald. Ervin
- 28.5 acres of CHA, potential for 33.5 if CHA-owned community building/ storage is replaced

## Demographics
(Census Tract)

Race & Ethnicity (2020)
- 65.7% Black
- 14.4% Hispanic
- 14.4% White
- 2.6% Multi-racial
- 2.5% Asian

Median HH Income (2019)
- $17,100

Population Trend (2010-20)
- 5.9% growth




