UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO HOUSING INITIATIVE; COALITION TO PROTECT CHICAGO HOUSING AUTHORITY LAND; and LUGENIA BURNS HOPE CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; MARCIA FUDGE, in her Official Capacity as Secretary of HUD; and CHICAGO HOUSING AUTHORITY, an Illinois Municipal Corporation, <br><br> Defendants. | No. 23 C 03476 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

The United States Department of Housing and Urban Development ("HUD") approved the Chicago Housing Authority's ("CHA's") application to lease a vacant lot designated for public housing to the Chicago Fire Football Club (the "Fire"), a professional soccer team, for the development of a new practice and performance facility. According to Plaintiffs, the Chicago Housing Initiative ("CHI"), the Lugenia Burns Hope Center ("Hope Center"), and the Coalition to Protect Chicago Housing Authority Land ("the Coalition"), HUD's approval of the lease without the completion of a civil rights review violated the Administrative Procedure Act, the Fair Housing Act, and the Rehabilitation Act. Plaintiffs filed a motion for a temporary restraining order ("TRO") and/or preliminary injunction ("PI") that seeks to enjoin CHA and HUD

1

from taking any further steps to dispose of or develop the land until this case is resolved, because they argue low-income families will permanently lose land designated for public housing if construction on the Facility begins. R. 7. Defendants responded and argued in part that Plaintiffs lacked standing. While this Court was considering Plaintiff's motion, Defendants also filed motions to dismiss for failure to state a claim and lack of standing. R. 51, 55. For the reasons explained below, Plaintiff's motion for a TRO/PI is denied and Defendants' motions to dismiss are granted because Plaintiffs lack standing to bring this case and seek injunctive relief.

## Background[1]

This case centers on a 23-acre portion of a 67-acre vacant lot in the "Roosevelt Square" neighborhood of Chicago that at one time was the site of various public housing developments, including the Abbot Apartments, Brooks Homes, Loomis Courts, Jane Addams Homes, and Jones Senior Apartments ("the ABLA lot"). R. 1 ¶¶ 4, 60. Some of these developments were demolished in the early 2000s, and much of the land has since remained vacant. *Id.* Up to at least 2016, the CHA's plans have envisioned the ABLA lot being used in part for residential housing and mixed-use development. R. 1 ¶¶ 45–48, 60, 64.

There is a pressing need for affordable housing in Chicago that disproportionately affects racial minorities and those with disabilities. Smith Decl., R. 11 ¶ 3. Indeed, there are over 200,000 households on the CHA's waiting list for public housing. R. 17 at 3. The Roosevelt Square neighborhood is a rapidly gentrifying

---

[1] All facts in the Complaint are assumed to be true for the purposes of this opinion.

2

area, with close proximity to Chicago's urban center and easy access to well-paying jobs, community resources, parks, education, transportation, and shopping. R. 1 ¶¶ 6–9. It is thus considered an "opportunity area" by the CHA. *Id.* ¶¶ 60–61.

In October 2021, the Mayor's Office, the CHA, and the Chicago Department of Planning and Development offered three potential sites to the Fire for a training facility, one of which was the ABLA lot. *Id.* ¶ 70. CHI and the Hope Center were made aware of a deal to offer the ABLA land to the Fire via a long-term lease in January 2022. *Id.* ¶ 73. They formed the Coalition in opposition to the proposed land deal and started organizing community members; testifying in opposition at CHA and City of Chicago (the "City") hearings; reaching out to politicians; engaging the press; protesting; filing Freedom of Information Act requests; and sending letters to Defendants. Washington Decl., R. 9 ¶¶ 15–36; Wilson Decl., R. 10 ¶¶ 15–22. Nonetheless, the City Council Zoning Committee and City Council voted to approve the application for the development filed by the CHA on behalf of the Fire. R. 1 ¶¶ 76, 81–83.

The CHA then submitted a disposition application to HUD, seeking approval of the disposition of land designated for public housing via a long-term lease (up to 60 years) to the Fire. *Id.* ¶ 86. The application detailed that the CHA planned to use the $23 million in lease payments during the first 20 years of the lease to rehabilitate other public housing developments, including the remaining housing developments on the ABLA land. *Id.* It also informed HUD that the Fire would agree to pay the CHA $8 million, in addition to its regular rent payments, for the CHA to improve and

3

develop its properties. *Id.*; R. 1-1 at 161. The CHA additionally certified that it complied with relevant housing laws and would honor its replacement housing obligations at the ABLA lot or within half a mile of the site. R. 1 ¶¶ 86, 90.

Plaintiffs wrote multiple letters to HUD explaining their concerns that the disposition of the land would affect access to affordable housing and highlighting perceived inconsistencies in the CHA's application. R. 1 ¶¶ 91, 97, 101; R. 1-1 at 214–21, 293–312. In apparent response to the concerns raised by Plaintiffs, HUD's Office of Fair Housing and Equal Opportunity ("FHEO") requested further information from the CHA regarding the civil rights impacts of the ABLA land lease. R. 1 ¶¶ 103–09. In its responses to HUD's inquiries, the CHA advised that zoning changes approved by the City allowed it to develop the same number of government-assisted housing units planned for the ABLA area on adjacent lots. *Id.*; Isaacs Decl., R. 35-2 ¶¶ 19–20; The FHEO did not, however, conduct a full civil rights review. *Id.*

On March 6, 2023, HUD approved the CHA's application. R. 1 ¶ 111. The Fire then signed the lease agreement with the CHA. *Id.* On April 25, 2023, the Mayor's Office, the CHA, and the Fire broke ground on the facility. *Id.* ¶ 119. Yet, the last step of HUD's approval—the release of the declaration of trust—has not occurred. *Id.* ¶ 120; R. 61 at 7. This "ministerial act" by HUD releases the property from regulatory requirements but apparently does not otherwise impact the lease or construction on the site. Horstein Decl., R. 35-1 ¶ 28. In the meantime, environmental remediation work on the site is ongoing. R. 61 at 48–49. On June 1, 2023, Plaintiffs filed their Complaint in this case, as well as their motion for a TRO/PI, requesting an injunction

4

on all further construction development at the site and the release of the declaration of trust. R. 1, 7. Plaintiffs allege they are injured because Defendants' actions frustrated their mission and that their members "will be deprived of land dedicated for future housing development in an opportunity community." R. 1 ¶ 128.

## Discussion

As a threshold issue, Defendants argue that Plaintiffs do not have standing to seek the relief they request. Questions of standing originate from the case-or-controversy requirement of Article III of the United States Constitution. *Wernsing v. Thompson*, 423 F.3d 732, 743 (7th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). These three elements are the "core of Article III," and the plaintiff "bears the burden of establishing [their] existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (A plaintiff seeking injunctive relief bears the "burden to demonstrate standing."). Specifically, to seek prospective injunctive relief, the plaintiff must show a "'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017).

Plaintiffs rely on two theories of standing—representative (or associational) standing and direct standing—to assert their claims. However, neither are sufficient

5

to seek injunctive relief, and indeed, to assert their claims at all. Therefore, the Court need not address the substance of Plaintiffs' motion for TRO/PI, and instead grants Defendants' motions to dismiss for lack of subject matter jurisdiction. *Simic*, 851 F.3d at 738 ("issues of subject matter jurisdiction are always on the table in federal courts") (affirming denial of preliminary injunction and directing district court to dismiss action for lack of subject matter jurisdiction); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 744 (7th Cir. 2007) (refusing to "reach the merits of . . . or express an opinion on" the plaintiff's request for a preliminary injunction because the plaintiff organization lacked standing).

### I. Representative Standing

First, Plaintiffs argue that they have representative standing on behalf of their members. An organization "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs claim their members have standing to sue in their own right because they will be harmed by the loss of land that was designated for affordable housing. But this injury is neither concrete and particularized to Plaintiff's members, nor actual and imminent. Plaintiffs do not point to a single member of their organizations

who has been injured by Defendants' conduct. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1009 (7th Cir. 2021) ("[S]tanding for at least one individual member remains an essential component of associational standing."). They do not claim that any of their members live on the ABLA lot leased to the Fire—and nor could they, because the land has been vacant for over 20 years and no housing units will be displaced as a result of HUD's actions. The Complaint does not state that any members of Plaintiffs' organizations were relying on a current promise of housing at the ABLA site—and nor could they, because the CHA had no immediate plans for development on the site. Indeed, the disposition of the land did not (and could not) immediately affect or reduce the number or availability of government-assisted housing in the area. And there is no substantial probability that Plaintiffs' members would have obtained housing on the ABLA site absent the lease. *Warth v. Seldin*, 422 U.S. 490, 504 (1975) (finding plaintiffs lacked standing to challenge zoning practices as making it more difficult to find affordable housing where the plaintiffs did not allege that, absent those practices, they could obtain housing); *Hope, Inc. v. DuPage Cty., Ill.*, 738 F.2d 797, 807 (7th Cir. 1984) (plaintiffs lacked standing where they alleged exclusionary housing practices prevented construction of affordable housing) ("[T]here have been no allegations nor proof offered . . . establishing that a single proposed project for [affordable] housing was in any way impeded, much less denied.").

Even assuming there was a concrete injury, a decision in Plaintiffs' favor would not satisfy the redressability prong. First, the Court cannot force the CHA to fulfill

7

its prior plans to develop more housing units on ABLA land. A decision in Plaintiffs' favor would therefore not necessarily address their supposed injury—loss of potential affordable housing units. Second, HUD's approval of the lease referenced that the City has permitted higher-density residential development in the areas surrounding the site, and the CHA has committed to developing the same number of previously promised units in the Roosevelt Square area—just not on the leased portion of the land. *See* R. 1-4 at 2. This means that Plaintiffs need a reason that the disposition of this *particular* property is injurious—otherwise, future alternative housing options in the area redress their concerns. Finally, CHA has promised that it will use the money earned on the Fire lease to renovate and upgrade existing public housing, which it argues will then free up funds to pursue development of further housing units in the area, increasing the amount of public housing in Chicago. True, the Court cannot be certain that CHA will fulfill its promises. But that is the point. The potential of harm or benefit here is entirely speculative. Speculation cannot establish standing.

In short, Plaintiffs' belief that hypothetical housing units might have been built in the future on the ABLA land in which its members might have lived, and which might or might not now be lost, is far too speculative to confer representational standing by Plaintiffs on behalf of their members.

## II. Direct Standing

Plaintiffs also argue that they have standing to bring suit on their own behalf. An organization has standing to sue if it alleges that the defendant's actions caused

8

a concrete injury to the organization such as a "drain on the organization's resources," rather than merely "a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 609 (7th Cir. 2020). An organization's philosophical objection to an espoused policy is insufficient to confer standing without tying it to a concrete example of mission frustration or resource depletion. *See Havens Realty*, 455 U.S. at 378-79 (describing how an "impair[ment] [to] HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers" constituted an injury-in-fact while "a setback to the organization's abstract social interests" was not); *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Plaintiffs argue that Defendants' conduct frustrated Plaintiffs' missions to increase affordable housing in Chicago and caused them to divert resources (allegedly $120,000) from other activities to advocate against the ABLA land lease.

Plaintiffs argue that their injuries are like those suffered by the organizations in *Havens Realty*, 455 U.S. 363, and *Common Cause*, 937 F.3d 944. In *Havens Realty*, a fair housing organization alleged injury based on expending resources to investigate and alleviate the effects of a realty company's discriminatory racial steering practices suffered by the organization's clients. 455 U.S. at 369. The organization's mission of assisting clients with obtaining fair, affordable housing was therefore frustrated. *Id.* The Supreme Court held that this was sufficient to confer standing because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply

9

a setback to the organization's abstract social interests." *Id.* at 379. And in *Common Cause*, voters' rights organizations had standing to challenge a state law that purported to clean the voter rolls because the organizations expected to divert time and funds to alleviating the effects of the law, such as dispelling voter confusion, helping those whose voter registrations were erroneously removed, and assisting those with issues at the polling place. 937 F.3d at 952–56.

As described in the previous section, it is unclear how the Fire lease could have frustrated Plaintiffs' mission of increasing its members' access to affordable housing, since no affordable housing units were lost, nor their development thwarted by the lease. In a similar case, a housing organization did not have standing where it claimed to have diverted resources to advocate on behalf of individuals who did not themselves allege "a housing deprivation or discrimination." *H.O.P.E., Inc. v. Eden Mgmt. LLC*, 128 F. Supp. 3d 1066, 1079 (N.D. Ill. 2015) ("It certainly would be curious if the court found [the housing organization] demonstrated injury in fact for engaging in advocacy and investigation of the State Defendants' conduct towards [individuals] while simultaneously finding that [the individuals] themselves fail to identify any State conduct that harmed them." (cleaned up)).

Fatal to Plaintiffs' claim here is that they do not allege an injury that is meaningfully different from their general advocacy for public housing. They do not allege, for example, that it is now more difficult to counsel their members or help their members apply for affordable housing as a result of the Fire lease, like the organization in *Havens Realty*. Nor do they allege that they must now expend

10

resources to alleviate the negative effects of the Fire lease on their members, like the organizations in *Common Cause*. At most, Plaintiffs establish only that they worked to inform individuals about the lease, coordinated meetings, townhalls, and demonstrations, and wrote letters to Defendants outlining their organizations' concerns with the proposal. R. 10 at 719; R. 9 at 711. But again, these actions were not taken in response to an impending actual loss of affordable housing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"). And although these are typical activities undertaken by an advocacy organization in opposition to some governmental policy or action, mere advocacy work against that policy or action, without more, does not create an actual injury. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982) ("[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy."); *Sierra Club*, 405 U.S. at 735 (The Sierra Club's advocacy interest in protecting land from a Disney development could not confer standing because it did not allege that it or its members used the land at issue "for any purpose, [or] that they use[d] it in any way that would be significantly affected by the proposed actions of the respondents."). And though Plaintiffs' campaign to stop the Fire lease was unsuccessful, this too does not create an actionable injury for standing purposes. *Havens*, 455 U.S. at 379 (noting that standing is not established by "a setback to the organization's abstract social interests"); *Keep Chi. Livable*, 913 F.3d at 623–25 (plaintiffs must tether the

11

challenged actions to a specific harm to the organization, and interference with advocacy goals does not confer standing). Because Plaintiffs do not allege expenditures that are meaningfully distinct from their advocacy for public housing generally, they cannot demonstrate an injury-in-fact.[2]

Moreover, Plaintiffs stated that, for purposes of their request for prospective injunctive relief, their "ongoing injury" is the legal fees they are expending to prosecute this very lawsuit. R. 61 at 9–10. The expenditure of legal fees in the case at hand cannot establish standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."). Plaintiffs would create an end-run around the injury-in-fact requirement if entities could manufacture standing by asserting their interests are consonant with pursuing their claim. *Sierra Club*, 405 U.S. at 739 ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved.'").

Finally, Plaintiffs again fail to establish their injuries are redressable by a decision in their favor. Here, Plaintiffs do not allege that, if HUD were to conduct a

---

[2] Plaintiffs CHI and the Hope Center argue that they re-routed funds to create the Coalition, which was created in response to (and to advocate against) the Fire lease. The Coalition itself, then, could not have rerouted funds because it was founded to expend resources on this very issue. *Common Cause*, 937 F.3d at 955 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)) (Organizations "cannot convert [ ] ordinary program costs into an injury in fact.").

civil rights review as they request, HUD would withdraw its approval of the lease.[3] Specifically, Plaintiffs do not allege that a civil rights review would prevent the Fire development or increase the availability of affordable housing. Therefore, Plaintiffs have not shown that any injury would be redressed by a favorable outcome. *See Lujan*, 504 U.S. at 561 (holding that plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."). In the end, Plaintiffs' objections stem from a philosophical difference—rather than a legal injury—as to how CHA manages its vacant land.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a temporary restraining order or preliminary injunction, R. 7, is denied, and Defendants' motions to dismiss, R. 51, 55, are granted. This case is dismissed without prejudice because Plaintiffs lack Article III standing to challenge HUD's approval of the Chicago Fire lease in the first instance.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: October 20, 2023

---

[3] HUD alleges that it did conduct an informal civil rights review when it considered the concerns raised by Plaintiffs in their letters and requested additional information from the CHA.

13